```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF INDIANA
 2                       HAMMOND DIVISION

 3     UNITED STATES OF AMERICA        ) Cause No.:
                                       ) 2:14-CR-129
 4          vs.                        )
                                       )
 5     ETHEL SHELTON and ALEX WHEELER, ) Hammond, Indiana
                                       ) April 12, 2018
 6          Defendants.                )

 7
                             VOLUME 9
 8                    TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE JOSEPH S. VAN BOKKELEN
 9                 UNITED STATES DISTRICT JUDGE

10     APPEARANCES:

11     For the Government:    MARIA N. LERNER and
                              ABIZER ZANZI
12                            ASSISTANT UNITED STATES ATTORNEY
                              UNITED STATES ATTORNEY'S OFFICE
13                            5400 Federal Plaza, Suite 1500
                              Hammond, Indiana  46320
14                            (219) 937-5500

15     For the Defendant,     ANDREA E. GAMBINO
       Ethel Shelton:         LAW OFFICES OF ANDREA E. GAMBINO
16                            53 W. Jackson Boulevard, Suite 224
                              Chicago, Illinois  60601
17                            (312) 322-0014
                              agambinolaw@gmail.com
18
       For the Defendant,     LARRY W. ROGERS
19     Alex Wheeler:          ROGERS LAW OFFICE
                              2801 Bertholet Boulevard, Suite 301
20                            Valparaiso, Indiana 46383
                              (219) 476-0443
21                            lwrogerslawoffice@gmail.com

22

23

24     Proceedings reported by stenotype.  Transcript produced by
       computer-aided transcription.
25
```

```
 1                    INDEX OF WITNESSES

 2   FOR DEFENDANT, ETHEL SHELTON                    PAGE

 3   ETHEL SHELTON
     Further Redirect Examination by Ms. Gambino     28
 4   Further Recross-examination by Ms. Lerner       32
     Further Redirect Examination by Ms. Gambino     38
 5
     DEFENDANT, ETHEL SHELTON, RESTS                 39
 6
     DEFENDANT, ALEX WHEELER, RESTS                  39
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (The following proceedings were held in open court,

 2           commencing at 9:04 a.m., reported as follows:)

 3      (Call to Order of the Court.)

 4           THE COURT:  You can all seated.

 5           Ms. Shelton, how are you feeling today?

 6      DEFENDANT SHELTON:  I feel great.

 7           THE COURT:  Ready to go forward?

 8      DEFENDANT SHELTON:  Yes, Your Honor.

 9           THE COURT:  Mr. Wheeler, I ask you the same

10  question:  How are you feeling today?

11      DEFENDANT WHEELER:  Fine, Your Honor.

12           THE COURT:  Are you ready to go forward?

13      DEFENDANT WHEELER:  Yes, Your Honor.

14           THE COURT:  Government ready for the jury to be

15  brought in?

16      MS. LERNER:  Yes, Your Honor.

17           THE COURT:  Defendant ready for the jury?

18      MS. GAMBINO:  Yes, Your Honor.

19           THE COURT:  Okay.  Bring the jury in.

20      MS. GAMBINO:  You want Ms. Shelton back in the

21  chair?

22           THE COURT:  Yes.  Thanks for reminding me of that.

23           Remember, you're still under oath.

24      DEFENDANT SHELTON:  Yes, Your Honor.

25           THE COURT:  Okay.
```

```
 1        (Jury in at 9:06 a.m.)

 2            THE COURT:  You can be seated.

 3            First thing, good morning.  It's a wonderful day in

 4   the Region.

 5            Ready?

 6            MS. GAMBINO:  Yes, Your Honor.  The defense passes

 7   this witness to the jury.

 8            THE COURT:  Okay.  Do the jurors have any questions?

 9        (Questions tendered to the Court.)

10            THE COURT:  Counsel, approach the bench.

11        (Bench conference.)

12            THE COURT:  There's a lot of them.  I'll start this

13   way.  Some are on the backside.

14            MS. LERNER:  We have no objection to these.  All

15   these are fine with us.

16            THE COURT:  There are some of these that clearly

17   can't be asked, but you might see what the jury's thinking.

18            MS. GAMBINO:  This one, I think, requires a

19   preliminary question because it presumes that she did.

20            THE COURT:  Right.  We'll go each one of them down.

21            MS. GAMBINO:  Okay.

22            THE COURT:  I'm just handing them for you to look at

23   them right now.

24            MS. LERNER:  No objection.

25            Your Honor, one quick point.  We didn't get a chance
```

1    to cross on the points that Mr. Rogers raised.  I understand

2    that Ms. Gambino had no redirect, but Mr. Rogers raised some

3    points that we were hoping to ask the witness about.

4         **THE COURT:**  We've got to stop at this point, go back

5    down there, and ask those questions.

6         **MS. GAMBINO:**  I'm sorry?

7         **THE COURT:**  The questions on your cross-examination

8    that she didn't get a chance to redirect.

9         **MS. GAMBINO:**  She doesn't get to redirect.

10        **THE COURT:**  I'm trying to think this thing through.

11        **MS. GAMBINO:**  They don't get to --

12        **MS. LERNER:**  I understand.  But we usually get to

13   respond to, as they do, to respond to any points raised in a

14   cross.

15        **THE COURT:**  The problem we have -- and this is more

16   of a procedural issue -- is the party who proffered the

17   witness, in this case, Ms. Gambino, she gets the last crack at

18   it.  And she says, "I got no more questions."

19        **MS. LERNER:**  Just to clear the record, we're not

20   going to be able to address those questions.

21        **MS. GAMBINO:**  You should have addressed them in your

22   cross.  That was your opportunity.

23        **MS. LERNER:**  They were raised in Mr. Rogers' cross,

24   and we never got a chance.

