```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF INDIANA
 2                        HAMMOND DIVISION

 3      UNITED STATES OF AMERICA        ) Cause No.:
                                        ) 2:14-CR-129
 4           vs.                        )
                                        )
 5      ETHEL SHELTON and ALEX WHEELER, ) Hammond, Indiana
                                        ) April 13, 2018
 6           Defendants.                )

 7
                             VOLUME 10
 8                     TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE JOSEPH S. VAN BOKKELEN
 9                  UNITED STATES DISTRICT JUDGE

10      APPEARANCES:

11      For the Government:      MARIA N. LERNER and
                                 ABIZER ZANZI
12                               ASSISTANT UNITED STATES ATTORNEY
                                 UNITED STATES ATTORNEY'S OFFICE
13                               5400 Federal Plaza, Suite 1500
                                 Hammond, Indiana  46320
14                               (219) 937-5500

15      For the Defendant,       ANDREA E. GAMBINO
        Ethel Shelton:           LAW OFFICES OF ANDREA E. GAMBINO
16                               53 W. Jackson Boulevard, Suite 224
                                 Chicago, Illinois  60601
17                               (312) 322-0014
                                 agambinolaw@gmail.com
18
        For the Defendant,       LARRY W. ROGERS
19      Alex Wheeler:            ROGERS LAW OFFICE
                                 2801 Bertholet Boulevard, Suite 301
20                               Valparaiso, Indiana 46383
                                 (219) 476-0443
21                               lwrogerslawoffice@gmail.com

22

23

24      Proceedings reported by stenotype.  Transcript produced by
        computer-aided transcription.
25
```

| | | |
|---|---|---|
| 1 | **INDEX** | |
| 2 | **Jury Instructions by the Court** | **17** |
| 3 | **Closing Argument - Government** | |
| | By Ms. Lerner | 38 |
| 4 | | |
| 5 | **Closing Argument - Defendant Ethel Shelton** | |
| | By Ms. Gambino | 93 |
| 6 | **Closing Argument - Defendant Alex Wheeler** | |
| | By Mr. Rogers | 127 |
| 7 | | |
| 8 | **Rebuttal Argument - Government** | |
| | By Ms. Lerner | 153 |
| 9 | **Final Instructions of the Court** | **170** |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

```
1         (The following proceedings were held in open court

2          commencing at 9:13 a.m., reported as follows:)

3    (Call to Order of the Court.)

4         THE COURT:  You can all be seated.

5              It's the Court's intention to give instructions

6    numbered 1 through 47, which I believe you have those

7    instructions.  Those instructions were a result of yesterday

8    afternoon's meeting, e-mails, and so forth.  Anyway, it's the

9    Court's intention to give those instructions as you have them,

10   1 through 47.

11             Does the government have any objections to those

12   instructions?

13        MR. ZANZI:  Your Honor, we don't have any

14   objections, but I think because the instructions came about

15   pursuant to some discussions that were off the record, I think

16   for the record, I think we just need to state some things on

17   the record.

18        THE COURT:  Go ahead.

19        MR. ZANZI:  This is specifically with respect to two

20   instructions.  The discussions yesterday, Your Honor, were

21   largely in chambers and during the jury instruction conference

22   where in an attempt to clarify or simplify the distinction

23   between conspiracy versus the substantive counts.

24             And during the discussions, the parties and the

25   Court -- decisions were made to eliminate some definitions
```

 1   relating to the underlying elements.  I think because we're

 2   doing that, I think there needs to be a statement on the record

 3   that the parties are in agreement on that.  Otherwise, the

 4   record could be muddied if anyone's reviewing it at some later

 5   date.

 6          **THE COURT:**  Right.  Last night when this -- you

 7   know, this became a pretty fluid discussion.

 8          **MR. ZANZI:**  So I can identify two and --

 9          **THE COURT:**  Identify what it is because last night,

10   I told my staff that there had been an agreement at the

11   conference at least on a certain set of instructions.  We then

12   proposed some modifications.  I don't think they were

13   fundamental modifications, but there were modifications.  And

14   my position was it's going to be one or the other.  We're not

15   going to go through the whole process again because I've got a

16   jury I've got to get to and get them going on this case.

17          So any record you want to make regarding that, I

18   would appreciate.  It's down to two choices, either the one we

19   agreed to at the conclusion of the conference or the revised

20   ones that were submitted to you later that night.  And, plus,

21   you had some, I call them, mechanical changes too, which I

22   think we incorporated.

23          **MR. ZANZI:**  Well, Your Honor, the government doesn't

24   object to final instructions written except to the extent that

25   we just want to clarify the record --

1      THE COURT:  Go ahead and make the clarification.

2      MR. ZANZI:  We just ask that there is an

3  acknowledgment from the all parties that there is an agreement

4  so that if anyone is ever looking at this record, at least we

5  know what was done in chambers.

6      THE COURT:  Right.

7      MR. ZANZI:  There's two instructions, one regarding

8  government's proposed -- this is from Docket Entry 173, which

9  was the government's proposed revised instructions after the

10  Court had --

11      THE COURT:  Wait just a second -- I'm trying to

12  figure out how to do this mechanically.  I had Vilius -- over

13  the years I found out that you have to take everything out of

14  my binder that I'm not going to read.  I have a habit of

15  reading -- looking through, I start reading stuff that should

16  have been out.  So they took everything out of my binder now

17  except --

18      MR. ZANZI:  I have the two pages I'm going to talk

19  about.

20      THE COURT:  Okay.  Just read those into the record.

21      MR. ZANZI:  I will.

22      THE COURT:  And also reference the final

23  instructions.

24      MR. ZANZI:  Well, Your Honor, these are about the

25  elimination of two instructions.

1          **THE COURT:**  Yeah.  Just go ahead and do what you're

2     going to do.

3          **MR. ZANZI:**  Sure.  If we need clarification, I'm

4     happy to do so.  This comes from Docket Entry 173, the

5     government's proposed revised instructions.

6          The first one was government's proposed revised

7     instruction number 30 pertaining to defining the definition of

8     material.  It reads:  "A false or fraudulent pretense,

9     representation, promise, omission, or concealment" --

10         **THE COURT REPORTER:**  Can you slow down.

11         **MR. ZANZI:**  Sure.  Sorry.

12         "A false or fraudulent pretense, representation,

13    promise, omission, or concealment is material if it is capable

14    of influencing the decision of the persons to whom it was

15    addressed.  It is not necessary that the false or fraudulent

16    pretense, representation, promise, omission, or concealment

17    actually have that influence or be relied on by the alleged

18    victim, as long as it is capable of doing so."

19         That proposed instruction comes from the pattern

20    criminal jury instruction from the Seventh Circuit regarding

21    the definition of material.  It is the government's

22    understanding that all parties are in agreement to remove this

23    instruction.

24         **THE COURT:**  Okay.

25         **MR. ZANZI:**  And I'm going to read the second one,

 1  and I just ask that the parties acknowledge that this was

 2  actually the agreement.  If it's not, then we'll address that

 3  too.

 4          The second instruction, Your Honor, is --

 5          **THE COURT:**  Let me stop that first one.

 6          Ms. Gambino, is that your understanding?

 7          **MS. GAMBINO:**  Yes.  Can you also refer to the number

 8  of the Court's instruction that was?  The way I went through

 9  this was to make notes from last night according to the Court's

10  instruction number.

11          **MR. ZANZI:**  The problem is we removed this

12  instruction entirely, so I don't have it as one of the Court's

13  instructions.  Oh, do you mean from the Court's instructions

14  that were given to us yesterday?

15          **MS. GAMBINO:**  Yes.

16          **MR. ZANZI:**  I can do that.  Just give me a second.

17  So this particular instruction that also the Court provided

18  prior to the jury instruction conference yesterday, proposed

19  instructions, one of the proposed instructions was jury

20  instruction number 36.  That was the one that was removed,

21  Your Honor.  So I just -- before I move to the next one, I want

22  to clarify the record that this is actually the agreement of

23  the parties to remove the instruction.

24          **MS. GAMBINO:**  Yes, it is.

25          **MR. ZANZI:**  And from Mr. Rogers as well.

```
 1              MR. ROGERS:  Yes.
 2              MR. ZANZI:  Okay.  One more for the record,
 3   Your Honor.  The second instruction relates to the definition
 4   of interstate communications.  It was in Document Entry 173,
 5   the government's proposed revised instruction number 36.  I can
 6   read the whole instruction, or I can at least read part of it
 7   so it reflects the record.
 8              It starts out with:  "The government must prove that
 9   the interstate communication facilities were used to carry out
10   the scheme or were incidental to an essential part of the
11   scheme."  And it goes further to supply additional definitions
12   regarding wire communications.  It comes from the Seventh
13   Circuit pattern instruction for use of interstate
14   communication.
15              I don't know if this was in the Court's proposed
16   instructions, but the parties had a discussion about the
17   inclusion of this proposed instruction.  And I just want to
18   clarify the record, there's an agreement to remove that
19   instruction.
20              THE COURT:  And it's in the final set that I've
21   presented to the parties.
22              MR. ZANZI:  It's not.
23              THE COURT:  Oh, it's not.  Okay.
24              MR. ZANZI:  What I'm asking for is a clarification
25   on the record -- and I can show this to defense counsel if they
```

1    want to see it -- that there was an agreement not to include

2    this instruction.

3             **MS. GAMBINO:**  I recall that, yes, that's true.

4             **THE COURT:**  Mr. Rogers?

5             **MR. ROGERS:**  I do also.

6             **MR. ZANZI:**  I just wanted to memorialize that for

7    the record.  Other than that, Your Honor, we have no

8    objections.

9             **THE COURT:**  Okay.  As to Ms. Gambino, do you have

10   any instructions [verbatim] as to what instructions the Court's

11   going to give?

12            **MS. GAMBINO:**  Your Honor, no.  I don't have any

13   objections to the instructions the Court is going to give.

14   There are objections that I had yesterday, and I just wanted to

15   note those for the record.

16            **THE COURT:**  Okay.  We'll do that in a minute.

17            Mr. Rogers, do you have any objections to the

18   instructions the Court's going to give?

19            **MR. ROGERS:**  I do not.

20            **THE COURT:**  Okay.  Do you have any other objections,

21   Ms. Gambino, you want to put on the record?

22            **MS. GAMBINO:**  Your Honor, I just want to go through

23   a couple of things and, as a preference, say that the current

24   instructions reflect the changes and the discussions that we

25   had at our conference yesterday.  This is with regard to the

1   Court's original instructions number 13, which dealt with

2   inconsistent statements or statements of Ms. Shelton.  The word

3   "inconsistent" was taken out of that instruction.

4           With respect to 14, this is the instruction with

5   respect to Stafford Garbutt.  The government objected to saying

6   that he was promised benefits, and the Court replaced that with

7   "believed he was promised."

8           With respect to Court's instruction 17, we objected

9   to the giving of this instruction.  This was the instruction

10  that the -- using an informant is permitted.  And we objected

11  to that based on our position that it appears to give the

12  imprimatur of the Court to use the informant.  That objection

13  was overruled.

14          We objected to Court's instruction 23, which dealt

15  with persons who order or authorize are also responsible for

16  the act, and that instruction was withdrawn.

17          Court's instruction 29, we objected to language in

18  that definition of a conspiracy saying that a conspiracy may be

19  proved even if its goal was not accomplished because we took

20  the position that the instruction should address what needs to

21  be proved and not what doesn't need to be proved.  That

22  objection was overruled.

23          Instruction number 30, we objected to Paragraph 2

24  and 3.  Paragraph 2 was stricken and 3 stays in.  And, again,

25  this was a matter regarding what doesn't need to be proved and

1    suggested lowering of the burden.

2            With respect to Court's instruction 32, we objected

3    to, "the government is not required to prove all overt acts

4    charged in the Indictment," because it is redundant and also

5    addresses what doesn't need to be proved.  That objection was

6    overruled.

7            Court's instruction 35 we objected to, and it was

8    taken out.  Court's instruction 36 has already been addressed

9    by Mr. Zanzi.

10           Court instruction 39, on the definition of kickback,

11   we asked for the addition of, "for private gain," and that was

12   done, and that's in the Court's current instructions.

13           We objected to the Court's instruction number 40,

14   and it was taken out.  Court's instruction 41, the government

15   objected to Paragraph 2, and that was taken out.

16           Court's instruction 42, the government objected to

17   the first sentence in the paragraph, and it was altered to

18   read, "an official act can include."

19           Court's instruction 43, we objected and it was taken

20   out.  44 is our good faith instruction.  The government made

21   some objections to the way it was worded.  That was revised,

22   and it has been included in the current Court's instructions,

23   as per our discussions.

24           And, finally, with respect to the verdict forms, I

25   ask that there be signature lines for all the jurors, and that

1    has been done, although I note there is a line missing, Judge.

2    You're one line short.  If we could add a line to the new

3    verdict form, that would be great.

4              **THE COURT:**  Okay.  We'll do that.

5              Anything else, Mr. Rogers?

6              **MR. ROGERS:**  No, Your Honor.

7              **THE COURT:**  I assume we're ready to go.  I'm going

8    to take a short break just to get my head back on and make sure

9    I'm pointing the right direction.  The Court would note that we

10   had a number of conferences.  One was an informal conference

11   back in my chambers on the Court's tendered -- proposed

12   instructions, the parties' proposed instructions, and there was

13   a lot of negotiating, give and take.  And what the Court has

14   now in its final form represents a lot of that give and take in

15   it.

16             Things were taken out.  Actually, more things were

17   taken out than were added back in, which is a good thing.  But

18   the Court believes that this represents each of the side's

19   positions.  They represent fair statements -- correct

20   statements of the law, and so the Court's going to indicate

21   that as to any objection to those are overruled, and the Court

22   intends to give its instructions 1 through 47.

23             Anything else we need to do before we take a break

24   and then bring the jury in?

25             **MR. ZANZI:**  Not from the government's perspective,

1     Your Honor.

2               **THE COURT:**  Defendants?

3               **MS. GAMBINO:**  Not on behalf of Ms. Shelton.

4               **MR. ROGERS:**  None from Mr. Wheeler.

5               **THE COURT:**  And last thing, which I always say,

6     Ms. Shelton, how are you feeling today?

7               **DEFENDANT SHELTON:**  I feel great.

8               **THE COURT:**  Mr. Wheeler, same question.

9               **DEFENDANT WHEELER:**  Fine, Your Honor.

10              **THE COURT:**  We'll take a five-minute break.  Five

11    minutes never happens.  It takes me five minutes to get to my

12    chambers.  We'll take a ten-minute break and come back and

13    start with instructions to the jury.

14              **MR. ZANZI:**  Your Honor, we have talked a little bit

15    about the Court's proposed instructions before the jury

16    conference.  This is all -- I want to make sure that our

17    appellate people don't yell at me.

18              Were those proposed instructions before the

19    conference, since we've referenced them, are they filed on the

20    record?  And if not, can they be?

21              **THE COURT:**  The answer is they can be.  The

22    instructions they tendered to us, their proposed instructions,

23    they're filed, right?

24              **MS. KWAIT:**  Their proposed instructions are filed.

25              **THE COURT:**  Try it again.

1      **MR. ZANZI:**  So, Your Honor, we have talked about

2   proposed instructions.  Yesterday's jury instruction conference

3   were discussions -- we were each handed out a set of proposed

4   instructions, the Court's proposed instructions.  I have a

5   marked-up copy here.  But we've had several references to it,

6   but we actually don't have -- to the numbers.  The numbers have

7   changed because we've moved things and added things.

8      **THE COURT:**  Right.  What we'll try to do is see if

9   we can put Humpty-Dumpty back together on that.  As things come

10  in and things go out, we get them out so we don't -- at one

11  time -- it was early in my career as being a judge -- I kept --

12  we had these different rough drafts.  So I come in here and

13  started reading the instructions, and I started reading the

14  wrong set of instructions, so they take them away from me.

15     **MR. ZANZI:**  Yes.

16     **THE COURT:**  Not only from me, but they take them

17  away from themselves after it goes out.  But we'll try to

18  recreate that.  To the extent we can recreate it, we'll put it

19  on the record.

20     **MR. ZANZI:**  We have a copy.  I'm happy to cross

21  reference with anything the defendants have.  I'm concerned

22  about a record referencing instructions where numbers have

23  changed and somebody ever looking at this down the road and not

24  figuring out what was said.

25     **THE COURT:**  What we'll do with both sides, we'll

1  make sure that what you've filed, your tendered instructions,

2  are filed on the record.

3         MR. ZANZI:  I'm talking about the Court's proposed

4  instructions.

5         THE COURT:  They'll be filed likewise.

6         MR. ZANZI:  Okay.  Thank you, Your Honor.

7         THE COURT:  Anything else?

8         MR. ZANZI:  That's it.

9         THE COURT:  Ten minutes at most.

10     (Recess had at 9:29 a.m., and proceedings resumed in open

11      court at 9:44 a.m.)

12         THE COURT:  You can be seated.

13         As to the issue that Mr. Zanzi raised right at the

14  end, the long and short of it is we have nothing.  We've

15  destroyed about everything we have that we're not using.  But

16  in reality that represents what's going on here.  The

17  objections are going to be what the -- the Court said what it's

18  going to give.

19         MR. ZANZI:  Your Honor, I think we have a proposal

20  of how to resolve that, if that's okay.

21         THE COURT:  Okay.

22         MR. ZANZI:  I spoke with Ms. Gambino, and when the

23  jury deliberates, we both have copies of the Court's proposed

24  instructions.  I think we're both concerned about having a

25  clear record.  We're going to compare and make sure that

 1    they're accurate.  We will provide one to -- and make sure

 2    Mr. Rogers is comfortable as well, and then we'll provide a

 3    copy, if we're both in agreement, that these were the proposed

 4    instructions provided before the jury instruction conference.

 5    We'll provided it to your law clerk, and we'll just ask that if

 6    an -- if that can be filed as well.

 7            **THE COURT:**  We can file that of record.  What I'm

 8    saying those is the final instructions are the ones I gave you,

 9    1 through 47.  So if you have objections, they've got to be

10    made to those things.  The other ones are just a part of the

11    process to get us there, as you went through the historical

12    context of the thing.

13            **MR. ZANZI:**  But there were references made to the --

14            **THE COURT:**  No, I understand what you're talking

15    about so you have a good record -- well, not a good, but

16    somebody reading that knows what you're talking about.  But my

17    understanding is there are no objections to the Court's

18    instructions 1 through 47.  Is that correct?

19            **MS. GAMBINO:**  That's correct, Judge.

20            **THE COURT:**  Okay.  Mr. Rogers?

21            **MR. ROGERS:**  That's correct.

22            **THE COURT:**  And government?

23            **MR. ZANZI:**  Yes, Your Honor, correct.

24            **THE COURT:**  Okay.  To the extent you can get me

25    something you are agreeing on that that's what I gave you, day

```
 1   one, that's fine.
 2            MR. ZANZI:  Thank you.
 3            THE COURT:  Ready for the jury to be brought in?
 4            MR. ZANZI:  Yes, Your Honor.
 5            MS. GAMBINO:  Yes, Your Honor.
 6            MR. ROGERS:  Yes.
 7            THE COURT:  Okay.  Bring the jury in.
 8            With regard to final arguments, there is two hours
 9   per side.  Defendants can break them up however they want to
10   break them up.  If you can't agree, it is an hour per
11   defendant.
12            MR. ZANZI:  What if the government can't agree?
13            THE COURT:  You'll have to talk to Mr. Hollar about
14   that.  And you don't have to use your two hours.  Just
15   understand there's no obligation.
16       (Jury in at 9:47 a.m.)
17            THE COURT:  You can be seated.
18            Members of the jury, the evidence in the case has
19   been completed and both sides have rested.  I will now instruct
20   you as to the law.  This is going to appear -- each one of you
21   is getting a copy of all these instructions I'm giving you to
22   take back to the jury room.  They're also going to appear on
23   the monitors in front of you and also appear in the monitors up
24   there.  If everything holds true to form, I'll misread
25   instructions.  It's what you get, not what I may have read
```

1   wrongly.

2           Members of the jury, I will now instruct you on the

3   law that you must follow in deciding this case.  I will also

4   give each of you a copy of these instructions to use in the

5   jury room.  You must follow all of my instructions about the

6   law, even if you disagree with them.  This includes the

7   instructions I gave you before the trial and any instructions I

8   gave you during the trial, and the instructions I am giving you

9   now.

10          As jurors, you have two duties:  Your first duty is

11   to decide the facts from the evidence that you saw and heard

12   here in court.  This is your job, not my job or anyone else's

13   job.  Your second duty is to take the law as I give it to you,

14   apply it to the facts, and decide if the government has proved

15   the defendants guilty beyond a reasonable doubt.

16          You must perform these duties fairly and

17   impartially.  Do not let sympathy, prejudice, fear, or public

18   opinion influence you.  In addition, do not let any person's

19   race, color, religion, national ancestry, or gender influence

20   you.

21          You must not take anything I said or did during the

22   trial as indicating that I have an opinion about the evidence

23   and about what your verdict should be.

24          The charges against the defendants are in a document

25   called an Indictment.  You will have a copy of the Indictment

  1  during your deliberations.

  2          Count 1 of the Indictment charges that from the

  3  spring of 2003 and continuing through the fall of 2014, the

  4  defendants conspired to commit wire fraud.

  5          Count 6 charges that from the spring of 2003 and

  6  continuing through the fall of 2014, defendants conspired to

  7  commit honest services wire fraud.

  8          The defendants have pled not guilty to the charges.

  9  The Indictment is simply the formal way of telling the

 10  defendant what crimes he or she is accused of committing.  It

 11  is not evidence that the defendant is guilty.  It does not even

 12  raise a suspicion of guilt.

 13          Each defendant is presumed innocent of each of the

 14  charges.  This presumption continues throughout the case,

 15  including during your deliberations.  It is not overcome unless

 16  from all the evidence in the case you are convinced beyond a

 17  reasonable doubt that a defendant is guilty as charged.

 18          The government has the burden of proving the

 19  defendant's guilt beyond a reasonable doubt.  This burden of

 20  proof stays with the government throughout the case.  The

 21  defendant is never required to prove his or her innocence.  The

 22  defendant is not required to produce any evidence at all.

 23          You must consider only that evidence you saw and

 24  heard here in court.  Do not consider anything you may have

 25  seen or heard outside of court including anything from the

```
 1   newspaper, telephone, radio, the internet, or any other source.

 2         The evidence includes only what the witnesses said

 3   when they were testifying under oath, the exhibits that I

 4   allowed into evidence, and the stipulations that the lawyers

 5   agreed to.  A stipulation is an agreement that certain facts

 6   are true or that a witness would have given certain testimony.

 7   Nothing else is evidence.

 8         The lawyers' statement and arguments are not

 9   evidence.  If what a lawyer said is different from the evidence

10   as you remember it, the evidence is what counts.  The lawyers'

11   questions and objections likewise are not evidence.  It is the

12   responsibility of the Court to decide which evidence is

13   admissible and which is not.

14         A lawyer has a duty to object if he or she thinks a

15   question is improper.  If I sustained objections to questions

16   the lawyers asked, you must not speculate of what the answers

17   might have been.  If during the trial I struck testimony or

18   exhibits from the record or told you to disregard something,

19   you must not consider it.

20         Give the evidence whatever weight you decide it

21   deserves.  Use your common sense in weighing the evidence, and

22   consider the evidence in the light of your own everyday

23   experience.

24         People sometimes look at one fact and conclude from

25   it that another fact exists.  This is called an inference.  You
```

 1    are allowed to make reasonable inferences so long as they are

 2    based on the evidence.

 3         You may have heard the terms direct evidence and

 4    circumstantial evidence.  Direct evidence is evidence that

 5    directly proves a fact.  Circumstantial evidence is evidence

 6    that indirectly proves a fact.  You are to consider both direct

 7    and circumstantial evidence.  The law does not say that one is

 8    better than the other.  It's up to you to decide how much

 9    weight to give to any evidence, whether direct or

10    circumstantial.

11         Do not make any decisions simply by counting the

12    number of witnesses who testified about a certain point.  You

13    may find the testimony of one witness or a few witnesses more

14    persuasive than the testimony of a larger number.  You need not

15    accept the testimony of the larger number of witnesses.  What

16    is important is how truthful and accurate the witnesses were

17    and how much weight you think their testimony deserves.

18         If you have taken notes during the trial, you may

19    use them during deliberations to help you remember what

20    happened during the trial.  You should use your notes only as

21    an aid to your memory.  The notes are not evidence.  All of you

22    should rely on your independent recollection of the evidence,

23    and you should not be unduly influenced by the notes of another

24    juror.  Notes are not entitled to any more weight than the

25    memory or impressions of each juror.

1          Part of your job as jurors is to decide how

2    believable each witness was, how much weight to give each

3    witness's testimony, including that of a defendant.  You may

4    accept all of what a witness says or part of it or none of it

5    at all.  Some factors you may consider include:  The

6    intelligence of the witness; the witness's ability and

7    opportunity to see, hear, or know the things the witness

8    testified about; the witness's memory; the witness's demeanor;

9    whether the witness had any bias, prejudice, or other reason to

10   lie or slant the testimony; the truthfulness and accuracy of

11   the witness's testimony in light of the other evidence

12   presented; and inconsistent or consistent statements or conduct

13   by the witness.

14          A defendant has an absolute right not to testify or

15   present evidence.  You may not consider in any way the fact

16   that a defendant did not testify or present evidence.  You

17   should not even discuss it in your deliberations.

18          It is proper for an attorney to interview any

19   witness in preparation for trial.

20          You have heard evidence that, before the trial, a

21   witness made a statement that may be inconsistent with his or

22   her testimony here in court.  You may consider an inconsistent

23   statement made before the trial only to help you decide how

24   believable the witness's testimony was here in court.

25          If an earlier statement was made under oath, then

1    you can also consider the earlier statement as evidence of the

2    truth of whatever the witness said in the earlier statement.

3            You have heard evidence that before the trial

4    Ethel Shelton made statements.  You may consider these

5    statements by Ethel Shelton made before the trial to help you

6    decide how believable Ms. Shelton's testimony was here in court

7    and also as evidence of the truth of whatever Ms. Shelton said

8    in the earlier statement.

9            You have heard testimony from Stafford Garbutt, who

10   believed he was promised a benefit in return for his

11   cooperation with the government and has stated that he was

12   involved in some of the crimes that defendants are charged with

13   committing.

14           You may give this witness's testimony whatever

15   weight you believe is appropriate, keeping in mind that you

16   must consider that testimony with caution and great care.

17           You have heard the testimony about Ethel Shelton's

18   character for truthfulness.  You may consider this evidence

19   only in deciding the believability of Ethel Shelton's testimony

20   and how much weight to give to it.

21           You have heard testimony that Alex Wheeler made a

22   statement to the FBI.  You must decide whether Alex Wheeler

23   actually made the statement and, if so, how much weight to give

24   to the statement.  In making these decisions, you should

25   consider all evidence including Mr. Wheeler's personal

1    characteristics and the circumstances under which the statement

2    may have been made.  You may not consider the statement of

3    Alex Wheeler as evidence against Ethel Shelton.

4         You have heard evidence obtained from the

5    government's use of an informant.  The government is permitted

6    to use informants.  You should consider evidence obtained this

7    way together with and in the same way you consider other

8    evidence.

9         You have heard recorded conversations and have seen

10   a video recording.  This is proper evidence that you should

11   consider, together with and in the same way you consider other

12   evidence.

13        You were also given transcripts of the conversations

14   on the recordings to help you follow the recordings as you

15   listened to them.  The recordings are the evidence of what was

16   said and who said it.  The transcripts are to be used only as

17   an aid.  If you notice differences between what you heard in a

18   conversation and what you read in the transcripts, your

19   understanding of the recording is what matters.