25        **THE COURT:**  That's why I started doing it the other

```
 1   way, to have Mr. Rogers do it first and then government.  I

 2   thought that would resolve that issue.  For whatever reason you

 3   all changed the sequence than what I would have done, so the

 4   questions that --

 5         MS. LERNER:  It would be just limited to things

 6   raised in Mr. Rogers' cross and nothing else.

 7         THE COURT:  I think she has a right to ask that.

 8   Again, that's why I had it the other way.  I was going to have

 9   it -- it was going to be you, Mr. Rogers --

10         MS. GAMBINO:  That's not our responsibility, and she

11   has already been crossed by the government.  She doesn't get

12   two bites at the apple.

13         MR. ZANZI:  That's not a second bite at the apple.

14         THE COURT:  What I usually do is keep going until it

15   is over.  And usually when it is over is when the person who

16   has proffered the witness has no further questions.  There is

17   no law school courses on this.  I'm going to let her ask those

18   questions and then we'll come back, obviously.  As I would have

19   done, I would've preferred to have done -- the order got

20   changed around on me.

21         How many questions do you have?

22         MS. LERNER:  Just a handful, Your Honor.

23         THE COURT:  What's a handful defined as?

24         MS. LERNER:  Five or six.  I can make it part of any

25   followup we have so we don't have to stop this.  We can do it
```

1  that way.  That gives --

       **THE COURT:**  I shouldn't have let you change the order.  I should have stayed the way I wanted it done because that would have accommodated what you're talking about.

       **MR. ZANZI:**  Either way that defendant wants it.  If the defendant wants us to do it in response to these questions, that's fine.  If they want us to do it now --

       **THE COURT:**  What you can do is do it -- take it as part of the followup to these questions so that way it just seems like it's --

       **MS. LERNER:**  And I'm sure the jury wants their questions answered.

       **THE COURT:**  Well, they aren't going to get them all.

       **MR. ROGERS:**  Did Lendell Smith testify?

       **MS. GAMBINO:**  No.

       **MS. LERNER:**  No, but people testified about him.

       **MR. ROGERS:**  Mr. Smith testified that Ethel gave him five tickets?

       **THE COURT:**  I'm not going to ask the question.

       **MR. ROGERS:**  He never testified.

       **THE COURT:**  Yeah, but I wouldn't ask the question that way.  We'll come back to all these questions --

       **MS. LERNER:**  The government doesn't object to any of them.  Are there any questions the Court does not intend to ask so that we are --

THE COURT:  I don't have them back in front of me.
My memory -- I don't remember --

MR. ZANZI:  Do you want some Post-its or something?
I just mean there's a lot here.

    (Post-it Notes tendered to Court.)

THE COURT:  These are interesting.  I have never
seen Post-its like this.  Just admiring the Post-its.

Okay.  We'll do them one at a time.

MS. GAMBINO:  I object to all of these.

THE COURT:  Okay.  We're going to start one at a
time.

MS. GAMBINO:  I think those are irrelevant.

THE COURT:  Okay.  This one is:  Who paid for the
postage on the bulk mail of tickets that you mailed out for
Mary Elgin?

MS. GAMBINO:  I don't think it's relevant --

MR. ZANZI:  It's a scheme --

MS. GAMBINO:  Wait a second.  I haven't finished.

THE COURT:  Oh, I thought you had.

Turn me back on.

    (A brief interruption in the bench conference.)

THE COURT:  Just so you don't think I'm up here
having a real game of a time, this is a Post-it Note container
she gave me (indicating).  And you open it up, low and behold,
there's Post-it Notes in there.  And that's why -- I've never

seem them like that.  So I'm not trying to be overly funny.
Anyway, you can turn it back on.

     (Bench conference resumed.)

          **MS. GAMBINO:**  Is there one with Post-it Notes?  I
didn't see that.  They don't have anything written on them?

          **MR. ZANZI:**  No.  I think we were just saying, to
help him mark --

          **MS. GAMBINO:**  Oh, okay.

          **THE COURT:**  I borrowed my court reporter's Post-it
Notes, and she has clever notes.

          Okay.  First question:  Who paid for the postage on
the bulk mail of tickets that you mailed out for Mary Elgin?

          **MS. GAMBINO:**  I don't have a problem with that, but
it's not relevant.

          **MS. LERNER:**  It is relevant.  There's a scheme to
defraud.

          **THE COURT:**  I don't think the question's harmful.  I
don't think it violates federal rules or anything like that, so
I'm going to ask it.

          If the 500 free tickets were given away, of the 2500
ticket, why were part of the free ones not offered to the
employees?

          **MS. GAMBINO:**  I don't know that she testified that
there were 500 that were given away but there were 500 in case
they wanted to give --

**THE COURT:**  Unless everybody agrees to the question, I'm not going to ask it.

**MS. GAMBINO:**  Okay.  I'm not agreeing to the question.

**MS. LERNER:**  Your Honor, it's absolutely relevant. She testified that she participated in the ticket distribution. She made a huge point of getting in that tickets were given to senior citizens.  This is absolutely important.  This is part of a scheme.  This is part of what the government is alleging. The jury is entitled to know that.

**MR. ZANZI:**  The obligation for them to pay using funds --

**THE COURT:**  What if I do this --

**MS. LERNER:**  You can take out the 500, if that's the dispute.

**THE COURT:**  If free tickets were given away, why were the free ones not offered to the employees?

**MS. GAMBINO:**  One, I don't know that she would know, and, two, it presumes that there were 500 tickets given away --

**THE COURT:**  Well, I would take out the number --

**MS. GAMBINO:**  -- and there's not testimony about that.

**THE COURT:**  -- but I'm not sure of the relevancy.

**MR. ZANZI:**  Why don't you ask:  Were free tickets offered to employees?

                    THE COURT:  I could rephrase --

          MS. LERNER:  She already testified -- she made a
point of it that there were free tickets given to senior
citizens.  She was proud of that fact.

                    THE COURT:  She did say that.

          MS. LERNER:  And whether there were 500 or not, it
doesn't matter.

                    THE COURT:  Let me do this.  I'm going to ask the
question and say, "It's my understanding" -- well, not my
understanding.