20        In other words, you must rely on what you heard, not

21   what you read.  And if you could not hear or understand certain

22   parts of the recording, you must ignore the transcripts as far

23   as those parts are concerned.

24        It is up to you to decide whether to listen to a

25   recording or view the video recording during your

1     deliberations.  You may, if you wish, rely on your recollection

2     of what you heard during the trial.  If you wish to listen to

3     the recordings or view the video recording, let the Court know

4     by sending a note through the court security officers.

5          A summary was admitted in evidence.  You may use

6     that summary as evidence.  It's up to you to decide how much

7     weight to give to the summary.

8          The Indictment charges that crimes happened on or

9     about the dates listed in the Indictment.  The government must

10    prove that the crimes happened reasonably close to that time.

11    The government is not required to prove that the crimes

12    happened on that exact time.

13         Defendants have been accused of more than one crime.

14    The number of charges is not evidence of guilt and should not

15    influence your decision.  You must consider each charge and the

16    evidence concerning each charge as to each defendant

17    separately.  Your decision on one charge as to a defendant,

18    whether it is guilty or not guilty, should not influence your

19    decision on any other charge or as to any other defendant.

20         In deciding your verdict, you must not consider the

21    possible punishment for the defendants.  If you decide that the

22    government has proved a defendant guilty beyond a reasonable

23    doubt, then it will be my job to decide what the appropriate

24    punishment is.

25         An offense may be committed by more than one person.

 1   A defendant's guilt may be established without proof that the
 2   defendant personally performed every act constituting the crime
 3   charged.
 4           Any person who knowingly aids the commission of an
 5   offense may be found guilty of that offense if he or she
 6   knowingly participated in the criminal activity and tried to
 7   make it succeed.  If a defendant knowingly causes the acts of
 8   another, then the defendant is responsible for those acts as
 9   though he or she personally committed them.
10           A defendant's presence at the scene of a crime and
11   knowledge that a crime is being committed is not sufficient by
12   itself to establish the defendant's guilt.
13           If a defendant performed acts that advanced the
14   crime but had no knowledge that the crime was being committed
15   or was about to be committed, those acts are not sufficient by
16   themselves to establish the defendant's guilt.
17           A defendant's association with persons involved in a
18   crime or a criminal scheme is not sufficient by itself to prove
19   his or her participation in the crime or membership in the
20   criminal scheme.
21           Count 1 of the Indictment charges the defendants
22   with conspiracy to commit wire fraud.  In order for you to find
23   a defendant guilty of this charge, the government must prove
24   the following elements as to the defendants beyond a reasonable
25   doubt:

1       One, the conspiracy to commit the crime of wire

2  fraud as charged in Count 1 existed; two, the defendant

3  knowingly became a member of the conspiracy with an intent to

4  advance the conspiracy; and, three, one of the conspirators

5  committed a least one overt act in an effort to advance the

6  goal or object of the conspiracy.

7       If you find from your consideration of all the

8  evidence the government has proved each of these elements

9  beyond a reasonable doubt for the charge you are considering,

10 then you should find that defendant guilty.

11      If, on the other hand, you find from your

12 consideration of all the evidence that the government has

13 failed to prove any one of these elements beyond a reasonable

14 doubt for the charge you are considering, then you should find

15 that defendant not guilty.

16      Count 6 of the Indictment charges the defendants

17 with conspiracy to commit honest services wire fraud.  In order

18 for you to find a defendant guilty of this charge, the

19 government must prove the following elements as to that

20 defendant beyond a reasonable doubt:

21      One, the conspiracy to commit the crime of honest

22 services wire fraud as charged in Count 6 existed; two, the

23 defendant knowingly became a member of the conspiracy with the

24 intent to advance the conspiracy; and, three, one of the

25 conspirators committed at least one overt act in an effort to

         1    advance the goal or object of the conspiracy.

         2         If you find from your consideration of all the

         3    evidence that the government has proved each of these elements

         4    beyond a reasonable doubt for the charge you are considering,

         5    then you should find that defendant guilty.  If, on the other

         6    hand, you find from your consideration of all the evidence that

         7    the government has failed to prove any one of these elements

         8    beyond a reasonable doubt for the charge you are considering,

         9    then you should find the defendant not guilty.

        10         A conspiracy is an expressed or implied agreement

        11    between two or more persons to commit a crime.  A conspiracy

        12    may be proved even if its goal was not accomplished.  In

        13    deciding whether the charged conspiracy existed, you may

        14    consider all the circumstances, including the words and acts of

        15    each of the alleged participants.

        16         To be a member of a conspiracy, a defendant must

        17    have reached an agreement or understanding with at least one

        18    other person in the conspiracy.  For the purpose of becoming a

        19    member of a conspiracy, a person does not need to join it at

        20    the beginning.  Likewise, a person may join in an agreement or

        21    understanding without knowing all the details of the agreement

        22    or understanding and without knowing who all the other members

        23    are.

        24         Further, it is not necessary that a person agree to

        25    play any particular part in carrying out the agreement or

1    understanding.  A person may become a member of a conspiracy

2    even if that person agrees to play only a minor part in the

3    conspiracy as long as that person has an understanding of the

4    unlawful nature of the plan and voluntarily and intentionally

5    joins in it.

6          The conspiracy must include at least one member

7    other than the defendant who, at the time, was not a government

8    agent or informant.  In deciding whether a particular defendant

9    joined the charged conspiracy, you must base your decision only

10   on what the defendant did or said.  To determine what the

11   defendant did or said, you may consider the defendant's own

12   words or acts.  You may also use the words or acts of other

13   persons to help you decide what the defendant did or said.

14         An overt act is any act done to carry out the goal

15   or object of the conspiracy.  The overt act may, itself, be a

16   lawful act.

17         The crime of conspiracy to commit wire fraud is

18   different from the crime of wire fraud.  However, to help you

19   decide whether the defendant conspired to commit wire fraud as

20   charged in Count 1 of the Indictment, you should consider the

21   elements of the crime of wire fraud.

22         One, a person knowingly devised or participated in a

23   scheme to defraud; and, two, he or she did so with the intent

24   to defraud; and, three, the scheme to defraud involved a

25   materially false or fraudulent pretense, representation, or

1   promise; and, four, that for the purpose of carrying out the

2   scheme or attempting to do so, the person caused interstate

3   wire communications to take place.

4          You should consider these elements in determining

5   whether a defendant conspired to commit wire fraud, keeping in

6   mind that this count of the Indictment charges only a

7   conspiracy to commit the crime.  It does not charge the

8   defendant with the crime of wire fraud.

9          A scheme is a plan or course of action formed with

10  the intent to accomplish some purpose.  As to wire fraud, a

11  scheme to defraud is a scheme that is intended to deceive or

12  cheat another and to obtain money or property or cause the loss

13  of money or property to another by means of materially false or

14  fraudulent pretenses, representations, or promises.

15         The crime of conspiring to commit honest services

16  wire fraud is different from the crime of honest services wire

17  fraud.  However, to help you decide whether a defendant

18  conspired to commit honest services wire fraud as charged in

19  Count 6 of the Indictment, you should consider each of the

20  elements of the crime of honest services wire fraud:

21         One, a person knowingly devised or participated in a

22  scheme to defraud; and, two, he or she did so with the intent

23  to defraud; and, three, the scheme to defraud involved a

24  materially false or fraudulent pretense, representation, or

25  promise; and, four, that for the purpose of carrying out the

1   scheme or attempting to do so, the person caused interstate

2   wire communications to take place.

3         You should consider these elements in determining

4   whether a defendant conspired to commit honest services wire

5   fraud keeping in mind that this count of the Indictment charges

6   only a conspiracy to commit the crime and does not charge the

7   defendant with the crime of honest services wire fraud.

8         A fiduciary duty is a duty to act only for the

9   benefit of the public.  Public officials owe a fiduciary duty

10  to the public.  As to honest services wire fraud, the alleged

11  scheme is to violate a fiduciary duty owed by the public

12  official to the public by receiving kickbacks for private gain.

13  A defendant need not owe the fiduciary duty personally in order

14  to violate the honest services wire fraud statute so long as he

15  or she devises or participates in a kickback scheme intended to

16  deprive the public of its right to a fiduciary's honest

17  services.

18        Kickbacks involve the exchange of a thing of value

19  for official action by a public official; in other words, a

20  quid pro quo, a Latin phrase meaning this for that.  The public

21  official and the payer need not state the quid pro quo

22  agreement in express terms.  It does not matter whether or not

23  the payer actually provides the thing of value and whether or

24  not the public official performed the requested official action

25  or intends to do so.  A kickback occurs when a public official

1    demands, solicits, or seeks or asks for directly or indirectly

2    something of value from another person in exchange for being

3    induced to do or omit to do any act in violation of the

4    official duty and the act itself provides a source of the funds

5    to be kicked back.

6          In other words, a kickback is a form of bribery

7    where the government official's action is a source of the funds

8    to be paid to the public official.

9          The term "official act" means any decision or action

10   on a specific matter involving the formal exercise of

11   governmental power.  In this case, the government has alleged

12   that specific matter is, one, retaining or not laying off

13   employees or, two, favorable treatment in job duties and

14   responsibilities.  An official act can include making a

15   decision or taking an action or agreeing to do so on one or

16   both of these specific matters.

17         You must find that the public official made a

18   decision or took an action or agreed to do so on one or both of

19   these specific matters.  The public official's decision or

20   action may include using his or her official position to exert

21   pressure on another official to perform an official act.  It

22   may also include advising another official, knowing or

23   intending that such advice will form the basis for an official

24   act by the other official.

25         But, for example, merely arranging a meeting,

```
 1    hosting an event, or talking to another official to discuss a

 2    matter without more --

 3             MS. LERNER:  Your Honor --

 4             THE COURT:  -- does not qualify as making a decision

 5    or taking an action on that matter.

 6             MS. LERNER:  May we approach quickly, Your Honor?

 7             THE COURT:  Yes.

 8         (Bench conference.)

 9             MS. LERNER:  The second sentence of the second

10    paragraph was supposed to be out.  The second sentence of the

11    second paragraph was supposed to be out.  They don't have to

12    find that.

13             MR. ZANZI:  It was something we discussed yesterday,

14    Your Honor.  I don't know how it made it back into the

15    instructions.  We had a lengthy discussion on this.

16             THE COURT:  What line?

17             MS. LERNER:  It's the second sentence.  I think

18    that's why we missed it, because it had been the first sentence

19    and --

20             THE COURT:  So what specific thing?

21             MS. LERNER:  Where it begins, "you must find..."

22             THE COURT:  Where it says, "You must find that the

23    public official made a decision or took an action or agreed to

24    do so on one or both of these specific matters"?

25             MS. LERNER:  I think it got moved.
```

```
 1              THE COURT:  Is that what you're talking about?

 2              MS. LERNER:  Yeah.

 3              MS. GAMBINO:  I thought the objection was the first

 4    sentence that was --

 5              MS. LERNER:  This was the first sentence before.

 6    Now, it's the second sentence instead of coming out.

 7              THE COURT:  I just read what's in front of me.

 8              MS. GAMBINO:  I have to look at my proposed

 9    instructions because I thought it was the first sentence that

10    was an issue.

11         (Discussion off the record between the Court and

12          Ms. Kwait.)

13              THE COURT:  Julia says Maria is correct, that the

14    second sentence was to replace -- one of them was taken out.

15    And, again, this went through some various gyrations.  But,

16    anyway, Julia is telling me that the sentence should not have

17    been in there.

18              MS. GAMBINO:  All right.  Well, rather than -- I

19    would just cross it out and reread it without that.

20              THE COURT:  That's what I was going to do.

21              MR. ZANZI:  That's fine.

22              THE COURT:  Do the parties agree on that?

23              MS. LERNER:  That's fine.

24              MS. GAMBINO:  If that's what happened, then yes.

25              MR. ROGERS:  Yes.
```

```
 1              THE COURT:  All right.  I'm just saying, do you
 2   agree?
 3              MR. ZANZI:  We agree, Your Honor.  If you want to
 4   give a clean copy back to the jury, that's fine.
 5              THE COURT:  We'll send a clean copy back to the
 6   jury.  That, we will do.
 7              What I'll do is read -- it's going to read, "The
 8   official act can include making a decision or taking any action
 9   or agreeing to do so," and then it goes to, "A public
10   official's decision or action may include using his or her
11   official position."  That sentence is taken out.  Does
12   everybody agree to that?
13              MR. ZANZI:  Yes.
14              MR. ROGERS:  Yes.
15              MS. GAMBINO:  Yes.
16              THE COURT:  I'm not going to apologize because I
17   read what's in front of me.
18              MS. LERNER:  There's no need.
19              MR. ZANZI:  No need to apologize.
20              THE COURT:  Okay.  All right.
21         (End of bench conference.)
22              THE COURT:  Ladies and gentlemen, without getting
23   much into it, instructions go through a process of things being
24   put in, taken out, put in, taken out, changed.  Sometimes they
25   get back in again.  In this case, a sentence got back in that
```

 1   had been taken out with the agreement of all the parties.  So

 2   let me read Instruction No. 37 to you again, and you'll get a

 3   corrected copy back in the jury room.  And I apologize.

 4          The term "official act" means any decision or action

 5   on a specific matter involving the formal exercise of

 6   government power.  In this case, the government has alleged

 7   that the specific matter is, one, retaining or not laying off

 8   employees or, two, favorable treatment in job duties and

 9   responsibilities.

10          An official act can include making a decision or

11   taking an action, or agreeing to do so, on one or both of these

12   specific matters.  The public official's decision or action may

13   include using his or her official position -- his or her

14   official position to exert pressure on another official to

15   perform an official act.  It may also include advising another

16   official, knowing or intending that such advice will form the

17   basis for an official act by the other official.

18          But, for example, merely arranging a meeting,

19   hosting an event, or talking to another official to discuss a

20   matter without more does not qualify as making a decision or

21   taking an action on the matter.

22          As to both wire fraud and honest services wire

23   fraud, a materially false or fraudulent pretense,

24   representation, or promise may be accomplished by an omission

25   or the concealment of material information.

1          As to wire fraud, a person acts with intent to

2     defraud if he or she acts knowingly with the intent to deceive

3     or cheat the victim or victims in order to cause a gain of

4     money or property to himself, herself, or another, or the

5     potential loss of money or property to another.

6          As to honest services wire fraud, a person acts with

7     intent to defraud if he acts knowingly with the intent to

8     deceive or cheat the victim or victims in order to deprive

9     another of the intangible right of honest services.

10          If the defendant acted in good faith, then he or she

11    lacked the intent to join a conspiracy.  A defendant does not

12    have to prove his good faith.

13          A person acts knowingly if he or she realizes what

14    he or she is doing and is aware of the nature of his conduct

15    and does not act through ignorance, mistake, or accident.  In

16    deciding whether a defendant acted knowingly, you may consider

17    all of the evidence including what a defendant did or said.

18          Ghost payrolling is not charged in this case.

19    Evidence was presented regarding the Calumet Township Trustee's

20    Office employee handbook.  You may consider such evidence to

21    the extent you find it sheds light on questions of knowledge,

22    willfulness, and intent to defraud; but violations of the

23    policies of the employee handbook should not be considered as

24    implying a violation of federal law.  You may not convict the

25    defendant of any of the counts alleging that he or she engaged

1   in a conspiracy to commit a scheme to defraud simply on the

2   basis of the conclusions that they may have violated the

3   policies of the employee handbook.

4          Evidence was presented regarding the activities of

5   several persons who are not on trial before you in this case.

6   You should not speculate as to why any other person or persons

7   are not currently on trial before you.

8          Now, in their closing arguments, the attorneys will

9   tell you what they think the evidence shows.  Again, what they

10  say is not evidence, and you will disregard what they say

11  unless it is supported by evidence.  The government counsel

12  will begin, followed by defendants' counsel, followed by a

13  brief rebuttal from government's counsel.

14         Counsel for the government may proceed.

15         **MS. LERNER:**  Thank you, Your Honor.  Can everyone

16  hear me okay?

17     (The jury collectively responded.)

18              **CLOSING ARGUMENT - GOVERNMENT**

19         **MS. LERNER:**  So when we began this case, we told you

20  it was a case about government waste and accountability.  It

21  was a -- when you're a public official, you don't get to use

22  your office to benefit yourself.  You don't get to use your

23  office as your campaign headquarters.  You don't get to use the

24  public employees that are paid by taxpayer money to raise money

25  for your own personal fundraisers.

1          And everyone involved in the conspiracy that you've

2     heard about and that I'll talk to you about in my closing, they

3     knew that this was wrong, and they did it anyway.  They

4     betrayed the duty that they owed to the public.  They betrayed

5     the public trust.  They betrayed the public by not doing the

6     work that they you were supposed to do for the public.

7          The mission of the Calumet Township Trustee's Office

8     was to serve the poor, and you heard testimony that it offered

9     a lot of services such as helping people with their rent

10    payments or mortgage payments, helping with electrical bills,

11    helping women and children with temporary shelter in the

12    building in the multipurpose center.  It served a lot of needs,

13    helping people find jobs when they needed jobs.  That was what

14    the township trustee's office was intended to do, and that's

15    not what happened here.

16         Now, before I begin going into the elements, I want

17    to make one thing clear.  This case is not about Ms. Shelton's

18    character or Mr. Wheeler's character.  I don't think you heard

19    any evidence that maligned their character in this trial, and

20    most of the witnesses, including the government's witnesses,

21    said that they liked those two.  This case is about their

22    conduct.  This case is about accountability.  As

23    Bishop Hairston told you, good people can do bad things.  And

24    when they do bad things, they have to be held accountable, and

25    that's what this case is about.

1          The other thing I wanted to let you know is that
2    you've heard jury instructions that are kind of -- they don't
3    necessarily -- they're not necessarily in an order that makes
4    sense.  And you've heard testimony and evidence not in an order
5    that makes sense.  I know that is frustrating and,
6    unfortunately, that's how the system works.  I'm going to do my
7    best to show you what the elements are and how the government
8    has proven each and every one of them through the evidence and
9    the testimony and the evidence that has been admitted here at
10   trial.
11          So you've seen this picture a lot, and you've heard
12   testimony about the people in it.  Just to reiterate, that's
13   Mary Elgin.  And this is a conspiracy that we're talking about,
14   and people in a conspiracy play different roles.  And
15   Mary Elgin was the head of this particular conspiracy.  Not
16   every -- conspiracies can't have more than one boss.  Not
17   everyone can be the boss in a conspiracy, so Ms. Elgin took the
18   leading role in this conspiracy.
19          She hired in the trustee's office people that she
20   trusted, her close friends and her family.  And this is
21   Donna Frazier, her niece, who held a very high-level position
22   at the trustee's office.
23          This is Lendell Smith, which some people told you
24   they didn't know what he did, but they did know that he was
25   hired at the trustee's office to help with the campaign.  And

 1   this is the person that you heard Warrien Poole say he barged

 2   into a meeting in the IT department, a meeting in progress, and

 3   said, "I'm on break."  And I think Mr. Poole said it just like

 4   that (indicating).  He put his fingers up and then started

 5   talking about the campaign with Mr. Hunter, and the people in

 6   the meeting are having to wait for this campaign discussion to

 7   finish.

 8          This is Mr. Harris that you've heard has been also a

 9   longtime associate of Ms. Elgin helping with her campaign.  He

10   headed one of the departments at the township.

11          You heard from Mr. Taylor.  He was one of the two

12   campaign managers for Mary Elgin.  He testified to you at

13   length about what was going on at the trustee's office.  He

14   told you, for example, that he knew Ethel Shelton from the

15   beginning of the first campaign, and he understood that

16   Ethel Shelton was a close or good friend of Mary Elgin.

17          Now, what motive does he have to lie to you about

18   that?  It's inconsistent with what Ms. Shelton told you, but

19   Mr. Taylor testified that he met Ms. Shelton during the first

20   election; that Ms. Shelton was a good friend of Mary Elgin.

21   She brought political experience to the table.  She knew

22   something about political campaigning.  She was a big

23   contributor to the campaign.  She was a key member of EPIC.

24   She was a valuable contributor, and she brought her own ideas.

25          Mr. Taylor told you that the folks in the picture,

1    they considered every employee at the township to be part of

2    EPIC.  In other words, they conflated the township with their

3    political campaign.  These were all members that were active

4    from the beginning; and they blended -- as Mr. Taylor

5    testified, they blended political discussions with their

6    deputies' meetings with the work that they were supposed to be

7    doing.

8           And you heard that too also from

9    Cynthia Holman-Upshaw, who told you that closer to the

10   fundraisers, they would start talking about planning the

11   fundraisers at the deputies' meetings, the political

12   fundraisers.

13          This is Ethel Shelton, who you've heard a lot about

14   and you've heard from.  She testified, of course.  She was

15   Mary Elgin's best friend.  And whether or not they've had a

16   falling out, whether or not things turned out the way that

17   Ms. Shelton wanted them to in the end, she was Mary Elgin's

18   best friend, and she supported her, and Mary trusted her.  And

19   you'll see that through the evidence and the testimony.

20          And this is Alex Wheeler, her longtime campaign

21   manager.  He was with her from the very beginning.  She made

22   him a deputy, and he was always there, an active supporter in

23   the EPIC meetings.

24          You also heard about a couple of other people not in

25   this picture.  Stafford Garbutt was part of this conspiracy.

1    He eventually went to the FBI, but he was part of this

2    conspiracy in the beginning, and he was doing the exact same

3    things.  He admitted that to you.

4           Steven Hunter, who is Ms. Elgin's son, who, as far

5    as anyone can tell, his only qualification for the job he had

6    was that his mommy was the trustee, he was also part of the

7    conspiracy.  And, again, each of these people played a

8    different role.

9           Ethel Shelton, for example, put the tickets

10   together, collected the money.  Alex Wheeler distributed them

11   to his own people.  They helped Mary Elgin during the campaign

12   work.  They helped planning with the fundraising.

13          And this is really what it was all about.  And these

14   are things that are all in the evidence.  The boxes of evidence

15   that are in front of the court reporter's desk here, that's the

16   label that you see on there, Government Exhibits 31, 31 and 21,

17   this was all kept at the trustee's office.  Because that's

18   where they used it.  They were using their position -- they

19   were using their positions at the trustee's office to keep

20   themselves in power, to keep their jobs, and to keep Mary Elgin

21   in power, and not just Mary Elgin, but also to support their

22   own campaigns.

23          Why did they do this?  Well, not only were they

24   close to Mary Elgin and they wanted to support her, but they

25   wanted to keep the jobs that they had.  They did so much

1    political work at this job that it must not have been a very

2    demanding job for them to be able to do that.  In addition,

3    they wanted Mary Elgin's support for their own campaigns.

4            And you heard that there was talk about whether or

5    not she gave them the support that they had hoped for, and they

6    had fallings out.  But they wanted that support, they hoped for

7    that support, they expected that support, and that's why they

8    were with her.

9            So there are two conspiracies that are charged.  One

10   is wire fraud, and one is honest services wire fraud.  The wire

11   fraud conspiracy -- and you may remember this slide from the

12   beginning -- it's a scheme to defraud Calumet Township of money

13   or property.  And the purpose is to serve the personal and

14   political interests of those in the conspiracy.  And the way

15   that they did it was using township resources to work on they

16   personal political campaign, and that includes using the space,

17   using the employees, using their own time, and the other ways

18   that I'll get into in a moment.

19           The other conspiracy is honest services fraud, and

20   this is a little bit different, even though the evidence is

21   very similar.  It's to defraud Calumet Township of the honest

22   services of its elected official, and that's Mary Elgin.  She

23   was the trustee at the time.  And the purpose of it is to

24   enrich her political campaign.  And the way they did it was to

25   get employees to buy campaign tickets in order to secure their

1    jobs.

2         Now, there's a lot of people that you didn't hear

3    from, the victims, which are the citizens of Calumet Township,

4    the ones who were basically against their will contributing to

5    Mary Elgin's political campaign.  They should have been doing

6    work in this building and doing their campaign work at their

7    campaign headquarters, but that's not what they were doing.

8         And the citizens of Calumet Township are not the

9    only ones who suffered because for every minute that one of

10   these folks in the conspiracy or someone else that worked at

11   the township that they got to help them do these campaign

12   fundraisers and planning, every time someone spent one less

13   minute doing work that was supposed to be done at the township,

14   the folks that were served by the township suffered for it.

15   That's one less minute of work that was spent towards helping

16   those that were supposed to be helped by the township.

17        And these folks suffered too.  These are the folks

18   that you heard from.  You heard from Gladys Miller who survived

19   three administrations, and she told you how she dutifully

20   bought her tickets every year.  And one time, one time, she

21   couldn't afford to buy tickets because she had to pay $60 for

22   her son's band practice, and what happened?  She got a call

23   from Ms. Shelton saying, "Do you want to go see the trustee?

24   Do you want to go see Mary Elgin?

25        And Ms. Miller said, "No, I don't.  I don't want to

1   go see the trustee.  I can't afford the tickets this time."

2   And she kept pressing and pressing and pressing until

3   Ms. Miller finally said, "I'm going to hang up the phone now,"

4   and she did.  She bought her tickets every time after that, but

5   she stopped going to the event.

6           You heard from Horace Clay who told you that he

7   wasn't worried about his job because he was on a payment plan,

8   and he was on a payment plan because Ms. Shelton told him about

9   it and put him on it.  And you saw some of the envelopes that

10  were in Mary Elgin's office that held the $11 per workweek that

11  he contributed from his $22,000 a year salary.  Did you hear

12  anyone cutting him a break on how many of those $100 tickets he

13  would have to buy?  Did you hear anyone cutting him a break or

14  giving him a discount on those tickets?  Nope.  No break for

15  him.  He just had to be on a payment plan.

16          You heard from Cynthia Holman-Upshaw, who enjoyed

17  going to the events and she had no problem with it, but she

18  also told you that she understood it was expected of her, and

19  so she bought her tickets.

20          You heard from Elena Lynch, who told you that she

21  was shocked when she was told that she had to buy tickets to

22  fundraisers at work.  She refused to do it, and she was fired.

23  You heard from Warrien Poole that Steven Hunter told him she

24  was fired for not buying tickets.

25          You heard from Debra Piggee who, again, struggled to

```
 1     buy the tickets but did so because she believed it was expected
 2     of her and she needed to.  She also had to pay an installment
 3     because she couldn't make the payments all at once, but she did
 4     do it because she wanted to keep her job.
 5            You heard from Linda Collins-Brown who, again,
 6     dutifully brought her tickets and even enjoyed going to the
 7     fundraisers, but there was one time when she struggled to make
 8     a payment.  She made a donation instead, instead of buying a
 9     ticket, and she heard from Ethel Shelton about why you can't
10     return those tickets.  You're going to have to eat them.  And
11     she had to listen to this call in the middle of talking to a
12     client.
13            And that's exactly the example I was talking about.
14     Instead of allowing Ms. Collins-Brown to work on what she was
15     supposed to be doing with the clients of the township, she had
16     to listen to a call from Ethel Shelton about, "You can't return
17     those tickets, and you're going to have to eat them."
18            You heard from John Davis who, if you recall, he's
19     the one that had a criminal record and it was really difficult
20     for him to find a job.  He was very grateful that he was able
21     to get a part-time job at the township in the IT department.
22     And knowing that he wasn't going to be able to pay much, if
23     any, money on those tickets, he did whatever he could to help
24     the campaign in other ways.  For example, you heard that he
25     spent a substantial amount of time helping Ethel Shelton with a
```

political mailing, almost a week's worth of time total that he
spent.

And you heard from Warrien Poole, again, from the IT
department, as with all of these employees, whether they felt
pressured or not, they knew they were expected to buy the
tickets. And nobody's arguing that they were forced to buy the
tickets. These -- the tickets were bought voluntarily. And
that question goes more toward the honest services fraud, which
I will explain in a little bit.