          If free tickets were given away, why were the free
ones not offered to the employees?  I'll phrase it that way.

                    MS. GAMBINO:  I still object, but --

          MS. LERNER:  May I also add, Your Honor, my memory
was just refreshed, but this is a question from counsel that I
objected to and the Court overruled; and she asked it again,
and the witness answered.  So it's a little hypocritical for
her to be objecting to it now.

                    THE COURT:  Well, I'm not sure hypocritical here.
We're all hypocritical at some point.

                    MS. GAMBINO:  I don't get into ad hominem attacks.
I'd appreciate if you --

          MS. LERNER:  I apologize.  That word was harsh.
Inconsistent.

                    THE COURT:  Were your personal receipts provided to

the FBI from your personal funds -- wait a minute.  Were your

personal receipts provided to the FBI --

      You can stretch if you want to at any time.

      **MR. ZANZI:**  I don't think they could hear you,

Your Honor.

    (A brief interruption in the bench conference.)

      **THE COURT:**  Yeah, you got it.  Any time you want to

stretch when we're up here -- this is going to take longer than

most of them.  You wrote a lot of notes.

      But, anyway, we'll -- you can just chill out over

there and do what you want to do to a point.  Okay.

    (Bench conference resumed)

      **THE COURT:**  Were your personal receipts provided to

the FBI from your personal funds paid for your own cash

campaign funds?  I think they're talking about the receipts

that she had.  She paid cash for -- some of the receipts were

for cash that she had paid, I think, and -- versus that came

out of somebody's -- came out of her campaign fund.  I'm not

really sure what the question is.

      **MS. GAMBINO:**  Well, the question is whether she

provided information to the FBI, which I don't think she's

obligated to respond to.

      **MR. ZANZI:**  I don't understand the question.

      **MS. LERNER:**  I don't understand it either.

      **MR. ZANZI:**  I think we can not ask that one.

**MS. LERNER:**  Yeah, that's fine.

**MS. GAMBINO:**  That's fine.

**THE COURT:**  Okay.  You stated in the beginning that you did not need this income from working at the CTTO.  Why were you worried about standing up to Mary Elgin on issues you felt were unethical?

**MS. GAMBINO:**  I don't think -- I think that misrepresents her testimony.  I don't think she said she was worried about standing up to her.

**THE COURT:**  She said she could get fired.

**MR. ZANZI:**  I think you should let her explain.  The jury is curious about this.

**MS. LERNER:**  Yeah.

**THE COURT:**  Mr. Rogers?

**MR. ROGERS:**  This is not my witness so --

**THE COURT:**  You have a vote.

**MS. GAMBINO:**  My vote is no.

**THE COURT:**  I know your no vote.

**MS. LERNER:**  The jury is entitled to know what her motivations are for what she did.

**MS. GAMBINO:**  They're not entitled to this at all.  This is an extraordinary procedure which the judge allows and most judges don't, and she does not give up her rights by testifying.

**MS. LERNER:**  Right.  She's not entitled to this as a

whole --

        **THE COURT:**  Wait a minute.  I do this in this court.
I'm not the only judge in the world that does it.

        **MS. GAMBINO:**  I've never had a judge --

        **MS. LERNER:**  I've done it once.  It's useful.  It's
very useful.

        **MR. ZANZI:**  Well, regardless, let's --

        **THE COURT:**  I'm like Mr. Rogers, an old trial dog,
and I might bring some biases to the process, what I wish would
have happened when I was trying cases.

        **MR. ROGERS:**  In Indiana now it's absolutely
permitted and required.

        **THE COURT:**  Oh, is it?  Okay.  Indiana is kind of
leading the charge.

        **MS. GAMBINO:**  It is indeed.  I think it would
terrify most of the judges in Illinois.

        What you can do is go to the last part of it.  Why
were you worried about standing up to Mary Elgin about issues?

        **MS. LERNER:**  No objection.

        **MS. GAMBINO:**  Can you ask it a different way because
it presumes that she was.  Just ask her if she was worried.

        **MR. ZANZI:**  Why not just ask:  Were you worried and
why?

        **THE COURT:**  Were you worried about standing up to
Mary Elgin?

**MS. GAMBINO:**  Right.

**THE COURT:**  Because the government made a big deal about that.

**MS. LERNER:**  We don't object to that.

**THE COURT:**  And if she says yes:  Why?

**MS. GAMBINO:**  Why?

**THE COURT:**  Yeah.

**MS. GAMBINO:**  That's fine.

**MR. ZANZI:**  That would be a more appropriate way.

**THE COURT:**  We're going to get to easier ones here in a minute.

**MS. GAMBINO:**  I love that little Post-it thing. It's so cute.

**THE COURT:**  I get really fixated with it.

**MS. GAMBINO:**  It's inspired me to go to Blick.  My supplies are too boring.

**MR. ZANZI:**  What's the next one?

**THE COURT:**  So you were freely able to go into Mary Elgin's office without her being there, but no one could go into your office if you were not there.  This is not really a question really.  It's kind of a statement.  It's a statement.

**MS. GAMBINO:**  It's a statement, and it --

**THE COURT:**  I tell the jurors that they need to be neutral in their questions.  This is not a neutral question.

          **MS. GAMBINO:**  It is an argumentative question, and
it's also not exactly accurate.  I don't believe she testified
she was free to go in and out of Mary Elgin's office.

          **THE COURT:**  I'm not going to ask it.

          **MR. ZANZI:**  That's fine.

          **MS. LERNER:**  No objection.

          **THE COURT:**  They caveat this question with a thing,
which is not part of the question but it's part of the thought
process, which probably causes problems with the question.

          You talked about not remembering the conversation
between you and Gladys Miller but then said that the
conversation upset you.  How, if you don't remember?

          I don't quite remember the question entirely, and I
think there's a number of ways that question is approached.

          **MR. ZANZI:**  Your Honor, I think if you recall
yesterday, the question was asked by Ms. Lerner.  And you made
a comment that that's referring to a different witness.