No one is arguing that these were bought forcefully.
They were bought voluntarily, but they were bought because they
believed that if they didn't do that, they were at risk of
getting on the layoff list, and they wanted to protect their
jobs.

So both counts in this trial are conspiracy. And
here's where it's going to get a little confusing, but
hopefully I can talk you through it in a way that makes sense.

The first element is that -- and these three
elements that I'm going to give you, these three elements the
government has to prove beyond a reasonable doubt.

The first element is that there was a conspiracy as
charged, and it was expressed or implied, and there has to be
at least two people. And you remember that picture that we
keep putting up. Few people say, "Hey, let's go conspire to
rob a bank," or write it down or that sort of thing. So

1   conspiracies, in order to figure out whether one exists, you

2   have to use inferences.  And this is one of the instructions

3   that the judge read you.

4        People sometimes look at one fact and conclude from

5   it that another fact exists.  This is called an inference.  You

6   are allowed to make reasonable inferences so long as they are

7   based on the evidence.

8        So when you see people meeting at a campaign meeting

9   and then talking about how they are going to figure out ways to

10  get the employees to buy more tickets and they're frustrated

11  that they have no leverage over the employees to get them to

12  buy more tickets, that's evidence you can make an inference

13  that these people are in a conspiracy.

14       The second element is that the defendants,

15  Ms. Shelton and Mr. Wheeler, knowingly became members of the

16  conspiracy so they could advance it.  They had to join that

17  conspiracy.  They had to understand the purpose of it, and they

18  had to want to make it happen, make it work.  The goals of the

19  conspiracy don't have to be accomplished, but they have to be

20  embraced and understood and wanted to move forward.

21       Finally, someone in the conspiracy has to commit an

22  overt act, some action to advance the goal in the conspiracy.

23  Saying, "Hey, let's go rob a bank," is not enough to make a

24  conspiracy.  You actually have to do something about it.  And

25  that action doesn't have to be illegal.  It can be any kind of

 1    action, as long as it's done for the purpose of carrying out

 2    the conspiracy.

 3            And a few additional things to keep in mind about

 4    conspiracy is that people can join a conspiracy without knowing

 5    all of the details of the agreement.  A person doesn't have to

 6    play any particular role in carrying out the conspiracy, and,

 7    again, recall that I was talking about how folks in a

 8    conspiracy have different roles in the conspiracy.

 9            Someone can be found guilty of a conspiracy even if

10    they only played a minor role as long as they understood the

11    unlawful nature of the plan and they voluntarily and

12    intentionally joined in the agreement.  And that's what the

13    government has to prove.

14            So you may have -- this is part -- I'm going to put

15    up part of jury instruction number 5.  You may not have caught

16    it because there's a lot to that particular instruction and

17    sometimes things go fast.  But I like to remind juries that you

18    need to use your common sense.  That's what you bring here

19    that's valuable.  Because you can talk about evidence, you can

20    talk about the law, you can talk about testimony, but if you're

21    not evaluating it with your common sense, you're not really

22    bringing to the table what your value is.

23            You need to consider the evidence in light of your

24    own, everyday experience.  So as you're considering whether

25    someone is telling the truth or whether they're not telling the

1    truth, consider that in light of your own, everyday experience.

2    When you're thinking about whether someone has something on

3    their computer or in their desk and for what purpose would they

4    keep it there, consider that.  Use your common sense.  Consider

5    that in light of your own, everyday experience.

6         So going back to the three elements the government

7    has to prove beyond a reasonable doubt, the first is that there

8    is a conspiracy between two or more people.  And, again, this

9    is Mary Elgin's inner circle, but it has to be not just any

10   conspiracy, but a conspiracy as charged.  So the first count is

11   actually conspiracy to commit wire fraud, and here's where I'm

12   going to try to do my best not to confuse things.

13        I'm going to give you the elements of wire fraud.

14   The government doesn't have to prove these beyond a reasonable

15   doubt.  We have to prove beyond a reasonable doubt that that's

16   what the conspiracy was but not that each and every one of

17   these elements occurred beyond a reasonable doubt.

18        So the first one is scheme to defraud, and I'll

19   define these in a second.  There is intent to defraud, there is

20   materially false representation or pretense, and an interstate

21   wire in furtherance of.  So starting with a scheme to defraud,

22   a scheme to defraud is pretty basic.  It's a plan or course of

23   action formed with the intent to accomplish some purpose.

24        In this case, specifically, it's to obtain money or

25   property of the township by using the time, resources, and

1    employees of the township in order to further their own

2    personal and political interests rather than benefitting the

3    citizens of the township.  That is a scheme to defraud here.

4           So you saw the check on Ethel Shelton's desk for the

5    campaign headquarters, and it was dated the end of January.

6    And if you recall, the search warrant that got all of this

7    evidence was six to eight weeks later, and this was found at

8    the Calumet Township Trustee's office, not at the headquarters.

9    They kept it at the trustee's office even after opening their

10   headquarters.  And why not?  Why wouldn't you keep things you

11   need where you use them?

12          They were so used to running their campaign out of

13   the trustee's office, why change things?  Why move?  You had to

14   leave the office and go somewhere else to go to the campaign

15   headquarters.  Why do that when you could just do the work at

16   work?  They had volunteers, also called employees, who could do

17   the work for them there.  This is the way they had done it for

18   12 years.  They weren't going to change.

19          The second element of wire fraud is intent to

20   defraud.  And basically someone acts knowingly with the intent

21   to deceive or cheat a victim in order -- and in this case,

22   remember, the victim is the Calumet Township -- in order to

23   cause a gain of money or property to the defendants or another

24   or a loss of money.  And, here, that's what we're talking

25   about:  Loss of money, loss of time, the employees' time, the

```
 1   defendants' time, the other coconspirators' time, the resources
 2   of the Calumet Township.  All of that's lost, and it can be for
 3   the defendant or another.  It doesn't have to be Ms. Shelton
 4   and Mr. Wheeler doing this.  It could be another or both of
 5   them or all of them.
 6           So what evidence do we have?  What evidence have we
 7   seen of a scheme to defraud?  So some of this you're going to
 8   see for the first time because we haven't pulled out everything
 9   in the boxes, so I'm going to slow down when we get to
10   something new to you.  But we've seen and heard testimony about
11   distribution of tickets to employees at the township office.
12   We've seen and heard testimony about collecting money at the
13   township office.  We've seen and heard testimony about sending
14   mailings from the township office.
15           We've heard testimony about people spending their
16   work hours at the township office running campaigns, attending
17   political meetings at the township office, using township
18   employees to plan and organize political fundraisers, using the
19   township office to run their own campaigns, and using computers
20   and printers at the township office.
21           So as far as the testimony is concerned on the
22   distribution of tickets and collecting of money, we have
23   Mr. Garbutt who told you that he saw Ethel putting together the
24   tickets and distributing them to the deputies.
25           We have Gladys Miller who told you that she
```

1    dutifully bought her tickets every year.  She was given tickets

2    one year by Ethel Shelton to distribute to her own

3    subordinates.  This was done at work.

4         And as you're thinking about the testimony of these

5    employees, ask yourself if you're getting a ticket from your

6    boss and your boss is saying, "I really want you to support my

7    campaign."  He gives you a ticket three times a year.  You're

8    an at-will employee.  You're not in a union.  You could get

9    fired at any time for any reason.  Are you going to buy that

10   ticket?  Well, maybe, maybe not.  It's still your choice.  But

11   you kind of feel pressured to do that, don't you?  You kind of

12   feel like maybe I need to do that to make sure I'm in the

13   boss's good graces so if there are layoffs, I'm not on the

14   list.

15        Lamar Taylor told you and acknowledged that's what

16   the whole system -- how it was structured.  He distributed the

17   tickets he received from Ethel Shelton.  Linda Collins-Brown

18   told you how she received tickets from Mr. Wheeler and how the

19   one time she had trouble paying for her tickets, she got

20   bullied by Ethel Shelton about it and said, "You have to eat

21   those tickets.  You can't return them."

22        Elena Lynch didn't buy the tickets, got fired.  A

23   lot of people noticed that.  Cynthia Holman-Upshaw, again,

24   given tickets to distribute by Ethel Shelton and she did so.

25   And she told you she -- if you recall, she told you she was

 1    perfectly happy going to those fundraiser.  She enjoyed them.

 2    She thought they were social events, but she acknowledged they

 3    were also a fundraiser.  But she did also tell you that she

 4    felt she was expected to buy those tickets.

 5          And Debra Piggee, who told you that she struggled

 6    sometimes to buy tickets and had to get on installment plans,

 7    but she too understood that you had to buy those tickets.

 8          And, finally, Warrien Poole told you the same thing.

 9    He wasn't as worried about his job because his boss,

10    Steven Hunter, didn't know his job very well, so Warrien Poole

11    kind of had some job security of his own.  But he said he still

12    felt expected to buy those tickets.

13          Now, you've heard this before.  I'll play just a

14    little bit of it again.

15       (Audio played.)

16          **MS. LERNER:**  So yesterday Ethel Shelton told you

17    that if she knew it was illegal, she wouldn't have done it.

18    But when she didn't know you were going to be listening in,

19    that's what she said:  "I know what you can do and what is

20    legal and what is not legal."  That is not consistent with what

21    she told you yesterday, is it?

22          And Mr. Wheeler, he responded, "I'm going to give

23    you 100 percent and make sure they give you, my employees, they

24    give you 100 percent."  He was committing to get his employees

25    to buy the tickets.

```
 1            Here's more evidence of ticket distribution and
 2   money collection.  This is from Mary Elgin's office, and I
 3   showed you a little bit of it yesterday.  These are employees.
 4   And they also keep track, again, of who's not buying tickets
 5   because that's important for when you're making a layoff list,
 6   I guess.  They keep track of these things for a long time, and
 7   they are broken out by section.
 8            This is just Mr. Wheeler's section, but Mr. Harris
 9   has a section, and the other deputies all have sections where
10   their employees are listed and whether or not they've paid and
11   how much they've paid is listed.  And there's a lot of these.
12   Tickets are there as well.  This is all from Mary Elgin's
13   office.
14            Also from her office, the ones that we talked about
15   the other day with Horace Clay, there's a lot of them.  He was
16   paying dutifully.  He told you he was not worried about his job
17   because he was on a payment plan.  Those were his words.  He
18   paid every time.  The only time he didn't is when he was sick
19   and he couldn't work.
20            And let me just make a quick point.  Here when
21   Mr. Wheeler says, "I'm going to give you 100 percent and make
22   sure they give you 100 percent," you may recall Mr. Rogers in
23   his opening statement told you that Mr. Wheeler told his
24   employees they don't have to buy tickets and it's unfair and
25   improper to make his employees buy the $100 tickets.  Does that
```

1      sound like that's what he thinks?

2              Another piece of evidence that we've heard a lot

3      about, about ticket distribution and money collection, this is

4      when Gladys Miller was given tickets by Ethel Shelton, and

5      you'll recall she testified that she got those tickets at the

6      north annex.  And she got them from Ethel Shelton when

7      Ethel Shelton made the comment, "I'm not going to jail for

8      anybody."  Again, does this sound like someone who doesn't know

9      the law?

10             So Gladys Miller's thinking, "I'm getting tickets at

11     work; I need to make a receipt," because she's a finance

12     person, so she uses her work computer to create a receipt.  And

13     she's sent back an e-mail, or a note, from Ethel that says,

14     "Gladys, we are not to use government computers to record

15     political donations.  Please do not record any information

16     concerning anything political on work computers."  Is this

17     consistent with what she did herself?  Is this consistent with

18     her testimony?

19             Mailings.  You've heard a couple of recordings that

20     talked about mailings being done at the township trustee's

21     office.  Now, Ms. Shelton told you that she did them all at

22     home, assembly line with the family, but we have testimony from

23     Mr. Davis that he had to do a mail merge that took him about

24     40 hours because Ms. Shelton wasn't exactly sure how to work

25     the mail merge function at work.  This was done at the

1    township.  It was a political mailing.

2            In this recording Stafford is telling her, "Aren't

3    you tired of these tickets?"

4            And Ms. Shelton says, "I have sent out plenty of

5    them."  And then later on Ms. Shelton says, "Did you know Mary

6    sent tickets?"

7            Now, here she's talking with Teresa Hamblin, who is

8    in maintenance and who helped Ms. Shelton do the mailings.  As

9    you see the discussion, they're talking about, "How many did

10   you give them?  Two.  I got them.  879, 88 -- I haven't gotten

11   that yet.  You were looking for -- "

12           And then Stafford says, "I didn't mean to throw you

13   guys off."

14           And then Ms. Shelton says, "874, 78, 79."  They're

15   counting tickets.  They're counting ticket numbers because

16   these tickets have ticket numbers, and they're putting a

17   mailing together.  This was done at 9:47 a.m. on October 16,

18   2013.  And the recording was only ten minutes long, so I'm sure

19   that the excuse will be, "I was on break."  And you have to ask

20   yourselves, that's been used a lot.

21           First of all, if you don't know what you're doing is

22   illegal, why do you need to keep saying, "I'm on break."  What

23   difference does it make?  If it's legal, you don't need to do

24   it on break.  You can do it during regular time.  You know it's

25   illegal.  That's why you're doing it on break or at lunch.

1          And Ms. Shelton said, "I have sent out plenty of

2     them," and they're in the 800s.  Do you think she only started

3     this at -- you know, took a ten-minute break to do ten of these

4     and then took the rest home?  That's not what the testimony

5     says.

6          She was doing her own mailings for her own campaign,

7     and, again, here, Mr. Garbutt says, "Are you finishing up the

8     Griffith people, the precinct people?"  Now, you'll recall

9     Ms. Shelton was a precinct committeewoman.  She says, "I'm done

10    with that.  This is my stuff.  I'm sending it to the churches."

11    Later on in that same recording she says, "I'm done.  I've got

12    some stamps left."  3:10 p.m., February 6, 2014.

13         A lot of the recordings contain political

14    discussions.  And some of you might think, "Well, sure,

15    everybody talks about politics in the break room."  But listen

16    carefully to them before you make that conclusion because these

17    are the conversations between two people, Ms. Shelton and

18    Mr. Garbutt, who are very familiar with local politics, and

19    they're discussing strategy for Mary Elgin's campaign and her

20    own campaign:  Who she's going to send out tickets to, who

21    she's going to ask for her support, who she's going to ask for

22    political donations.  You probably recognized one or two of the

23    names mentioned in there.  They're other political figures in

24    this area.

25         These are not casual conversations about what

 1  politician did what on her Tweeter account.  These are

 2  politicians [verbatim] about political strategy, and they're

 3  held everywhere throughout the trustee's office.

 4          How does that serve the clients of the township?

 5  How does that serve the poor?  They kept these prepaid

 6  envelopes for EPIC at the township.  Where do you keep the

 7  envelopes that you need?  You keep them where you're going to

 8  use them, right?  You keep them at the office, if that's where

 9  you're going to use them.  Here are some of the mailings that

10  they sent out, including Ms. Shelton's own mailing.

11          Where do you keep letterhead that you're going to

12  use?  You keep it in the location where you plan to use it, and

13  if you're using it at the office, you keep it at the office.

14  They spent a lot of time doing political work, political

15  meetings on township time.  There are two -- there was a lot of

16  discussion about these two meetings and this one in particular

17  because it was a longer meeting.  And this was held at the

18  north annex, if you recall.

19          This was another EPIC meeting.  Let's take a look at

20  that.  First of all, let me -- before I even go to the next

21  slide, are you allowed to do your campaign work at the

22  trustee's office just because you say you're on break or you're

23  on -- you're at lunch?  You're not.  As I'll show you in the

24  handout, the employee handbook, the work that's supposed to be

25  done at the trustee's office is only intended to serve the

1    clients of the trustee's office.

2          So there was a meeting here that's highlighted on

3    September 26, 2013.  This is at noon, and it goes on for two

4    and a half hours, and, as you recall, it was at the north

5    annex.  And this is Ms. Shelton's time sheet.  She knows she's

6    supposed to keep accurate time sheets because she signs that

7    every week.  And on that day, on September 26, she signed in at

8    8:00 and signed out of 4:00, and she did not put in an hour and

9    a half for personal business.

10          Let's assume that out of that two and a half hour

11   meeting, one of those hours was for lunch hour.  What did she

12   do with that extra hour and a half?  Why is it not indicated on

13   the time sheet as personal business?  Again, this is at 12:07,

14   and it ended two and a half hours later.  She knew -- this is a

15   different date.  She knew how to record her time for personal

16   business.  It's not like she didn't know.  She just didn't do

17   it, probably because she didn't consider it any differently

18   than her regular work.

19          This is Alex Wheeler, same day.  He's very careful

20   with making sure that he records exactly what time he comes in,

21   9:15 a.m. and he leaves at 6:00.  And he, too, does not record

22   anything about taking that extra hour and a half to do personal

23   campaign work.  And, in fact, he records his time as 45 minutes

24   more that week.

25          Here's the other meeting, the other EPIC meeting at

1    the annex.  Mr. Wheeler recorded that he came in at 9:15 that

2    day, recorded that he left at 5:30 that day, and recorded .23,

3    23 minutes of compensation time that week.  This is when he was

4    in that long meeting that started right around 4:00 o'clock.

5    So he got paid by the citizens of Calumet Township for sitting

6    in a political meeting.  And not only that, but he asked for

7    comp time on top of that.

8            You've heard testimony from Lamar Taylor talking

9    about how there were regular meetings at the north annex, one

10   of the township's buildings, for EPIC.  And they concerned

11   political matters regarding -- political matters and campaign

12   matters.  You heard there were some political matters discussed

13   during the deputies' meetings.  There was a comingling.  They

14   didn't keep it separate.

15           You heard Mr. Garbutt tell you the same thing; they

16   discussed political matters at the trustee's office, and the

17   recordings also show you that.  You heard Cynthia Holman-Upshaw

18   tell you that during the deputies' meetings, especially when

19   they were getting closer to the fundraisers, they would start

20   talking about planning for the fundraisers.  These were not

21   fundraisers for the trustee's office.  These were fundraisers

22   for Mary Elgin and her campaign.

23           And the records of the north annex showed that they

24   only paid for renting that space three times, and this was

25   after the Van Til case, which is another public corruption

1    case, discussed on the recordings became public.

2           So here's where they're discussing -- this is the

3    one in October, October the 3rd.  It's Exhibit 4C and 4T.

4    Here's where they're discussing the tickets again.  "You know,

5    we got to get the tickets out," Ms. Shelton says.  "Are the

6    tickets coming Monday?"  She's not sure.  "I'm pretty sure I

7    can get them Monday."

8           Then Ms. Elgin talks about passing the tickets out,

9    and they talk about having a kickoff and there being an

10    opportunity to invite people.  Ms. Elgin says, "No, it's just

11    the staff," and she insists it's just the staff.  This is going

12    to be a kickoff for the employees to give them their tickets

13    basically.

14           And she says, "It'd be a good time for the tickets

15    on account -- can't nobody say we gave them to them at the

16    office, because we do give them to somebody in the office.

17    We'll just say we had a party and we passed them out."  That's

18    evidence of a conspiracy.

19           They know what they're doing is wrong.  They know

20    they can't do it at the office, so they're trying to find

21    another way to do it to get the tickets to the employees.  It

22    goes on.

23           And she says here, "I want to caution you, we have

24    three candidates in the office now.  Because this year and

25    right now, we're going through a season where everybody is

1   recording everybody," and she wants everyone to be very careful

2   in their conversation and using their computers and their

3   conversations.  Because, again, they know what they're doing is

4   wrong.

5          She says, "We're going to have a headquarters.

6   We're going to do our business.  We're going to get quieter,

7   and don't tell them."  Well, they did.  This is October.  They

8   got their headquarters several months later.

9          And she says, "It's going to be payback.  We'd be

10  crazy to fall for some of this stuff.  They'll get us in jail.

11  They're looking to get somebody in jail, and we have to be very

12  careful."

13         And then, again, same meeting she cautions them,

14  "Don't ask anyone to help you.  Be very careful who you ask.

15  You might have to put a little extra energy, I guess, maybe not

16  using the employees and doing it themselves."

17         And here she says, "When you're outside the

18  building, the expectation of every employee that works here is

19  the same, but don't ask them here.  If you want to talk to

20  someone, ask them to go to lunch and talk to them then.  Talk

21  to them at lunch.  Walk them to their car."

22         The expectation is the same.  If you work there, you

23  were expected to buy her tickets.  She knows she can't ask you

24  at work, so she's going to send her deputies out to chase the

25  employees in the parking lot, to take them to lunch to ask them

1    about their tickets.

2            She says, "When you're outside the building, talk to

3    them.  Don't have a conversation with them at their desk.

4    Don't insist that they do some stuff.  Walk them outside and

5    ask them outside.  And if don't nobody else hear you, you ain't

6    even ask them.  It wasn't me."

7            And, again, these are exactly the kinds of

8    conversations that you can use to draw an inference about

9    whether a conspiracy exists and what the conspiracy was

10   intended to do.  This is not the kind of conversation that

11   people have when they know they're doing things that are

12   perfectly legal.

13           Using township employees to plan and organize

14   fundraisers.  This is for one of the prayer brunch, the women

15   of Elgin volunteer list, and there's a lot of them.  And

16   there's also a no list.  Why do you need to keep a no list?

17   Why do you need to know who doesn't want to participate in your

18   fundraiser?

19           Here's more volunteer lists, again, keeping track of

20   who isn't participating.  Again, who isn't participating.

21           What's the purpose of a no list?  It's to make sure

22   the employees know that if they don't buy the tickets, that

23   they could end up on that layoff list because Mary's watching.

24   She keeps track, and those that help her, help her keep track.

25   A lot of the employees enjoyed working on the decorating

```
1    committee -- oops.  I'm going backward -- and much of the work
2    they did was on the clock.  You heard that they put the
3    decorations together at the trustee's office.  They were stored
4    at the trustee's office.  And then they were driven to the
5    Genesis Center by the maintenance staff.  Again, using the
6    employees for their own political fundraisers.  Using their
7    offices and the township office as their own campaign
8    headquarters.
9            So here is a check from EPIC to Mr. Visclosky.  It
10   is a donation for the spring brunch.  And you recall that
11   Ms. Elgin told you she sometimes signs Mary Elgin's name, and
12   you've probably seen her signature enough to notice that she's
13   got that distinctive "e."
14           Now, money is one of those funny things that can
15   break up marriages and break up friendships.  It's a really
16   touchy subject.  So the people that you trust with your money
17   are the people that are closest to you, right?  And you've
18   heard testimony that Donna Frazier, Ms. Elgin's niece, there
19   were some allegations about some mismanagement of the EPIC
20   money.  So who did Mary Elgin give that money to?  She gave
21   that responsibility to her best friend, Ethel Shelton.
22           Ethel got to keep track of the cash that came in
23   from the tickets that the employees were getting.  Ethel got to
24   keep track of the checkbooks.  Ethel got to sign checks on
25   Mary's behalf because that's how much Mary trusted her.  She
```

```
 1    was Mary's right-hand person.  She trusted her with her money.

 2            This is a check for the Genesis Center.  Here is the

 3    letter that went out for the extravaganza showing Ethel was the

 4    chairperson that year.

 5            The same list that I showed you and some additional

 6    ticket lists that were kept.  Blank envelopes for EPIC, the

 7    extravaganza.  Ms. Elgin's campaign finance reports and

 8    tickets.

 9            Also in Mary Elgin's office, the Horace clay

10    envelopes and envelopes for other people, including some names

11    that you've heard of:  Warrien Poole; John Davis;

12    Warrien Poole; Warrien Poole again; Alex Wheeler, the

13    defendant; James Leslie that you heard about; Lamar Taylor;

14    Johnnie Barbie.  These are all in Mary Elgin's office.  Why

15    does she need to keep track of all of that?

16            Election day volunteer sheets.  Completed voter

17    registration application forms.  And you might see some of

18    these things have blacked out information.  That's my doing.

19    The originals won't have that when you take the evidence back

20    to look at it.  Because this is being broadcast out there, I

21    didn't want the personal information of people who didn't want

22    to have their information in Mary Elgin's office to be

23    broadcast out there.

24            There was a stack of completed voter registration

25    forms in one of those boxes that's labelled Exhibit 20 in
```

 1    Mary Elgin's office.  EPIC bank statements and volunteer forms.

 2            And with Ms. Shelton's desk -- again, Mary Elgin

 3    trusts Ms. Shelton with her money.  And that's why Ethel keeps

 4    track of the cash and the checks.

 5            Also, in Ethel Shelton's desk, tickets to the

 6    extravaganza on the same or a different number of years and the

 7    prayer brunch.  Her own mailings.  Her own letterhead.  You

 8    heard some testimony about this, especially from Ms. Piggee and

 9    from the transcript that I read from a moment ago where they

10    were talking about having a kickoff so they could give the

11    tickets to the employees.  Well, this is it.  It occurred a few

12    weeks later on October the 23rd at 4:00 p.m.  And you heard

13    Ms. Piggee got an invitation to this on her desk telling her to

14    go after work.

15            She wanted to go home.  She wanted to do something

16    else.  She didn't want to go to a rally, but she felt she had

17    to.  She goes to the rally where she's told about the

18    extravaganza, and then she listens to Ethel Shelton discuss all

19    the details about the extravaganza and tell her what the

20    details are about where, when, the programs, the tickets, the

21    ad books.  And then, as if that isn't enough just to be told

22    what's coming, then you've got to sit through EPIC trivia,

23    which is this (indicating).

24            You have to sit through EPIC trivia before you can

25    go home.  You're asked:  Who the president, vice president, and

1    treasurer for EPIC?  How does that help the poor?  Why are the

2    employees of the township being required to go to this meeting

3    to answer these question.  Who are the two spinoff groups for

4    EPIC?

5            And there was a sign-in sheet.  Ms. Piggee couldn't

6    remember, but it was there.  She, in fact, signed in.  She's

7    right there.  As a matter of fact, a lot of people signed in.

8    There was a lot in attendance there.  This was when the office

9    was already down to about 80 people, and 50 of them showed up.

10   That's high attendance for a rally after work.

11           Ms. Shelton's mailings and more mailings.  This is

12   all in her desk, again, and letterhead from her time as a

13   precinct committee person.  This, as you recall, I showed you

14   earlier where she's having her campaign literature sent to the

15   trustee's office.

16           She told you she does a lot of this stuff at home,

17   but that's not consistent with what's in her desk and what

18   she's having delivered there.  Returned mail from EPIC, also in

19   Ethel Shelton's desk.  Her own fundraising stuff.  And there's

20   not a lot of this stuff, so she could have easily kept it in a

21   folder at home, but it was in her desk a work.  This is for a

22   campaign advertisement from The Committee to Elect

23   Ethel Shelton.  The letter that we talked about from

24   Gladys Miller.  More checks.  And, of course, the blank checks

25   which Mary Elgin trusted with Ethel Shelton.

1      And, again, Ethel Shelton's office -- this is what's

2  kept in their office.  They know they're not supposed to do

3  this, and this is what's in their office.  This is an EPIC

4  Thanksgiving extravaganza ad book.  You heard several witnesses

5  describe it.  These are volunteer forms, and this is the EPIC

6  stamp and some more checks.

7      And then Mr. Wheeler's office:  Ms. Shelton's

8  fundraiser speech from 2013.  Some literature for fundraising.

9  Additional campaign literature when he's running for Calumet

10  Township board.  This is some proofs for some buttons,

11  something of the sort, for when he was running for

12  councilman-at-large a few years back.  Some proofs, again, for

13  that same office run, which are still in his office or were

14  still in his office, and literature, again, from that campaign

15  run and envelopes.  More labels.  Donations.  This is why they

16  were doing what they were doing, because Mary Elgin supported

17  them in their own campaigns.  Maybe not as much as they wanted

18  to, but she did.