          **THE COURT:**  Right.

          **MR. ZANZI:**  We remembered it as regarding
Ms. Miller.  That would basically be a clarification issue.  I
think this question is intended to clarify that.

          **MS. GAMBINO:**  I don't think so.  I think what
happened --

          **THE COURT:**  And you may have been right.  There's
just two things bouncing around.

**MR. ZANZI:**  I think she just needed a clarification. There's obviously different recollections about what happened.

**THE COURT:**  I'm not sure this question clarifies it.

**MS. GAMBINO:**  The question doesn't clarify it.  And I'm not sure that -- my interpretation of what happened is that she was answering a different question that was asked because I think she was reacting to how she feels about it now and not how she felt about it then.

**THE COURT:**  I'm not going to ask it.  I don't think it's a relevant question.  I think it's going to confuse --

**MR. ZANZI:**  It may create more confusion.  That's fine.  Fair enough.

**THE COURT:**  Most of the questions I have to rephrase if I ask them.

You seem to be very involved in EPIC, but when asked what EPIC stands for, you seem to struggle with knowing what it stands for.  Why?

**MR. ZANZI:**  I think it's a fair question maybe asked a different way.

**MS. GAMBINO:**  I think that just goes down to being nervous.

**THE COURT:**  It could be a number of things, nervous is one.

**MS. GAMBINO:**  I just don't know that it's relevant to the evidence.

   **MS. LERNER:**  We don't object to giving it.

   **THE COURT:**  I understand that.  I'm not going to ask the question.

   **MS. LERNER:**  Okay.

   **MR. ZANZI:**  Okay.

   **THE COURT:**  Again, when I do this process, I always get gun shy when I have defendants up there.  I don't get defendants testifying all that often.  I'm kind of, I guess, using a little different rule to some extent.

   **MR. ZANZI:**  Okay.

   **THE COURT:**  Okay.  On this one I'm going to ask who paid for postage.  I'm going to ask that one.  The 500 tickets, we are going to ask, basically:  Did you testify -- I'll say it that way.  I'm going to try it that way:  Did you testify that some of the tickets were given away?

   And if she says yes, I'll say:  Why were the free ones not offered to employees?  I'll try to change it that way.

   **MS. LERNER:**  I think that's fair.

   **THE COURT:**  And the other question is -- ask her: Were you worried about standing up to Ms. Elgin?

   And when she says yes, I'll say:  Why?

   **MS. GAMBINO:**  Yeah.

   **THE COURT:**  I'm sure I'll muff these as we go through them.  I have little notes even.

   If the phone call to Gladys Miller was at the

direction of the trustee, why wouldn't the trustee just tell
Gladys to come into her office for a meeting?

   **MR. ZANZI:**  I think that's a very astute
observation, Your Honor.  I think that's a question --

   **THE COURT:**  My only problem with this question is
you get a feel with what the jurors are thinking about, so --

   **MR. ZANZI:**  I think that's an appropriate question,
Your Honor.

   **MS. GAMBINO:**  I don't have an objection to that.

   **THE COURT:**  Okay.  Was Lendell Smith a deputy or an
assistant deputy?  If yes, nothing else.  If no, please ask
Ethel is she remembers Mr. Smith.

   He didn't testify, did he?

   **MS. LERNER:**  He did not.

   **MS. GAMBINO:**  No.

   **MS. LERNER:**  You can ask the first part.  I think
that's fair.

   **THE COURT:**  If no -- okay.  I see, if she remembers.

   **MR. ZANZI:**  You can ask her how many tickets did he
receive.

   **MR. ROGERS:**  Shouldn't is be cleared up that he did
not testify because somebody is apparently under the assumption
that he did.

   **MR. ZANZI:**  I don't have a problem with that either.

   **MS. LERNER:**  That's fine.

**THE COURT:**  I'm just going to ask if he was a deputy or assistant deputy.

**MS. GAMBINO:**  That's fine.

**THE COURT:**  Just leave it at that.

You have no problem with the first part of that question, right, if the phone call to Gladys Miller --

**MR. ZANZI:**  Uh-huh, that explains the question.

**MS. GAMBINO:**  What was the first question?

**THE COURT:**  If the phone call to Gladys Miller was at the direction of the trustee, why wouldn't the trustee have told Gladys to come to her office?

The second question I'm just going to ask her:  Was Lendell Smith a deputy or assistant deputy?  I'm going to go with that.

Is there any time when reading the employee handbook -- is there time when reading the employee handbook you disregarded any rule because you thought it wouldn't apply to your work?

**MR. ZANZI:**  Yeah.

**THE COURT:**  And if no, explain why.

**MS. GAMBINO:**  They're going to be instructed that they can't rely on the employee handbook for a violation of the rules, and I'm afraid that getting into questions like this, it puts more emphasis on this handbook than it's entitled to have.

**MR. ZANZI:**  It's evidence, Your Honor.

**MS. LERNER:**  They are entitled to use it.  It's an instruction that's in the draft section.  They are entitled to use it for knowledge, willfulness, and intent to defraud.  Your Honor, that question goes to that.

**MR. ZANZI:**  As to this question will not confuse the issues because you'll still have an instruction on it.

**THE COURT:**  I think that's correct.  There is going to be an instruction on that.  We'll ask them the question.  Sometimes not asking the question makes it more complicated.

**MS. LERNER:**  Right.  And the proposed instruction that we submitted also contains language that Mr. Rogers had requested, which is that it is not a violation of federal law.

**THE COURT:**  Well, I tell them that another witness may be in a better place --

**MS. GAMBINO:**  Sure.

**THE COURT:**  But the other thing is that I'll let this one go.

**MR. ZANZI:**  You're not going to ask it, Your Honor?

**THE COURT:**  I'm going to say:  As regard to the handbook, there is going to be an instruction.  I'd rather let it sit out there with an instruction.