19      And you saw some of the invoices that were up on the

20  screen the other day that had him using his township e-mail to

21  get the -- to get to his campaign literature.  His campaign

22  finance reports.  Declaration of candidacy.  And, of course, a

23  ticket.

24      So there are, as you can see, six boxes that have

25  material that was campaign related over a 12-year period.  I'm

 1    not going to show you this.  I'm going to try to read through

 2    it very quickly because it's a long list.  Tickets the

 3    extravaganza, prayer brunch, and Mardi Gras; bank statements

 4    for EPIC; programs for the prayer brunch; employee ticket lists

 5    for multiple fundraisers and multiple years; campaign

 6    literature, leaflets, palm cards, and flyers.

 7           EPIC expenses and receipts filed by month and year;

 8    records of checks received from campaign donors, including

 9    employees, over multiple years; planning material for

10    fundraisers; the EPIC stamped envelopes that you saw a moment

11    ago; planning booklets; ad booklets; campaign finance reports;

12    campaign finance manuals; receipts for printing and costs;

13    letterhead that you saw earlier on an earlier slide; list of

14    poll workers; completed applications for absentee ballots and

15    voter registration forms.  This is similar to what was in

16    Mary Elgin's office, again, with people's information already

17    on there.

18           Invitations to fundraisers; campaign mailings; logs

19    of ad purchases; vendor lists; mailing labels; donor lists;

20    collection letters.

21           And, again, remember, this is a collection letter.

22    There's a stack of these that Ms. Shelton sent out and signed.

23    This one went to Debra Piggee, one of the witnesses who said

24    that she sometimes struggled to pay for the full amount of the

25    tickets that she was given.  Apparently she didn't pay quickly

1    enough, so she got a collect letter from Ethel Shelton.

2          And then we have the computers.  And, again, these

3    are some of the things that are found on Mr. Wheeler's

4    computer, and Ms. Shelton's we already know about.  The

5    fundraising letter, the speech, the things that her friend

6    designed and sent to her at work, her letterhead.  This is the

7    design for her T-shirts.  This is her speech for when she was

8    running for the Calumet board.

9          This is from Steven Hunter's computer, and I

10   apologize that it's a little fuzzy.  It's in Exhibit 39, so you

11   can see the original in there, and it's a lot clearer.

12         Basically, this is an e-mail from Steven Hunter.

13   It's actually from a personal address, and it's regarding the

14   Elgin Eagles.  And you'll recall that the Elgin Eagles were the

15   male organization that kind of spun off of EPIC that did the

16   Mardi Gras for Mary Elgin.  And this was sent to Alex Wheeler

17   and to Ethel Shelton, and Steven Hunter sent it back to

18   himself.  And this is all at their work address, at their

19   township e-mail address because, again, there was a complete

20   connection between everything they were doing from the campaign

21   and what they were doing at work, even though there shouldn't

22   have been.

23         Steven Hunter's computer had -- and this is another

24   e-mail.  I'm sorry.  This is another e-mail.  Now, you recall

25   one of the recordings had -- was with Chuck Winer.  This is the

```
 1    one that had a long conversation about going on vacation in the

 2    Caribbean in Mexico and you probably kind of --

 3              THE COURT:  Ms. Lerner, could we take a short break

 4    here.  Keep your break.  The jurors have asked for a break.

 5              MS. LERNER:  Sure, we can do that.

 6              THE COURT:  Is the lunch here yet?

 7              SECURITY OFFICER VELEZ:  Yes.

 8              THE COURT:  What we'll will do is take a quick lunch

 9    break.  I'm talking about the same like we'd have our morning

10    break so 15 or 20 minutes, whatever it takes you to eat your

11    sandwich and so forth.  You can take longer if you need it, but

12    we need to get back as soon as we can.

13              SECURITY OFFICER ROGALSKI:  Bring the lunch

14    upstairs?

15              THE COURT:  Yes.

16              Usual admonition -- and it's obviously more

17    important now.  You're going to have this case shortly.  Don't

18    talk to anybody -- you still can't talk to each other about the

19    case.  You can't let anybody talk to you about the case.  If

20    somebody tries to talk to you, let me know.

21              We'll take a recess, 15 to 20 minutes or whatever it

22    takes you to do whatever you have to do.  Just let Carlos and

23    Lenny know when you're ready to come back in.  We'll be in a

24    short recess.

25         (Jury out at 11:18 a.m.)
```

```
 1              THE COURT:  I apologize.

 2              MS. LERNER:  No worries.

 3              THE COURT:  It has been a long time, and so we'll

 4   probably take one more break this afternoon maybe.  We'll see

 5   how long we can go.  Anyway, stay close.  As soon as they say

 6   they're ready to come back in, I want to start up immediately

 7   at that point.

 8              MR. ROGERS:  Judge, I was doing something else.  I

 9   didn't follow that.  The jury is eating their lunch now.

10              THE COURT:  They're going to have their lunch.  This

11   is like a morning break, you know, 15 to 20 minutes.  It will

12   probably be closer to 20 or a little bit longer because they're

13   eating lunch too.  Anyway, that's what it is.

14              MR. ROGERS:  Okay.

15              THE COURT:  We'll be in recess until the jury is

16   ready to come back in.

17       (Recess had at 11:18 a.m., and proceedings resumed in open

18        court at 11:54 a.m.)

19              THE COURT:  You can all be seated.

20              Government ready for the jury to be brought back in?

21              MS. LERNER:  We are, Your Honor.

22              THE COURT:  Defendants ready for the jury to be

23   brought in?

24              MS. GAMBINO:  Yes, Your Honor.

25              MR. ROGERS:  Yes, Your Honor.
```

```
 1              THE COURT:  Bring the jury in.
 2              Are you keeping your own time, Ms. Lerner?
 3              MR. ZANZI:  We have been tracking, Your Honor.  It
 4   has been about 50 to 55 minutes.
 5              THE COURT:  Marijana is keeping track for me.  You
 6   want her to give you a notice?
 7              MS. LERNER:  How much time did you have that I used?
 8              THE COURTROOM DEPUTY:  About 55 minutes.
 9              THE COURT:  Okay.  So if you want her to give you a
10   note or something, she'll do that.
11              MS. LERNER:  There is no way I'm using two hours.
12   Mr. Zanzi would be very annoyed at me.
13              THE COURT:  Yes.
14       (Jury in at 11:55 a.m.)
15              THE COURT:  You can be seated.
16              Feel free to pass the notes across because I get
17   involved in other things and I forget and operate on my own
18   internal clock sometimes.  Any time you need to take a break,
19   pass a note and we'll do it.
20              Ms. Lerner.
21              MS. LERNER:  Thank you, Your Honor.
22              Before we broke we were talking about how the
23   conspiracy members were using the computers and equipment at
24   the trustee's office to do their campaign work, and we had
25   covered Mr. Wheeler's computer, Ms. Shelton's computer, and we
```

1   were talking about Mr. Hunter's computer.  And this is an

2   e-mail sent from Mr. Hunter.  It appears to be a private e-mail

3   address, but he's sending it to these people at their township

4   trustee address, including Ms. Shelton, himself, and

5   Mr. Wheeler, and other people in this conspiracy, Ed Harris,

6   James Leslie, Lamar Taylor.

7           This is how they used their work computers.  There

8   was nothing wrong to them in how they were using them.  They

9   saw nothing wrong in using it for their own personal benefits.

10  This is, again, the Elgin Eagles meeting, and the Elgin Eagles

11  were the fundraising leg of EPIC for the men in the office.

12          Here is another e-mail from Chuck Winer.  And,

13  again, I was reminding you that this was the individual who was

14  chatting about vacationing in Belize and in the Caribbean, and

15  then at the end of that discussion, Mr. Garbutt told you that

16  he handed Ethel Shelton a check.  And when I asked Ms. Shelton

17  about that, she said she couldn't remember.  Well, Mr. Winer

18  didn't think anything of using the township trustee's office to

19  do that kind of thing because that's probably what he was told

20  to do.  He's sending information for an ad for the prayer book

21  to Ms. Shelton at her township trustee address and copying

22  Mr. Hunter on it.

23          Also, on Mr. Hunter's computer, something from

24  Ms. Shelton's precinct committee person campaign from a few

25  years ago.

1          And then you heard testimony that Mr. Leslie was

2     doing a lot of printing of banners and things on the computers

3     and the banner printer at the office.  On Mr. Leslie's computer

4     were found things he did for Alex Wheeler.  Several of these

5     things, including the banner for the campaign headquarters that

6     included all three of the candidates at that time and for

7     Ms. Shelton, this is on James Leslie's computer.  This is all

8     from James Leslie's computer.

9          And so, again, we have the conspiracy to commit wire

10    fraud.  One of the elements of wire fraud is that materially

11    false pretense, representation.  And, again, we don't have to

12    prove that there was one.  It's just there to -- we believe

13    there was, and I'll explain it to you, but it's there to help

14    you understand what conspiracy they're charged with so you can

15    determine whether they joined it.

16          So here we have the handbook, which clearly states

17    that rest or coffee breaks are considered as time worked.  Now,

18    of course, no one's going to say that if you want to go out to

19    lunch or, you know, eat at your desk that you have to abide by

20    whatever policies you were doing at work.  It's your break.

21    This is time you get off.  That doesn't mean you can violate

22    other policies in the handbook or violate the law just by

23    saying, "I'm on break," or "I'm on lunch."

24          It is considered -- they're paid for that time, and

25    it's considered part of the time that they're worked.  And here

1    we have, of course -- this requirement prohibits employees from

2    performing any services for vendors or clients on nonworking

3    time that are normally performed by CTTO personnel.  This

4    prohibition also extents to the unauthorized use of any CTTO

5    tools or equipment and the unauthorized use of any CTTO client

6    service methods and business.

7            Now, you don't need a handbook to tell you that you

8    can't do your campaign stuff at work, but it's there.  And it

9    also prohibits misusing communication systems including

10   electronic mail, computers, internets, and telephones.  One of

11   the instructions the judge gave you before I began was that

12   there's a handbook and you can use it to consider whether or

13   not the defendants had the requisite intent to commit the

14   crime.

15           This is proof that what they knew what they were

16   doing is wrong and they did it anyway.  This is common sense,

17   and it's in the handbook as well.

18           Here's another misrepresentation that we mentioned

19   earlier.  This is the -- from the recording on September 26,

20   2013, where as I mentioned Ms. Shelton failed to indicate that

21   she had taken personal business for two and a half hours for

22   that meeting.  And in another meeting, the one on October 3rd

23   where Alex Wheeler got paid for the entire meeting that he sat

24   through, a political meeting, and then asked for 23 minutes of

25   comp time on top of that.

1        And when you're hearing arguments about how hard

2   Mr. Wheeler worked and how he spent so much time working

3   overtime and out of the goodness of his heart, he didn't list

4   any of it.  Ask yourself two things:  First of all, what

5   evidence do I have of that?  There's no evidence from anyone

6   that he was working those hours.  Maybe he was.  But there's no

7   evidence of it.

8        The evidence that you do have is that he is

9   extremely precise in his time sheets.  When he comes in at

10  9:05, he puts down 9:05.  When he wants 8 minutes of comp time,

11  23 minutes of comp time, 15 minutes of comp time, he puts it

12  down.  Is someone who is that precise really going to be

13  lackadaisical about keeping his hours when he's asking for 23

14  minutes of comp time?

15       And then on this last element -- and this is a

16  stipulation that the judge read into the record, and it says

17  that the parties agree and stipulate that at the times alleged

18  in the Indictment, the payment of the township employees'

19  salaries and wages by check and through direct deposit,

20  electronic funds transfers, involved the transmission of

21  information and funds in interstate commerce.

22       And the other piece of that is that the whole

23  conspiracy to commit wire fraud is, at least in part, grounded

24  on the fact that they were using their own time at the

25  trustee's office and the time of the other employees that they

1    were using to help in the campaign instead of doing their own

2    work.  So the payment of their salary, through interstate

3    commerce, is in furtherance of the scheme because they're

4    getting that salary when they're not supposed to be when

5    they're doing campaign work.

6            So I've just gone through the elements of wire

7    fraud, but I'm going to loop back to conspiracy because this is

8    the one that we have to prove beyond a reasonable doubt.

9            Here it is.  This is a conspiracy as charged for

10   wire fraud as we just looked -- as we just discussed.  And the

11   defendants knowingly became members of the conspiracy so they

12   could advance it, and someone in the conspiracy committed an

13   overt act to advance the goal of the conspiracy.  So there was

14   a conspiracy to obtain money or property of the township by

15   using the time, resources, and employees of the township for

16   their own political interests rather than the benefit of the

17   citizens and the clients of the township.

18           And you saw evidence of this conspiracy.  You saw it

19   through the recordings.  You saw it through Lamar Taylor's

20   testimony when he told you about how many meetings they were

21   sitting through, regular meetings at the north annex on EPIC.

22   You saw all the material on their computers, all the material

23   in their office.  There was a conspiracy to use the township as

24   their campaign headquarters, and the defendants knowingly

25   became members so they could advance it.  These people all

 1   participated in that conspiracy.  They were all doing what they

 2   could to make it happen, including Ms. Shelton and Mr. Wheeler.

 3          And, again, remember from earlier, if a defendant

 4   joins a conspiracy, as long as they do it knowingly and

 5   voluntarily with the intent to advance the goal, they don't

 6   have to play any particular role.

 7          And, finally, an overt act -- sorry -- was committed

 8   in furtherance of the conspiracy.  Here we have several that

 9   were committed.  There were tickets distributed at the township

10   office, collecting money at the township office, sending

11   mailings at the township office.  These are all the ones we

12   just reviewed.  Using the time at the township office to run

13   the employee campaigns, political meetings, planning and

14   organizing political fundraisers, and using the office

15   basically as their campaign headquarters and the computers and

16   printers as well.

17          The citizens of Calumet Township basically made

18   involuntary contributions to Mary Elgin's campaign and, by

19   extension, to Ethel Shelton and Alex Wheeler's campaign when

20   they were running their campaigns out of that office.

21          The second conspiracy is to defraud the Calumet

22   Township of honest services of the elected official, and that's

23   Mary Elgin, and the purpose of it is to enrich her political

24   campaign.  And the way they did it was the employees bought

25   campaign tickets in exchange for job security.

1          So the scheme of conspiracy to defraud honest

2     services -- conspiracy to commit honest services fraud -- sorry

3     -- is basically depriving the citizens of Calumet Township of

4     the intangible right to the honest services of the trustee and

5     the employees of the CTTO through kickbacks of the employees'

6     salaries to the trustee.

7          Now, this word "honest services" I know some people

8     kind of laugh when you're talking about it in terms of a

9     politician, but, nonetheless, when an elected official takes

10    office, they have an obligation and the public as a right to

11    their honest services without corruption, and they cannot do

12    that office in a corrupt way without violating this law.  And

13    that's what this law covers.  And in this situation, it was

14    done through kickbacks, and I'll explain that in a minute.

15         And the reason that the public official must do that

16    is they have a fiduciary duty to act only for the benefit of

17    the people, not just who elected him but for the people that

18    they serve, their constituents.  A public official owes a

19    fiduciary duty to the public.

20         Now, the defendants in this case don't have to owe

21    that fiduciary duty themselves.  As long as they participate in

22    a kickback scheme intended to deprive the public of its right

23    to Mary Elgin -- the fiduciary's honest services.

24         So what is a kickback?  The judge told you it's kind

25    of the same thing as a bribe, but the main difference is the

```
1    timing is different.  So usually when you think of a bribe, you
2    think -- okay.  So you have the public official.  You have the
3    person who wants to make the bribe.  They give the money to the
4    public official, and then the public official performs an
5    official action, you know, like putting a bill into law or
6    signing an ordinance or something like that.
7            The kickback, it's a little bit different.  You have
8    the public official.  They take the official action first, and
9    that produces money.  And from that pot of money, some of that
10   -- most of that -- goes to the payer, and some of that goes to
11   the public official.
12           The most traditional way people think and understand
13   this is that if there's a contract that needs to be signed for
14   garbage services and someone wants to get that contract from
15   the city, they may go to the mayor or whoever is making the
16   decision and say, "Look, Mr. Mayor, I really want this
17   contract, but I can't afford to pay you the bribe right now.
18   But if you let me have the contract, I can charge the city 10
19   percent more and then kick back the rest of it to you."
20           That's how it works.  It's a bribe.  It's just that
21   the timing of it is different than the normal bribe, but it's
22   the same thing.  It requires a quid pro quo.  It requires an
23   understanding that the employees will exchange a thing of
24   value -- in this case, it's buying fundraising tickets -- for
25   an official act, which is staying off the layoff list.
```

1           And keep in mind also that the instructions tell you

2      that a solicitation for a kickback is also enough to make part

3      of this quid pro quo.  It doesn't have to be an actual payment.

4      So the distribution of tickets at the office is a solicitation

5      for a kickback.  And the official act doesn't have to happen,

6      so the people don't have to be laid off for the quid pro quo to

7      be met, as long as it's promised or threatened or whatever.

8           So in this situation, in this scheme to commit

9      honest services fraud, we have the public official and those

10     acting on her behalf, Mary Elgin and the coconspirators,

11     Alex Wheeler, Ethel Shelton, and others.  And the official

12     action that they're taking is they let the employees keep their

13     jobs and stay off the layoff list, and this leads to employees

14     having their salary, which goes directly to them.  And then the

15     employees kick back part of that salary in the form of tickets

16     to Mary Elgin, which is a very lucrative situation for her.

17          Recall when Ethel Shelton was testifying, I asked

18     her how many employees participate in the extravaganza, and she

19     said about 35 to 40 percent.  And at the end of her tenure,

20     there were about 80 employees.  Let's assume 100 for the sake

21     of simplicity, and 40 percent of the employees are

22     participating.  You know that about a dozen of those are

23     deputies, and you know that they have to buy five tickets each.

24     And then you know that everybody else has to buy at least two

25     tickets, some three or four.  That's a lot of money.  That's a

1    lot of money that she expects, and that's not even at full

2    participation.

3         And that's why it was important that everyone in her

4    circle make sure that the employees knew they had to buy

5    tickets.  Even if they couldn't really exert a lot of leverage,

6    they could do it by threatening to lay them off.  That's why

7    Ethel Shelton was calling Gladys Miller and Linda Collins-Brown

8    to tell them, "You have to buy those tickets."

9         So, again, you heard the testimony of Gladys Miller

10   who told you she regularly bought the tickets except that one

11   time and got chewed out for it.  Lamar Taylor told you that it

12   was the expectation.  The employees were considered part of

13   EPIC by those in the inner circle.

14        The employees may not of thought of themselves that

15   way, but EPIC thought of them that way.  Elena Lynch, who dared

16   not to buy the tickets, got fired.  And that's the exact reason

17   that Steven Hunter gave Warrien Poole for why she was faired.

18   Horace Clay was confident he wasn't going to get fired because

19   he was on payment plan.  He was making $22,000 a year, but he

20   knew if he paid his $11 per pay period, he would be okay.

21        Cynthia Holman-Upshaw who, like I said, enjoyed

22   going to these fundraisers but knew it was expected of her.

23   Same thing with Ms. Piggee who got collection letters when she

24   couldn't pay right away.  John Davis, he couldn't buy the

25   tickets.  He was given tickets, but he couldn't buy them, so he

     1    tried to help in other ways.  And Warrien Poole, again, given
     2    tickets by Steven Hunter to buy at the office, and same thing
     3    with Linda Collins-Brown.
     4           And they kept track of who paid and who didn't for
     5    years.  There are so many of these, I couldn't possibly show
     6    them to you in slow motion without putting you all to sleep.
     7    But there are -- and this isn't even all of them in these
     8    boxes, in these five boxes.  This is only a sampling of the
     9    ones that are in there.  And this is really the most important
    10    part.  What is the point of keeping track of who did not pay?
    11    It doesn't go on the campaign finance report.  What's the
    12    purpose of keeping track of who didn't pay other than to
    13    threaten the employees that you might lay them off if they
    14    didn't get with the program?
    15           This was found in Ethel Shelton's desk.  This is the
    16    list the employees wanted to stay off of.  They had no union.
    17    They had no protection.  They didn't want to be on this list.
    18    She told you she wasn't involved in firing or layoffs but it
    19    was in her desk along with campaign material.
    20           And what are the employees worth?  Well, I gave you
    21    a rough estimate.  Here's an exact one.  This is an
    22    extravaganza.  It's in November.  If you recall, they're
    23    usually before Thanksgiving.  There were 81 employees in
    24    attendance.  At $100 a ticket, that's $8,100 for one fundraiser
    25    on an off year.  There were two other fundraisers that year,

```
 1   three per year, and certainly during election years they were

 2   making more.

 3             In their own words, here is Ms. Shelton agreeing

 4   that some people are going to pay and some people are not going

 5   to pay.  It doesn't matter how much time you give them.

 6             And then Ms. Elgin says, "You have to take them to

 7   lunch off campus, kind of like an incentive thing.  I need

 8   100 percent.  We still have our jobs.  It's election time

 9   because we still got our jobs.  I really need you to pay.  I

10   really need you to pay.  I need 100 percent.  Would you pay for

11   your ticket?  Can we just pay by edict?"

12             This is the message that Mary Elgin wants her

13   deputies to send to her employees.  She is connecting the

14   tickets with their jobs.  She is making it explicit.

15             And here is Alex Wheeler again, as you recall,

16   frustrated because he doesn't have any leverage over these

17   employees.  And Ethel says, "That's right."  She's agreeing

18   with him.  She says, "You tell them to buy the ticket and then"

19   -- of course, we've heard about this -- "there's no

20   consequences."  He told Mary from the very first year that

21   you've got to give people a year, and then you've got to take

22   out that stick.  But, as Ethel said, there's no consequences.

23   They're frustrated by that.

24             I guess maybe they wanted a one to one correlation

25   that if you don't buy your tickets you definitely get fired
```

1    instead of if you don't buy your tickets you might get fired.

2    It's not clear what consequences they're talking about, but

3    they wanted consequences.  And here we have Alex Wheeler

4    talking about, "I'm not talking about the law."

5            This is Stafford telling them they might be aware of

6    the law.  And he's like, "I'm not talking about the law.  What

7    I'm saying is if you know nothing's ever going to happen to you

8    legally, you can't force anybody to do a damn thing.  You can't

9    coerce anybody if you don't have a mechanism to coerce them

10    with."  And Ethel says, "They think they can do their job and

11    that's it."

12            They knew this was illegal.  It's in their own

13    words, and they said that when they didn't know that you were

14    going to be listening.

15            In this situation, in an honest services fraud, the

16    fraud is on the public, the deprivation of the honest services

17    of the public official.  And so the materially false

18    representation is that they were performing a fiduciary duty to

19    the public free of corruption.

20            And this is the letter that we talked about earlier

21    on in Government's Exhibit 60, one that's signed by

22    Alex Wheeler which says one week after taking office Mary

23    called a meeting of all township employees and announced she

24    was immediately abolishing the decades-old practice whereby

25    employees were required to donate two percent of their earnings

1    to a so-called political fund.

2           She declared she would rather have a harder time

3    raising political funds voluntarily given than to know she was

4    preying on helpless employees.  That is the kind of

5    compassionate individual she is.  But when there is an implicit

6    threat that your job is on the line, how voluntarily given is

7    that donation?

8           Again, because they're both wire fraud schemes, we

9    have the same stipulation that applies regarding salary and

10   wages being paid by interstate commerce, and in here it's the

11   salary of the trustee and those also running for -- sorry --

12   the trustee's salary being paid through check and wire that was

13   in furtherance of the scheme.

14          So, again, this is the -- these are the elements

15   that the government has to prove beyond a reasonable doubt.

16   The conspiracy:  That it was charged; that the defendants

17   knowingly became members so they could advance it; and then

18   someone in the conspiracy committed an overt act in furtherance

19   of.

20          In here, the conspiracy was to deprive the citizens

21   of the Calumet Township of their right to honest services

22   through kickbacks of the employees' salaries to the township,

23   and we saw that through the evidence and the testimony.  We saw

24   that the defendants participated.  We saw through the tapes

25   that I just showed the transcripts from.  We saw from the

 1   testimony of people that said that they went to Ms. Shelton to
 2   pay and they got tickets from Ms. Shelton to distribute.  We
 3   saw it from the EPIC meetings that were recorded where they're
 4   discussing doing the distribution and selling and how people
 5   were saying they have to do it on break in order to make it
 6   legitimate.
 7            This is the conspiracy that these defendants were a
 8   part of, and they were frustrated that they didn't have more
 9   leverage.  It wasn't that they weren't a part of it.  They were
10   frustrated that they didn't have more leverage that they could
11   use.  They wanted to do more to make sure those tickets were
12   bought.  And the overt act, distributing tickets at work,
13   collecting money, keeping track of who pays and who doesn't,
14   pointing out who's a team player and who's not, harassing
15   people if they refused to buy tickets.
16            Employees were led to believe that retention
17   depended on their purchases.  Wheeler admitted in his interview
18   with law enforcement that the process was meant to be
19   intimidating.  The distribution of tickets and the collection
20   of money, it was meant to be intimidating.  They were both
21   frustrated that there were no consequences, and Wheeler told
22   Mary from day one to enforce consequences.
23            So those are the two charges.  I want to address a
24   couple of things.  We heard in Ms. Shelton's testimony that she
25   was really trying to distance herself from Mary Elgin, for

obvious reasons, because you've heard a lot about Mary Elgin in
the trial. This trial is about Mary Elgin and it's not. She's
part of the conspiracy, but she's not on trial here.

When she didn't know that you were going to be
listening in, Mary Elgin said that, "She's still my best
friend," and Ethel said that too. And you heard that there was
a falling out between the two of them. Well, Ethel says we
fall out all the time. It's no big deal.

And you also heard Ms. Shelton repeatedly saying
she's just a secretary. She was doing what she was told. She
didn't really have any authority, except that when asked, "You
have more influence as her secretary than you'll have on the
board," she said, "Oh, yeah, absolutely. They don't know that.
They think that it's the other way around." She actually had a
lot of influence in that position because Mary trusted her with
her money. Mary trusted her with her cash. Mary trusted her
with making sure the tickets were distributed, making sure the
payments were made, making sure that she went after employees
who were not paying for their tickets.

This was -- these were important parts of her
fundraising, and she trusted Ethel Shelton with that because
she was friends with Ethel Shelton for a long time. No matter
how much Ms. Shelton wants to distance herself from Mary Elgin
now, that's not true. You heard Lamar Taylor say that he saw
them and considered them close friends from as far back as the

1     first campaign.

2              And then you have, of course, the statement that

3     Alex Wheeler made to law enforcement where he said the

4     distribution and the collection -- distribution of tickets and

5     the collection of money were intended to be intimidating, and

6     he was frustrated he had no leverage.

7              Alex Wheeler was her longtime campaign manager,

8     again, from the very beginning.  He gave tickets to his

9     employees as he was given them from Ethel Shelton.  He

10    participated in the meetings.  He was part of the EPIC inner

11    circle.

12             These two were part of a team.  Mary needed people

13    she could trust, people who could advance her political

14    interests.  She depended on these two, her longtime campaign

15    manager and her close friend.  I expect the defendants will

16    point the finger at Mary Elgin and say it had nothing to do

17    with me, but it was Ethel Shelton who chose to do the things

18    that she did.  And it was Alex Wheeler who handed out tickets

19    and encouraged his coconspirators to use a heavy hand and

20    promised to give 100 percent participation.  He told Elena

21    Lynch to make it right if she wanted to keep her job.

22             They committed to 100 percent participation.

23    They're not on trial here for what Mary did.  They're on trial

24    for what they did.  This case is about accountability.  It is

25    about using the trustee's office for their own personal gain,

1  not just themselves personally but the entire conspiracy

2  including Mary Elgin.

3       Hold these defendants accountable.  Review the

4  evidence and return the verdict that the evidence requires,

5  guilty on all counts.