**MR. ZANZI:**  Okay.

**THE COURT:**  Unless -- if I ask the question, you can follow up.

**MS. GAMBINO:**  I do not want the question asked

because I think it's going to confuse things.  It raises more questions than it's going to answer.  It's going to put unwarranted emphasis on this handbook.

        **MS. LERNER:**  It is permitted for showing the jury her intent to defraud, Your Honor, and it is very relevant testimony.

        **THE COURT:**  I understand.  To me, it's argument.

        **MS. LERNER:**  Is there a different way to phrase it perhaps?

        **THE COURT:**  I don't think so.  It's served one purpose; it let you know what the jurors are thinking.  If it was another witness, I might.  But with the defendant, I'm not going to.  I'll probably end up blowing it and asking it.

        **MS. LERNER:**  Are there other questions on that?

        **THE COURT:**  Yeah.  These are all employee handbook questions.  You can get copies if you want to.  We'll make copies for you.

        **MS. LERNER:**  Okay.

        **MS. GAMBINO:**  That would be helpful to have before --

        **MR. ZANZI:**  You file them on the record, right?

        **THE COURT:**  Yes, I file them.

        **MS. GAMBINO:**  It would be helpful to have copies this evening.

        **THE COURT:**  We'll get copies for you.  Just ask

Marijana.  She'll make copies for you.

This next question, if I ask it at all, I'll only ask the question part of it:  You stated you were advised by Upshaw about doing political work during township work hours is wrong.  Why would you have Rebecca Smith send your board campaign literature to work?  I'll ask that second part.

**MS. GAMBINO:**  Yeah, that's --

**THE COURT:**  Unless there's an objection to it.

**MS. GAMBINO:**  I don't have a problem with the second part.

**MR. ZANZI:**  That's fine to take out the other part.

**THE COURT:**  Okay.  I tried a case about a week or two ago and the evidence lasted about a day and a half.  I had more questions from jurors than the parties had of this witness.

**MR. ZANZI:**  At least you know they're paying attention.

**THE COURT:**  Oh, they're paying attention.  And I think they pay a little more attention when they ask questions.

Did Ethel Shelton move files from her home computer to her work computer?

The next part along with it asks:  Why did she move files from home computer to work computer?

**MR. ZANZI:**  If she answers yes:  Why?

**MS. LERNER:**  Uh-huh.

**THE COURT:**  I would rephrase it a little bit.

**MS. GAMBINO:**  Well, I guess the first -- well --

**THE COURT:**  The way I'd ask it:  Did she move files from her work computer to her home computer and vice versa?

**MS. GAMBINO:**  Did she, yes.

**THE COURT:**  Yes.  It's got to be put in a question form, not in an accusatory form.

Here's what I propose to do, the last part:  Did Ethel Shelton use Mary Elgin's mailing list for her own campaign?  In other words, Ethel Shelton's campaign.  I have no problem with that.

The first one, what I would do is:  Would you move files from time to time from your home computer to your work computer and vice versa?  That's what I'd ask.

**MR. ZANZI:**  Okay.

**THE COURT:**  The next part of that question is -- that's the first part:  Why did you move files from your home computer to your work computer?

**MS. GAMBINO:**  If she says that she did.

**THE COURT:**  Right, if she says she did.

**MR. ZANZI:**  Only if she says yes.

**THE COURT:**  So this is okay if I do it right.  Okay.

**MR. ZANZI:**  I think we got it, Judge.

**THE COURT:**  Yeah.  If you hear me going off the rails on a question, somebody get my attention, and I'll go

back to my notes and try to figure it out.

**MR. ZANZI:**  Sounds good.

(End of bench conference.)

**THE COURT:**  I want to compliment you all on your note writing.  As I indicated, sometimes I will ask a question.  Sometimes I won't.  If I don't ask a question, it is for reasons that shouldn't concern you.  I will change the wording of it, and that I do many times.  If you hear a question that sounds like it might have been your question but it is a little different, it's still your question.  It's different.  That's what I've done.

If I have asked a question up here I shouldn't have asked, I will hear about it here real quick too.

Ms. Shelton, as you know, the jurors can ask questions.  As you also know, as I tell all the witnesses, an answer -- if you don't know, that's an answer.  You shouldn't guess or speculate.  If you know what the question is asking for, you can answer it.  If you can't answer it, that's an answer.

How -- did you move files between your home computer and work computer?

**DEFENDANT SHELTON:**  Files?

**THE COURT:**  Files on your computer.  By moving -- cut and paste.

Did you send files from your home computer to your

work computer and your work computer to your home computer?

        **DEFENDANT SHELTON:**  Yes, I did.

        **THE COURT:**  And why would you move the files between the two places?

        **DEFENDANT SHELTON:**  To proofread a letter.  To -- not remembering the exact form, I would mostly move from my home to work.  Rare did I move from work to home.

        **THE COURT:**  Did you use Mary Elgin's mailing list for your own campaign?

        **DEFENDANT SHELTON:**  Did I use -- I didn't hear you. I'm sorry.

        **THE COURT:**  I probably didn't say it very well.  Am I on or not on?  Okay.

        Did you use Mary Elgin's mailing list for your own campaign?

        **DEFENDANT SHELTON:**  No, I did not.

        **THE COURT:**  Did you direct Rebecca Smith to send your board campaign literature to your work e-mail?

        **DEFENDANT SHELTON:**  Did I direct her?

        **THE COURT:**  Yeah.

        **DEFENDANT SHELTON:**  No, I did not.

        **THE COURT:**  Did she send it to your work e-mail?

        **DEFENDANT SHELTON:**  She sent some to my work mail and some to my home mail.

        **THE COURT:**  Do you know why she did that?

**DEFENDANT SHELTON:**  She knew both addresses, so sometimes she would send to one.  Other times, she would send it to my home.

**THE COURT:**  Did you testify that you made a phone call to Gladys Miller -- yeah, Gladys Miller -- at the direction of the trustee?

**DEFENDANT SHELTON:**  Yes, I did.

**THE COURT:**  Next part of that question is this:  Why wouldn't the trustee have just called Gladys Miller herself to come into her office for the meeting?