6       **THE COURT:**  Ms. Gambino.

7       **MS. GAMBINO:**  Thank you, Your Honor.  It is going to

8  take me a second to get set up here, so if you want to stand up

9  and stretch and move around a little.

10      Can you hear me?  Great.

11            **CLOSING ARGUMENT - DEFENDANT SHELTON**

12      **MS. GAMBINO:**  When I stood before you at the very

13  beginning of this trial, I told you that Ethel Shelton was

14  presumed innocent, she's not guilty of the charges here, and

15  that the evidence would not support a finding that she is.  And

16  now you have had a chance to review all of the evidence, and

17  I'm going to go back through it briefly, not in great detail

18  because I know that you've been paying close attention and you

19  have your own ideas and impressions about the evidence.  There

20  is no conspiracy here, ladies and gentlemen.

21      Conspiracy is an agreement to do something illegal.

22  And at no moment during the entire time that the government is

23  alleged the supposed conspiracy went on did Mrs. Shelton agree

24  with Mary Elgin or Alex Wheeler or any other person to engage

25  in any conduct, and the government's evidence simply hasn't

1   shown that's true.  Mrs. Shelton did not agree to commit fraud

2   against the citizens of Calumet Township or fraud against

3   anyone else.

4           Mrs. Shelton all her life -- and you've heard a lot

5   about Mrs. Shelton's background, has been a hardworking, honest

6   and dedicated --

7           **THE COURT:**  Ms. Gambino, I don't think your mike's

8   working.

9           **MS. GAMBINO:**  Oops.  I guess it helps if I turn it

10  on.  Sorry.  Is that better?

11      (The jury collectively responded.)

12          **MS. GAMBINO:**  Okay.  Good.

13          Anyway, Mrs. Shelton is a dedicated, hardworking,

14  and honest individual.  And if the government suggests that

15  Mary Elgin trusted Ethel Shelton with her money, which we could

16  talk about a little bit later, she did so because she knew that

17  Mrs. Shelton is an honest woman and that Mrs. Shelton is not

18  going to steal from her and not going to write checks to

19  herself and is not going to do anything that she's not supposed

20  to do because she's a person of character, honesty, and

21  integrity.  And she conducted herself that way throughout the

22  entire course of her work with Mrs. Elgin just the same way she

23  had conducted herself throughout the entire course of her work

24  for the steel mill, how she had conducted herself when she

25  worked for the dress shop.

1      You know, my mom once upon a time said a leopard

2 doesn't change its spots.  And you have heard from every

3 witness that testified here, including government's witnesses,

4 that Mrs. Shelton is nothing if not a person of character and

5 integrity and honesty and decency and somebody who's

6 compassionate and willing to help other people.

7      And you don't start out that way from the time that

8 you're a young woman in the '60s struggling to support your

9 kids and family and trying to help workers in the steel mill

10 and raising a family and raising your family's family and then

11 suddenly end up and decide to participate in illegal activities

12 when you're 72.  I'm sorry, ladies and gentlemen.  It just

13 doesn't happen that way.

14      Did Mrs. Shelton agree with Mary Elgin or anyone

15 else to participate in bribery?  Of course, she didn't.  There

16 is absolutely no evidence of bribery in the case, and you even

17 heard Agent Holbrook testify to that.

18      And as far as kickbacks go, we all know what

19 kickbacks are, and being a neighbor to Illinois, certainly, you

20 know what kickbacks are.  Kickbacks are when some big

21 contractor promises to put money in a politician's pocket if he

22 gets to work on the tollway or if he gets to work on the

23 highways.  We're not talking about kickbacks in this case,

24 ladies and gentlemen.

25      If the government's theory is correct, then every

 1    single political donation that anybody ever makes anywhere is a

 2    kickback.  And to suggest that Ms. Elgin, in trying to get her

 3    employees to participate as well as getting community members

 4    to participate by making voluntarily donations was asking for a

 5    kickback is absurd.  It's completely absurd, and it's even more

 6    absurd to suggest that Mrs. Shelton agreed in any way, shape,

 7    or form to try and get employees to involuntarily buy tickets,

 8    which is essentially what the accusation here is.

 9          Let's talk about what the government alleges.  They

10    allege that the conspiracy, if it exists, started in 2003 and

11    lasted all the way until 2014.  Now, we know that that's not

12    true for a number of reason.  But with respect to Mrs. Shelton,

13    for sure we know it's not true.

14          And how do we know that?  First of all, there is no

15    agreement back in 2003.  Mrs. Shelton told you about her

16    relationship with Mary Elgin, how their families and selves had

17    crossed paths over the years, and she was a friend and an

18    acquaintance of Mrs. Elgin.  She hadn't yet become her best

19    friend but she knew her, and she was asked to participate after

20    Mrs. Elgin won her first election in 2003.

21          Mary Elgin asked her if she wanted a supervisory

22    position.  And is that hard to understand?  No, it's not hard

23    to understand because Mary Elgin knew about Ethel Shelton's

24    role in union organization when she was working in the steel

25    mills, and she knew that Mrs. Shelton was good at organizing,

1  detail oriented, and that she was an energetic worker.

2          But did Mrs. Shelton say, "Sure, I'll become a

3  deputy or supervisor"?  No, she didn't say that.  And why

4  didn't she say that?  One, because she didn't know what a

5  deputy was, didn't know what a supervisor was.

6          And Mrs. Shelton is also a careful person, and she

7  doesn't want to overextend what she does or promise to do

8  things she doesn't know how to do.

9          Two, she'd already worked for 35 years in the steel

10 mill.  She had a nice part-time job in a clothing store she

11 liked.  She didn't really need a job.  And if she was going to

12 take another one that would help the community and be

13 interesting, she didn't want to have to do it full time.

14          She asked Mrs. Elgin if she could have a part-time

15 job, and Mrs. Elgin as part of her campaign had claimed that

16 she's not going to have a bunch of part-time employees because

17 that had been a problem with the prior administration.  If

18 Mrs. Shelton was going to come on board, it was going to be

19 full time.

20          And you know, based on the testimony, that she was

21 offered a position once Ms. Elgin won, and it was in the

22 finance department.  She came in as a finance clerk making, you

23 know, 25, $28,000, whatever it was.  And she did that position

24 from 2003 to 2006, and she was an employee just like any other

25 employee.

1          She wasn't involved in dealing with the tickets.

2    Her deputy was giving tickets to her.  And she said, yes, she

3    would buy the tickets as the finance clerk because she believes

4    in supporting the organizations that she belongs to.  If she

5    believed in Mary Elgin and her politics and what she was trying

6    to do at the township, she was going to support Mary Elgin the

7    same way that she would support her church, that she would

8    support her family, that she would support the people and

9    causes that she believed in.

10          Now, come 2006/2007, Mary Elgin, who you've heard

11   very much about, is a rather difficult person to deal with.

12   She had already lost two secretaries, and she was looking for

13   another secretary to take the place of the most recent one that

14   had just left, and so she asked Mrs. Shelton to be her

15   secretary.  Why would she do that?  Because Mrs. Shelton knows

16   how to deal with workers, and she knows how to deal with

17   management.  She had experience doing this at the steel plant.

18   She's an even-keeled person, and she's a quiet person, but

19   she's quiet and strong.  She can be funny and all those things.

20          So then she becomes a secretary.  Now, selling and

21   distribution of the tickets, the fundraising tickets, that was

22   something that had been going on since the very beginning of

23   Mary Elgin's time with the township, and she had a system in

24   place, and this is how she did it.  Some employees bought their

25   tickets and some employees didn't, and it was the secretary who

1    take care of keeping track of the tickets.

2            Now, why do you need to keep track of the tickets?

3    Well, you need to keep track of the tickets because politicians

4    have to keep track of everybody who makes donations to them,

5    and they have to provide the amount and the name and the

6    address of the person who's donating and put it in their

7    campaign finance reports.  Somebody's got to do that work.

8            Why would you keep track of people that don't pay?

9    Well, if you've ever worked in an organization or worked on an

10   event or a fundraising event or something that happens yearly,

11   you know that you want to get involved the people that are

12   supporters.  You want to try to encourage other people to

13   become involved, and you need to know how many tickets you're

14   going to want to buy for the next year.

15           If it turns out that half or 60 percent of your

16   people are not buying your tickets, then maybe you don't want

17   to order as many tickets the next time around.

18           The government suggests to you without a single

19   scintilla of evidence that there was a layoff list.  No such

20   list existed.  You haven't seen that list.  You haven't been

21   presented with any deputy who said we kept such a list or any

22   individual who said there actually was such a list.  This is

23   employee talk.  This is rumors.  This is the sort of thing that

24   happens any time an organization has a layoff.

25           Everybody gets afraid of who's going to have to go.

 1   Last one in, first one out.  You've got seniority.  You don't.

 2   The boss likes you.  She doesn't like me.  And, you know,

 3   that's what happens during the time of a layoff.

 4          And why was there a layoff?  This wasn't the

 5   creation of Mary Elgin.  As you will recall, Mary Elgin did a

 6   lot of pretty significant work for the township.  She was --

 7   she had moved one building -- from one building to the next.

 8   She had found another location that was much improved not only

 9   for the clients but for the employees.  Several people talked

10   about that.

11          She was involved in trying to save the township's

12   budget.  The township needed the budget to be able to help the

13   people it served, and there were people in the state who were

14   trying to take the budget away.  So she was fighting with the

15   state officials and various other people to try and maintain

16   their budget.  And when the state didn't provide money or they

17   didn't have enough to meet their budget, she had to make budget

18   cuts.  And that's a normal thing.

19          You know, it's not as if you've been led to believe

20   that layoffs were somehow used as some kind of a threat or

21   another.  She would have much rather -- if you listened to the

22   full context of the political meetings that had been recorded

23   by Stafford Garbutt, she would much rather have not laid off

24   anyone and kept her office functioning at full speed.

25          Also, ladies and gentlemen, you have to kind of

 1    wonder about the timing of an investigation when it happens

 2    during an election year.  That just has to raise a little bit

 3    of suspicion, but let's go back to the conspiracy that's

 4    alleged.

 5           So we know that Mrs. Shelton doesn't even begin to

 6    be involved in dealing with tickets, a system that's already in

 7    place before she ever gets there, until she becomes a

 8    secretary, and they move into the new building in 2008.

 9           Now, Mrs. Shelton didn't have to come in and testify

10    but she did; and she answered my questions, and she answered

11    the government's questions, and she answered your questions.

12    And what she said with respect to the relationship between the

13    tickets and the supposed layoffs is there wasn't any.  That she

14    would never have agreed with Mrs. Shelton [verbatim] to try and

15    force anyone to buy any tickets, and she didn't do that.

16           Now, there were two incidents of phone conversations

17    that were upsetting to both Mrs. Shelton and to the people she

18    had conversations with, one in 2009 and one in 2013.  And she

19    was making those phone calls as Mrs. Elgin's secretary.  You

20    know, there are two things going on here.  Mrs. Shelton is an

21    employee, and she's not even one of the most highly paid

22    employee.  She makes less money than the deputies.  She makes

23    less money than the assistant deputies, and she makes far less

24    money than Stafford Garbutt or Mary Elgin.  She got no special

25    perks.  She got her salary.  She didn't ask for special perks.

1    She would have liked to have had a township car.  The other

2    secretaries did, but she didn't.  She would have liked to have

3    had her gas paid for and her insurance paid for; but it wasn't

4    offered to her, and she didn't have it.

5         She would have liked to have had Stafford Garbutt's

6    -- who wouldn't like to have Stafford Garbutt's $60,000 salary

7    for doing we're not quite sure what, but she didn't have that

8    either.  So we're not talking about personal benefits to

9    Ethel Shelton other than the salary that she worked very hard

10   to earn.

11        Now, in 2013, we know that she and Mary Elgin are

12   having problems and their friendship is on the rocks, and she's

13   deciding she's going to run for board membership, a campaign

14   which doesn't work out, and eventual she's not elected.  And

15   onward her life goes, and she continues to work, not in

16   politics.

17        But to say that she was involved in a conspiracy to

18   engage in criminal conduct from 2003 to 2014 rests on

19   absolutely no evidence.  They are relying on phone

20   conversations -- or rather recorded conversations and

21   allegations and recordings made by Stafford Garbutt for a very

22   brief time in 2013 to establish a 10- or 11-year conspiracy.

23   And it doesn't even make sense because during the whole first

24   three quarters of this alleged conspiracy, Mrs. Shelton wasn't

25   even in a position to be involved in the conduct they are

1    alleging was illegal.

2           And they're saying that this is somehow some kind of

3    fraud.  Nobody has alleged here nor has any evidence been

4    provided that Mrs. Shelton made any fraudulent statements of

5    any kind.  And, in fact, you've had an opportunity to listen to

6    Mrs. Shelton's testimony and evaluate it, and she admitted to

7    facts that weren't necessarily all that helpful to her.

8           She was asked about the conversation between her and

9    Gladys Miller, which obviously was upsetting to Gladys miller.

10   She didn't recall it.  She didn't claim that Mrs. Miller didn't

11   say those things or that they didn't have the conversation.

12   What she said was, "I respect Gladys Miller.  She's a woman

13   who's very careful and detailed in her work.  If she said it

14   happened, it probably happened."  No intent to deceive anyone.

15          Every single person who has testified up there has

16   said about Ethel Shelton that she's going to tell you what she

17   thinks:  Good, bad, ugly, whatever it is.  She's going to say

18   what's on her mind.  She's not trying to deceive anyone about

19   what she said or why she did it.  No intent to hide any

20   conduct.

21          When Ethel Shelton tells you, "I didn't believe it

22   was wrong to do some campaign work or personal work on my

23   breaks or at my lunch hour or after work," it's because that's

24   what she believed.  And why does she believe that?  Because the

25   leadership of the organization didn't lead her to believe

1    anything else.

2         Use your common sense, ladies and gentlemen.  How

3    many times have you been at work and you had to make a doctor's

4    appointment?  You had to get in touch with a friend for

5    something.  You had to arrange a family member' birthday party.

6    You had to do something that required you to do business during

7    business hours.  You do that on your lunch break.  You do that

8    on whatever break you have.  You do that after work.  And you

9    don't think that you're violating any law by doing that.

10        And nobody has pointed out to you in this courtroom

11   any law that has been violated by doing personal work or

12   campaign work on your lunch hour or on your break.  Even this

13   employee handbook which, by the way, is put together by the

14   trustee herself and changes at the desires and whims of the

15   trustee, is not clear about what activities are prohibited

16   except for those that are going to conflict with the business

17   of the township.

18        What about actual deception by Ethel Shelton in

19   terms of her work?  She worked -- her normal hours were 8:00 to

20   4:00.  And if you look at the attendance sheets that have been

21   put into evidence, you'll see that she entered comp time, sick

22   time, vacation days.  Some days were 8:00 to 4:00.  Some days

23   were less.  So 8:00 to 4:00 was normal, but there were times

24   when she worked less.  Could she record times when she worked

25   more?  No.  Why not?  Because the handbook also says that flex

1    time and overtime and comp time are all at the discretion of

2    the supervisor, and her supervisor was Mary Elgin.  And

3    Mary Elgin told her, as Mrs. Shelton told you, that she didn't

4    allow her to record her comp time because they were working

5    late all the time and she didn't want to set up an appearance

6    or favoritism or impropriety or anything like that by having

7    Mrs. Shelton earn all this extra comp time.

8           So she didn't.  She stayed after work, and she made

9    up work.  If she went over an hour and a half on her lunch time

10   for a meeting offsite paid for by EPIC that Mary asked her to

11   be at, then she would work longer at the end of the day to make

12   up for whatever work she didn't get done.

13          Mrs. Shelton would have done that anyway because

14   that's the kind of worker she is.  She takes pride in her work.

15   She works hard, and she wants to get the things done that she

16   has to do.  So she worked extra hours.  If anything, the

17   citizens of Calumet Township and the Calumet Township Trustee's

18   Office owed her money that she didn't ask for that she would

19   never be paid for.  So the idea that she was somehow cheating

20   anyone out of her work and her good efforts is simply untrue.

21   It's a fantasy.

22          Bribery.  We don't have to spend much time on

23   bribery.  But no quid pro quo.  No this for that.  No money

24   going into Mrs. Shelton's pockets.  No money going into

25   Mary Elgin's pockets.  No money going anywhere where it doesn't

1    belong.  There is no bribery in the case.

2            Kickbacks.  The problem with the government's theory

3    about kickbacks is that you have to have both the quid and the

4    quo.  Both the "this' and the "that."  And what we have in this

5    case is a handful of employees who were disgruntled or upset

6    about something or another who believed that there was a layoff

7    list, who believed that their contributions would have

8    something to do with whether they got fired or not, but no

9    official offer or act on the other side.

10            Nobody got hired and were sat down and said, "You're

11   going to have to be a part of my EPIC team and you're going to

12   have to make political contribution or I'm not going to hire

13   you."  Nobody testified to that, and there is not even the

14   implication of that.  And the reason you know that is because

15   there were at least three or four people who testified here who

16   had started off in Dozier Allen's administration, and they were

17   rehired.  They weren't political friends.  They weren't

18   political -- but they were qualified people, and they were

19   rehired by the Elgin administration.  It had nothing to do with

20   whether money was going to come out of their salary or wasn't.

21            It's not good enough for people to imagine or

22   believe that there's some layoff list or that their jobs are

23   dependent of these contributions.  There has to be some

24   evidence of it.  There is nothing but the speculation of

25   evidence of it.

```
 1              Now, we have to talk about Stafford, although I
 2   would rather not.  And the Judge is going to give you an
 3   instruction, and the instruction is going to say that you have
 4   to consider Stafford Garbutt's testimony with caution and great
 5   care.  And the reason that you do that is because he, if not
 6   actually offered benefits, believed he was offered benefits and
 7   was involved in criminal activity himself.  And in return for
 8   his work with the FBI agent, nothing happened to him.
 9              Now, what do we know about Mr. Garbutt and his
10   motivation?  First of all, Mr. Garbutt didn't want to own up to
11   you that he had an intimate relationship with Mary Elgin when
12   he first started off, but you know that's true.  How do you
13   know that's true?
14              First of all, Mrs. Shelton told you that that's what
15   happened, and she was in a position to observe and see the
16   comings and goings of Mary Elgin and Stafford Garbutt.  And how
17   else do you know that?  Who else gets to create their own job,
18   get highest pay in the organization, create a completely new
19   job -- nobody's sure what it is and what it does -- that hasn't
20   been in existence before, gets $60,000, get a car, get gas, get
21   insurance, and live with the boss?  Does that happen to
22   somebody who is not having a relationship with a boss?  I mean,
23   that's just -- we can use our common sense.  That makes no
24   sense.
25              And why was it that he went to the FBI after waiting
```

```
 1    13 years to do that?  Mr. Garbutt started out with Mary Elgin

 2    at the very beginning back in 2003.  Well, because we also know

 3    and he grudgingly admitted, that after he and Mary Elgin fell

 4    out, he lost $15,000 from his salary.  She took away his car.

 5    She took away his gas, and she took away his insurance.  And

 6    she humiliated him in front of others.

 7            So Stafford Garbutt may have a conscience with a

 8    slow burn, and he may like to now conceptualize himself as a

 9    whistleblower; but really what Mr. Garbutt is is a vengeance

10    seeker.  And why would he include Mrs. Shelton in that?  He

11    kind of lumped her in with Mary Elgin.  And you also know,

12    although he didn't want to own up to you, he and Mrs. Shelton

13    had some pretty serious differences of opinion with respect to

14    their various religious and philosophical views.  He, in fact,

15    had contempt for Mrs. Shelton's beliefs, and he made her feel

16    bad about them.  But he wasn't willing to say that, and he

17    wasn't willing to own up to the fact that he had an affair with

18    his wife was living in Belize.

19            Now, do we bring that up to make any kind of

20    judgment about his moral principals?  No.  We bring that up

21    because that is a measure of deceit.  That is an unwillingness

22    to say what's what and to hide the truth.  And it's important

23    because it goes to credibility, and it's super important in

24    this case because the whole case is based on this man's word.

25    He chose who he recorded.  He chose the documents he took out
```

1    of the office.  He chose what he was going to do, when he was

2    going to do it, and how he was going to do it.  And the FBI

3    agents relied on him.  They relied on his representations, and

4    they relied on him being a truth teller when he clearly wasn't.

5         This is a jury instruction that the Judge has read.

6    And as you can see -- and it will be in your packet -- you may

7    give this witness's testimony whatever weight you believe is

8    appropriate keeping in mind that you must consider that

9    testimony with caution and great care, not only because he

10   received these benefits, but he's a liar.  He wasn't honest

11   with FBI Agent Holbrook.  He didn't tell him about his

12   relationship with Mary Elgin.  He didn't tell him why he lost

13   the income, the car, and the perks.  And he told him that his

14   wife was living here.

15        You heard him Agent Holbrook testify, "Oh, I think

16   his wife was living here with him."  But he told you guys that

17   his wife, he admitted, lives in Belize; had to stay in Belize

18   because of their property in Belize; and she only came up here

19   to visit.  She never lived here.

20        He was dishonest with you about his relationship,

21   and he was dishonest with you about his conduct and feelings

22   with respect to Mrs. Shelton.

23        Now, we don't blame the FBI agent for relying on

24   Mr. Garbutt, although he could have done a much more thorough

25   investigation into what Mr. Garbutt was all about.  He was a

1    new agent, and he had only managed two informants before.  This

2    is an informant that really got over on him.

3           Now, in order for this supposed system of

4    intimidation to work, you have to have the cooperation of the

5    deputies because they are the ones giving out the tickets to

6    their employees.  You had two deputies that came here and

7    testified, Cynthia Holman-Upshaw and Lamar Taylor, and each of

8    them said they didn't discuss the tickets with their employees.

9    They didn't tell their employees that they were going to be on

10   a layoff list if they didn't buy the tickets.  They didn't even

11   discuss the tickets at all.  It was up to the employees to buy

12   the tickets or not buy the tickets.

13          Cynthia Holman-Upshaw didn't even think this

14   extravaganza was a political event.  She thought it was a

15   social event.  They were trying to create an atmosphere of

16   support for the work of the office, and this was a reward.

17   This was something that people liked to go to.  It was a nice

18   event.  And Lamar Taylor contributed his tickets because he

19   supported Mary.  He was her campaign manager.  But he didn't

20   tell you that he went around coercing his employees to buy

21   tickets or that anyone else did either.

22          Now, there's a difference between the testimony of

23   Lamar Taylor and Mrs. Shelton on the question of when they met,

24   and that's understandable.  They had associations with each

25   other over a long period of time.  Neither Mrs. Shelton nor

1   Mr. Taylor are super young anymore, although very energetic and

2   well spoken, and it's just quite possible that he's mistaken

3   about how he and Mrs. Shelton met.

4          Mrs. Shelton told you when she met him and how she

5   got involved with Mary Elgin and how she got involved with the

6   campaign, and she simply wasn't involved with the first

7   campaign.  She didn't come involved with the Elgin political

8   campaigns until the second round.

9          Let's talk about Gladys Miller.  Gladys Miller was a

10  lovely person.  She trained Mrs. Shelton when she came to

11  finance, and the phone call that she was upset about that

12  occurred in 2013, or whenever it was -- I don't remember

13  exactly.  You all probably have a better memory about that than

14  I do.  Mrs. Elgin had asked Mrs. Shelton as her secretary to

15  call Gladys Miller and set up a meeting, and that's what

16  Mrs. Shelton was trying to do.

17         Now, she was persistent in trying to do it because

18  her boss asked her to do it, and typically when your boss asks

19  you to get a job done, you want to get the job done.  Set up a

20  meeting.  Okay.  I'll set up the meeting.

21         There was no negative after effect as a result of

22  that.  We don't know that the subject of that meeting was

23  tickets because there was no followup on that, and Mrs. Miller

24  didn't testify that she had any bad feelings about Ethel or

25  Mrs. Shelton after that, and she didn't buy the tickets at that

1    time.  Not only did she not buy the tickets at that time, but

2    she's still working for the CTTO.  And she, who distributed

3    tickets to employees also, never testified that she coerced,

4    forced, or said anything to employees about whether or not they

5    had to buy their tickets.

6           Linda Collins-Brown is the other person who had a

7    problematic interaction with Mrs. Shelton in 2009, and we're

8    talking about one problematic interaction in a work

9    relationship that lasted for 10 years.  I mean, I don't know

10   about you all, but I certainly have had more than one

11   problematic interaction with people over the course of 10

12   years.  I think one is pretty good.

13          What do we know about Ms. Collins-Brown?  She

14   received -- she was one of the ones that started off in Dozier

15   Allen's administration.  She received work related reprimand

16   from her deputy.  She didn't want to be here in this courtroom

17   to testify.  And what she expressed about the telephone

18   conversation that she had with Mrs. Shelton was that she was

19   upset with Mary Elgin.  Mrs. Shelton had asked Mary Elgin to

20   call her and tell her that she wasn't going to be -- that Ethel

21   was not going to be permitted by Mrs. Elgin to take back the

22   tickets, and Linda Collins-Brown didn't take that well.  She

23   wrote a letter.  You saw the letter.  And at her request,

24   Mrs. Shelton returned to her everything she had sent.

25          Same thing as with Miller, there are no subsequent

1    bad interactions reported between she and Mrs. Shelton for the

2    remainder of her work there.  It was an incident that happened

3    in 2009, and Linda Collins-Brown is still with the CTTO.  She

4    wasn't involved with trying to coerce or be coerced or

5    threatened or anything else with respect to tickets.

6        Now, Elena Lynch, she's the young woman who

7    testified she believed she was laid off or fired because she

8    didn't buy tickets.  Well, that may or may not be true.  What

9    we do know from Warrien Poole is that Elena Lynch was

10   overqualified for the job that she applied for and that she was

11   hired by Steven Hunter against Warrien Poole's advice.  Warrien

12   warned Steven, you know, she's not going to work out with us

13   because she needs more money and challenge than we're going to

14   be able to give her here.  She's going to get bored.  Sure

15   enough, that's what happened.  She got bored.  She didn't have

16   enough challenge.

17       So then she became difficult to deal with from

18   Warrien Poole's point of view, and then it got to the point

19   where she had to go.  Well, Steven Hunter, facing Warrien Poole

20   saying I told you so, it'd be much easier for him if he did

21   say, "Well, she was not a team playing.  She didn't buy her

22   tickets so we just got rid of her."  It's much easier of

23   Steven Hunter to say that than to say, "You're right, Warrien.

24   You were right.  I was wrong.  I shouldn't have hired her in

25   the first place."

1           And what does she say about Mrs. Shelton?  She went

2     up to Mrs. Shelton to fix her computers, and she was very

3     pleasant to interact with and had absolutely no dealings with

4     Mrs. Shelton around the question of tickets.

5           Now, Horace Clay is the only person who claimed in

6     court that he bought tickets as job security, and perhaps in

7     his mind that's what he did.  But his deputy was Lamar Taylor,

8     and you know that Lamar Taylor testified that he never talked

9     to his employees about tickets.  So if Mr. Clay thought it was

10    going to be job security for him, nobody in authority ever told

11    him that.

12          We know it wasn't, in fact, true because

13    Mrs. Shelton told you that at one point in time when layoffs

14    were being considered and they had to get rid of people out of

15    Mr. Taylor's area, Mr. Horace Clay's head was on the chopping

16    block, and Ethel intervened and said, "No, you shouldn't get

17    rid of him now because he's ill and needs the insurance."  Now,

18    Mr. Clay doesn't know that, but that's the fact of it.

19          And what about John Davis?  He seemed like a nice

20    guy.  If you remember when he was on the stand and we started

21    to talk about that the agents came to his house to talk to him.