**DEFENDANT SHELTON:**  An elected official is very busy.  I am her secretary.  She has told me on many occasions to call different people in and outside of the office.  It was part of my duties.

**THE COURT:**  Was Lendell Smith a deputy or assistant deputy, if you know?

**DEFENDANT SHELTON:**  He was neither.

**THE COURT:**  Who paid for the postage on the bulk mail of tickets that you mailed out for Mary Elgin?

**DEFENDANT SHELTON:**  Mary Elgin paid for them from her campaign funds.

**THE COURT:**  There was some testimony that some free tickets were given away of the tickets that were received, total tickets.

Do you remember that?

**DEFENDANT SHELTON:**  Yes, I remember that.

**THE COURT:**  Why were the free ones not offered to the employees?

**DEFENDANT SHELTON:**  Are you talking about Mary Elgin's tickets or my tickets?

**UNIDENTIFIED JUROR:**  Mary Elgin.

**THE COURT:**  Mary Elgin.

**DEFENDANT SHELTON:**  I can't answer why free tickets was not given to the employees.  Probably for a campaign fund, it's very, very expensive, in the thousands, to run for an elected office.  I can't tell you why they weren't given free tickets.

**THE COURT:**  Okay.  That's an answer.  Were you worried about standing up to Mary Elgin on certain issues?

**DEFENDANT SHELTON:**  Mary Elgin was my supervisor. My background -- I didn't believe in upstaging my boss among her employees or his employees, so I would talk to her privately about any matter that I had concerns with.

**THE COURT:**  Followup questions, Ms. Gambino.

### FURTHER REDIRECT EXAMINATION

**BY MS. GAMBINO:**

**Q.**  Mrs. Shelton, in terms of files being sent back and forth between your home computer and your work computer, if you sent files that you had worked on at home to work, would you then look at or use those files during your working hours if they

were not related to township business?

**A.**   No, I would not.

**Q.**   And Rebecca Smith, she knew both your e-mail addresses, your personal and your Calumet Township address; is that right?

**A.**   She did.

**Q.**   And would the -- would it have any bearing on whether she sent things to your home or to your work as to how urgent it was that she needed an answer from you whether this was going to work or not?

**A.**   Correct.

**Q.**   And you said that it was part of your duties to make phone calls to arrange meetings for Ms. Elgin?

**A.**   I did it all the time.

**Q.**   And did you do that for people who were employees as well as politicians and other people?

**A.**   I called the governor's office.  I called out in the county.  I called whoever she told me to call.  I had all their numbers, and she always said, "Ethel" -- she could be someplace.  She's very busy.

**Q.**   So she would call you and tell you to set up a meeting with so-and-so, and then you were also responsible for her schedule; is that correct?

**A.**   Oh, yes.

**Q.**   And so you knew when she had time to meet with people and when she did not?

**A.**  Right.

**Q.**  Did she always, ever, or never tell you what the substance of these meetings was going to be?

> **MS. LERNER:**  Objection.  Hearsay.

> **THE COURT:**  Overruled.

**Q.**  Were you aware -- let me rephrase it.

> Were you aware of the nature or the subject of all of the meetings that she asked you to set up?

**A.**  No, I did not.

**Q.**  Now, who was it that decided or made decisions with respect to tickets for Mary Elgin's affairs and how much they were going to cost?

**A.**  Mary Elgin made that decision totally by herself.

**Q.**  And with respect to your own tickets, who made the decision about how much your campaign tickets would cost?

**A.**  I made that decision.

**Q.**  And with respect to standing up -- the issue of standing up to Mary Elgin, you were -- were you -- you were not afraid to stand up to her; is that correct?

**A.**  I was not afraid to stand up to her.

**Q.**  But you would choose your time and place to stand up to her?

**A.**  Yes, I would.  I'm not going to embarrass my boss in front of the people that she is over.

**Q.**  And with respect to pointing out to her things that you

disagreed with, once you did that, would she follow or respect
what you said or not, or would it depend on the issue?

**A.**   I'm sorry.  You're going to have to repeat the question.

**Q.**   When you would have -- when you would confront Mrs. Elgin
with things that you did not like, you didn't want to do, you
didn't approve of, that sort of thing, would she respond to you
in a favorable way or not, or would it depend on the issue?

**A.**   Most of the time unfavorable.

**Q.**   So she's not necessarily going to accommodate whatever your
concerns are?

**A.**   No, she would not.

        **MS. GAMBINO:**  Thank you.

        **THE COURT:**  Mr. Rogers.

        **MR. ROGERS:**  I have no questions.

        **THE COURT:**  Ms. Lerner.

        One thing, the government had some questions when we
were going through the -- when you've got more than one
attorney, I have to remember both sides have an opportunity to
do the same things, and I forget.

        Ms. Lerner had a followup to some questions that
Mr. Rogers had asked on cross of Ms. Shelton, so she's going to
be able to do it at this time rather than stopping and starting
up again and so forth.

        Some of the questions will be a little bit beyond --
hopefully, a very few of them -- will be a little beyond the

actual question that was asked.