22    And he said at first it started out okay, and they were sitting

23    around his kitchen table.  And then one of the agents started

24    pounding her first on his table, and it made him feel a little

25    bit scared, a little bit uncomfortable.  Mr. Davis was not

 1    happy being here.  He felt he was not here under his own will.

 2              And what else do we know about Mr. Davis?  We know

 3    he didn't buy tickets at all.  Nothing ever happened to him.

 4    He didn't say he felt coerced or forced or threatened or on a

 5    layoff list because he didn't buy tickets.  It didn't seem to

 6    matter to him at all.  The person he felt intimidated by was

 7    the FBI agent pounding on his kitchen table.

 8              And Ms. Piggee is another one.  She didn't buy all

 9    the tickets for all the events.  Nothing ever happened to her.

10    Her deputy didn't coerce her.  She didn't testify that anybody

11    told her or threatened her that she was going to be laid off,

12    and she didn't have any complaints about Mrs. Shelton

13    whatsoever.

14              Same thing with Warrien Poole.  Warrien Poole was in

15    a completely different area, and he talked about Steven Hunter.

16    Now, do we have any idea if there was any relationship at all

17    between Mrs. Shelton and Steven Hunter?  No, we don't.  We

18    don't know what Steven Hunter thought.  We don't know what he

19    did.  All we know is what other people say he did or said, and

20    none of what Steven Hunter did or said had anything at all to

21    do with Mrs. Shelton.

22              Warrien Poole, as we discussed earlier, recommended

23    against hiring Elena Lynch.  He said she was overqualified,

24    bored, and troublesome.  Certainly, it was easier for Hunter to

25    say that she wasn't a team player than to admit that Mr. Poole

 1    was right and he was wrong.

 2              That's a mistake.  It should say 2014, not 2013.

 3              Let's talk about the other evidence, and I won't

 4    belabor it.  Listen to the recordings of the meetings that

 5    happened, the first one on September 26th that happened during

 6    the lunch hour and the other one that happened -- I think it's

 7    T4 in your tab -- that occurred after work.

 8              And if you listen to not just the clips, you'll have

 9    the -- if you want them, you'll have the disks that have the

10    entire conversation.  Listen to those and get a feeling for how

11    those meetings went and what the tenor of the meetings were and

12    what subjects were being talked about beyond these four to

13    two-minute clips out of two and a half hours of discussion.

14              You will see that there was nothing ever decided and

15    there's been no evidence, no matter how people vented or

16    expressed their frustrations about people not participating in

17    fundraisers, there was no action to follow up on any of the

18    things that were said.  Nobody came in here and testified,

19    "Yeah, sure enough, after this meeting happened, my supervisor

20    asked me to go to lunch and tried to get me to buy tickets."

21    Or, "Yeah, sure enough, when I was on my way to the car after

22    work, I was stopped by another deputy, and that deputy said,

23    'Come on, help us out.  We need to buy tickets.'"

24              In fact, after the EPIC meeting in which

25    Mrs. Shelton is asking the deputies to help, they had one of

1    their worst years ever in terms of participation.  Nobody did

2    anything.  And you know that because you know Stafford Garbutt,

3    when he was going around recording people, they have a

4    conversation about it.  Yeah, nobody's -- nobody's buying

5    tickets this year.  But there isn't a followup conversation

6    that says, "Oh, so we're going to go threaten to lay them off,

7    fire them, take away their benefits, anything like that."  No.

8    None of that happened.

9         What people say in venting to each other in meetings

10   about how they're frustrated about the things they can't do and

11   wish they could do that aren't going to be done, you know, that

12   doesn't mean without evidence that any of that ever happened.

13   And we don't have that evidence in this case, and we don't have

14   it because it didn't happen.

15        Computers documents, another thing.  Now, you know

16   Mrs. Shelton's computer was not only her computer but had been

17   used by other people beforehand.  And these documents, we went

18   through them in great detail to show you what was on the

19   computer and what wasn't on the computer.  And, yes, there were

20   a couple of e-mails back and forth between she and

21   Rebecca Smith and a couple pictures and things she sent to be

22   approved and not approved.

23        Now, using a common sense approach, does that

24   constitute -- if what's going on here -- okay.  Say I open my

25   e-mail.  Oh, it's from Rebecca.  She sent me some work she's

1  been doing on my campaign material.  I open it up.  Look at it.

2  Oh, that looks nice.  She wants to know if I approve or not.  I

3  send her an e-mail back, "Yeah, I approve."  That takes all of,

4  what, 30 seconds?  40 seconds?  On a lunch hour at a break, are

5  you going to think -- is the foremost thing in your mind going

6  to be, "Oh, I'm doing campaign work on company time"?  No.

7  It's probably one of those things that went back quickly.  She

8  just didn't even think about it.

9         If this was a conspiracy among all these people to

10 extort employees or take kickbacks and all that sort of thing,

11 don't you think you'd have a bit more on the computer than what

12 you have here.  I mean, you have some blank forms.  You have a

13 couple of pictures, and you have a couple of e-mails, and

14 that's it.  There aren't e-mails between she and Mrs. Elgin.

15 There aren't e-mails between she and Mr. Hunter, between she

16 and Mr. Garbutt or Mr. Leslie or anybody else.

17        If there was really a conspiracy going on, if

18 Mrs. Shelton was really carrying on her campaign out of her

19 office, you'd expect to see a whole lot more than this.

20        It's the same thing with items found in her office.

21 When they showed you that yesterday, it was like, "Oh, well

22 there was this folder in Mrs. Shelton's desk that said Ethel's

23 stuff."  And inside the folder that said Ethel's stuff was

24 Ethel's stuff, not surprisingly.

25        How many times have you carried stuff back and forth

1   with you if you know you're going to be someplace after work,

2   if you have been working on something at home and you want to

3   bring it to work or if you've been working on something over

4   your lunchtime and want to take it home, you have those things

5   that you carry with you.  This wasn't files in a Calumet

6   Township filing box or anything else like that.  This was a

7   folder clearly marked Ethel's stuff.

8           And these boxes here, ladies and gentlemen, most of

9   which come from the storage room and most of which contain

10   documents that are really old, that's not evidence that there

11   is ongoing campaign work.  They had campaign headquarters but

12   for a limited time every year.  And in the meantime, you have

13   to put all the junk somewhere, so they put it in the storage

14   room.  And you heard Mrs. Shelton testify that she talked to

15   Mary Elgin and said, "You got to get this stuff out of here.

16   Take it home.  Do something with it."  She's a pack rat,

17   Mary Elgin.  She keeps everything.  She stores everything.  And

18   she should have kept it somewhere else, but she didn't.  That's

19   not evidence that Ethel Shelton was conspiring with her to

20   violate or commit fraud or anything else.

21           The employee handbook, you can look at it.

22   Government -- the judge's instruction 43 says you can look at

23   it to see if it helps you to decide whether Mrs. Shelton had an

24   intent to defraud anyone or not.  And I would suggest you can

25   look through that entire book and come to the conclusion that

 1    it doesn't help you at all:  One, because it's not clear; two,

 2    because it's not law; three, because it contains no law; and it

 3    doesn't have any bearing on whether Mrs. Shelton intended to

 4    defraud anyone.

 5          The attendance records I encourage you to look at.

 6    And the two photos that you were showed with respect to the car

 7    on the street and Mrs. Shelton getting into her car, I don't

 8    think they help you one way or another, and I'm not even really

 9    sure why they wasted the time and energy taking them.  They

10    certainly don't show that Mrs. Shelton is involved in any kind

11    of illegal activity.

12          Who is she?  You know who she is, not only because

13    you've heard from people that have known her for all her life

14    or all of their lives but because she testified.  And I'm sure

15    that you have made your own conclusions about her testimony and

16    ability her character as a result of her decision to come

17    before you and tell you her version of events.  Family and

18    friends, community, church, union, politics, and work, these

19    are the things that are important to her and have always been

20    important to her.

21          She worked for Mary Elgin as a secretary.  She

22    worked as a finance clerk.  You would think from the way this

23    case has been conducted that Mrs. Shelton was Mary Elgin.

24    Sharon Cummings, a contemporary of Ms. Shelton, came here.

25    They met through children and then work.  She's a contemporary.

1    She's in the same generation.  And how did she describe

2    Mrs. Shelton?  Loyal, honest, and a person of integrity.  And

3    she probably could have gone on at great length if she had been

4    able to do so, and they're still friends today.

5         The next generation -- similar generation,

6    Diane Bates, around the same time.  Single mom together.

7    Worked at the steel mill.  Mrs. Bates is a little woman, but

8    she packs a powerful personality.  She described Mrs. Shelton

9    as a champion in working on behalf of other people, and she

10   said she would trust Mrs. Shelton with her life.  Now, we can

11   all use our own experience and our common sense and know that

12   there aren't very many people -- and maybe there are very many

13   people.  But in my personal case, there's not very many people

14   about whom you would say that.

15        And Bishop Norman Hairston has known her since she

16   was a kid, involved with the family, involved with the

17   pastoring in their church.  It's true, like he said, that good

18   people can do bad things.  But Mrs. Shelton was a good person

19   who didn't do bad things.  Mrs. Shelton has spent her whole

20   life trying to help other people be good, be better, be

21   productive.

22        And you know that because you heard from her

23   great-niece, Jocelyn Brown.  She raised Jocelyn Brown, or

24   helped to raise Jocelyn Brown, and her siblings when their

25   mother was having difficulties on at least two different

```
 1   occasions.  And Jocelyn Brown is another one who worked at the
 2   township.  Not only did she start off working in the kids
 3   program, but she worked eventual as a general assistance
 4   department case manager, over 1300 cases.  She bought tickets
 5   or she didn't buy tickets.  She said she bought them the first
 6   time around to see what it was all about and didn't after that.
 7   And she didn't testify -- and couldn't testify because it
 8   didn't happen -- that anyone bothered her, that her deputy or
 9   her supervisor wanted her to buy tickets.
10           And Rebecca Smith did Ethel Shelton's campaign
11   designs for her when Ethel ran her campaign.  You saw the
12   stationery.  Ethel used her personal address, her personal
13   phone number, her personal data, and her personal person to run
14   her own campaign.  Mrs. Shelton was the beginning, the end, and
15   the middle.  There were discussions about working together with
16   Mary and with Alex and all that sort of thing, but that stuff
17   never happened.
18           What happened was Mary Elgin put three campaign
19   posters on headquarters, including Alex and Mrs. Shelton, that
20   neither one of them asked for and then didn't do very much at
21   all to support them financially.  Mrs. Shelton paid for her own
22   campaign with savings she and her husband earned because that's
23   the kind of person she is.  Once Mary Elgin made it clear to
24   her that she wasn't going to support her, she could have said,
25   "I'm not running then.  I'm done."  But Mrs. Shelton is the
```

```
 1    kind of person that if she agrees to do something, if she makes

 2    a commitment, she's going to follow through on that commitment

 3    even if it costs her money.  It cost her her own money, and she

 4    lost the election.

 5           The interesting thing about her character witnesses

 6    is that they come from all generations and different parts of

 7    Mrs. Shelton's life, but they all come to the same conclusion

 8    about her, that she is a person of honor and integrity and

 9    honesty and decency.  That she is a good person.

10           And why do we bring character witnesses?  We bring

11    character witnesses because you don't know Mrs. Shelton, and

12    Mrs. Shelton testified.  And you have to have a basis for

13    evaluating whether what Mrs. Shelton says to you is the truth

14    or not to truth.  And it is very hard to decide that with a

15    person you don't know.

16           But when you have character witnesses who have known

17    a person for decade you can say, "Well, okay.  These people

18    have known her for 50 years, for 40 years, for all their life,

19    and they feel this way.  Let me take that into account when I

20    decide whether I believe her or not."

21           She answered tough questions.  She answered all the

22    questions, and I'm sure that you all have other questions that

23    you would like to ask.  But fundamentally what she told you was

24    that she never agreed to engage in illegal conduct, that she

25    did not agree to engage in bribery.  She didn't agree to engage
```

    1    in kickbacks, and she didn't gain anything out of this.  And as

    2    far as the evidence that's been presented here, neither did

    3    Mary Elgin.  Neither did anybody in this so-called conspiracy.

    4           The Calumet Township Trustee's Office was a small

    5    office, and like any small shop, a lot of times people take on

    6    a variety of different roles inside or outside.  And it would

    7    have been much better if Mary Elgin had maintained a campaign

    8    headquarters and kept all her stuff in the campaign

    9    headquarters all year round.  We don't even know what was in

   10    the campaign headquarters because it wasn't searched and most

   11    of the stuff that's here is old storage junk.

   12           Now, there's a couple of instructions I want to

   13    bring to your attention.  One is that even if you think that

   14    maybe Mary Elgin did something wrong, maybe Mrs. Shelton was

   15    involved in something that Mary Elgin did so -- she because she

   16    was her friend and because she was her employee, she was

   17    involved too.  Not permissible.  A person's association with

   18    someone who did something wrong is not enough to find that they

   19    also did something wrong.

   20           And it's not enough to show that anyone participated

   21    or agreed to participate in a conspiracy, let alone a

   22    conspiracy to do something illegal.  If the defendant acted in

   23    good faith, then he or she lacked the intent to join a

   24    conspiracy, and a defendant doesn't have to prove his or her

   25    good faith.

1          Mrs. Shelton came to talk to you and told you that

2    she did her work in good faith.  She believed that what she was

3    doing was within the bounds of the law and that she did not

4    intend to defraud anyone or to take money from anyone or to be

5    involved in kickbacks or bribery.  If she had good faith, she

6    lacked the intent to defraud.  In good faith she had an

7    abundance.

8          The only just result in this case for Mrs. Shelton

9    is a finding of not guilty, and we're confident that when you

10   have had a chance to re-review any of the evidence that you'd

11   like to catch up on and had a chance to discuss it with one

12   another, you will come do the same conclusion.

13        **THE COURT:**  Ladies and gentlemen, would you want to

14   take a break at this time?

15     (The jury collectively responded in the affirmative.)

16        **THE COURT:**  Okay.  We'll take a short break.  We'll

17   try 15 minutes.  Get back when you can get back.  Same

18   admonition as always:  Don't talk to anybody else about this

19   case.  Don't let anybody talk to you, and don't talk to each

20   other about the case yet until it's submitted to you.  We'll

21   take a 15-minute break.

22     (Jury out at 1:23 p.m.)

23        **THE COURT:**  About 15 minutes or so.

24     (Recess had at 1:24 p.m., and proceedings resumed in open

25      court at 1:43 p.m.)

1    THE COURT:  Are both sides ready for the jury to be

2  brought in?

3    MS. GAMBINO:  We are.

4    MS. LERNER:  Yes, Your Honor.

5    MR. ROGERS:  Judge, one quick question.  I think I

6  know the answer.  The Indictment is going back, is it not?

7    THE COURT:  The revised Indictment, yes.

8    MR. ROGERS:  Okay.

9    THE COURT:  Bring the jury in.

10    MS. LERNER:  Your Honor, has a copy of the revised

11  Indictment been circulated?  I don't know that we've seen it.

12    THE COURT:  I don't know.  It hasn't gone back.  It

13  should be in that bunch of stuff.

14    MR. ROGERS:  I'm assuming that the statute it refers

15  to and is printed is going to stay the same.

16    THE COURT:  There was really only two statutes in

17  this case.

18    MR. ROGERS:  Right.

19    THE COURT:  I don't know if we print out the statute

20  or not.  We give an instruction on the statutes.  Whether the

21  full statute is printed out, I'm not sure.  It's what you saw

22  last night.

23    MR. ROGERS:  It's in the Indictment.

24    THE COURT:  Yeah, you're right about that.  Just

25  make sure the Indictment goes back.  There's a lot of stuff in

```
 1    this case.
 2        (Jury in at 1:45 p.m.)
 3              THE COURT:  You can be seated.
 4              Mr. Rogers.
 5              MR. ROGERS:  Thank you.
 6                 CLOSING ARGUMENT - DEFENDANT WHEELER
 7              MR. ROGERS:  Good afternoon, ladies and gentlemen.
 8    I guess I'm in the unenviable position of being the third
 9    person you have to listen to, to drone on and on.  I guess it's
10    like one of these big old Italian weddings I used to go to when
11    my relatives were getting married, and all you can think of is,
12    "Oh, my gosh, isn't this thing over yet?"  So bear with me.
13              As you know, this is my opportunity to speak on
14    behalf of Alex Wheeler.  What I say is not evidence, what the
15    government says is not evidence, and what Ms. Gambino says is
16    not evidence.  Evidence is what you see and hear from the
17    witness stand and the reasonable inferences that you can draw
18    from it.
19              Now, I like to think I take pretty careful notes,
20    but if I say something that you disagree with, I'm not trying
21    to mislead you.  I'm not trying to pull a fast one on you.  It
22    just may be that my recollection is different from yours.
23    Yours is what counts.  Mine doesn't count.
24              So I'd like to take a minute and talk to you about
25    this whole situation.  You're members of a jury.  You are here
```

1    because the Constitution gives every defendant the right to be

2    tried by a jury of his or her peers.  And that's real important

3    because on one side we've got the government, and I mean the

4    government.  And the government's got a whole lot of resources

5    to bring against a defendant.  And the defendant only has this

6    courtroom, and standing between Alex Wheeler and the government

7    is the jury.  They have to get through you and convince each

8    and every one of you beyond a reasonable doubt that he's

9    guilty.

10          A couple hundred years ago this system was formed

11   and I believe it works well.  I believe it works very well.

12   And every year I do this, I think it works even better because

13   I see it day in and day out; so, thank you, ladies and

14   gentlemen.

15          If you will give me the kindness, I guess, of

16   listening to me, I'm going to tell you what I think this case

17   is about and what I think the evidence shows and what the

18   evidence doesn't show.

19          Now, after about -- let me see.  The jury got picked

20   -- you folks got picked on Monday.  Tuesday, Wednesday we had

21   testimony.  Along about Thursday I was thinking about bringing

22   a little sign, put it right here, that says, "He ain't

23   Mary Elgin."  That's what this case has been about, Mary Elgin.

24   Mary Elgin and Steven Hunter and what they've been doing.  I

25   would say that both of these defendants are what's called

```
 1   collateral damage, and I don't believe that's what the evidence
 2   shows, that they're guilty.
 3        Let's talk about this.  The judge just gave you
 4   instructions, and I want to talk to you about a couple of them
 5   because I think they're very important.  And when you go back
 6   into the jury room, you're going to get a copy of what's called
 7   the Indictment.  Those are the charges that the government
 8   brought.
 9        And remember what the instructions say, what the
10   government says, they are not trying to prove that Alex Wheeler
11   is guilty of wire fraud and honest services fraud, and I don't
12   think they have, but they're trying to prove that they're part
13   of a conspiracy, this big agreement.  So as long as they
14   allege, the government, that this is a conspiracy, well, if
15   Alex didn't do anything and Mary Elgin did, therefore, Alex is
16   guilty.
17        It only works if you folks believe that the
18   government has proven beyond a reasonable doubt that there was
19   a conspiracy.  If you say no conspiracy, no charges, no
20   convictions.  They have to prove a conspiracy.
21        And you were read the jury instructions, and there
22   was one instruction you didn't get.  That instruction would be,
23   ladies and gentlemen, if the government says it's true, it's
24   true.  Why?  Because the government says it's true.  Doesn't
25   work that way.  But to listen to Ms. Lerner, it's true because
```

1   she says it's true.  And she's just doing her job, and she's a

2   fine lawyer, and I'm not disparaging her in any way, just as I

3   hope I'm doing my job.  But just because the government says,

4   "This is the way it is," doesn't mean it's the way it is.  It's

5   what you folks think it is.  It's what you folks say it is, not

6   the government.

7          Let me show you what you will see in the

8   government's Indictment, just a paragraph I'm going to ask you

9   to look at.  Can we have that for the jury?  Oh, it's on.

10  Okay.

11         And let me zoom in on this a little bit.  It says

12  that the defendants knowingly and unlawfully combined,

13  conspired, and agreed to commit the following offense against

14  the United States, wire fraud, having devised and intended to

15  devise a scheme and an artifice -- to what?  To defraud and for

16  obtaining money and property by means of materially false and

17  fraudulent pretenses, representations, and promises.  It goes

18  on to say for the purpose of executing such scheme.  So a

19  scheme to defraud for obtaining money, property, by means of

20  materially false and fraudulent pretenses.

21         Who obtained money by means of materially false and

22  fraudulent pretenses, representations, and promises?  Who did

23  that?  That's the statute that they violated according to the

24  government.

25         Who devised a scheme to defraud for obtaining money

1  by means of materially false and fraudulent pretenses,

2  representations, and promises?  Who did it?  Who did that?

3  What fraudulent misrepresentations were made?  What materially

4  false representations were made?  I don't hear any.  Who did

5  that?  Again, a conspiracy.

6         Next count, honest services wire fraud.  Engaging in

7  wire fraud by devising a scheme, an artifice, to defraud and

8  deprive the CTTO and the citizens of Calumet Township of their

9  right to the honest and faithful services of the defendants

10  through the solicitation and payment of bribes and kickbacks in

11  the form of campaign ticket payments and forced political work

12  and the concealment of material information.

13        Who took a bribe in this case?  And like Ms. Gambino

14  said, who took a kickback?  No one.  Again, I agree with

15  Mrs. Shelton's lawyer.  Kickback, I believe, is somebody in a

16  position of power, the Trustee maybe, to award a contract for

17  printing, maintenance, whatever; and then they go to the person

18  and say, "Hey, you got the job.  I want to money.  Give me ten

19  percent back.  Give me cash money."  Didn't happen.

20        Who's the bribe?  You bribe somebody in order to do

21  something for you.  Who paid a bribe to who?  To Alex Wheeler?

22  Did he make any money off this?  If he did, I must have missed

23  it because I didn't hear about it.  I didn't see it.  I don't

24  think he got a bribe, and I don't think he got a kickback.

25        Collateral damage.  You throw enough mud at

1    Mary Elgin and Steven Hunter, and something might stick on

2    Alex.  That's why we're here.  Something might stick on Alex.

3    But I would suggest to you that hasn't happened.  This has been

4    somewhat of a long trial, and I'm guessing that maybe some of

5    you -- I might be wrong -- at the end of last week, beginning

6    of this week, are saying, "You know, we haven't heard much

7    about Alex Wheeler.  Maybe this next witness is going to bring

8    in the dirt.  Going to bring in the evidence to take it home.

9    Going to bring in the evidence that's going to convince me that

10   he is guilty of the crime charged."

11          Okay.  That witness didn't do it.  How about the

12   next witness?  Well, that witness didn't do it.  What about the

13   next witness?  Nah, that one didn't do it either.  And then all

14   the sudden the government stands up and says, "We rest.  We

15   rest.  We have no further evidence."  Then you say, "Okay.

16   That's all you got?"  And I believe that's the situation here.

17          So how did this whole thing start?  It started with

18   Stafford Garbutt, and you heard him testify for a couple of

19   days.  I would say he's quite impressed with himself.  I think

20   Mrs. Shelton says he's -- Stafford's always got to be the

21   smartest guy in the room.  And I believe, as he indicated --

22   well, first he said, "Well, I wanted to go because it just

23   isn't right.  What's going on at the Calumet Township Trustee's

24   Office just isn't right."

25          Well, he ought to know because he's the one that

 1    started it, and he's the one that conspired with Mary Elgin to

 2    literally steal the taxpayers blind.  Then he said, "I also

 3    read about this Mr. Van Til, a Lake County officeholder that

 4    got in trouble with the government for doing some things that

 5    he should not have done."  And I believe that's the real

 6    reason.  He got scared because he knew what he and Mary Elgin

 7    and Steven Hunter had been doing, and if the government comes

 8    knocking on their door, the three of them are in big trouble.

 9         So he tries to get an investigation started.  How do

10    we know it's Van Til?  Remember, Agent Holbrook of the FBI told

11    you that, that Mr. Garbutt said he was there because of

12    Van Til.  So he can tell you -- Mr. Garbutt can tell you all

13    day long that he was trying to do the right thing, but he was

14    trying to save his hind end.  That's what he was doing, in case

15    the government comes knocking.

16         There's an old saying:  First one on the bus gets a

17    free ride.  So he walks in with some documents that he thinks

18    the FBI is going to be interested in, gives it to him, and

19    within two weeks he signs up.  You're an informant.  You're a

20    confidential human source.  I always call them snitches.  It's

21    easier, but confidential human source sounds better.

22         So in two weeks he becomes a confidential human

23    source.  And to hear him talk, they sat down and talked to him,

24    gave him one or more recording devices and said, "Go get them.

25    Go record them."  That's what he told you.  Remember?  And he

1    said, "They left it up to me," me, Stafford, "to decide who I'm

2    going to record, when I'm going to record, how I'm going to

3    record, and why I'm going to record it."

4         There may be some truth to that because remember

5    what Agent Holbrook said.  Stafford would bring the recording

6    device back to him.  He wouldn't listen to it.  He would have

7    to turn it in so it could be downloaded and examined and things

8    of that nature.  He didn't listen to the recording.  Don't you

9    think that he should have and shouldn't he have said, "Well,

10   wait a minute, I think you need to do this.  See if you can get

11   a little bit of evidence about this.  How about this person?

12   Let's go -- let's see what this person's got to say."

13        And, remember, Stafford is in control of the

14   recording device.  He picks and chooses what he's going to do.

15   So what does he do?  I understand he made over 100 recordings.

16   I believe that's what Agent Holbrook said, over 100 recordings.

17   And each one of those recordings could be very short, could be

18   real long, hour and a half, two hours, something like that.

19        But what do we hear Alex Wheeler on?  Two of them,

20   the stick up the head and the other one said he's going to

21   participate 100 percent.  After that all -- and you've got to

22   believe that's the best they got on Alex Wheeler or you would

23   have heard it.  Now, you remember him saying there was another

24   recording made in Alex Wheeler's office by Stafford but his

25   words were, "Didn't have any evidentiary value."  In other

 1    words, it didn't show Alex Wheeler doing anything.  It didn't

 2    show him being guilty of anything.  Had no evidentiary value so

 3    you didn't hear it.

 4          Now, I believe -- it's my belief that every agent

 5    that works an informant, number one, has to do an investigation

 6    on him or should do an investigation on him to find out what

 7    kind of person they are.  Are they truthful?  Number two, you

 8    have to manage the informant.  And you have to be in control of

 9    the investigation as opposed to Mr. Garbutt.

10          I asked Agent Holbrook:  Why didn't you tell

11    Stafford to go down and talk to Alex Wheeler?  And maybe he did

12    and that recording that we didn't hear is a product of that.

13    But, again, how long was Stafford working as an informant?  How

14    long did he have the recording device?  I think a long time.

15    So the agent could have said, "We want to find out if

16    Mr. Wheeler has done what you say he does."

17          So all you got to do is say, "Stafford, go in and

18    strike up a conversation with him.  You're a smart guy.  Play

19    on his ego a little bit.  Why don't you go in there and close

20    the door and say, 'Alex, did you read that about George Van Til

21    in the newspaper?  He got indicted.  Ain't that the same thing

22    we've been doing?  I mean, look what you've been doing.  You've

23    been working in your office getting paid for 40 hours and 35 of

24    it is campaign time.  Aren't you afraid?'  Something along

25    those lines and see what Alex Wheeler says."

1       He didn't do it.  And I would submit to you if, as

2  Stafford said, he's in charge of the investigation, the reason

3  he didn't do it is because he knew that Alex wasn't doing that

4  and he wasn't going to get anything.

5       But the conversation that he did record with Alex,

6  in Alex's office didn't provide any evidentiary value.  So I

7  think a reasonable conclusion would be that Stafford did go in

8  there and did try to get Alex to talk but he wouldn't do it.

9  He didn't do it.  He didn't say anything.

10      Why?  It's my position, and only my position, he

11  didn't do anything.  He didn't do anything wrong.  There's no

12  conspiracy.  Now, if you're going to convict Alex Wheeler of

13  these two conspiracy charges, you have to agree that there, in

14  fact, was a conspiracy.