        **MS. LERNER:** I'll ask those first, and it is just a first, Your Honor.

### FURTHER RECROSS-EXAMINATION

**BY MS. LERNER:**

**Q.** Good morning, Ms. Shelton.

**A.** Good morning.

**Q.** Please let me know if you can hear me.

**A.** I can hear you.

**Q.** You testified yesterday you saw Mr. Wheeler working late hours, correct?

**A.** That's correct.

**Q.** Did you see him come in every day?

**A.** Did I see him come in every day?

**Q.** Yes.

**A.** No, I did not.

**Q.** Did you see him leave every day?

**A.** No, I did not.

**Q.** Do you know what hours he generally worked?

**A.** I believe it was 9:00 to 5:00.

**Q.** And you saw that because that's in evidence, correct?

**A.** No, I know he worked 9:00 to 5:00.

**Q.** And you worked 8:00 to 4:00, correct?

**A.** I worked 8:00 to 4:00, 8:00 to 8:00. I worked a lot of hours.

**Q.** And on the days that you said that he worked late, did he come up to the 3rd floor and sit with you?

**A.** No, he didn't come up and sit with me. He normally came up as he was leaving.

**Q.** And he's on the 1st floor, correct?

**A.** He is on the 1st floor.

**Q.** And so when he was working late, do you know whether he was reading newspaper in his free time?

**A.** I didn't know what he was doing. He's a very capable employee.

**Q.** He could have been doing personal things in his office?

**A.** I don't know what he was doing.

       **MS. LERNER:** That's all I had on that, Your Honor.

**Q.** And on the question regarding Ms. Miller, you testified on direct with Ms. Gambino and then you confirmed yesterday with me on cross that you stated that it happened the way that Gladys Miller testified. Do you remember that?

**A.** I said it probably happened that way because I could not remember the incident. It's been 10 years, so I just don't remember it.

**Q.** Okay. Regarding the items on your computer, the ones that you were sending from work to home --

       That's what you said, right?

**A.** I said I --

**Q.** Or was it the other way around?

**A.**   From home to work.

**Q.**   My apologies.  That was campaign related material, correct?

**A.**   Most of the time it was.

**Q.**   And would you agree with me that the property of the township belongs to the township?

**A.**   Of course.

**Q.**   And that includes the computers?

**A.**   Includes everything in the township office.

**Q.**   And the network systems, the office space, the storage space, all of that, correct?

**A.**   I assume so.

**Q.**   And they are paid for with taxpayer money, correct?

**A.**   Yes.

**Q.**   And the purpose of it is to serve the needy because that's the township's mission, correct?

**A.**   Absolutely.

**Q.**   And they're not to be used for any other purpose other than serving the needy; is that correct?

**A.**   I disagree with that.

**Q.**   So you can use those computers as you like?

**A.**   No, I'm not saying you could use them as you like.  There was other things that you could do.

**Q.**   So the computers that were paid for with taxpayer money that belonged to the township, you could do other things that you wanted outside of the mission of the township.  That's your

testimony?

**A.**   That's not exactly my testimony.

**Q.**   Then tell us what it is.

**A.**   Well, you could -- sometimes you could pull up information relating to the township to check.   Sometimes --

**Q.**   Like your campaign material?

**A.**   No, not like my campaign material.   The county have things on the internet that you can take a look at, one of the things that you showed me.

**Q.**   But that's related to fulfilling the mission of the township, correct?

**A.**   No, it's not because it's a -- it's a list of political leaders that's running for office on that particular list.

**Q.**   So you're talking about doing things completely unrelated to the township's mission?

**A.**   I'm talking about what came -- what can come over on my computer or anybody's computer at the township.

**Q.**   Is it your testimony that you can do Mary Elgin's campaign work on your computer?

**A.**   If Mary Elgin come out and ask me to do it --

**Q.**   It's a yes-or-no question.

**A.**   -- something on --

**Q.**   Your attorney can follow up.

         Is it your testimony that you can do Mary Elgin's work on your computer?

**A.** If she directs me to do it, yes.

**Q.** Okay. And is it your testimony that you can do your own campaign work on your computer?

**A.** No.

**Q.** But you did --

**A.** I had some materials sent to me.

**Q.** You told us about this many times, that you did things at Mary's directive. But you also told us that you made your own decisions. You remember that, correct?

**A.** Not about anything in the township office.

**Q.** Well, you chose to take the deputy job, didn't you? I'm sorry.

You chose to turn down the deputy job, correct?

**A.** Yes, I did.

**Q.** And you chose to take the job as the executive assistant, correct?

**A.** Executive secretary was the title.

**Q.** Okay. And you chose the -- the answer is yes then, correct?

**A.** Yes.

**Q.** And you chose to attend the EPIC meetings, correct?

**A.** Yes.

**Q.** And you chose to follow Mary's directive, correct?

**A.** Yes.

**Q.** You chose to pass out tickets, fundraising tickets, at the

office, correct?

**A.**  On my lunch hour, after work, and during my breaks.

**Q.**  Yes or no. Yes or no.  You chose to pass out campaign fundraising tickets --

**A.**  Yes.

**Q.**  -- at the office?

And you chose to collect money at the office, correct?

**A.**  Yes.

**Q.**  And you chose to keep campaign material in your desk, correct?

**A.**  Yes.

**Q.**  And you chose to keep campaign material on your computer, correct?

**A.**  Yes.

**Q.**  You chose to follow Mary's instructions, correct?

**A.**  Yes.

**Q.**  You chose not to say no, correct?

**A.**  Yes.

**Q.**  You chose to help Mary, correct?

**A.**  I chose to do my job.

**Q.**  You told us that you didn't need this job and yet you didn't leave it; is that correct?

**A.**  That is absolutely correct.

**MS. LERNER:**  No further questions.

**FURTHER REDIRECT EXAMINATION**

**BY MS. GAMBINO:**

**Q.** Mrs. Shelton, when you chose to fulfill your duties as secretary, did you understand or believe or intend that you were doing anything illegal?

**A.** No, I didn't think I was doing anything illegal.

**Q.** And if you thought at the time that you were being asked to do something illegal, would you have done it?

**A.** I would never have done it if I knew that I would be sitting in this seat. Never. I wouldn't have looked at a ticket.

**Q.** If you were aware that Mary Elgin had been involved in anything illegal, would you have decided to work for her?

**A.** No.

**Q.** And to your knowledge, was Mary Elgin involved in taking bribes from anyone?

**A.** No.

**Q.** And to your knowledge, was Mary Elgin involved in taking kickbacks from anyone?

**A.** No.

**Q.** And to your knowledge, was she involved in deceiving anyone about what she was doing?

**A.** No.

        **MS. GAMBINO:** Thank you.

        **THE COURT:** Mr. Rogers.

          **MR. ROGERS:**  No questions.

          **THE COURT:**  Government.

          **MS. LERNER:**  No questions, Your Honor.

          **THE COURT:**  Okay.  Thank you, Ms. Shelton.

          **MS. GAMBINO:**  Your Honor, on behalf of Ms. Shelton, the defense rests.

          **THE COURT:**  Okay.  Mr. Rogers.

          **MR. ROGERS:**  Your Honor, on behalf of Mr. Wheeler, we don't believe the government has met their burden.  We, therefore, rest.