15      So I ask you, when did the conspiracy start?  How

16  did it start?  Who said what?  What's the evidence?  You -- the

17  government just can't say there's a conspiracy.  Believe it

18  because we said it.  That's what they are doing here.  What

19  evidence did you hear of Alex being involved in a conspiracy?

20  I would submit to you none.

21      And these trials, in some aspects and some regards,

22  are a little bit theatrics.  Okay.  And I would say, folks,

23  take a look at this evidence.  It goes from here to there.

24  Look at all these boxes.  Man, the government really hauled in

25  the evidence.  Must be guilty.  Except for these (indicating).

1    Here's what they got out of Alex Wheeler's office.  I don't

2    think they got Government's 28, 33.  They didn't get any of

3    this stuff out of his office, but it sure looks like there's a

4    heck of a lot of evidence there.

5           So what do we got in Alex Wheeler's -- from his

6    office?  It says desk:  Something about Mary Elgin.  Okay.  So

7    how did that get on his desk?  Where on his desk was it?  What

8    was it there for?  If that's all they got, that proves a

9    conspiracy?  That proves a conspiracy for honest services?

10          Got these envelopes.  2011, primary election.  This

11   was in 2014.  What does primary election candidate info from

12   2011 prove that he's in a conspiracy, that he's doing political

13   work?  It doesn't.  He could have brought that in one day,

14   decided he was going to take a look at it maybe on his lunch

15   hour, maybe not.  I don't know.  Speculation on my part.  Set

16   it there and forgot about it.

17          I asked Holbrook:  Where did you get those two

18   envelopes?  I don't know.  I wasn't there to search

19   Alex Wheeler's office.  I don't know where it came from.  What

20   was in his desk drawer?  Something that said Alex's stuff.  Is

21   that a felony to have something in your desk drawer at work

22   that may not relate to work?

23          What if Alex Wheeler -- let's say he was going to

24   Purdue Calumet here in Hammond studying for his MBA and he

25   brought some homework in the office in a textbook, and on his

1    lunch hour he was going to do some homework, maybe read the

2    book, and he left it there.  The next day, the government

3    serves a search warrant and they find this stuff.  Holy cow.

4    That's not related to Calumet Township Trustee's work.  Is that

5    a felony?  Is that a crime?  No.

6           There is no evidence that has been presented to you

7    that Alex Wheeler did any political work on his computer in his

8    office on company time.  As a matter of fact, the evidence has

9    been to the contrary, that Alex was not computer savvy.  Who

10   told you that?  I think Mr. Davis did, and I also think

11   Mr. Poole did.  And, remember, Agent Holbrook said, "Well, the

12   government came in and imaged the computers of everybody."  In

13   other words, they took an image of the computer.

14          They had the ability to go through that computer and

15   find out when these documents were put on the computer that

16   they found -- and I think it was a couple of things regarding

17   his campaign.  Who put them on there.  How it got on there.

18   Did it come as an e-mail?  Did somebody send it to him?

19          Incidentally, they have a copy of one e-mail in

20   there.  It's to Frederick C. Williams that Alex sent, and then

21   Mr. Williams sent it back to him, and then he sent it back to

22   Mr. Williams.  And the government is interpreting that as a

23   request for a campaign picture.  Well, if you look closely at

24   the e-mail, it shows that Mr. Williams is using his Purdue

25   University e-mail account.  Maybe he'll get indicted.  But it

1  has nothing to do with a campaign, nothing.  But that's their

2  mindset.

3          And, incidentally, if it came off of Alex Wheeler's

4  computer and it was an e-mail, did you ever hear any testimony

5  about how many e-mails were on Mr. Wheeler's computer and how

6  many they seized?  He could have had a thousand e-mails.  He

7  could have had 500 e-mails.  Did they find one e-mail to

8  somebody at Purdue Cal?  That, ladies and gentlemen, isn't

9  evidence of a conspiracy.

10          Now, I would like to go over some of these

11  instructions that the judge read to you, and I'm not going to

12  read them all over.  I've just sort of highlighted a couple

13  things here.  Jury instruction number 3:  Each defendant is

14  presumed innocent of each of the charges, and this presumption

15  continues throughout the case including your deliberations.

16          When you're back in the jury room, the judge is

17  telling you to consider Alex Wheeler innocent.  The government

18  has a burden of proving the defendant's guilt beyond a

19  reasonable doubt and this burden stays with the government

20  throughout the case.  A defendant is never required to prove

21  his or her innocence, and a defendant is not required to

22  produce any evidence at all.  Again, how can an individual

23  defendant match the resources of the federal government?

24          Number 10:  A defendant has an absolute right not to

25  testify.  The last sentence, you are not to even discuss it in

1   your deliberations because he has that right, and he's

2   exercised that right.

3          Judge has given you an instruction regarding

4   Stafford, the last part:  You may give this witness's testimony

5   whatever weight you believe is appropriate, keeping in mind

6   that you must consider that testimony with caution and great

7   care.  There is no other instruction for any other witness

8   along that lines.

9          Number 25:  If a defendant performed acts that

10  advanced the crime but had no knowledge that the crime was

11  being committed or was about to be committed, those acts are

12  not sufficient by themselves to establish the defendant's

13  guilt.  Further, a defendant's association with persons

14  involved in a crime or criminal scheme is not sufficient by

15  itself to prove his or her participation in the crime or

16  membership in the criminal scheme.

17         Just because Alex sat in political meetings or

18  deputy meetings doesn't make him part of the conspiracy.  The

19  government has to prove that he was part of that conspiracy.

20  They just can't say, "Well, Alex is part of that conspiracy

21  because he has been at the Calumet Township Trustee's Office

22  since 2003, and he was Mary Elgin campaign manager."  It

23  doesn't make him part of the conspiracy.  What's the evidence?

24         Instruction number 30:  In deciding whether a

25  particular defendant joined the charged conspiracy, you must

1    base your decisions only in what that defendant did or said.

2    To determine what the defendant did or said you may consider

3    the defendant's own words or acts.  You may also use the words

4    or acts of other persons to help you decide what the defendant

5    did or said.

6          And the government is hanging their hat on the

7    recording where Alex is talking about a stick upside the head.

8    And, folks, I believe that has to be taken figuratively.  You

9    know, there's been no evidence that Alex went around or anybody

10   else went around beating people on the head with a stack.  I'll

11   get back to that in a minute.

12         Number 36, definition of kickback:  Kickbacks

13   involve the exchange of a thing of value for official action by

14   a public official, in other words, a quid pro quo.  What

15   official act did Alex do and what did he get for it?  He didn't

16   get anything.  And remember what Agent Holbrook said.  I almost

17   fell out of my chair.  He said, "No, there has been no quid pro

18   quo."  He said that in his testimony.  There was no quid pro

19   quo.

20         A kickback occurs when a public official demands,

21   solicits, or seeks, or asks for directly or indirectly

22   something of value from another person in exchange for being

23   induced to do or admit to do any action in violation of the

24   official duty and the act itself provides the source of the

25   funds to be kick backed.  In other words, a kickback is a form

1   of bribery where the government official's actions and the

2   source of the funds to be paid to the public official.

3         Bribery?  What did Alex Wheeler get out of this?

4   What's the official act?  If you'll recall, I don't think there

5   was anybody from that witness stand that said Alex Wheeler was

6   in charge of layoffs; Alex Wheeler was in charge of firing;

7   Alex Wheeler had anything to do with layoffs; Alex Wheeler had

8   anything to do with firing.  Anybody hear a witness get up

9   there and testify?  I didn't.

10        But the government is saying, "Well, he was close to

11  Mary Elgin, you know, so maybe he had some influence.  Maybe he

12  didn't."  You cannot guess Alex Wheeler guilty.  There has to

13  be evidence.  It has to be able to go back in that jury room

14  and say this proves that there's a conspiracy.  This proves

15  that there's a kickback.  This proves that there's a bribery

16  scheme.  How can you do that based on the evidence that you

17  heard here?

18        Instruction number 37:  It says in this case the

19  government has alleged that the specific matter is, number one,

20  retaining or not laying off employees; and, number two,

21  favorable treatment in job duties and responsibilities.  What

22  witness came in here and said Alex Wheeler had anything to do

23  with laying off employees?  What witness came in here and said

24  Alex Wheeler had anything to do with favorable treatment in job

25  duties and responsibilities?  Nobody did.

1      Well, the government will say, "Well, he didn't have

2  to because Mary Elgin did it.  Steven Hunter did it.  Because

3  they're part of the conspiracy."  And my question I would ask

4  you to think about asking is, what conspiracy?  What have you

5  proved?

6      Stafford was wearing a wire.  Why didn't he just

7  stand up in a political meeting and say, "Okay, folks.  Are we

8  all in agreement if somebody doesn't buy tickets, we're going

9  to lay them off?  We're going to fire them.  Are you on board

10  with that, Alex?  Are you on board with that, this deputy, that

11  deputy?"  If everybody said, "Yeah, we'll do it," conspiracy.

12      Don't have that.  Don't have any of that.  As to

13  wire fraud, a person acts with intent to defraud if he or she

14  acts knowingly with the intent to deceive or cheat the victim

15  or victims in order to cause a gain of money or property to

16  himself, herself, or another, or the potential loss of money or

17  property to another.  What did Alex do?

18      As to honest services wire fraud, a person acts with

19  intend to defraud if he acts knowingly with the intent to

20  deceive or cheat the victim or victims in order to deprive

21  another of the intangible rights of honest services.  What did

22  he do?  I guess it could be argued that Alex is a victim

23  because he had to buy five tickets.  He had to pony up 500

24  bucks.  Sell them.  Eat them.  Buy them.

25      I believe the testimony was in 2003 there was about

1   200 employees in the Calumet Township Trustee's Office, and

2   then it got whittled down to about 80 because of the decrease

3   in property tax revenue.  Now, we have to assume that some of

4   those individuals worked for Alex.  How many?  There was no

5   testimony to that effect.  Couldn't the government have brought

6   one, two, three prior employees in?  That's all they had to do.

7   Put them on the witness stand.

8           Did Alex Wheeler hand deliver you some tickets?  Did

9   he tell you if you didn't buy them, you're going to be fired;

10  you're going to be laid off?  Surely, if he's part of this

11  conspiracy and surely if she's doing this, they can find

12  somebody.  One person testified that she worked for Alex,

13  Linda Collins-Brown.  And what did she have to say about it?

14  No good scoundrel?  Horrible person?  Twisted my arm?

15  Threatened to fire me?  No.  She said he was a fine gentleman.

16          If that's the best they have from Alex's former

17  employees, that he's a fine gentleman, where's these other

18  people that he must have coerced, intimidated, defrauded, made

19  promises to, false misrepresentations?  You saw nobody from

20  that witness stand that said that about Alex Wheeler.  And,

21  ladies and gentlemen, what has not been given to you speaks

22  volumes.  If they had it, they would have bought it in.  If

23  they had somebody that was prepared to do that, they would have

24  brought them in.  Didn't happened.

25          Now, there has been a lot of red herrings flying

1   around here, and a red herring is something used to distract

2   you.  One of those red herrings is the employee handbook.  Why,

3   they violated the employee handbook.  Shame on them.  How dare

4   they.  Wouldn't it have been interesting if Mary Elgin, instead

5   of having the EPIC trivia contest, would have said, "Okay.

6   We're going to have a quiz on the employee handbook."  How many

7   people do you think would have known what was in that employee

8   handbook, word for word, section by section?  Nobody.

9          And the judge has instructed you and you'll have --

10  reading only part of this:  Violation of policies of the

11  employee handbook should not be considered as implying a

12  violation of a federal criminal law.  You may not convict the

13  defendant of any of the counts alleged that he or she engaged

14  in a conspiracy to commit a scheme to defraud simply on the

15  basis of the conclusion that they may have violated the

16  policies of the handbook.

17         It is not a crime.  Now, you might be able to be

18  discharged, have your pay docked, suspended, reduced your

19  position, but it's not a crime.  It's not a law to violate an

20  employee handbook.  But I think some people might have thought

21  that after the way it was paraded around by the government, but

22  it's not.

23         Now, let's look at the stick up the head.  This

24  comes out of Government's Exhibit T1.  And Page 16, the very

25  bottom, it starts AW, Alex Wheeler:  "I'm going to tell you

```
 1   what it's really about.  People don't see no consequences if
 2   they buy them or not."  And he's stating a true fact.
 3          There are no consequences.  You cannot force anybody
 4   to buy tickets.  If somebody else is suggesting that, okay,
 5   that's on them, not on Alex.  And when a new public official
 6   comes in, they can't clean house and fire everybody; otherwise,
 7   they'd be in court.
 8          So the paragraph that the government is beating on
 9   says, "There's nothing you can say.  Ain't nothing I can say.
10   You -- you got to hit them upside the head with a stick."
11   That's not legal.
12          "I told Mary the first year she got here, I said,
13   'You gave them a year, Mary.  You got to take the stick out and
14   bust some damn heads, if you know what I mean.  You can sound
15   it any way you want it to sound.'"
16          So when Mary first got there, that was 2003 and that
17   was ten years roughly, give or take a few years, probably when
18   he made that statement.  "But if you don't, people will know
19   there ain't no consequences.  There ain't nothing anybody can
20   do in this room and say to them if there ain't no consequences.
21   I mean, that's what life is."
22          I interpret that -- you interpret that any way you
23   want -- Alex is saying there ain't no consequences.  There's
24   nothing we can do to these people.  So if Mary Elgin or
25   somebody else is urging them to get tough, do something to sell
```

 1   tickets, Alex is saying, "Ain't go consequences.  Can't do

 2   anything."

 3          Further down:  "If there ain't no consequences, if

 4   Stafford know I ain't going to be able to do nothing to him,

 5   whether it gets him or not, Stafford say, 'What the hell.  I

 6   ain't going to buy them.  What you gonna do?'"  He's stating a

 7   fact.

 8          And then on Page 18, the next page, I believe this

 9   is Alex Wheeler:  "Stafford, it's the way you can deal with it

10   right here.  I'm not talking about the law.  What I'm saying,

11   if you know that there ain't never gonna happen to you legally,

12   no other way, then I don't see no way for you to force anybody

13   to do any damn thing."  So I'm gathering that Stafford, at some

14   point, is making the issue.  You can't coerce nobody if you

15   ain't got no mechanism to coerce them with.

16          And then Alex says:  "You don't want to go back in

17   the past."  But the trustee told him that.  Don't go back into

18   the past, and I would submit to you that's Alex saying, "You

19   can't go back into the past."  Number one, it's illegal.

20   Number two, you don't want to do it because Alex wrote a

21   campaign letter on behalf of Mary Elgin -- it was referred to

22   in the government's case -- that says -- and this is

23   Government's Exhibit 60 right there where he's writing a

24   letter.  And, actually, I believe the testimony was he didn't

25   write it, Stafford did, but he signed off on it.  But the date,

1    October 28, 2003, where he says basically Mary Elgin did away

2    with the two percent club.

3              Now, much has also been made of Government's Group

4    Exhibit 52.  These are the time sheets.  But they're really not

5    the time sheets.  Because, again, it says right down at the

6    bottom, "I attest that the recorded time is the actual time I

7    signed in and out of the Calumet Township Trustee's Office,

8    which is recorded for security and insurance purposes only."

9              Now, if Alex doesn't put his actual time there, is

10   that a violation of the law?  No.  He gets paid 40 hours a

11   week.  If, let's say, he put in 10 hours one day, 12 hours

12   another day, 6 hours another day, is he doing anything wrong?

13   Don't think so because there was testimony from individuals,

14   and I think Gladys Miller may have been one of them, that they

15   in finance do the actual time sheets.  And those are the green

16   sheets that have been marked and made an exhibit.

17             So what's the benefit to him of doing it?  He's a

18   deputy.  There has been testimony from others that they can set

19   their own hours.  They can do what they want.  They're still

20   going to get paid for 40 hours a week.  And if, let's say, he's

21   out of the office for a campaign meeting for two hours and

22   let's say over a period of time that he has accumulated 10, 15,

23   20 hours of accumulated overtime -- he's not going to paid for

24   that.

25             And the government says, "Oh, my gosh, he keeps

1   track of every minute, and he wants that comp time."  I would

2   just ask you to look at some place -- I think it's in green

3   writing -- it's not him doing that.  It's somebody in the

4   finance department doing it.  He's not asking for the comp

5   time.  And I believe that Ethel Shelton said that oftentimes

6   Alex was one of the last ones to leave before the building was

7   locked up at 8:00 or 8:30, something like that.

8          So if that's the case, what was Alex Wheeler doing?

9   Was he catching up on his township time?  Was he working on his

10  political campaign?  How would he be working on his political

11  campaign at the office other than perhaps using the office

12  computer?  There wasn't anything on there that he prepared.

13  And if there was, because of the image that the government took

14  of his computer, there would be a forensic computer expert

15  coming in saying, "Well, it appeared to me at 7:30 p.m. on this

16  date, he's using the township computer to do this, to work on

17  campaign materials."  Nobody came.

18         So what do they do with that image?  Did somebody

19  examine it?  We don't know.  Didn't hear about.  Did they

20  examine it and say, "Nothing's here.  Toss it.  Erase it"?  No.

21  I believe a reasonable inference that you can make is there was

22  nothing, nothing of any evidentiary value on that computer.

23         Now, I would ask you when you make your decision

24  regarding Alex Wheeler to judge him not on what he might have

25  said in one recorded meeting.  And, again -- I'm sorry.  There

1    were two recorded meeting where he said, "I'll give 100 percent

2    effort," on his part.

3          Judge him on what he did.  Judge him on the evidence

4    that people came in and testified under oath and said, "This is

5    what Alex Wheeler did."  There's been inferences that he's a

6    deputy; therefore, he handed out tickets.  He gave his

7    employees tickets and threatened them or misrepresented.

8          What's the evidence of that?  I heard evidence all

9    over the place.  One, that Johnnie Barbie, who didn't testify,

10   from the mail room delivered the tickets.  Put them on people's

11   chairs.  Put them on people's desks.  Is that true?  That's

12   what individuals told you.  Johnnie Barbie didn't tell you

13   that.

14         Okay.  Other people say, "No, I got the tickets from

15   my deputy in an envelope with my name on it."  I'm not aware of

16   anybody saying Alex Wheeler gave them directly a ticket with

17   their name on it.

18         Did anybody come in here and say that Alex Wheeler

19   threatened them to buy tickets?  Did anybody come in here and

20   say that Alex Wheeler pocketed the money from the tickets?  Did

21   anybody come in here and say that Alex Wheeler falsely

22   misrepresented anything?  I didn't hear any.  But there's a lot

23   of mud being thrown.

24         James Leslie, he's the guy that's printing off the

25   posters.  I don't remember seeing him up there.  But he had

1    something from Alex Wheeler or about Alex Wheeler on his

2    computer, right?  Therefore, that means Alex did what?  Don't

3    know.  How did he get it there?  Did Stafford take it down to

4    him?  Did Mary Elgin take it down to him because she wanted his

5    smiling face on the poster at the campaign headquarters?  We

6    don't know.

7            The government has the burden of proof.  If James

8    Leslie did all these campaign chores on government time, where

9    is the evidence of that?  And, most importantly, what ties

10   Alex Wheeler to that?  Stafford supposedly did all of these

11   things, but I don't believe he presented you with any evidence,

12   concrete or otherwise, that Alex did anything.

13           But yet he was in control of the microphone.  He was

14   in control of the recordings.  He was in control of the

15   investigation basically.  And I would think with this being a

16   criminal case and Alex Wheeler being a defendant, that the

17   government witnesses are going to come in and say things that

18   are not complimentary to him, that are not exonerating -- what

19   would I call it -- exculpatory for him.  I didn't hear any.

20   He's a fine gentleman.

21           I don't doubt that there was all kinds of chicanery

22   going on in the Calumet Township Trustee's Office.  But I would

23   say the leaders of the pact would have been, and the conspiracy

24   could be certainly made, for Mary Elgin, Stafford, and

25   Steven Hunter.  The government is trying to draw Alex into

1    that, and I don't think they have been successful.  That's your

2    question.  That's your answer to give us.  Has the government

3    been successful in bringing Alex into two conspiracies?

4            I'm just about done.  When I go -- when you go back

5    there, I would ask you to pose this question to yourself and to

6    others.  What -- at what time did Alex join this conspiracy?

7    And what's the proof?  What is the proof that Alex ever joined

8    the conspiracy?  What's the proof?  I would suggest there is

9    none.

10           Ladies and gentlemen, it is an awesome

11   responsibility to sit in judgment of another person, and I

12   would ask you to take that responsibility very heavy, and I'm

13   sure you will.  It appears from the evidence that Alex Wheeler

14   has led an upstanding life.  Had he not, you would have heard

15   about it.  That he worked, and he worked diligently for the

16   Calumet Township Trustee's Office.

17           I believe the evidence is that he never did anything

18   wrong, maybe a minor hiccup here or there by having something

19   on the floor or maybe on the desk or in the desk from years

20   ago, but I don't believe that rises to the level of a felony of

21   conspiracy.

22           So on behalf of Alex Wheeler, I would like to thank

23   you.  I would ask you, please, follow the judge's instructions.

24   Hold the government to their burden of proof.  Remember your

25   obligation to consider Alex Wheeler innocent, innocent here in

1    this courtroom and innocent back in the jury room, unless and

2    until the government proves him guilty beyond a reasonable

3    doubt.  And, ladies and gentlemen, I don't think the government

4    has come close to that burden.  Thank you.

5            **THE COURT:**  Ladies and gentlemen, do you want to

6    take a break?  Are you ready to keep going?

7        (The jury collectively responded.)

8            **THE COURT:**  Keep going.  Okay.  Counsel for the

9    government may proceed with rebuttal argument.

10                   **REBUTTAL ARGUMENT - GOVERNMENT**

11          **MR. ZANZI:**  Can you all hear me okay?

12          Ladies and gentlemen, it has been a long two weeks.

13   It has been a long day.  I'm sure that you are tired of hearing

14   from the lawyers.  I'm sure you're ready to start talking about

15   this case and making decisions.

16          It's been said repeatedly that the government bears

17   the burden of proof.  We do.  And because of that, I have to

18   respond to some things, so bear with me as I go through some of

19   the statements and arguments made by defense counsel.

20          First, I want to start off by putting this in

21   context, the case in context.  You have heard testimony that

22   Ethel Shelton and Alex Wheeler are good people.  They led

23   honorable lives.  They have friends who care about them and

24   respect them.  None of that is in dispute.  The government is

25   not alleging that.

1          Something that was said by Ethel Shelton's character

2     witness, Pastor Norman Hairston -- I think one of the jurors

3     had posed the question:  Can good people do bad things?  And he

4     said yes.

5          This case is about whether or not the law was

6     violated and whether or not Ethel Shelton and Alex Wheeler

7     participated and joined in the conspiracy.  That's all this

8     case is about.  It's not about whether or not they've led

9     exemplary lives or all the things they had.  It's not an attack

10    on their character.  It is about holding government employees

11    accountable for their participation in an illegal conduct.

12         So I just want to put this in context because it's

13    about what was done here, ladies and gentlemen, and I want to

14    go through a couple of -- one thing I think has been confused

15    in the statements is what it is the government has to prove.

16         This is a conspiracy case.  And you have heard all

17    the instructions, and I want to show them to you.  I want to

18    show you what it is the government has to prove and doesn't

19    have to prove so that when you're sitting back in the jury

20    room, you understand what the burden is on the government and

21    what it isn't.

22         The jury instruction number 26 and 27 talk about

23    what the government has to prove beyond a reasonable doubt.

24    And it states these are the elements:  That a conspiracy to

25    commit wire fraud or honest services wire fraud in Count 6

1    existed; that the defendant knowingly became a member of the

2    conspiracy with an intent to advance the conspiracy; and that

3    one of the conspirators, not necessary Ethel Shelton, not

4    necessarily Alex Wheeler, committed at least one overt act in

5    an effort to advance the goal or object of the conspiracy.

6         Did Ethel Shelton and Alex Wheeler join the

7    conspiracy?  Did they do so?  Did they knowingly become a

8    member of the conspiracy?  And did they do that with intent to

9    advance the conspiracy?  That's what the government has to

10   prove.

11        You are also getting instructions on the underlying

12   elements of -- this is, for example, honest services wire

13   fraud.  And jury instruction number 32 is the elements of wire

14   fraud.  Pay attention to the first paragraph of this, ladies

15   and gentlemen.  The crime of conspiring to commit wire fraud is

16   different from the crime of wire fraud.

17        However, to help you decide whether the defendant

18   conspired to commit wire fraud, the elements of wire fraud and

19   honest services wire fraud are laid out here.  So the

20   government does not have to prove that Ethel Shelton and

21   Alex Wheeler knowingly devised or participated in a scheme to

22   defraud; that they did so with intent to defraud; that the

23   scheme to defraud involved a materially false or fraudulent

24   pretense or any of this stuff happened.

25        Government does not have to prove these elements

1    beyond a reasonable doubt.  They -- the government -- we have a

2    burden of proof to show that they joined -- knowingly joined a

3    conspiracy to commit these crimes.

4          So you've heard argument that, "Well, Mr. Wheeler

5    never threatened or coerced anyone.  Alex Wheeler didn't do

6    this.  Ethel Shelton didn't do this.  Those are distractions.

7    Look at the elements the government has to prove on conspiracy.

8    Did they knowingly join the conspiracy with intent to advance

9    the conspiracy?

10          Arguments were made that Ethel Shelton and

11   Alex Wheeler didn't agree to join the unlaw conspiracy, or they

12   didn't know what they were doing was wrong.  Well, the evidence

13   shows that they did know what they were doing was wrong.  They

14   talked about it.  They talked about breaking the law.  They

15   talked about Van Til.  Ethel Shelton met with Gladys Miller,

16   asked her to meet after hours at the annex to give her tickets

17   and talked about, "I'm not going to jail for anybody."

18          The way that they acted and what they did is

19   evidence that what they knew they were doing was wrong and

20   illegal.  There were memos sent that you can't engage in

21   political activity on the public's dime.  But do you need

22   somebody to tell you?  Do you need a memo?  Do you need a

23   handbook to know that you can't steal from the government?

24   That you can't do personal business, political business, on the

25   public's time?

1          They want you to believe that this was all in good

2     faith, that their intentions were good.  Ethel Shelton and

3     Alex Wheeler had a history of being involved in politics, being

4     involved in union leadership, working on committees, knowing

5     what's right and wrong in the workplace.  They knew exactly

6     what's right and wrong.  Somewhere along the way, they forgot

7     that.  They got involved in this conspiracy, and they forgot

8     that.

9          Jury instruction 29, Ethel Shelton -- you've heard

10    testimony from James Leslie and from Stafford Garbutt that

11    Ethel Shelton was involved in the beginning.  Ethel Shelton

12    says that she was not.  She says she was her best friend.  She

13    says that she wasn't her best friend.  It's very confusing what

14    she's saying.  But the point is, is that for purposes of the

15    instruction, for purposes of your deliberation, for purposes of

16    becoming a member of the conspiracy, a person need not join it

17    at the beginning.

18         Whatever you believe -- whether you believe that

19    Ethel Shelton got involved from the beginning or in 2005 or

20    2006 when she became the executive secretary, if she joined it

21    at some point and the government has proved the elements that

22    she joined it knowingly and with intent to advance the

23    conspiracy, then she's a part of the conspiracy.

24         A person may become a member of a conspiracy even if

25    a person agrees to play only a minor part in the conspiracy.