          **THE COURT:**  Okay.  Thank you very much.

          **MS. LERNER:**  The government has no rebuttal, Your Honor.

          **THE COURT:**  Okay.  What we're going to do now -- and if you don't like it, eggs come at my direction.  We have a number of things -- we just don't know for sure when this is going to happen.  As you can see, I get surprised by a lot of things that happen, and I've done this for a while.

          We have to do a number of things to get this thing to you for arguments and things like that.  And we -- one way to do it is you go back there and sit for a couple hours while we're doing it.  They have to type it.  They have to do a bunch of things.

          What I would rather do is send you home today and come in, you know, fresh tomorrow morning, and what we would

have is I would read the final instruction to you.  You would

hear closing argument of counsel, and you'd deliberate.  I

guess it's really not a democracy at this point because that's

what I'm going to do.

        Anyway, be back here tomorrow at 9:30.  We will

start with the final instructions of the Court to you, closing

arguments of counsel, and then there's some other instructions.

I call them wrap-up instructions.  And then the case is given

to you for deliberations.

        Now, understand, at this point that one instruction

I give you is even more important.  During this recess and all

other recesses, you must not communicate about this case with

anyone.  This includes your family, other jurors, and anyone

involved in the trial.  This also includes all forms of

communication including electronic communication.  Do not watch

or listen to any news reports concerning this trial on

telephone or on the radio, and do not read any news accounts of

this trial in a newspaper or on the internet.

        This trial needs to be tried within the four corners

of this courtroom, nothing else.  It's got to be tried in here,

and I have to rely on you that you're not getting information

from outside because there's no way I can know you are or

aren't, but the integrity of the system requires that.

        And I know I have had some people that sat on juries

that I know, and a few of them sat on juries that I've

conducted.  I've had spouses complain to me that they won't

talk to them about the case while the case is going on.  And I

said, "Yep, that's what I told them."  So it made me feel good

that, in fact, they were following it.

         I'm relying on you to do the same thing.  Nobody is

monitoring you.  The parties and the system needs to know that

it's being tried the way it should be tried, which means within

the four corners of this courtroom.  So that's my final going

away instruction.

         I'll see you tomorrow morning at 9:30, and this case

will be in your hands shortly after noon.

         Should they take the notepads with them now?

Probably -- no.  You can leave your notepads there because

we're going to do instructions and everything like that.

There's more going.

    (Jury out at 10:03 a.m.)

              **THE COURT:**  You can be seated.

         Marijana, I indicated they get copies of the jurors'

questionnaires or juror notes.  Take off my sticky tabs on

them.

              **THE COURTROOM DEPUTY:**  Yes, I will.

              **THE COURT:**  Anything else at this point, government?

         **MS. LERNER:**  Regarding -- I assume we are going to

have the jury instruction conference.

              **THE COURT:**  Yes.  Yes, we are.  Other than that,

anything else?

  **MS. GAMBINO:** Your Honor, I'm just going to repeat, again, at this moment our motion for a directed verdict.

  **THE COURT:** Mr. Rogers, I assume you're making that same motion too.

  **MR. ROGERS:** I am.

  **THE COURT:** As you know, the evidence was locked in for those motions based on the first time you made them, and I did not grant them at that point.  I see no reason to change that ruling, so I deny the motions for judgment of acquittal.

  Hang around here.  Do they have the draft?  Okay.  You've got the draft.  Is there anything more we are going to be giving them at this point?

  (Discussion between the Court and Mr. Lapas off the
  record.)

  **THE COURT:** Some other stuff will come out to you, but it won't be very much.

  The way I do the jury instruction back in my chambers is that I go through our proposed instructions, the Court's proposed instructions, and take your objections to those.  Then we move to the government's proposed instructions, any objections the government has for not giving an instruction, and then defendants' instructions and any objections you may have for not giving your instructions.  That's how I proceed through the course of the process.

          And then we'll type up a final thing for you, which
is going to be given, and we can take that up today or first
thing tomorrow morning, 9:00 o'clock or something like that,
and then proceed to having the jury instructed.

          Any questions about that procedure?  That's the
question I really had.

          **MS. GAMBINO:**  No.

          **MR. ROGERS:**  No.

          **THE COURT:**  Okay.  Just hang around the courtroom
and we'll get back to you as to when we're ready for you to
come back.  The court will be in recess.

          **MR. ZANZI:**  Are we getting new copies of the
exhibits [verbatim] or should we --

          **THE COURT:**  Understand, I don't run anything at this
point.  Mr. Zanzi, you know how that operates.  It's in
somebody else's hands at this point.

          **MR. ZANZI:**  I wasn't sure if I should rely on those
or if we're getting new ones.  That's all.

          **THE COURT:**  There won't be a whole new set.  There
will be some tweaks to it, I think.  That's what we're talking
about.

          **MR. ZANZI:**  Fair enough.

          **THE COURT:**  And then we'll go through the process.
And when we get back there, it's a pretty informal process.
Okay.  See you shortly.

───────── Ashley N. Stokes, CSR, RPR ─────────
Ashley_Stokes@innd.uscourts.gov/ (219) 852-6557

(Proceedings adjourned at 10:06 a.m.)

* * * * *

*CERTIFICATION*


         I, ASHLEY N. STOKES, Federal Court Reporter, certify
that the foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.


         S:/Ashley N. Stokes_____  May 18, 2020
         Certified Realtime Reporter
         United States District Court
         Northern District of Indiana
         Hammond Division