1   To run a campaign at a public office, Mary Elgin couldn't have

2   done that by herself.  She needed people she could trust to do

3   it.  And everyone played a different role.  Some people played

4   minor roles.  Some people played larger roles.  That's not a

5   question.  Even if they played a minor part in the conspiracy,

6   they agreed to join the conspiracy.  If they knew they were

7   entering into the conspiracy, then -- and they intended to

8   advance the conspiracy, then they joined the conspiracy.

9           There are allegations made that there was no fraud.

10  The fraud was on the public, ladies and gentlemen.  The fraud

11  was on the taxpayers.  The public was expecting the people of

12  the Calumet Township Trustee's Office to do the work for the

13  poor, that the money that they were paying was solely going to

14  be used for the poor.  And Ethel Shelton and Alex Wheeler say

15  that they personally didn't do anything fraud.  Well, that's

16  not one of the elements of conspiracy.

17          I'll ask you to take a look again.  I'm not going to

18  show you again.  You've seen the payroll records many times.

19  Those payroll records are not just there for security.

20  Gladys Miller testified from the finance department, she's the

21  one who deals with the State Board of Accounts.  This is a

22  public entity that has to keep accurate records.  Why?  Because

23  the State Board of Accounts is a check on a public entity to

24  know what's happening with the money the taxpayers are paying,

25  where it is going, what people are doing.  That's a regulatory

1   agency.  It's the only way that the Calumet Township Trustee's

2   Office can identify how people should be paid.  That record

3   isn't just about security.  There's a certification at the top.

4        Stating something falsely on there is a false

5   representation.  And what it shows is it shows that they

6   weren't being honest.  You've seen it numerous times.  There's

7   been this argument over and over that Alex Wheeler was working

8   long hours and doing things for the job search works program.

9        Nobody knows -- there's no evidence in this case

10   about that, ladies and gentlemen.  The only thing the evidence

11   shows is that Alex Wheeler was very meticulous about how he

12   recorded his time.  There is a week in there, which we showed

13   you in evidence, where one day he clocks in at 9:00 o'clock.

14   The next day he clocks in at 9:05, same handwriting.

15        He was very careful about when he came in and when

16   he left.  And someone being that careful would know, should

17   know, that when they're taking time they're claiming that

18   they're working when they're spending a two and a half hour

19   meeting or one and a half hour meeting at the north annex

20   discussing politics, that's not being truthful.  That's not

21   telling the State Board of Accounts the truth.  That's not

22   telling the public the truth.  That's not honest work.  We

23   don't know what he was doing, ladies and gentlemen, but we know

24   what he represented.  We know that at least on those dates, on

25   October 3rd and September 26th, he wasn't being truthful about

1   what he was doing.

2          Ladies and gentlemen, public service is a privilege,

3   not a right.  When your salary is paid by the taxpayers, you

4   are accountable to the taxpayers, and public officials are not

5   entitled to anything.  They are not entitled to do whatever

6   they want on the public's dime.  They are not entitled to do

7   whatever they want with the public's property.  They are not

8   entitled to re-election.  They are not entitled to the

9   hard-earned money of public employees to give them a

10  competitive advantage.

11         What happens here, ladies and gentlemen, is Mary

12  Elgin got elected.  She brought her friends and her close

13  advisors along with her.  And whenever you believe that

14  Ethel Shelton became a part of this, she did become a part of

15  this.  Her salary she testified was, I think, between 38,000

16  and 40,000 when she became an executive secretary.  Gladys

17  Miller testified about her salary too.  Gladys Miller has been

18  working at the township for how long and everything that she

19  does in terms of dealing with finance.  She was an assistant

20  deputy.  Ethel Shelton was making the same amount as her.  Was

21  she providing the same services to run the operation for the

22  Calumet Township Trustee's Office?

23         Everybody benefitted from this.  They kept their

24  jobs and stayed in power.  This was all a scheme.  It doesn't

25  have to be for Ethel Shelton and Alex Wheeler's personal gain.

1    It could be for Mary Elgin's personal gain.  The conspiracy can

2    be for that.

3          But they did benefit.  The problem here, ladies and

4    gentlemen, is that they came into office and they abused the

5    office to keep themselves in power.  You heard when I asked

6    Lamar Taylor when Mary Elgin first ran for office:  Did you

7    solicit the employees of the Calumet Township Trustee's Office?

8    He said no.  He didn't have access to it.  Dozier Allen raised

9    money from the Calumet Township Trustee's Office with the two

10   percent club.  But as soon as Mary Elgin came in, she used that

11   as a fundraising source.

12         And you saw the amounts of money that was coming in.

13   That's a competitive advantage from the employees that they had

14   no right to.  If they want -- they're allowed to solicit

15   tickets from the employees, but mail it to their homes.  Don't

16   give it to them in their office through their deputies.

17         They're not entitled to that money.  And you heard

18   employees come in here and testify that they didn't want to pay

19   for that.  What?  Everyone just assumed that the employees

20   wanted to pay for this money, for these tickets?  They want to

21   pay $11 or $22 each pay period to buy these tickets on the

22   salary they were making?  Some of these employees had no

23   affiliation with Mary Elgin whatsoever.  People like Gladys

24   Miller and Horace Clay, they're just trying to do their job.

25   That's all they're trying to do.

1    Gladys Miller -- this is part of the system, the

2    expectation.  Every single year she paid for the tickets.  The

3    one time that she says, "I can't do it," 60 bucks for the

4    prayer brunch, she gets a call from Ethel Shelton.  And she

5    says, "Do you want to have" -- this is not just scheduling a

6    meeting with Mary Elgin.  Think of the context of that

7    conversation.

8    Gladys Miller was talking about explaining to

9    Ethel Shelton that she couldn't buy these tickets, and then in

10   the context of that:  Do you want to schedule a meeting with

11   Mary Elgin to explain that to her?  How do you think that makes

12   them feel?  Where's the respect and dignity for the employee?

13   I don't know.

14   Ethel Shelton and Alex Wheeler may have been

15   champions for union workers in the past, but where were they

16   protecting the union workers then?  You heard about layoffs,

17   that they were involved in layoffs -- actually, I'll get back

18   to that in a second.

19   The big defense theory in this case is to point the

20   finger at Mary Elgin.  This is all Mary Elgin's idea.  She told

21   us to do it.  She ruled with an iron fist.  We were just

22   following orders.  You know what that is, ladies and gentlemen?

23   That's an excuse.  Remember, this is a conspiracy case.

24   Mary Elgin did not engage in this scheme alone.  She got help

25   from her friends.

1          Ethel Shelton packed ticket envelopes.  She

2    collected money.  She made calls for her.  She kept track of

3    who's naughty and who's nice.

4          Alex Wheeler was her campaign manager, and he wants

5    to pretend he wasn't involved in this at all and he didn't know

6    what was going on.  He distributed tickets to employees.

7    Linda Collins-Brown said so.  He said so himself.

8          Showing Government's Exhibit 14, Page 21, it's easy

9    to pick and choose quotes, but you can't hide from your own

10   words.  "Well, I'm just going to say that I'm going to give you

11   100 percent.  I'm going to make sure they give you 100

12   percent."  Not a hundred percent effort.  I'm going to give you

13   100 percent.  I'm going to get -- that is an agreement.  That

14   is an agreement to join the conspiracy.

15         Mary Elgin, in order for this to advance the

16   conspiracy, she needed people that she could trust.  She needed

17   people who believed it was okay to sell tickets to employees at

18   work or willing to do it despite the law.  She needed people

19   who were committed to getting 100 percent commitment from their

20   subordinates.  She needed people who believed that deputies

21   needed to bust heads for full participation.  We're not

22   alleging that anybody hit anybody.  This is not an assault

23   case.  She needed willing participants and people who were

24   willing to break the law.  She got that.

25         Ethel Shelton and Alex Wheeler are trying to paint

1    different pictures of themselves, that they're smart,

2    independent people but that they can't make decisions for

3    themselves.  When subjected to cross-examination, Ethel Shelton

4    did admit that she made choices.  These are two impressive

5    individuals.  They have a history of working in employee rights

6    and labor issues, and that experience should have taught them

7    that they know what's right and wrong in the workplace.

8         They have a history of making their own choices and

9    their own decisions.  And, ladies and gentlemen, everybody has

10   free choice.  Everybody has free will.  If your employee -- if

11   your boss tells you to break the law and you follow the law and

12   say, "I just do what my boss says," that's not a defense.

13   Everybody has a choice, ladies and gentlemen.  You can say no,

14   like they probably said no in the past to management when they

15   were working for the union.  Why didn't they say no this time?

16        These were choices, ladies and gentlemen.  They

17   chose to help Mary Elgin.  That is their choice, and they can't

18   blame anyone for their decisions other than themselves.

19        I want to talk to you a little bit about kickbacks.

20   Jury instruction 36, this has been muddled up in arguments by

21   the defense.  Read the instruction.  All the instructions are

22   important, but I want to point you to the kickback.  Kickbacks

23   are understandings.  They're an agreement.  They're a quid pro

24   quo.  The government doesn't have to prove that Ethel Shelton

25   and Alex Wheeler received anything.

1        The word "extortion" and "coerced" and "forced" has

2   been used over and over and over and over.  This is not an

3   extortion case.  The government does not have to prove that

4   anybody was forced.  It doesn't have to prove that there was

5   any pressure.  A kickback can occur in many ways.  A kickback

6   is an understanding.  It is an understanding.  And whose

7   word -- we had several employees come in here.

8        They said there was no evidence of a kickback.  A

9   kickback isn't only dealing with contractors.  Here, the

10  understanding from the employees was that they would get their

11  job, as employees, and the money that they received for that

12  job, some of that would have to go back to the trustee.

13       Now, that's the understanding.  The government

14  doesn't have to prove that that actually was what happened.

15  They don't have to prove that anybody was actually laid off.

16  That was the understanding.

17       You had several employees come in here -- Gladys

18  Miller said she expected it with the job.  She believed that

19  buying tickets would positively effect her job.  Debra Piggee

20  said she felt expected to buy tickets or felt that her job

21  would be impacted if not.  She went to a rally after working a

22  full day serving the public because she did it for job

23  security.

24       Horace Clay said people told him they were laid off

25  for not buying tickets.  Cynthia Holman-Upshaw felt pressured

1    to buy tickets.  Linda Collins-Brown felt it was expected of

2    her to buy tickets.  Warrien Poole felt expected to buy

3    tickets.  That was their understanding.  The kickback does not

4    require a written agreement or contract or statement.  It need

5    not express the quid pro quo agreement in express terms.

6          The quid pro quo can happen by action.  It happened

7    by context.  When you have deputies handing out tickets or

8    leaving them on their chair or walking to them during their

9    lunch breaks -- this excuse about breaks and lunch breaks is

10   offensive, ladies and gentlemen.  They're using it as an excuse

11   to say what they were doing is right.  What about the

12   employees' lunch breaks?  What about their breaks?  Don't they

13   have a right to be free from being harassed by their

14   supervisors or being encouraged gently and kindly, "Hey, it

15   would really help out.  You know, we got layoffs going on."

16         What about their breaks?  Aren't they entitled to a

17   break.  Does that make it right for Ethel Shelton and

18   Alex Wheeler and everyone else involved in this to do it during

19   a break?  Former union leaders should know better.

20         Alex Wheeler says there is no evidence against him.

21   The evidence against -- first of all, the evidence against

22   Ethel Shelton is overwhelming.  She's -- I don't think it is

23   even disputed that she was distributing tickets in the

24   workplace up on the 3rd floor, and she was collecting this and

25   keeping track of everything.

1            And the fact that people like her doesn't matter.

2    She's still doing it.  It's not -- like I said, this is not a

3    -- it's not about their character.  It's not about their

4    personality.  She's knowingly joining the conspiracy.  She's

5    advancing the conspiracy.  She's helping.  That makes her

6    guilty.

7            And Alex Wheeler did the same thing.  I'm not going

8    to put his quotes up again, but his quotes are pretty clear.

9    He said, "I will give you 100 percent."  He's agreeing.  He's

10    participating.  He handed out tickets.  He can't hide from his

11    words.

12            Now, I've not talked a lot about Stafford Garbutt

13    and defense counsel did.  They spent a lot of time attacking

14    his character, his motives.  They seem obsessed with who he's

15    sleeping around with, if he had sex with Mary Elgin.  And there

16    have been questions asked that he had disagreements about

17    religion with Ethel Shelton and that he said things that were

18    offensive to her.  What did that accomplish, ladies and

19    gentlemen?

20            This case really isn't about Stafford Garbutt.

21    Stafford Garbutt is -- nobody's saying he's a hero.  Nobody's

22    saying that -- he, himself, admits that he was a part of it, a

23    big part of it.  What Stafford Garbutt did is he let law

24    enforcement know about it.  In order for law enforcement to

25    find out more about it, they used him to record.  And he

 1    recorded -- he provided recordings.  And which ones were

 2    selected and which ones that -- ladies and gentlemen, whatever

 3    Stafford Garbutt's motives are, it doesn't change what

 4    Ethel Shelton and Alex Wheeler said in those conversations.  It

 5    doesn't change what was found on their desks.  It doesn't

 6    change what was found on their computers.  It doesn't change

 7    what the employees said.  That's the evidence, ladies and

 8    gentlemen.

 9         You heard testimony -- I want to address something

10    because I think there has been a misimpression here, ladies and

11    gentlemen, that Stafford Garbutt while working as an FBI

12    informant was instructed the copy or obtain documents that were

13    in plain view.  You heard Special Agent Nathan Holbrook testify

14    about plain view.  There was a suggestion in cross-examination

15    that there may have been some violation of privacy or rights.

16    You heard the judge strike that remark.

17         This whole nonsense about obtaining documents is a

18    red herring.  We heard about red herrings.  It's a tactic meant

19    to distract you.  The judge decides the law.  The judge decides

20    whether something is legal or illegal.  The judge decides

21    whether evidence is admissible or inadmissible.  The judge has

22    admitted all the evidence that you heard and saw.  That means

23    the judge has decided it is legally permissible for you to

24    consider all of the evidence that has been admitted.

25         It is your job to assess the evidence, to weigh it,

1    to use your common sense and reasoning to make sense of it.  It

2    is your job to assess whether Ethel Shelton and Alex Wheeler

3    meant what they said in conversations they did not know were

4    being recorded.  It is your job to decide what conclusions to

5    draw about the overwhelming amount of physical evidence of

6    campaign work found at the Calumet Township Trustee's Office,

7    including in Ethel Shelton and Alex Wheeler's office.

8            It is your job to evaluate the credibility of

9    current and former township employees and decide whether they

10   were telling the truth when they said that they paid for

11   campaign fundraiser tickets with money they earned from their

12   public salaries in exchange for job security.

13           It is your job to decide whether all the excuses

14   that you've heard justifying misuse of taxpayer property,

15   money, and resources for personal and political use are

16   defensible.  Because they're not.  This case is about -- we've

17   said it over and over, ladies and gentlemen.  This is about

18   government waste.  It's about accountability.  It's about

19   choices.

20           Ethel Shelton and Alex Wheeler made choices.  They

21   made choices to participate, to knowingly participate, in all

22   this unlawful activity, and they didn't make the choice to walk

23   away.  All the evidence points to one conclusion, that

24   Ethel Shelton and Alex Wheeler are guilty.  We ask you to

25   return a verdict of guilty on all counts.

```
 1          THE COURT:  Once you are all in the jury room, the
 2   first thing you should do is choose a foreperson.  The
 3   foreperson should see to it that your discussions are carried
 4   on in an organized way and that everyone has a fair chance to
 5   be heard.  You may discuss the case only when all jurors are
 6   present.
 7          Once you start deliberating, do not communicate
 8   about the case or your deliberations with anyone except other
 9   members of your jury.  You may not communicate with others
10   about the case or your deliberations by any means.  This
11   includes oral or written communications as well as any
12   electronic method of communication such as telephone, cell
13   phone, smart phone, computer, text messaging, instant
14   messaging, internet, chat rooms, blogs, websites, or services
15   like Facebook, Instagram, LinkedIn, YouTube, Twitter, or any
16   other method of communication.
17          If you need to communicate with me while you are
18   deliberating, send a note through the court security officer.
19   The note should be signed by the foreperson or by one or more
20   of the members of the jury.  To have a complete record of this
21   trial, it is important that you do not communicate with me
22   except by a written note.  I may have to talk to the lawyers
23   about your message, so it may take me some time to get back to
24   you.  You may continue your deliberations while you wait for my
25   answer.
```

1          Please be advised that transcripts of trial

2     testimony are not available to you.  You must rely on your

3     collective memory of the testimony.

4          If you send me a message, do not include the

5     breakdown of any votes you may have conducted; in other words,

6     do not tell me that you are split 6/6, 8/4, or whatever your

7     vote happens to be.  Verdict forms have been prepared for you.

8     You will take these forms with you to the jury room.

9          When you have reached a unanimous agreement, your

10    foreperson will fill in the date and sign the appropriate

11    verdict forms, and each of you will sign your name under each

12    of the verdicts.  Advise the court security officer once you

13    have reached a verdict on all counts, and you come back to the

14    courtroom.  I will read the verdicts aloud.

15         Your verdicts must represent the considered judgment

16    of each juror.  Your verdict on each count, whether it's guilty

17    or not guilty, must be unanimous.  You should make every

18    reasonable effort to reach a verdict.  In doing so, you should

19    consult with each other, express your own views, and listen to

20    your fellow jurors' opinion.

21         Discuss your differences with an open mind.  Do not

22    hesitate to re-examine your own view and change your opinion if

23    you come to the belief it is wrong, but you should not

24    surrender your honest beliefs about the weight or effect of the

25    evidence just because of the opinions of your fellow jurors or

1    just so that there can be a unanimous verdict.

2          The 12 of you should give fair and equal

3    consideration to all the evidence.  You should deliberate with

4    the goal of reaching an agreement that is consistent with the

5    individual judgment of each juror.  You are impartial jurors,

6    judges of the facts.  Your sole interest is to determine

7    whether the government has proved this case beyond a reasonable

8    doubt.

9          Members of the jury, in a moment you are going to

10   retire and deliberate on your verdict.  The Court will provide

11   you with the following verdict forms:

12         Count 1, conspiracy to commit wire fraud,

13   Ethel Shelton:  We the jury, upon our oath, unanimously find

14   defendant, Ethel Shelton, as to the offense of conspiracy to

15   commit wire fraud as charged in Count 1 of the Indictment,

16   there's a place for not guilty if that's your verdict or guilty

17   if that's your verdict; a place for the foreman's signature;

18   and then a date, which must be entered; and also a place for

19   everybody to sign the form.

20         Count 1, conspiracy to commit wire fraud,

21   Alex Wheeler:  We the jury, upon our oath, unanimously find

22   defendant, Alex Wheeler, as to the offense of conspiracy to

23   commit wire fraud as charged in Count 1 of the Indictment,

24   there's is a place to check not guilty; a place to check

25   guilty; a place for the foreperson's signature; a place for the

1   date; and a place for each of the jurors to sign the verdict

2   form.

3          Count 6, conspiracy to commit honest services wire

4   fraud, Ethel Shelton:  We the jury, upon our oath, unanimously

5   find the defendant, Ethel Shelton, as to the offense of

6   conspiracy to commit honest services wire fraud as charged in

7   Count 6 of the Indictment, there is a place to check not

8   guilty, if that's your verdict; a place to check guilty if

9   that's your verdict; a place for the foreperson's signature; a

10  place for the date; and a place for each of the jurors to sign

11  the verdict form.

12         Count 6, conspiracy to commit honest services wire

13  fraud, Alex Wheeler:  We the jury, upon our oath, unanimously

14  find defendant, Alex Wheeler, as to the offense of conspiracy

15  to commit honest services wire fraud as charged in Count 6 of

16  the Indictment, again, if your verdict is not guilty, a place

17  to check; if the verdict is guilty, a place to check; a place

18  for the foreperson's signature; a date; and then a place for

19  all the jurors to sign.

20         After your deliberations and when you have reached

21  your verdict, the proper verdict forms prepared for you should

22  be completed, signed by your foreperson and each juror, and

23  returned to open court.

24         Will the court security officers please stand?

25     (The Court Security Officers complied.)

1          **THE COURT:**  I now place this jury in your charge.

2    And, Marijana, would you administer the oath to the court

3    security officers.

4        (The oath was duly administered.)

5              **SECURITY OFFICER ROGALSKI:**  We do.

6              **SECURITY OFFICER VELEZ:**  We do.

7          **THE COURT:**  Mr. Dillon and Mr. Robinson, you have

8    been chosen in this case as alternate jurors; that is, jurors

9    who stand ready to replace any member of the jury of 12 who,

10   for whatever reason, may have to be excused from service.

11   While you will not be going into deliberations with the rest of

12   the jurors, you remain a part of the case until a final

13   resolution.

14          You may now leave, but you must continue observing

15   my admonitions about not talking with anyone about this case,

16   reading about it in the newspapers or internet, or following

17   the case on any media outlets.  Please give your contact

18   information to Marijana so she can contact you if your services

19   are needed during the deliberations.  And by the same token,

20   until you are told otherwise, please stay in the vicinity of

21   the Northern District of Indiana so you can be readily

22   summoned.  Even if your services are not needed, my courtroom

23   deputy will contact you to let you know when you are relieved

24   of your obligations.

25          Also, if you can wait a few more moments outside in

```
1    the hallway -- actually, my law clerk will take you back to my

2    chambers.  I'd like to thank the two of you individually for

3    your service.  As I said, again, she'll walk you back to my

4    chambers where that will take place.

5           Members of the jury, you are to go to the jury room

6    and elect a foreperson, but do not begin your deliberations

7    until I have instructed you through the court security officer

8    that you may begin your deliberations.

9           The court security officers may now escort the jury

10   to the jury deliberation room.  Please advise the Court when

11   the jury is ready for the verdict.

12      (Jury out at 3:22 p.m.)

13           THE COURT:  You can be seated.

14           The attorneys need to make sure the exhibits are in

15   the proper form to get back there and make sure that jurors

16   have been provided with exhibits, the Indictment as modified, a

17   copy of the instructions, and verdict forms.  Check those

18   things closely and make sure we have them right.  When all that

19   is done, I will tell the jury to start their deliberations.

20           One thing you need to do is stay within 15 minutes

21   of the courthouse if possible.  Make sure Marijana has your

22   cell phone so we can contact you if the jury has a question or

23   if the jury has a verdict.

24           MS. LERNER:  Your Honor, do you think you will keep

25   the jurors late today, assuming they're willing to?
```

Ashley N. Stokes, CSR, RPR
Ashley_Stokes@innd.uscourts.gov/ (219) 852-6557

1        **THE COURT:**  I'll keep them as long as they want to

2    stay.

3        **MS. LERNER:**  Okay.

4        **THE COURT:**  It's a Friday night, so I will keep them

5    as long as they want to stay.  I'll leave that up to them.

6        **MR. ZANZI:**  Okay.  We'll work on the exhibits.

7     (Recess had at 3:24 p.m., and proceedings resumed in open

8      court at 8:01 p.m.)

9        **THE COURT:**  You can be seated.

10       The long and short of it is the jury wants to go

11   home, so I'm going to bring them in and give them an admonition

12   about the recess and so forth.  But that's it.  I'm sorry I got

13   you all here.  One person from each side could have come and

14   that probably would have taken care of it.  You could have

15   given your proxy to people.

16       Anyway, bring the jury in.

17    (Jury in at 8:03 p.m.)

18       **THE COURT:**  You can be seated.

19       The quick answer to your question, you can go home.

20   I've got to give you -- the reason I had to bring you in here

21   is to give you your admonition for the record.

22       And also one thing, more of a minor thing, some of

23   you are smokers apparently.  I'm not going to have you identify

24   yourselves.  If you need to smoke, talk with the court -- just

25   don't do it all at one time.  You have to space your breaks

Ashley N. Stokes, CSR, RPR
Ashley_Stokes@innd.uscourts.gov/ (219) 852-6557

1   out.

2          To the other ones that are still here and not going

3   out, you can't deliberate while they're gone, so you have to

4   stop your deliberations while they're out.  When they come

5   back, you can start deliberating again.  There is really no way

6   to monitor that.  The CSOs can go with smokers.  One will stay

7   up here, but I really kind of count on you all to take care --

8   just make sure you don't start deliberating until you have a

9   complement of jurors.

10         We'll reconvene at 9:00 o'clock on Monday.  Again,

11  don't start deliberating until all the jurors are here on

12  Monday, and we'll proceed forward.  And enjoy your weekend.

13         **UNIDENTIFIED JUROR:**  Do we report to the courtroom

14  first Monday or go straight to the jury room?

15         **THE COURT:**  You go straight to the jury room and

16  start deliberating.  As soon as you have the 12 jurors all

17  there -- and your foreman can make that determination -- you

18  can start deliberating at that point.  Have a good weekend.

19         **MS. LERNER:**  Your Honor, do they get the regular

20  admonition that you give them regarding not reading the

21  newspaper and all of that?

22         **THE COURT:**  Thanks for reminding me of that.  That's

23  the purpose I brought them in here.  We see where the problem

24  is with this case.  It sits right up here.

25         During this recess and all other recesses, you must

1    not communicate about this case with anyone.  This includes

2    your family, other jurors, and anyone involved in the trial.

3    This also includes all forms of communication including

4    electronic communication.

5          Do not watch or listen to any news reports

6    concerning this trial on television or on the radio, and do not

7    read any news accounts of this trial in the newspaper or on the

8    internet, if any.

9          You are required to keep an open mind until you have

10   heard all the evidence in the case, the closing arguments of

11   counsel -- you've heard that.  Don't let anybody talk to you.

12   You can't tell your family or anyone else.  You can talk to

13   each other, but you can't talk to your family about it or any

14   of your friends.  And you can't talk to each other unless you

15   are all together.

16         I'll see you Monday at -- I probably won't see you

17   Monday.  You will all be here Monday, but just go straight to

18   the jury room, and you can start deliberating when you have all

19   12 there.  Enjoy your weekend.

20      (Jury out at 8:06 p.m.)

21         **THE COURT:**  Ms. Lerner, thanks for reminding me

22   about that.  I got sidetracked when I got on the smoking issue.

23         **MS. LERNER:**  I have Mr. Bell to thank for that.

24         **THE COURT:**  Okay.  We're not going to thank Mr. Bell

25   for anything, but we'll let it go at that.

```
 1              I'll see you -- they'll be here Monday at
 2    9:00 o'clock.  I won't start them with deliberations.  As soon
 3    as they have 12, they will start on their own.  Hopefully we
 4    can get to a verdict on Monday.  Have a good weekend.
 5              MR. ROGERS:  Judge, I have a gigantic criminal call
 6    on Monday morning in another court -- actually in Porter
 7    County.  I can probably be here at 9:30.
 8              THE COURT:  You don't have to be here.  The jury is
 9    coming in, and they'll start on their own.  What you have to be
10    is close enough that if a verdict is reached or something, you
11    could be here in 15 or so minutes, give or take.
12              I mean, make sure -- when Marijana was trying to get
13    ahold of you, your voicemail was full, and we have to be able
14    to get in touch with you and know where you are and what time
15    you're going to be somewhere.  You don't have to be here when
16    they come back.  Nobody has to be here when they come back.
17    They'll start deliberating on their own.
18              MR. ROGERS:  All right.  Thank you.
19              THE COURT:  Any other questions?
20              MS. GAMBINO:  No, Your Honor.
21              MS. LERNER:  No, Your Honor.
22              THE COURT:  Okay.  Have a good weekend.
23         (Proceedings adjourned at 8:08 p.m.)
24
25
```

1                          * * * * *

2                        CERTIFICATION

3

4          I, ASHLEY N. STOKES, Federal Court Reporter, certify
    that the foregoing is a correct transcript from the record of
    proceedings in the above-entitled matter.

5

6          S:/Ashley N. Stokes_____ May 19, 2020
           Certified Realtime Reporter
7          United States District Court
           Northern District of Indiana
8          Hammond Division

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25