1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF INDIANA
2                HAMMOND DIVISION

3   UNITED STATES OF AMERICA      ) Cause No.:
                      ) 2:14-CR-129
4       vs.              )
                      )
5   ETHEL SHELTON and ALEX WHEELER, ) Hammond, Indiana
                      ) April 11, 2018
6         Defendants.       )

7

                     **VOLUME 8**
8             **TRANSCRIPT OF JURY TRIAL**
      **BEFORE THE HONORABLE JOSEPH S. VAN BOKKELEN**
9           **UNITED STATES DISTRICT JUDGE**

10  APPEARANCES:

11  For the Government:    MARIA N. LERNER and
                      ABIZER ZANZI
12                   ASSISTANT UNITED STATES ATTORNEY
                   UNITED STATES ATTORNEY'S OFFICE
13                   5400 Federal Plaza, Suite 1500
                   Hammond, Indiana  46320
14                   (219) 937-5500

15  For the Defendant,    ANDREA E. GAMBINO
   Ethel Shelton:        LAW OFFICES OF ANDREA E. GAMBINO
16                   53 W. Jackson Boulevard, Suite 224
                   Chicago, Illinois  60601
17                   (312) 322-0014
                   agambinolaw@gmail.com
18
   For the Defendant,    LARRY W. ROGERS
19  Alex Wheeler:         ROGERS LAW OFFICE
                   2801 Bertholet Boulevard, Suite 301
20                   Valparaiso, Indiana 46383
                   (219) 476-0443
21                   lwrogerslawoffice@gmail.com

22

23

24  Proceedings reported by stenotype.  Transcript produced by
   computer-aided transcription.
25

```
 1                          INDEX OF WITNESSES

 2     FOR DEFENDANT, ETHEL SHELTON                        PAGE

 3     BISHOP NORMAN HAIRSTON II
       Direct Examination by Ms. Gambino                   27
 4     Cross-examination by Ms. Lerner                     31
       Redirect Examination by Ms. Gambino                 33
 5     Further Redirect by Ms. Gambino                     34

 6     DIANE BATES
       Direct Examination by Ms. Gambino                   37
 7     Cross-examination by Ms. Lerner                     41
       Redirect Examination by Ms. Gambino                 42
 8
       ETHEL SHELTON
 9     Direct Examination (Resumed) by Ms. Gambino         43
       Cross-examination by Ms. Lerner                     170
10     Cross-examination by Mr. Rogers                     217

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (The following proceedings were held in open court

 2           commencing at 9:04 a.m., reported as follows:)

 3      (Call to Order of the Court.)

 4              THE COURT:  You can all be seated.

 5              Government has something they want to bring up?

 6              MS. LERNER:  Yes, Your Honor, a number of matters.

 7              First, we filed early this morning a motion in

 8      limine to prevent any discussion of the alleged improper search

 9      throughout the rest of this trial.  As the Court has said, it

10      has been set aside for now.  It is no longer relevant going

11      forward.  There should be no questioning.  There should be no

12      argument.  There should be nothing said in closing argument on

13      this issue because it is up to the Court to decide after trial.

14      We want to make sure that, for example, Ms. Shelton is not

15      crossed on whether Stafford had permission to go into her

16      office, which is not relevant to any of the charges, no

17      comments in cross or in closing about him traipsing around and

18      searching people's office.  This is all irrelevant to the

19      charges, and it is nothing more than improper jury

20      nullification argument.  It has gone on far too long as it is.

21      It has tainted this trial as it is, and we ask that the Court

22      put a stop to it so that we can try to have a semblance of a

23      fair trial going forward.

24              And the second issue is that the Court ruled and

25      Ms. Gambino did not object to the government's motion in limine
```

 1   precluding specific acts of good conduct, and yet we heard a

 2   substantial number of those yesterday.  And in some situations

 3   we chose not to object, but in a number of situations it was

 4   blurted out by the witnesses.  And it's hard for the government

 5   to object after the witness says that, you know, This is my

 6   great aunt, and she has been fostering me, and I've had a tough

 7   time."

 8        The government is not going to object in that

 9   circumstance, but this is inappropriate and irrelevant

10   testimony.  It goes against the Court's ruling on specific acts

11   of good conduct, which the defense did not object to, and we

12   ask that it be stopped, whether it be blurted out by the

13   witnesses or made in questions by counsel.

14        And, I'm sorry, there is one more argument that we

15   wanted to make.  Ms. Gambino has already presented three

16   character witnesses, and my understanding is that your practice

17   is to permit three character witnesses.  I don't know what the

18   two additional witnesses are this morning, but I think we have

19   had more than enough.  It is cumulative to have any more

20   character witnesses at this point.

21        **THE COURT:**  Well, I think as to the last thing,

22   that's not a rule of mine.  It's a rule by somebody else

23   obviously.

24        **MS. LERNER:**  I was told that's your typical

25   practice.  In any event, it is cumulative at this point.  We've

1   had a lot of character witnesses.

2          **THE COURT:**  Yeah.  I haven't heard -- most of the

3   trials I've had, there's not many character witnesses that come

4   in.  I'm not saying I did not say that at some point, because a

5   lot of things I say sometimes, but I don't have a rule per se.

6   Let's put it that way.  I agree at some point it becomes

7   cumulative.  I don't think we're there yet, but it could get

8   there.  It's not taking up a whole lot of time.

9          What was your first point about the -- the character

10  evidence.  Your first point was about the --

11         **MS. LERNER:**  That the issue regarding Mr. Garbutt is

12  no longer relevant.  Well, it never really was relevant to this

13  trial, but it should not be raised at all at this point.

14         **THE COURT:**  Let me ask you -- not saying what I'm

15  doing but just as a question -- would it not go to some extent

16  to bias by Mr. Garbutt?

17         **MS. LERNER:**  I am not sure I follow that,

18  Your Honor.

19         **THE COURT:**  Well, the testimony was -- and I may be

20  talking about the wrong thing.  So we may be two ships passing

21  in the dark right now.  It seems to me that Garbutt going in

22  there -- I agree the issue of whether there's government

23  misconduct or not, that's going to be addressed at a later

24  time.  But the issue is he's probing around there and going

25  into offices and things like that, and he sort of left the

1    impression that that was no big deal, going into offices.  If

2    there was a policy or rule or something like that that you

3    couldn't go around going into other people's offices, that

4    would be relevant, wouldn't it?

5           MS. LERNER:  Well, we introduced the handbook.  He

6    was not crossed on it.

7           THE COURT:  What I'm talking about is if there's

8    some sort of understanding that you don't go into people's

9    offices and so forth.  What I'm saying is I think it goes to a

10   bias a little bit, cross-examination of Mr. Garbutt as to

11   his liability.  But on the other side -- you don't need to make

12   those expressions to me.  On the other side, Mr. Garbutt, in

13   reality, his testimony was somewhat limited because he has the

14   tapes that he took.

15          MS. LERNER:  Yes, Your Honor.

16          THE COURT:  So it's kind of a balancing thing here

17   because it's not like he's the sole evidence of conduct.  He

18   has it on tape.

19          MS. LERNER:  That's correct, Your Honor.

20          THE COURT:  And you could have stopped, probably,

21   the tapes to some extent.  You have to explain how he got there

22   and that kind of stuff, but you almost could have stopped at

23   that point really.  I'm not suggesting you should have; I'm

24   just saying you could have when talking about his credibility.

25   He does talk about other stuff, and I think they can get into

 1   some bias, and some of that could be the way he did the stuff

 2   and so forth.  But I also agree that once this comment -- and I

 3   sustained the objection -- was that when Ms. Gambino said

 4   that's a violation of constitutional privileges, that, I think,

 5   we're stepping too far on at that point.  I sustained the

 6   objection.

 7          You're worried about the blurting out things and I

 8   worry about the blurting out things, too, but the trouble is --

 9   and you've tried enough cases now -- that blurting out kind of

10   takes place in trials.  Particularly with witnesses.  You know,

11   they're not skilled.  And when they're asked questions about

12   her conduct, they just start talking about the good things she

13   did, which actually falls in the second part of that rule,

14   because your response can be different to that too.  You can

15   show bad conduct.

16          **MS. LERNER:**  May I respond?

17          **THE COURT:**  Yes.

18          **MS. LERNER:**  Your Honor, if we had introduced

19   evidence that Mr. Garbutt had taken from Ms. Shelton's office,

20   I would agree that it would be relevant.  But we introduced no

21   such evidence and counsel has not indicated any objection that

22   they have about the evidence that's currently in this case as

23   it relates to Mr. Garbutt.  I'm confused --

24          **THE COURT:**  You're getting notes handed to you and

25   I'm getting notes handed to me, so we've got battling notes.

1        **MS. LERNER:**  Sorry.

2        I'm confused about why it goes to his bias, whether

3   or not he could enter someone else's office.  That's an issue

4   for the Court to decide in whether he was legitimately in the

5   space in order to obtain a document.  That has nothing to do

6   with bias, unless I'm missing something.

7        **THE COURT:**  Well, why he would go into certain

8   offices and not other offices --

9        **MS. LERNER:**  He was instructed to.

10       **THE COURT:**  Well, there's some testimony to that

11  effect.  But I am saying the defense has a right to explore

12  that.  Now, on the other hand, is they can't get into some

13  other things, and I just don't know where the cutoff is without

14  hearing an objection as they bring it up.

15       I would hope that the parties wouldn't blurt out

16  questions really not caring about the answer, just throwing the

17  question out there and getting the impact of the question.

18       You have to understand a little bit, you know your

19  case very well; the defense knows theirs; I know your cases the

20  least.  The only thing I know about your case is what I have

21  seen in the *Santiago* proffer or other information that comes in

22  that tells me about the case.  I see this for the first time.

23  That's why I said, when the agent testified the way he did, I

24  was somewhat shocked.  I've had agents before.  I thought what

25  was going to happen was probably the agent says, "No, I didn't

1    tell him to do that; I didn't tell him to do that.  He was just

2    kind of rogue," to use that term.  That's my term.

3           So you have to understand that when you're

4    responding, I may be hearing it for the first time.

5           **MS. LERNER:**  I understand, Your Honor, and I don't

6    want to belabor the point here.  This is an extremely critical

7    argument because if the Court permits this, there will be jury

8    nullification in the case.  I would ask that the Court permit

9    us to brief this issue before closing arguments so that the

10   Court has all of the facts and all of the law in front of it.

11   This is an extremely important issue.  There is no reason to be

12   bringing this up in closing argument other than jury

13   nullification.

14          **THE COURT:**  Well, it could be, but there may be a

15   reason too.  I don't know --

16          **MS. LERNER:**  We'd ask to brief it.

17          **THE COURT:**  You can brief it, but the trouble is I

18   live in a context world.  I have to see the context that's

19   coming in.  Sometimes, one context, it's clearly not

20   admissible.  And in other contexts, it may be admissible.

21   Until I see the context -- you know, I'm a knuckle dragger.  I

22   just have to take these things one thing at a time.  I have to

23   see the context.  That's why my ruling -- more in civil cases

24   than criminal.  I don't do pretrials in criminal cases.

25   Judge Martin does those.

1          But in civil cases, I take a lot of what they have

2     there -- we have rules that say you've got to do this and

3     this -- I take it under advisement because, in a motion in

4     limine particularly, I need to see the context in which it's up

5     versus the government's arguments.

6          **MS. LERNER:**  I agree, and --

7          **THE COURT:**  Go ahead.

8          **MS. LERNER:**  -- and we would like to see the context

9     within which defense counsel intends to raise it so that we can

10    determine whether it's proper or not, not after they have

11    already blurted it out to the jury and the government is only

12    objecting after the fact.

13         I mean, this has been a jury nullification argument

14    from the beginning, and it has tainted this trial; and the

15    government is trying to clean it up at this point, and I'm

16    struggling to understand the best way to do that, which is why

17    I would ask that you permit us to brief it before closing

18    arguments so that counsel can state their case about why they

19    think it's relevant and should be able to argue and we can

20    respond.

21         **THE COURT:**  Well, jury nullification, there's

22    basically an instruction about jury nullification.  There is an

23    instruction.  Jury nullification will not be tolerated, but

24    sometimes there can be a narrow definition of nullification and

25    a broader reach of it, and they get foggy a little bit, when

1   there's nullification taking place or when you're just asking

2   the jury to use your own common sense.

3          You can brief it.  The trouble is your time frame is

4   getting very narrow because I'm not going to hold this jury up

5   while we're briefing these arguments.  When we get to final

6   arguments, we're going to have final arguments.

7          **MS. LERNER:**  Brief or not, I think this issue is

8   sensitive enough that they have to state why they want to use

9   it and be explicit so that we can respond and ask for a

10  limiting instruction and a curative instruction if they go

11  beyond that.

12         **THE COURT:**  What you may want to consider doing is

13  when they start down those roads is object.  I'm just saying,

14  you know, I respond to objections because I have to rule on

15  that, but --

16         **MS. LERNER:**  It's the cat's out of the bag,

17  Your Honor, and it's been out of the bag for quite some time.

18         **THE COURT:**  Well, then the harm is done then.

19         **MS. LERNER:**  We're trying to fix it.

20         **THE COURT:**  Maybe you can't fix it.  What I'm

21  suggesting to you is you've got to be more aggressive -- this

22  is not being critical at all, but you don't want to look like

23  you're making objections all the time, clearly --

24         **MS. LERNER:**  And that's the dilemma.

25         **THE COURT:**  -- and that may be a dilemma.  But, on

 1    the other hand, is I respond to objections.  When I have to do

 2    something, I'll do it.  If I can kick the can down the road,

 3    I'll keep kicking it as far as I can kick it before I make a

 4    ruling.  That's just me.

 5          **MS. LERNER:**  Counsel also don't seem to be

 6    respecting the Court's ruling.  We've had to make multiple

 7    objections on certain things.

 8          **THE COURT:**  Well, if you point that out to me more

 9    clear at that point -- see, they're going to take a different

10    position, I'm assuming.  But, anyway, okay.  Anything else?

11          **MS. LERNER:**  Nothing else, Your Honor.

12          **THE COURT:**  If you think a jury nullification

13    argument is being made or evidence is being presented for the

14    purpose of jury nullification, just ask for a sidebar and we'll

15    talk about it.  We'll take it up.  I guess that gets you ahead

16    of the question a little bit, if you think they are going into

17    it, and they will have to make a statement at that point where

18    they are going.

19          I have done that on the 610 or 611 issue about the

20    religious beliefs, that the questions have to come up here

21    first, let me hear them before you ask the question.  If

22    somebody blurts it out, I can't stop the blurting out.  I can

23    do something about it after it's done, but I can't stop it from

24    blurting out.  And witnesses are a whole different thing.

25    These are not skilled witnesses.

 1          **MS. LERNER:**  Right, Your Honor, but if there's a

 2    clear ruling, then, if they blurt it out, they've violated the

 3    Court's order.  That's what I am asking for.

 4          **THE COURT:**  I don't know how I can make a clear

 5    ruling on that one.  I said what I've said.  The parties, I

 6    think, know my position.  But, at the same time, sometimes they

 7    come from surprising places.  I was surprised about the agent.

 8    I was very surprised.  I was looking at something completely

 9    different, and he went the way he went, and you're kind of

10    stuck with that right now.  But he went the way he went, and

11    that's how trials go.  They play themselves out.  It's a real

12    life theater is what it is.

13          Any response?  There's some good points the

14    government makes, you know, this going where we can't go or

15    shouldn't go.  Let's put it that way.  I'm not saying you have,

16    but you've flirted with it a few times.

17          **MS. GAMBINO:**  Your Honor, with respect to the Fourth

18    Amendment issue, I think that the whole issue would not have

19    come up but for the testimony of Mr. Garbutt and the followup

20    testimony of the agent.  So I do think that they've both left

21    the impression that it was quite all right for Mr. Garbutt to

22    go wandering around people's offices and taking things.  He had

23    the understanding, he testified, that he could do that.  He was

24    free to come and go out of Ms. Shelton's or Ms. Elgin's office

25    as he pleased.  So to the extent that Ms. Shelton has a

1    position about that and disagrees with Mr. Garbutt being able

2    to come in and out of her office, I ought to be able to raise

3    that.  Now, I don't --

4              **THE COURT:**  I don't disagree with you on that one.

5              **MS. GAMBINO:**  I do not intend to raise with

6    Ms. Shelton anything about the Fourth Amendment.  I do intend

7    to raise what her policies and feelings were about having

8    people come in and out of her office and take things.  I think

9    that's fair in light of the testimony from the government's

10   witnesses.

11             As to closing argument on those issues, I think that

12   it is fair for us to be able to argue about the testimony of

13   the witnesses.  Now, I don't think it's appropriate either to

14   talk about -- necessarily talk about the Fourth Amendment or

15   tie it to a legal issue.  But I do think it's fair to be able

16   to say that, you know, here we have a witness who has taken it

17   upon himself at the request of the FBI to go rummaging in

18   people's offices.  And this is not right, and they relied on

19   him to be a truthful reporter of what he found and why he found

20   it and where he found it, and they were mistaken in doing

21   things of that nature.

22             I also don't think I should have to pretry my

23   closing argument.  I know very well what the limits of the law

24   are, and I think I have been very respectful of this Court's

25   orders.

1          With respect to character witnesses, my questions to

2    the witnesses are how they know Mrs. Shelton.  And some of how

3    they know Mrs. Shelton involves -- for instance, with her

4    great-niece, she knows her very well because she lived with

5    her, and Mrs. Shelton acted as her mother.  Now, that's not a

6    specific act of good conduct raised for that purpose.  That is

7    a fact that was given in the context of how do you know

8    Mrs. Shelton.  I have been very careful to respect the Court's

9    order and not ask about specific -- I mean, there are tons of

10   specific acts of good conduct that I would be more than happy

11   to ask each of these witnesses about, but I haven't done so.

12   Only enough information so that the jury has some context for

13   knowing how to evaluate the witness and his or her relationship

14   with Mrs. Shelton.

15          With respect to the three witnesses that testified

16   yesterday, they all had character aspects to them, but, more

17   importantly, Rebecca Smith was a fact witness because she

18   produced campaign literature for Ms. Shelton.  And

19   Jocelyn Brown was a fact witness because she worked at the

20   township and also testified about her perceptions with regard

21   to the issuing of fundraising tickets.

22          So the two witnesses that I have today will be

23   brief, like the witnesses yesterday.  I'm going to interrupt

24   Mrs. Shelton's testimony to get them on and off this morning.

25   And they are character witnesses, but they are not going to

```
 1    take any more than 10 or 15 minutes of the Court's time.  And I
 2    think it's important because I anticipate that after
 3    Mrs. Shelton finishes testifying, she's going to be subject to
 4    cross-examination by the government and they are going to do
 5    their level best, as they should, to put her credibility into
 6    question and challenge the veracity of the things that she says
 7    that they disagree with.  So it's important for the jury to
 8    have some context to know that there are other people in the
 9    community and have a basis for evaluating Mrs. Shelton's
10    character for truthfulness.
11            So I don't think that we have gone out of bounds
12    with respect to our witnesses.  I am quite cognizant of the
13    Court's orders and I respect them.  And I don't think I should
14    have to pretry my closing argument for the government or anyone
15    else.
16            As far as jury nullification goes, that word will
17    never cross my lips.  Jury nullification -- I am well aware of
18    what the evidence is on jury nullification, and there are
19    plenty of reasons to argue why the government has not met its
20    burden in this case that have nothing to do with jury
21    nullification.  So I don't even think that that's a realistic
22    issue.  I am sorry that this Fourth Amendment issue has come up
23    the way it has, but it's because of the testimony of the
24    government's witnesses.  If Mr. Garbutt hadn't testified the
25    way he had and if the agent -- because, like Your Honor, I was
```

 1   really shocked.  I have never in all of my years of practice

 2   had an agent get on the stand and say, yeah, I told the

 3   informant to do something illegal.  And that's essentially what

 4   he did.  So I didn't expect that.  But now that it's there, it

 5   has to be dealt with.  And I think that's only fair.

 6          And that goes to, you know, what he was doing and

 7   why he was doing it, and his preparation, or lack thereof, for

 8   testifying.  And that's not our fault, and that's not unfair,

 9   and it's not getting the case off track.  It's just the facts

10   of the way the testimony has come out in this particular trial.

11          So if there is another issue I am missing, remind me

12   of what it was, but I think I got the two main ones, which were

13   the Fourth Amendment issue and the character witness issue.

14          **THE COURT:**  Mr. Rogers.

15          **MR. ROGERS:**  I think the only issue that concerns me

16   at this point, since I haven't put on any character witnesses,

17   is this Fourth Amendment.  And as you indicated, trials are

18   live dramas.  You never know what to expect, and it's usually

19   the defendant's witnesses that give the government fodder.  But

20   in this particular case, you have Mr. Garbutt, who testified

21   that, as I would call it, he could do what he wanted.  He could

22   record what he wanted.  They didn't give him any parameters,

23   just give him a recording and said go to it.

24          And then when the government's agent comes in,

25   Agent Holbrook comes in and says specifically, yeah, I told him

```
 1   to go and search these offices.  These were not our witnesses.

 2   These were the government's witnesses.  And although it doesn't

 3   happen that often, the government's witnesses gave information

 4   in open court that is subject to a lot of question,

 5   legal/illegal, and I think we have a right to bring that up to

 6   the jury during closing arguments.  Not necessarily for jury

 7   nullification.

 8           I don't think either Ms. Gambino or I are going to

 9   argue jury nullification, but I think it has to be seen and we

10   have the right to argue to the jury that they can take it and

11   consider the government's conduct as a whole when they're

12   deciding this case.

13           THE COURT:  Isn't it more Mr. Garbutt's conduct?

14           MR. ROGERS:  I'm sorry?

15           THE COURT:  Isn't it more isolated to Mr. Garbutt's

16   conduct versus --

17           MR. ROGERS:  Well, yeah, but he's a governmental

18   agent according to --

19           THE COURT:  No, I understand that, but I think

20   sometimes we go too far on this.  The issue is, which the

21   Court's going to have to address after this case is over, is

22   whether or not there's been government misconduct.

23           MR. ROGERS:  Uh-huh.

24           THE COURT:  That's the issue.  It's not whether --

25   you know, whether the stuff that he did couldn't be done or
```

```
 1   whatever.  It's just whether or not the government engaged in

 2   misconduct.  I have another case apparently coming up in June

 3   that's got some issues, so I'm dealing with that directly right

 4   now.

 5              MR. ROGERS:  I think I read about that in the paper.

 6              THE COURT:  I think that's where I read about it

 7   this morning.

 8              Anyway, clearly, his biases and so forth are fodder

 9   for discussion, but it has to be within the context of the case

10   itself.  That's what I'm saying.  And you understand what

11   nullification is and Ms. Gambino knows what nullification is.

12   And Ms. Lerner knows what nullification is, and hopefully the

13   judge knows what nullification is.

14              MR. ZANZI:  Your Honor, may I briefly?

15              As a concern, defense counsel don't need to say the

16   words "jury nullification" for there to be jury nullification.

17              THE COURT:  I know that.

18              MR. ZANZI:  I think we all understand that.  Here's

19   the problem.  I know the Court has said many times that they're

20   surprised by what the witness said and defense counsel is

21   surprised.  Everybody is mischaracterizing the testimony.  This

22   needs to be briefed.  This goes to the importance of having

23   this issue resolved properly.  Everybody is now characterizing

24   what the witnesses have said and making conclusions about the

25   legality of the conduct.
```

1          Your Honor, the legality of the search, regardless

2     of whether the Court is concerned about it now or the

3     defendants, you just heard Ms. Gambino say that the FBI

4     instructed our informant to conduct an illegal search.  My

5     understanding is she's going to argue that to the jury,

6     Your Honor.

7          And here's the problem with that, Your Honor, is

8     that is not a question for the jury to decide.  Whether the

9     Court has concerns about that, that's fine, but let us brief

10    it, Your Honor.  Let us brief it outside the presence of the

11    jury because that's jury nullification, Your Honor, to suggest

12    it to the jury and to give them the impression that it's their

13    job to decide whether or not any evidence was illegal.  Or

14    anything was done illegal in violation of the Fourth Amendment

15    rights is jury nullification, Your Honor.

16         That is our concern.  If the Court has concerns

17    about it, we will brief it.  We will state our position, and we

18    will make our case.  It should not be made in this courtroom,

19    Your Honor.  It is unfair and prejudicial to the government.

20         **THE COURT:**  It has to be made in the courtroom.

21    That's where I do things.  I get things in the courtroom.  If I

22    wasn't in the courtroom, I wouldn't be getting things.  I would

23    be out doing something else.

24         **MR. ZANZI:**  No, I mean in front of the jury,

25    Your Honor.

 1            **THE COURT:**  I understand what you're saying, and I
 2    have no problems with you filing briefs on that.  I'm saying I
 3    am not going to hold this trial up for that, is what I am
 4    saying.  You have probably a day and a half to get that done.
 5    I really don't know.  Again, what I think is going to happen
 6    and what happens time-wise can be completely different.  But I
 7    think we're about a day and a half away from that point of
 8    arguments.  So if you want to file something, that's fine.  I'm
 9    just saying I am not going to hold the trial up for it.  That's
10    the only point I'm making.  I think sometimes people read more
11    into what I'm saying than what I'm actually saying.  Again,
12    like I said, I'm a knuckle dragger.  I take things one at a
13    time.  I don't want to -- like, when you do bridge, you're
14    always playing two or three hands ahead of yourself.  I'm not
15    doing that here.  I'm just trying to get what's in front of me
16    and deal with what that is.
17            And with the issue that came up the other day, we
18    are going to deal with that issue, whether or not it was
19    government misconduct or not, at a later time.
20            To the extent the arguments are made, they have to
21    be legal arguments that can be made.  If they can't be made
22    legally, then they aren't going to be made.  It's as simple as
23    it can be.  I don't know what's going to be said.  I think
24    there is some bias in the things that came out on Mr. Garbutt's
25    part probably, like any cooperating individual is subject to.

1    In drug cases, you see it all the time.

2             Sometimes we think this is more complicated than a

3    simple drug case.  It's really not more complicated than that.

4    The same rules apply.  Whether the government went overboard or

5    not, I don't know.  We will make that determination later.

6             The agent, to his credit -- nobody is crediting the

7    agent too much -- to his credit, he said what he understood the

8    truth to be, and that's refreshing.  It's always refreshing to

9    hear both sides.

10            **MR. ZANZI:**  But we're concerned that the Court is

11   making a conclusion already that there's something improper

12   about this.

13            **THE COURT:**  No, I am not.

14            **MR. ZANZI:**  But you said that you were concerned and

15   surprised, Your Honor.  That's our concern, is that there has

16   been a predetermination.

17            **THE COURT:**  Were you surprised?

18            **MR. ZANZI:**  No, Your Honor.  This has all been

19   disclosed to the defense counsel three years ago.  None of this

20   is surprising at all.

21            **THE COURT:**  You told the defense attorneys that

22   Garbutt was an agent of the government?  Did you tell them

23   that?

24            **MS. LERNER:**  Your Honor, that's a legal definition.

25   Anyone who understand how cooperating sources work understands

1   that.  I suspect counsel do too.  Whenever the government is

2   telling someone to do something, they are an agent in the legal

3   sense of the word.  I elicited that question.  I knew the

4   answer because that's how it works.  That's why they're

5   admonished about what they can do.  There's no surprise there.

6   And I suspect both counsel have done cases and they understand

7   this.

8          **THE COURT:**  I've been involved in a lot of cases in

9   my life, not many as you have got maybe, but I have been

10  involved in a lot of cases on both sides.  I bring a unique

11  perspective on that point.  I've been exactly where you've

12  been, and I've been exactly where they've been.  I've gotten my

13  head beat in where you are, and I've gotten my head beat in

14  where they are.  I have never heard a government agent say that

15  "I instructed them to go in there and go through offices and

16  get materials."  I have never heard that.  I am not saying it

17  didn't happen.  I'm saying I have never heard an agent admit to

18  that.

19         **MS. LERNER:**  And I understand the Court's concern.

20  And, as I mentioned yesterday, this was not something that was

21  done lightly.  He talked to Mr. Benson.  He talked to the

22  supervisor in the office.  It was discussed, the parameters

23  that this could be done, and it was discussed with Mr. Garbutt

24  before it happened.  This is not something that the government

25  does willy-nilly.

1          **THE COURT:**  Listen to what I said.  All I've said

2    was it's the first time I've heard it said in court,

3    acknowledged by an agent.  That's all I'm saying.  I'm not

4    saying it's illegal.  We're going to address that issue later.

5    I make no judgment on that whatsoever.

6          The question right now is to what extent the defense

7    can use what they have to, I assume, impeach Mr. Garbutt -- is

8    I assume the reason for it; he's the one that brought it up --

9    to reflect on his credibility.  I assume that's the only basis

10   to bring it up at this point.

11         **MR. ROGERS:**  Judge, or the conduct of the

12   investigation as a whole.

13         **MS. LERNER:**  The defendants are on trial, not the

14   investigation.

15         Your Honor, we understand your ruling.  My great

16   fear is that the jury is going to be encouraged to nullify

17   based on an allegedly illegal search which was, in fact,

18   perfectly legal, and that would be an injustice.  We understand

19   the Court's ruling, and we will respect it.

20         **THE COURT:**  Well, the other thing you need to do is

21   when something is coming up, you need to object to it too if

22   you think it's improper.

23         **MS. LERNER:**  Again, we can object; the Court can

24   rule; you can strike it from the record, but they've heard it,

25   and they've heard it throughout this entire trial.

1          **THE COURT:**  Okay.  Anything else?

2          **MS. LERNER:**  Nothing from the government.

3          **MR. ZANZI:**  We can proceed, Your Honor.  Thanks.

4          **THE COURT:**  Okay.  Are you ready to proceed?

5          **MS. GAMBINO:**  Yes, Your Honor.

6          **THE COURT:**  Mr. Rogers?

7          **MR. ROGERS:**  Yes.

8          **THE COURT:**  Bring the jury in.

9          **MS. GAMBINO:**  Your Honor, would you like to inform

10   the jury that we are interrupting Mrs. Shelton or shall I?

11         **THE COURT:**  I'll tell them.  Just remind me though.

12         One thing -- I hope one thing is clear.  If I

13   haven't said it before, I will say it now very clearly.  This

14   goes to closing argument.  The defendants can't claim on

15   closing argument that the government violated the Fourth

16   Amendment.  That just can't be made.

17         **MS. GAMBINO:**  Wasn't intending to make that

18   argument.

19         **THE COURT:**  No, I'm just saying, so everybody

20   understands.  Again, I think sometimes people read more into

21   what I say.  Maybe it's my own fault.  But I'm not saying that

22   I'm opening the door for those kind of arguments to be made in

23   cross-examination or in final argument.  What I'm saying is to

24   the extent it affects bias, those kind of things, you can get

25   to it.  But you can't get in and argue that they violated the

1   Fourth Amendment.  That's what you can't do.

2       (Jury in at 9:34 a.m.)

3           **THE COURT:**  You can be seated.

4           And just so you know, we weren't sitting here for a

5   half an hour eating bonbons.  We have been discussing things in

6   the case.

7           Additionally, in order to get witnesses in and not

8   keep you out any longer than necessary, Ms. Gambino has asked

9   that she can bring a couple other witnesses to testify, in

10  addition to Ms. Shelton, and bring them out of order, and

11  that's going to be permitted to do that.  So there will be some

12  breaks in there, the other two witnesses will come in, and then

13  we'll go back to Ms. Shelton.  That's what going to happen.

14          You can proceed.

15          **MS. GAMBINO:**  Thank you, Your Honor.

16          Our first witness this morning is going to be Bishop

17  Norman Hairston.

18          **THE COURT:**  What name?

19          **MS. GAMBINO:**  His name is Bishop Norman Hairston.

20          **THE COURT:**  Okay.

21          **MS. GAMBINO:**  I believe that I had him originally

22  listed as "pastor," but he is a bishop.  It's my mistake.

23          **THE COURT:**  Okay.  First thing you need to do, state

24  your name for the record.

25          **THE WITNESS:**  Bishop Norman Hairston II.

```
 1              THE COURT:  Second thing is, she needs to place you
 2   under oath, and would you take an oath at this point?
 3              THE WITNESS:  Yes.
 4        (The oath was duly administered.)
 5              THE WITNESS:  I do.
 6              THE COURT:  You can be seated.
 7              And then one final thing after you get seated and
 8   comfortable.  Go ahead and sit down and get comfortable.  The
 9   microphone in front of you, which you can pull over to you
10   right there, it will go sideways and come back and forth and so
11   forth.  The reason for that is you have to talk directly into
12   it no matter what you're doing.  If you're looking to the side,
13   it needs to be the side.  You just have to talk directly into
14   it.  You have to talk loud enough that the last juror in the
15   second row can hear you.  If she can hear you, everybody can
16   hear you.  Okay?
17              THE WITNESS:  Yes, sir.
18              THE COURT:  Ms. Gambino.
19     BISHOP NORMAN HAIRSTON II, DEFENDANT SHELTON'S WITNESS, SWORN
20                        DIRECT EXAMINATION
21   BY MS. GAMBINO:
22   Q.  Good morning, Bishop Hairston.
23   A.  Good morning.
24   Q.  And can you tell us where you're a bishop and what your
25   responsibilities there are.
```

```
 1   A.   I serve as a bishop under the reformation called United
 2   Covenant Churches of Christ as well as I am the senior pastor
 3   of Zion Progressive Cathedral International located in Gary,
 4   Indiana.
 5   Q.   Can everybody hear okay?  Okay.
 6             And how long have you been in that post?
 7   A.   I have been in that position as a senior pastor for
 8   15 years but at that church all of my life.  My father pastored
 9   it for 40 years before I became the pastor.
10   Q.   And do you have a family?
11   A.   I do.  I do.  I have three children -- I don't look my age
12   -- 30, 25, and 20.
13   Q.   And are any of your children planning on following in your
14   footsteps?
15   A.   Two of them.  My daughter is graduating in May from Wiley
16   College as a music major and theology student.  My son is
17   already playing the organ like I do and also in ministry, and
18   my other daughter sings.
19   Q.   So it's all in the family then?
20   A.   All in the family, just like my mother and father.
21   Q.   Now, Bishop Hairston, do you know Mrs. Ethel Shelton?
22   A.   I do.
23   Q.   And how is it that you know Mrs. Shelton?
24   A.   I'm 51.  I have probably been knowing them 45 years.
25   Q.   And when you say "knowing them," who are you referring to?
```

1    **A.**   The whole family.  The whole family.  My father pastored

2    them, and now I pastor them.  I am into probably the third to

3    fourth generation of pastoring with that family.

4    **Q.**   And so you have a lot of experience interacting with

5    Mrs. Shelton?

6    **A.**   I have, yes.

7    **Q.**   And you have seen how she behaves in all different kinds of

8    contexts?

9    **A.**   Yes.

10   **Q.**   And you are very familiar with her family and everyone

11   around her?

12   **A.**   Yes, I am.

13   **Q.**   And based on all of your experience with Mrs. Shelton and

14   her family, have you any opinions about her character?

15   **A.**   Just a wonderful person.  The family is wonderful.

16   Personally, I have known Mrs. Shelton for years, kindhearted,

17   sweet, personable, always available if I needed something for

18   the community and/or for the church.  All-around good person.

19   Never had any trouble within the church like some people I can

20   have.  But just never had any problems with her.  She's always

21   been working in the church and around the community.

22   **Q.**   And as far as her reputation in the community for

23   truthfulness and integrity, do you know what that is?

24   **A.**   Yes.  I've heard nothing but good things about her, and

25   even when -- at one point, I worked where she was working when

```
 1   I was younger, and even then her integrity was good.
 2   Q.  And so you know her to be a person who is not going to tell
 3   you things that are not true?
 4   A.  No.  No.  The one thing about Ethel Shelton is she's going
 5   to tell you the truth and tell you exactly how she feels.
 6   Q.  Whether it's good, bad or --
 7   A.  Good or bad.
 8   Q.  And you've had the experience personally with Mrs. Shelton?
 9   A.  On several occasions, yes.  Being a pastor, sometimes
10   people want to spare your feelings, but Ethel doesn't.  If she
11   felt I was wrong, as a pastor, she would tell me.  If she felt
12   I was wrong as just a -- because sometimes pastors are not
13   considered human.  But as a human being, if I was wrong as a
14   little boy or even as a grown man, she would say -- my nickname
15   is Jerry.  She would say, "You're Wrong.  You need to fix that.
16   Get it right."
17   Q.  And did you ever think when you had those kinds of
18   interactions with her that she was wrong in saying that?
19   A.  If I felt she was wrong, I would tell her, "I don't agree
20   with that."  And she would say, "Okay.  Let's think about it
21   and let's pray about it and let's see what we come up with."
22   Q.  Thank you, Bishop Hairston.
23            MS. GAMBINO:  I would tender the witness,
24   Your Honor.
25            THE COURT:  Cross-examination.
```

**CROSS-EXAMINATION**

 1

 2  **BY MR. ZANZI:**

 3  **Q.**   Good morning, Pastor.  How are you?

 4  **A.**   Good morning.  I am wonderful.  Thank you.

 5  **Q.**   So am I correct that your experience with Ms. Shelton has

 6  been through personal church experiences, correct?

 7  **A.**   Church experience and personal experience.  I've been a

 8  part of that family for years, down through the years.  And,

 9  again, as I said, my father pastored some of the family as

10  well.

11  **Q.**   You never worked at the Calumet Township Trustee's Office,

12  correct?

13  **A.**   Yes.

14  **Q.**   You worked there?

15  **A.**   I worked there when I was a younger man.

16  **Q.**   Okay.  But never with Ms. Shelton, correct?

17  **A.**   No, I don't think she worked there when I was there.

18  **Q.**   Okay.  Under a different administration, not Ms. Elgin?

19  **A.**   Yes, under a different -- I was there when Mr. Allen was

20  there.

21  **Q.**   Oh, okay.  So you don't have any personal firsthand

22  knowledge of anything that happened at the trustee's office

23  during Ms. Elgin's tenure, correct?

24  **A.**   No, I don't.

25  **Q.**   You said that you know Ms. Shelton to be someone who speaks

```
 1   her mind?
 2   A.   Yes.
 3   Q.   And she says what she means?
 4   A.   Yes.
 5   Q.   So we're to assume that if Ethel Shelton says something or
 6   if anyone has heard her say something, based on your
 7   experience, she meant it?
 8   A.   If it was directly towards her, yes, she would speak what
 9   she felt.
10   Q.   She's not someone to say something she doesn't mean,
11   correct?
12   A.   I've not known her to say anything she doesn't mean when it
13   becomes personal.  On a level of pastoring, one thing she did
14   is she had respect for me as a pastor.  So she really never got
15   involved in saying, oh, pastor you're wrong with the church.
16   She believed that if I heard from God, I heard from God, and
17   that's what it was.
18            Personally, if she saw me do something on a personal
19   level, just as Jerry, the young man she knows and been knowing
20   for years, she would say, "That's wrong.  Don't do that," or,
21   "Okay, I agree with that."  Something like that, you know, but
22   basically she would tell me how she would feel.
23   Q.   So if she disagreed with you, she would say something,
24   correct?
25   A.   If I said something, she would disagree with me if I
```

```
 1    didn't -- if she didn't agree with it.
 2    Q.  But in your experience, everything she ever told you, she
 3    meant what she said?
 4    A.  Basically meant what she said, yes.
 5           MR. ZANZI:  No further questions, sir.
 6           THE WITNESS:  Okay.
 7           THE COURT:  Redirect.
 8                    REDIRECT EXAMINATION
 9    BY MS. GAMBINO:
10    Q.  Bishop Hairston, you also know Mrs. Shelton to have a sense
11    of humor?
12    A.  Most definitely.
13    Q.  And she and her family -- many of her family members share
14    that?
15    A.  All of them share that.
16           MS. GAMBINO:  No further questions, Your Honor.
17           THE COURT:  Any recross?
18           MR. ZANZI:  Nothing further, Your Honor.
19           THE COURT:  Do the jurors have any questions?
20    (Questions tendered to the Court.)
21           THE COURT:  Come on up here.
22    (Bench conference.)
23           MS. LERNER:  I agree.  It should be asked.
24           THE COURT:  Do you all agree with it?
25           MS. LERNER:  That's lovely.
```

 1          **MS. GAMBINO:**  That's fine.

 2          **THE COURT:**  Without your agreement, I wouldn't ask

 3   it.

 4          **MS. GAMBINO:**  That's fine.

 5      (End of bench conference.)

 6         **THE COURT:**  The jurors have a right to ask

 7   questions.  An answer is -- if you don't know, that's an

 8   answer.  You don't have to know everything.

 9          **THE WITNESS:**  Thank you.

10         **THE COURT:**  The question is:  Do you believe that

11   good people can do bad things?

12         **THE WITNESS:**  Is that from a theological point of

13   view or -- humanistically, yes.

14                   **FURTHER REDIRECT EXAMINATION**

15   **BY MS. GAMBINO:**

16   **Q.**  Bishop Hairston, it is part of being human, is it not, that

17   people, whether they believe in God or don't believe in God,

18   can make mistakes of judgment and make errors along the way?

19   **A.**  Yes, ma'am.  I believe that people who believe in God and

20   don't believe in God can do some things that are not right.

21   According to the Bible, it talks about Romans 3 and 23, "For

22   all have sinned and come short of the glory of God."  We mess

23   up.  We're human --

24         **MR. ZANZI:**  Objection, Your Honor.  I think we are

25   getting too far afield of the question.

```
 1              THE COURT:  I would agree.  You've gone beyond the
 2   question.
 3              THE WITNESS:  Okay.
 4   BY MS. GAMBINO:
 5   Q.   Thank you, Bishop.  And you are not here to testify that
 6   Mrs. Shelton can do no wrong?
 7   A.   No.
 8   Q.   But you are here to testify about what you know of her?
 9   A.   Yes, ma'am.
10   Q.   And what you know of her is to be a person of character and
11   an honest person?
12   A.   Yes, ma'am.
13              MS. GAMBINO:  Thank you, Bishop.
14              THE COURT:  Cross?
15              MR. ZANZI:  Nothing further, Your Honor.
16              THE COURT:  Okay.  Thank you very much for coming.
17              THE WITNESS:  Thank you.
18              MS. GAMBINO:  Thank you, Bishop.
19              Your Honor, our next witness will be Diane Bates.
20              THE COURT:  Your Honor, may we approach before the
21   witness comes in?
22        (Bench conference.)
23              MS. LERNER:  Your Honor, if this is another
24   character witness, we renew our objection as to the cumulative
25   evidence.
```

1          **THE COURT:**  Is this the last one?

2          **MS. GAMBINO:**  It's the last one, Judge.

3          **MS. LERNER:**  She's already had four.

4          **THE COURT:**  No, I understand.  I don't have a

5    rule -- it is cumulative, I agree.  Character witnesses tend to

6    be cumulative.

7          **MS. LERNER:**  We are just renewing our objection to

8    that.

9          **THE COURT:**  I appreciate that.  This is the last

10   one.  I will let this one go.  There will be no more.

11         **MS. GAMBINO:**  That's fine.  That's all we have.

12         **THE COURT:**  Okay.

13      (End of bench conference.)

14         **THE COURT:**  First thing you need to do is state your

15   name for the record.

16         **THE WITNESS:**  Diane Bates.

17         **THE COURT:**  And you need to take an oath, so you

18   need to face my courtroom deputy over there and stand and take

19   an oath.

20      (The oath was duly administered.)

21         **THE WITNESS:**  I do.

22         **THE COURT:**  Now you can be seated.

23         One other thing, you found out very quickly that the

24   microphone is a directional microphone.  It has to be right in

25   front of your mouth when you're talking.  No matter what

```
 1    direction you're facing, it has to be right in front of you.

 2              THE WITNESS:  Okay.

 3              THE COURT:  You have to talk loud enough so that the

 4    last juror in the back row at the very end can hear you.  If

 5    she can hear you, everybody can hear you.

 6              THE WITNESS:  Okay.  Can you hear me?

 7              UNIDENTIFIED JUROR:  I can hear you.

 8              THE COURT:  Okay.

 9         DIANE BATES, DEFENDANT SHELTON'S WITNESS, SWORN

10                    DIRECT EXAMINATION

11    BY MS. GAMBINO:

12    Q.  Good morning, Mrs. Bates.

13    A.  Good morning.

14    Q.  Do you live here in Indiana?

15    A.  I live in Chesterton right now.

16    Q.  And were you born and raised in this area?

17    A.  I actually was born in Florida.  Somebody took a wrong

18    turn, but I have been here many years.

19    Q.  And do you know Mrs. Ethel Shelton?

20    A.  I have known Ethel Shelton for over 30-some years.

21    Q.  And how is it that you know her?

22    A.  We worked together.  We were single mothers together.

23    We've just been friends for that long.

24    Q.  And when -- how far back was it that you first started

25    working together and were single mothers together?
```

1  **A.**  Wow.  I'm really bad on dates, but it was in the early

2  '60s.

3  **Q.**  And where was it that you worked together.

4  **A.**  Bethlehem Steel when it was Bethlehem Steel.

5  **Q.**  And what did it become after it was Bethlehem Steel?

6  **A.**  Wow.  I can't remember.  It went two more things, and it's

7  ArcelorMittal now.

8  **Q.**  Okay.

9  **A.**  But ISG, that's what it was.

10  **Q.**  Now, what was the position that you had at Bethlehem when

11  you first met Mrs. Shelton?

12  **A.**  I worked in the metallurgical department, and we went to

13  see people that didn't like our steel or had a problem with our

14  steel.  We were kind of like the customer service department.

15  **Q.**  And that's what Mrs. Shelton did, too, when she came into

16  your department?

17  **A.**  Yes.

18  **Q.**  And at the time that you first met, was the steel plant

19  unionized as far as clerical workers go?

20  **A.**  I'm sorry.  Would you repeat that?

21  **Q.**  Was Bethlehem Steel unionized as far as the clerical

22  workers go at that time?

23  **A.**  We were not organized at the time.  We did get organized

24  later, and both of us were officers in the union later.

25  **Q.**  And what position in the union did you have?

```
 1   A.   Secretary, recording secretary.

 2   Q.   And what was the position that Mrs. Shelton had?

 3   A.   She was our griever.

 4   Q.   And what did she do as the griever?

 5   A.   She interacted with both the union and management, which is

 6   a fine line to walk, and she did a good job at it.

 7   Q.   And did you share that opinion with other employees?  Did

 8   most people believe, in your experience, that Mrs. Shelton was

 9   an effective griever?

10   A.   Yes.

11   Q.   And was this an important role to have had in your union at

12   that time?

13   A.   It was extremely important.  We had gone years without a

14   union, and, you know, you're dealing with two different sets of

15   people and you're walking this fine line.

16   Q.   And when you're talking about two different sets of people,

17   what are you referring to?

18   A.   Union and management, who both had different ideas, of

19   course.  It took a smart person to get through it, to tell you

20   the truth.

21   Q.   And in your view, did Mrs. Shelton perform that role with

22   integrity?

23   A.   She got along extremely well with both sides.

24   Q.   And was it important to you and Mrs. Shelton as women that

25   this clerical staff be unionized?
```

```
 1    A.   Clerical staff be what?
 2    Q.   Unionized.
 3    A.   Yes, it was very important, especially when they went
 4    bankrupt later.
 5    Q.   So your friendship with Mrs. Shelton carried beyond your
 6    time at the steel factory; is that right?
 7    A.   Yes.
 8    Q.   And does it continue into the present?  Does it continue
 9    into the present?  Are you still friends?
10    A.   Yes.
11    Q.   And have you had a chance over the last 30 years to observe
12    Mrs. Shelton and come to some opinions about her character?
13    A.   Wow.  I don't know.  Ethel is just a plain, good person.
14    And that's the best thing I could say about her.  I would tell
15    you, it was always me that was the hothead.  And I was wanting
16    something done about something, and she kept saying, "God will
17    take care of it."  I'm real impatient about it though.
18    Q.   So did you then complement each other and work well
19    together?
20    A.   I think so.
21    Q.   And do you have an opinion with respect to Mrs. Shelton's
22    honesty and truthfulness?
23    A.   I'm having trouble hearing the last part of your --
24    Q.   I'm sorry.  Do you have an opinion about her honesty and
25    truthfulness?
```

```
 1   A.   Oh, she's very honest, very.

 2   Q.   And when you say "very," what do you mean?

 3   A.   I would trust her with anything.

 4   Q.   Up to and including your life?

 5   A.   Yes.

 6           MS. GAMBINO:   Thank you.

 7           I don't have any further questions, Your Honor.  I

 8   tender the witness.

 9           THE COURT:   Government, cross?

10                     CROSS-EXAMINATION

11   BY MS. LERNER:

12   Q.   Good morning, Ms. Bates.  Can you hear me?

13   A.   Yes, I can.

14   Q.   So you testified that Ms. Shelton was a griever at the

15   union; is that correct?

16   A.   Yes.

17   Q.   And you mentioned that there was a divide, a union and

18   management divide; is that correct?

19   A.   Yes.

20   Q.   Which tends to happen when there's unions because there's

21   sometimes conflicting interests there; is that right?

22   A.   Yes, although we did have something called "partnership"

23   that started out there that was very helpful.

24   Q.   Certainly.  In her role as a griever, Ms. Shelton, she had

25   to defend workers against management in disputes; is that
```

1  correct?

2  **A.**  Yes.

3  **Q.**  And that's so that management couldn't force them to do

4  something they didn't want to do; is that correct?

5  **A.**  Yes.

6  **Q.**  And, more specifically, something that wasn't part of the

7  requirements of their job; is that correct?

8  **A.**  I guess so.

9  **Q.**  And in situations where management might be forcing someone

10  to do something that wasn't part of their job, Ms. Shelton

11  would put a stop to that; is that correct?

12  **A.**  Well, yes.

13       **MS. LERNER:**  No further questions.

14                 **REDIRECT EXAMINATION**

15  **BY MS. GAMBINO:**

16  **Q.**  Ms. Bates, you mentioned the partnership.  What was that?

17  **A.**  It was kind of a coming together with management and union

18  to work for the betterment of the company.

19       **MS. LERNER:**  Relevance, Your Honor.

20       **THE COURT:**  I'm going to sustain the objection.

21       **MS. GAMBINO:**  Okay, Your Honor.

22  **BY MS. GAMBINO:**

23  **Q.**  So did you get to see Mrs. Shelton operate along with

24  management as well as with the employees?

25  **A.**  Yes.

1    **Q.**   And she did well with both sides?

2    **A.**   Yes, she did.

3    **Q.**   And did she try to be a fair person?

4    **A.**   Very fair.

5            **MS. GAMBINO:**  Thank you.

6            I don't have any further questions, Your Honor.

7            **THE COURT:**  Okay.  Any recross?

8            **MS. LERNER:**  No, Your Honor.

9            **THE COURT:**  Okay.

10           **MS. GAMBINO:**  Thank you very much, Ms. Bates.

11           **THE COURT:**  Don't leave yet.

12           **MS. GAMBINO:**  The jurors get to ask questions.

13           **THE COURT:**  Do the jurors have any questions?

14           You can leave now.  Thank you very much for coming

15   in.

16           Ms. Shelton, you can return to the stand.

17   Ms. Shelton, remember you are still under oath.

18           **DEFENDANT SHELTON:**  Yes.

19           **THE COURT:**  I'm not going to do it again.  You can

20   be seated.

21                 **DIRECT EXAMINATION (resumed)**

22   BY MS. GAMBINO:

23   **Q.**   Mrs. Shelton, do you need some water?

24   **A.**   I have some here.

25   **Q.**   Okay.  Yesterday when we left off, we had gotten to the

1   point at which you were starting to talk about being hired as a

2   secretary for Mary Elgin.

3   **A.**   Yes.

4   **Q.**   So she asked you to become a secretary.  And what was your

5   decision with respect to that?

6   **A.**   I accepted.

7   **Q.**   And, again, that was -- why did you decide to accept her

8   offer to become secretary?

9   **A.**   Because of I was a finance clerk, and I was making 28,000.

10   She said that this job would start out at 38,500, and I

11   accepted to help my granddaughter through school, through

12   college.

13          **MS. LERNER:**  Objection, our earlier objection that

14   was discussed.

15          **THE COURT:**  I'm going to overrule the objection to

16   this question.

17          **MS. GAMBINO:**  So the answer can stand, Your Honor?

18          **THE COURT:**  The answer can stand.

19          **MS. GAMBINO:**  Okay.

20   **BY MS. GAMBINO:**

21   **Q.**   Now, were you offered a township car when you became

22   secretary?

23   **A.**   No, I was not.

24   **Q.**   Do you know whether or not the secretaries who came before

25   you had been offered township cars?

```
 1   A.   I believe they both had cars.

 2   Q.   So this was something different with respect to you?

 3   A.   Yes, it was.

 4   Q.   Now, were you and Mary Elgin best friends at this point?

 5   A.   At this point, I would say we were not.

 6   Q.   And was this -- this was 2005/2006?

 7   A.   Yes.

 8   Q.   And your friendship with Mary Elgin developed as you worked

 9   with her; is that right?

10   A.   That's correct.

11   Q.   Now, at some point you considered each other best friends?

12   A.   Yes.

13   Q.   And then you and Mary Elgin had a falling out?

14   A.   Yes, we did.

15   Q.   And we'll get to that later.

16            Let's talk about your duties as Mary Elgin's

17   secretary.  What were you responsible for as her secretary?

18   A.   Well, if you ever worked for an elected official, it's a

19   very, very busy office.  My responsibility was to answer all

20   incoming calls, to schedule all appointments.  Any clerical

21   work that needed to be done, I had to -- that was part of my

22   responsibilities.

23   Q.   And let me interrupt you for a moment.

24            When you say "clerical work," what does that

25   include?  What does that entail?
```

1    **A.**   That's includes an enormous amount of filing.  All the

2    deputies are sending reports.  General assistance has huge

3    reports.  We had to file them in boxes.  Just an enormous

4    amount of work.

5    **Q.**   And how would you characterize Mary Elgin as whether she's

6    organized or not organized?

7    **A.**   Very unorganized.

8    **Q.**   And was part of your responsibility to try and keep her

9    organized?

10   **A.**   Yes, to keep her desk clean.  It would be just full of

11   papers.  She kept sales papers, receipts, canceled checks.  I

12   mean, it was a lot.

13   **Q.**   Now, did you have any supervisory responsibilities?  Did

14   you have any employees who worked for you?

15   **A.**   No, I had none.

16   **Q.**   And was Mary Elgin the only individual for whom you worked?

17   **A.**   Well, Mary Elgin -- Trustee Elgin told me that I had three

18   people, including herself, that I would take my directives

19   from.  I took directives from her, I took directives from

20   Donna Frazier, the chief deputy, and I took my directives from

21   Stafford Garbutt, the executive aide.

22   **Q.**   And how often was it that you were called upon to do work

23   for either Mr. Garbutt or Donna Frazier?

24   **A.**   Donna Frazier, rarity that -- she worked on the 2nd floor.

25   Rarity that she asked me to do something.  But Mr. Garbutt

1   would ask me to do a number of things.

2   **Q.**   And what sorts of things would Mr. Garbutt ask you to do?

3   **A.**   He would ask me to proofread a letter.  Sometimes, rare, he

4   would ask me to type, file something, make a phone call to

5   someone, something like that.  And when he lost his eyesight,

6   part of his eyesight, I did a lot of proofreading for him.

7   **Q.**   So during the course of time that he worked with

8   Mary Elgin, he had some issues with his vision?

9   **A.**   Yes.  He -- we were in a meeting in Trustee Elgin's office,

10  and I talk about God, but not excessively --

11  **Q.**   Well, let's not get into that right at this moment.  I just

12  wanted you to respond to whether or not he had some problems

13  with his vision.

14  **A.**   Yes, he did have problems with his vision.  I'm sorry.

15  **Q.**   Okay.  Now, most of your work, though, was for Mary Elgin?

16  **A.**   Yes, it was.

17  **Q.**   And did Mary Elgin keep regular 8:00 to 4:00 business

18  hours?

19  **A.**   I didn't hear you.

20  **Q.**   Did Mary Elgin keep regular 8:00 to 4:00 business hours?

21  **A.**   Oh, no.

22  **Q.**   And would she often either start early or stay late?

23  **A.**   Yes.

24  **Q.**   And when she started earlier or stayed late, were you also

25  expected to be there with her?

```
 1   A.   Most of the time, yes.

 2   Q.   And so did you find that you were working far more than the

 3   8:00 to 4:00 hours that were the regular business hours?

 4   A.   Yes.  I worked many, many hours over with Trustee Elgin.

 5   Q.   And did she have a policy with respect to whether you could

 6   get paid for the time that you worked extra?

 7   A.   Yes.  She told me that -- you know, we worked over, and she

 8   told me that she was not going to give me comp time for that.

 9   Q.   And why did she not want to give you comp time?

10   A.   She said it would look suspicious to the other employees

11   because we stayed over so much.

12   Q.   So you just continued to stay over without any compensation

13   for it?

14   A.   I stayed over.  She was, you know, my friend.  I stayed

15   over to help her.

16   Q.   Now, with respect to, for instance, other people in the

17   office, were other people also staying over to work?

18   A.   Rare did I see anyone stay over that much.  Mr. Wheeler

19   stayed over later than anyone that I know.  He worked on the

20   1st floor, and I worked on the 3rd floor.  So when he would

21   leave, he would either call upstairs and say, "I'm leaving," or

22   he would either come upstairs --

23              MS. LERNER:  Objection.  Hearsay.  I ask that the

24   answer be stricken.

25              THE COURT:  The question was:  Now, with respect to
```

```
 1   instances of other people in the office, were other people

 2   staying to work?  Let me stop this thing real quick.  And she

 3   said:  Rare did I see anyone stay over that much.

 4            I'm going to overrule the objection as to that

 5   question.

 6            MS. LERNER:  It's to the answer, Your Honor, not the

 7   question.

 8            THE COURT:  Well, the answer too.  I'm looking at

 9   the answer.  I don't want to read the answer back because that

10   defeats the whole purpose.  But I'm looking at the answer, and

11   I don't see how that, per se, is objectionable.

12            MS. LERNER:  It's statements of the defendant,

13   Your Honor, of another defendant, not Ms. Shelton.

14            THE COURT:  No, I understand that.  But she's

15   talking about -- said:  When he would leave, he would either

16   call upstairs and say, "I'm leaving," or would either come

17   upstairs.

18            I mean, I don't see any harm in that answer.  Maybe

19   you know something I don't know, which is probably pretty

20   likely, but I'm going to overrule the objection.

21            MS. LERNER:  Thank you, Your Honor.

22   BY MS. GAMBINO:

23   Q.  Now, Mrs. Shelton, did you have keys to the building?

24   A.  No, I did not.

25   Q.  And so if you stayed late yourself, could you stay there
```

```
 1   indefinitely?

 2   A.   No, I could not because I couldn't set the alarm.  I

 3   couldn't lock the doors.

 4   Q.   And was there security in the building?

 5   A.   Yes, there was security.  Trustee Elgin changed the way she

 6   did things downstairs with security.  When I first started

 7   working as a secretary, the security would stay as long as we

 8   stayed.  But then she changed that policy to security, I think,

 9   left at either 5:00 or 6:00 in the evening.  I can't remember

10   exactly.  So either security would come up and tell us that he

11   was leaving at 5:00 or 6:00, when they were supposed to leave.

12   So when he leaves, we had to leave.

13   Q.   So that the --

14   A.   When I speak of "we," myself or anyone else that was in the

15   building, and most of the time that was me and Alex Wheeler.

16   And so we had to leave because we didn't have keys and we

17   couldn't set the alarm, so we left.

18   Q.   Now, when Ms. Elgin was there, you could stay as long as

19   you wanted?

20   A.   When Ms. Elgin was there, we could stay as long as we

21   wanted to.

22   Q.   Now, after you started to become more friendly with

23   Mrs. Elgin, did she sort of break it down to you about her

24   policy with respect to friends in the office?

25   A.   With respect to who?
```

```
 1   Q.   Friendship in the office.

 2   A.   Yes.  Ms. Elgin told me that -- and she told me this on

 3   numerous occasions -- she said, "I'm your friend."

 4            MS. LERNER:  Objection.  Hearsay.

 5            THE COURT:  It is hearsay.  What's the purpose of

 6   the question or the exception.

 7            MS. GAMBINO:  Your Honor, it goes to Mrs. Shelton's

 8   understanding of what she was -- how things were in the office

 9   as opposed to outside the office.  It's the effect on her

10   actions.

11            THE COURT:  So the question would be:  What effect

12   did that statement have on you?

13            MS. GAMBINO:  Right.  But I need her to say what the

14   statement is.

15            THE COURT:  I understand.

16            MS. LERNER:  She can answer what effect it had on

17   her without saying what the statement was.  She, obviously,

18   knows what the statement was.

19            THE COURT:  I'm going to overrule the objection at

20   this point.  Go ahead.

21   BY MS. GAMBINO:

22   Q.   So what did Mary Elgin tell you about friendship in the

23   office?

24   A.   She said, "We're friends."  She says, "When you come in

25   this office, we leaving our friendship out the door.  You are
```

 1   just like any other employee here."  That's what she told me on

 2   numerous occasions.

 3   **Q.**  And as a result of that, did that affect how you acted in

 4   the office?

 5   **A.**  It affected how I responded to her because I knew that she

 6   meant what she said.  I had been around her.  I knew her

 7   personality, so I knew she meant that.

 8   **Q.**  Now, did Mrs. Elgin involve you as a matter of course in

 9   hiring and firing decisions?

10   **A.**  Absolutely not.

11   **Q.**  And who was involved in hiring and firing decisions?

12   **A.**  Ms. Elgin let everybody know:  I'm the boss.  I do the

13   hiring.  I do the firing.  I sign your check.

14          **THE COURT:**  The question was:  And who was involved

15   in hiring and firing decisions?

16          **THE WITNESS:**  Trustee Elgin.

17          **MS. LERNER:**  Your Honor, may we approach, please?

18          **THE COURT:**  Yes.

19     (Bench conference.)

20          **MS. LERNER:**  The government filed a motion on this.

21   She is eliciting hearsay after hearsay after hearsay, and she

22   can't get all of this in by saying, "Oh, it goes to her state

23   of mind," or something.  This is all being put in for the truth

24   of the matter, and it is question after question after

25   question.  I can't object to every single question.  It makes

1    it look like I'm trying to --

2         **THE COURT:**  No, I understand, but it seems to me

3    like it's a classic example of what effect it had on her

4    because it's what she understood.  Now, if what she understood

5    is incorrect, that's something different.  But it's what she

6    understood.  And they can't argue -- and they know that -- get

7    up there and say, "Well, she told her she could do this."

8    That's going to the truth of it.  It's the effect it had on her

9    and what she understood she could do or couldn't do.

10        **MS. LERNER:**  But that's one clear example.

11   Ms. Gambino could have asked:  Did Ms. Elgin tell you something

12   about friendship, and what was that effect on you?  But,

13   instead, she said:  What did Ms. Elgin say?  Then, what was

14   that effect on you?  She doesn't have to elicit the hearsay.

15   She's getting it for the truth.

16        **MR. ZANZI:**  She can ask her what her understanding

17   was and but -- and what that understanding is based on without

18   actually eliciting the statements of Ms. Elgin.  And that's the

19   problem, Your Honor, is that every single response is, "Well,

20   it's not for the truth of the matter."  But her answer is that

21   this is what she meant when she said, so it is coming in for

22   the truth of the matter, Your Honor.  It's coming in for both

23   purposes.

24        **MS. GAMBINO:**  My last question that you objected to

25   was:  Who did she involve with the hiring and firing?  And then

1   you're objecting to Mrs. Shelton's answer, which I have no

2   control over.

3         **MS. LERNER:**  You can instruct her not to say what

4   other people said.  You've done it before.

5         **THE COURT:**  The hearsay rule is the hearsay rule.

6   It's probably one of the most reviewed rules of evidence.  If

7   it's not being offered for the truth of it -- I agree.  I

8   agree.  It's what are you offering it for, and it's the effect

9   on her.  And the next question has to be what is the effect,

10  and you have to get to that question pretty quick, and I think

11  she has gotten to that question.

12        I think we are trying to cabin the hearsay rule a

13  little too narrow here.  There's going to be an instruction

14  that you've been told certain evidence is for a limited

15  purpose; and if in final argument they start arguing the

16  question that was asked, a hearsay question that was permitted

17  to come in for the effect, then that's where it's going to

18  stop.

19        **MS. LERNER:**  So then if I -- I don't understand,

20  Your Honor, what exactly -- if Ms. Gambino says to every

21  question "it's not being offered for the truth," then what

22  exactly are the rules regarding the admitting -- not admitting

23  out-of-court statements of the defendants?  I mean, if you use

24  that excuse, then doesn't that admit everything in?

25        **THE COURT:**  Except nothing's coming in for the

1  truth.  So, I mean, they're relying on other things that they

2  don't know is true or not, and that can be pointed out very

3  clearly.

4          **MS. LERNER:**  They are relying on it for the truth.

5          **THE COURT:**  Then it can't come in.

6          **MS. LERNER:**  That's what our objection is.

7          **THE COURT:**  If they try to move that needle and

8  start arguing subsequently that she said this so it must be the

9  truth, that's --

10         **MS. LERNER:**  They'll argue that in closing.

11         **THE COURT:**  In closing, it's objectionable.

12         **MS. LERNER:**  Okay.

13         **THE COURT:**  And if it starts going on, we can come

14  up here and talk about it; and if it's necessary, a limiting

15  instruction will be given at that time.  I have given some

16  limiting instructions about hearsay coming in, and I'll do

17  another one right now on it so the jury can at least have their

18  antenna up when it goes on.  But she's qualifying what it is.

19  She has given an exception -- or not an exception.  It's not

20  being offered for the truth of it, so it's not hearsay.

21         **MS. GAMBINO:**  It's very hard to talk about what her

22  understanding of the policies are without at least -- and how

23  she acted without getting some notion of what the policies

24  were, what she was told.

25         **THE COURT:**  I'm agreeing with you.  I'm saying you

1    can't cabin this too narrowly.  On the other hand, you can't

2    uncabin it too broadly either.  So I agree with both of you.

3             You know, if we have five days of testimony coming

4    in not for the truth but what's the effect, the jurors are

5    going to be confused by that, but I don't see that happening

6    yet.

7             **MS. LERNER:**  Okay.

8             **THE COURT:**  I'm not sure what yet is, but not yet.

9             **MS. GAMBINO:**  Thank you.

10       (End of bench conference.)

11            **THE COURT:**  Ladies and gentlemen of the jury, the

12   objection is overruled.  But we talked about hearsay.  I gave

13   you kind of the five second -- the CliffsNotes version of it.

14   Anyway, hearsay is -- the rule against hearsay is you're

15   offering by a declarant outside the courtroom -- most evidence

16   you hear is outside the courtroom, but it's being offered for

17   the truth of the statement.  If it's not being offered for the

18   truth of the statement, it's not hearsay.  But the other thing

19   is, the statement cannot be relied on as truthful because that

20   relies on the declarant.

21            So I may be confusing your further, but the thing

22   is, you have to be able to cross-examine the witness on the

23   statement.  You can't cross-examine a witness to the statement

24   that somebody else made to them.  That's what I'm really

25   talking about.  Now, they can rely on that statement, but they

1    don't rely on it because of the truth of the statement.  They

2    assume it's true, but they don't know it's true.  And the

3    government or the defense can't cross-examine the person who

4    made that statement.  That's the essence of the rule.

5           So next week we'll get your law degree out to you

6    and you can start doing this too.

7           Anyway, the objection is overruled.

8           **MS. GAMBINO:**  So tell the jury, Judge, that hearsay

9    is the hardest thing in law school.

10          **THE COURT:**  I didn't do very well in it.

11   **BY MS. GAMBINO:**

12   **Q.**  Okay.  So, Mrs. Shelton, what I wanted to know, without

13   saying what anyone said to you, what was your understanding

14   about whether you were going to be involved in hiring and

15   firing decisions?

16   **A.**  I was not involved.

17   **Q.**  Okay.  Now, occasionally, did you share your opinion with

18   Mrs. Elgin about issues that would come up with respect to

19   hiring and firing?

20   **A.**  I remember just one time she was --

21   **Q.**  Without saying what she said, what opinion did you offer?

22   **A.**  I didn't offer any opinions about hiring and firing.

23   **Q.**  And there were a couple of exceptions to that, were there

24   not, specifically --

25   **A.**  Not specifically hiring and firing but layoffs.

1   **Q.**  Layoffs, okay.  Well, with respect to one instance of

2   someone who was under consideration for a layoff, who was that

3   and what was the opinion that you offered?

4   **A.**  Horace Clay was that person.  He was ill at the time, and

5   he had talked to me about it.  He was on the layoff list, I

6   understand, and I asked her not to lay him off because he

7   needed his insurance because he was ill.

8   **Q.**  And did she in that particular instance act according to

9   your --

10   **A.**  She did.  She did not lay him off.  He's still there today.

11   **Q.**  Now, you had come up through the finance department?

12   **A.**  Yes.

13   **Q.**  And at some point Irene Vargo left the finance department;

14   is that right?

15   **A.**  Yes, she retired.

16   **Q.**  And did you offer an opinion to Ms. Elgin at that time

17   about who you thought would be a good leader for the finance

18   department?

19   **A.**  Well, I worked in the finance department so I knew the

20   people in the finance department.  Gladys Miller knows

21   everything about that department.  She is very detailed.  She's

22   a very good person.  So I asked her -- I said, "I think

23   Gladys Miller would be a very good deputy."  She didn't, no.

24   **Q.**  In that instance, she did not follow your opinion?

25   **A.**  She did not follow my opinion.

1    **Q.**   So it's fair to say that sometimes if you had an

2    unsolicited opinion, she would take it or not take it?

3    **A.**   Yes.

4    **Q.**   And would she very often ask you affirmatively for your

5    opinion?

6    **A.**   Not often.

7    **Q.**   Now, what was your role with respect to the board when you

8    became Mrs. Elgin's secretary?  Did you continue with taking

9    the board minutes?

10   **A.**   No, I did not.

11   **Q.**   And who took over that responsibility when you stopped

12   doing that?

13   **A.**   I believe it was LaDarean Ricks.  That's who I think.  I'm

14   not quite sure about that answer.

15   **Q.**   And with respect to the board, did you ever have to do

16   mailings to the board on behalf -- or on behalf of the board

17   for Mary Elgin?

18   **A.**   Yes, I did.

19   **Q.**   And what sorts of mailings would you do on behalf of the

20   board or on behalf of Mary for the board?

21   **A.**   Well, the board by law have to meet four times a year, but

22   they met more than that.  And I had to get the folders together

23   with the materials, what was going to be discussed at that

24   meeting.  I had to get her folder together, the chief deputy,

25   and the three board members.  And I had to make sure that those

```
 1   was delivered to the board members so that they could look over
 2   it before they attended that meeting.
 3   Q.   So you kept that aspect of the responsibilities even though
 4   you weren't still the board secretary?
 5   A.   Yes, I did.
 6   Q.   And what, if anything, did you have to do with the deputies
 7   in the office?
 8   A.   I really didn't interact too much with the deputies.  I
 9   knew who they were, and I saw them when they came up to the
10   meetings in Ms. Elgin's office.  But that was about my extent
11   of dealing with them.
12   Q.   Were you involved on a regular basis with the deputies'
13   meetings?
14   A.   Never attended a deputies' meeting.
15   Q.   And was that your choice or Mrs. Elgin's choice?
16   A.   That was Ms. Elgin's choice.
17   Q.   Did you think it would have been appropriate for you to sit
18   in on the meetings and take minutes?
19   A.   I asked her because I was a secretary and I asked her, "Do
20   you want me to go in and take the minutes?"
21   Q.   And were you ever permitted to do that?
22   A.   Never.
23   Q.   Did you feel that she wanted to keep you out of that for
24   whatever reason?
25   A.   She wanted to keep me out of those meetings.
```

1  **Q.**  Now, with respect to the organization of the office, where

2  was your office located with respect to hers?

3  **A.**  We were in close proximity with each other.  My office was,

4  let's say, here (indicating), and there was a door to the

5  side -- there was two doors to my office.  One led into her

6  office, and the other door led into the sitting area where

7  people would come in that had meetings with her and they would

8  sit in that area.

9  **Q.**  Now, when you first started off working as her secretary,

10  was she spending all day every day in the office?

11  **A.**  No.  She was out of the office a lot.

12  **Q.**  And were you in a position to know or see the comings and

13  goings of Stafford Garbutt?

14  **A.**  Yes.

15  **Q.**  And how was it that you could see the comings and goings of

16  Stafford Garbutt?

17  **A.**  Stafford's office was -- I had to go outside of my office

18  and that sitting area, and then across the hall was his office.

19  He would regularly come into the area going into Ms. Elgin's

20  office all the time.

21  **Q.**  So he spent a lot of time in Mrs. Elgin's office?

22  **A.**  He spent a lot of time in Ms. Elgin's office.

23  **Q.**  Do you know whether or not he had an intimate relationship

24  with Mrs. Elgin in addition to his professional

25  responsibilities?

```
1              THE COURT:  The answer would be "yes" or "no," do
2    you know?
3              THE WITNESS:  Yes.
4    BY MS. GAMBINO:
5    Q.  And how is it that you know that?
6    A.  Because she told me.
7    Q.  Did you also observe their relationship?
8    A.  Yes, I did.
9    Q.  And the fact that they had spent a lot of time together?
10   A.  Yes, they spent a lot of time together.  I would be in the
11   office.  They would leave during the day -- this was the first
12   couple of years, I would say.  They would leave during the day,
13   be gone all day.  I had to take care of the whole office.
14              At that time I was up there by myself.  There was
15   nobody on the 3rd floor but me, Stafford, and Mary.  So if they
16   left -- I mean, they're my bosses.  They can leave whenever
17   they want to.  They left.  I stayed.  And that happened a lot
18   during the first couple of years.
19   Q.  For the first couple of years.  But it didn't remain with
20   the same intensity throughout?
21   A.  No, it did not.
22   Q.  And were you aware of whether he and Mrs. Elgin had a
23   falling out at some point?
24   A.  I kind of assumed that they did because I noticed the
25   difference in the way he acted and the way she acted, so I kind
```

1   of thought they had a falling out.

2   **Q.**   Now, with respect to Mr. Garbutt, did you allow him to come

3   into your office and search through your office and take

4   documents at will?

5           **MS. LERNER:**   We renew our earlier objection,

6   Your Honor.

7           **THE COURT:**   I'm going to let her answer this

8   question.   The objection is overruled.

9   **BY MS. GAMBINO:**

10  **Q.**   Did you allow Mr. Garbutt to come into your office, whether

11  or not you were there, to take documents and things out of your

12  office?

13  **A.**   No, I did not.

14  **Q.**   And did you have an understanding with Mr. Garbutt that he

15  could do that before you got there in the morning?

16  **A.**   I didn't have an understanding with him about that.

17  **Q.**   And do you know whether or not he was permitted to come and

18  go and take things out of Mary Elgin's office when she was not

19  there?

20  **A.**   No, he was not.

21  **Q.**   Was Mr. Garbutt, as far as you know, permitted to go and

22  take things out of anyone's office when they weren't --

23          **MS. LERNER:**   Objection.   Lack of foundation.

24          **THE COURT:**   Let her finish the question and then

25  renew your objection.

**BY MS. GAMBINO:**

**Q.**   As far as you know, during the time that you were working as Mrs. Elgin's secretary, did Mr. Garbutt have permission to go into anyone's office?

**A.**   As far as I know, he did not have that permission.

**Q.**   Were you surprised to hear him testify here that he had gone into your office without your permission?

**A.**   I was shocked.

             **MS. LERNER:**   Objection.  Relevance.

             **THE COURT:**   I'm going to strike the answer.  Whether she was shocked or not really has nothing to do with the case. The objection is sustained, and the answer is stricken.

**BY MS. GAMBINO:**

**Q.**   Now, when you first started working as Mrs. Elgin's secretary, were you responsible for doing anything with respect to fundraising tickets?

**A.**   Yes.

**Q.**   And when did that responsibility start?

**A.**   I believe it started when we went into the new building. It might have started 2007.  I'm not really sure.  But between 2007/2008.

**Q.**   That's when you got involved with fundraising tickets?

**A.**   I believe that's when it was.

**Q.**   And when you say "moved to the new building," which building is the new building?

**A.**   610 Connecticut Street.

**Q.**   And where were you prior to that?

**A.**   I done forgot the address, but it was a short distance from 610.  It was on 5th Avenue, East 5th Avenue.

       **THE COURT:**  Why don't you hold that thought.

       Ladies and gentlemen of the jury, we are going to take the morning recess.  While you haven't been in here that long, I have been sitting here since 9:00, and I'm not a young man.  We are going to take our morning break, 15 to 20 minutes.  This will be the last break until we have lunch, so make good use of it.

       Usual admonition:  Don't talk to each other about the case.  Don't let anybody else talk to you about the case.  See you back here in about 15 to 20 minutes.

   (Jury out at 10:30 a.m.)

       **THE COURT:**  You can step down.

       The Court will be in recess.

   (Recess had at 10:30 a.m., and proceedings resumed in open court at 10:57 a.m.)

       **THE COURT:**  You can all be seated.

       **MS. GAMBINO:**  Do you want Mrs. Shelton back on the stand, Your Honor?

       **THE COURT:**  Yes.

       Ready for the jury to be brought in?

       **MS. GAMBINO:**  Yes, Your Honor.

1          **MS. LERNER:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  Bring the jury in.

3          Do you expect lunch here between 12:00 and 12:15?

4          **SECURITY OFFICER ROGALSKI:**  Do you want us to let

5     you know when it's here?

6          **THE COURT:**  My intention is to recess between 12:00

7     and 12:15.  That's my intention.

8          **SECURITY OFFICER ROGALSKI:**  Okay.

9          **THE COURT:**  Ms. Shelton, you are still under oath.

10         (Jury in at 10:59 a.m.)

11         **THE COURT:**  You can be seated.

12         Ms. Gambino, continue.

13         **MS. GAMBINO:**  Thank you, Your Honor.

14         Is everybody hearing okay?

15         (The jury collectively responded affirmatively.)

16         **THE COURT:**  They just don't hear me when I forget to

17    turn my microphone on.  That's all.

18    **BY MS. GAMBINO:**

19    **Q.**  Before we go to the new building, there are a couple of

20    additional questions I wanted to ask you about your move up to

21    be secretary.

22         You said you had a pay increase from somewhere

23    around 28- to 38,000; is that right?

24    **A.**  Yes, ma'am, 38,5.

25    **Q.**  38,5.  And were all of the salaries of all the people at

1  the township public knowledge?

2  **A.**   Yes.

3  **Q.**   And are you aware of how much the deputies earned, for

4  instance?

5  **A.**   46,000 a year.

6  **Q.**   46,000 a year?

7  **A.**   Yes, ma'am.

8  **Q.**   Okay.  And then the assistant deputies?

9  **A.**   I'm not sure about the assistant deputies.  I think there

10  was a little difference in their salary based on the department

11  that they worked in.

12  **Q.**   Okay.  And Mr. Garbutt?

13  **A.**   60,000 a year.

14  **Q.**   And the trustee?

15  **A.**   I believe she was at 88,000.

16  **Q.**   Now, did you -- you didn't get your car paid for?

17  **A.**   No, I bought my car.

18  **Q.**   Your own car, personal car?

19  **A.**   My own personal car.

20  **Q.**   So you didn't have a township car.  Did the township pay

21  for your gas?

22  **A.**   No, I paid for my own gas.

23  **Q.**   And did the township pay for your insurance?

24  **A.**   No, I paid for my own insurance.

25  **Q.**   Did you receive any perks that anyone else did not receive?

```
1   A.   Not that I know of.

2   Q.   So you were paid for your job like everyone else?

3   A.   Yes.

4   Q.   Now, I have put on the ELMO Government's Exhibit 56.  Is

5   that the new building?

6   A.   Yes, it is.

7   Q.   Okay.  And the new building everybody moved into in

8   approximately 2008; is that correct?

9   A.   Yes, I believe it was 2008.

10  Q.   And who was responsible for getting the new building, if

11  you know?

12  A.   I don't know.

13  Q.   Okay.

14           THE COURT:  When you say "new," you mean new to

15  them?

16           MS. GAMBINO:  New to them.

17           THE COURT:  Right.

18           MS. GAMBINO:  Right.  It was not a new building, but

19  it was new to the township.

20  BY MS. GAMBINO:

21  Q.   Can you compare the conditions in the old building to the

22  conditions in the new building?

23  A.   Yes, I can.  The old building, it was terrible.  The

24  bathrooms were bad.  We had mold.  People were getting sick.

25  And it was just not a very good building to work in.
```

1   Trustee Elgin was instrumental in getting this new building.

2   She did a lot of good things for the township --

3           **MS. LERNER:**  I'm going to object to the relevance of

4   the answer and the question for that matter.

5           **THE COURT:**  Well, it's hearsay.

6           **MS. LERNER:**  Not just hearsay but relevance.

7           **THE COURT:**  Any one of a number of reason.

8           Just go ahead to your next question.

9           **MS. GAMBINO:**  Okay.

10          **THE COURT:**  You're not a professional witness, but

11  one thing you need to do is just answer the question that's

12  asked of you.  If Ms. Gambino thinks it needs another question,

13  she'll ask another question.  Okay?

14          **DEFENDANT SHELTON:**  Okay.  All right.

15          **THE COURT:**  Thank you.

16  **BY MS. GAMBINO:**

17  **Q.**  So it was a good move from the old building to the new

18  building?

19  **A.**  Yes, it was.

20  **Q.**  All right.  Now, once you arrived in the new building, you

21  took on some additional responsibilities?

22  **A.**  Yes, I did.

23  **Q.**  And what were those responsibilities?

24  **A.**  Well, Ms. Elgin came out and she told me that --

25  **Q.**  Without saying what she told you.

```
 1          THE COURT:  As best you can, remember that.  But,
 2   again, it's not what you do all the time.
 3          MS. GAMBINO:  It's okay, just without saying
 4   anything that she said.
 5          DEFENDANT SHELTON:  Okay.
 6   BY MS. GAMBINO:
 7   Q.   What new tasks were you assigned to do?
 8   A.   The responsibility that I had was to --
 9          In regard to the extravaganza tickets?
10   Q.   Uh-huh.
11   A.   -- was to put those tickets together for the deputies, put
12   the employee's name on the envelopes with tickets in them,
13   rubber band them together, and to take them to the deputies on
14   my lunch hour, on my break, or after work.
15   Q.   And why was it your understanding that you should do this
16   on your lunch hour, on your break, or after work?
17   A.   Because I could do that on my lunch hour, my break, and
18   after work because it was a break and because it was my lunch
19   hour and I -- it was okay to do that.
20   Q.   So was it your understanding that as long as it wasn't
21   during work hours it was okay?
22   A.   It was okay.
23   Q.   Did you subsequently learn that there was a different
24   understanding with respect to that?
25   A.   No.
```

 1    **Q.**   When was the first time that you realized that even if it

 2    was your lunch hour or your break, you shouldn't have been

 3    doing it?

 4    **A.**   When the FBI came in.

 5    **Q.**   And that was, what, in 2014?

 6    **A.**   That was in March 2014, I believe.

 7    **Q.**   Now, did you keep track of the tickets that went out?

 8    **A.**   Yes, I did.

 9    **Q.**   And why did you do that?

10    **A.**   Ms. Elgin needed a report of all monies coming in and all

11    monies going out, and I was to keep that file.  Everybody -- it

12    wasn't just for employees.  It was for anybody that sent checks

13    into the township, and we received many checks through the mail

14    coming into the township, including checks for tickets, but

15    there were also checks for other things.

16    **Q.**   For township business?

17    **A.**   Township business.

18    **Q.**   So were you responsible then for keeping track of all

19    monies that came into and out of the township regardless of

20    what they were for?

21    **A.**   If it came upstairs and Ms. Elgin wanted it to come up

22    there, I did keep track of it.

23    **Q.**   And did you keep track of these items -- how did you keep

24    track of them?

25    **A.**   Well, I had a form.  Ms. Elgin kind of drafted it out on a

1    piece of paper, asked me to type it.  She wanted me to keep the

2    names, the address, how much the donation was.  I don't

3    remember whether or not the phone number was on it or not.  It

4    might have been.  And I had to keep that in my files.

5           And once I kept that, she had to make a report to

6    the election board.  I don't know whether it was quarterly or

7    bimonthly.  I don't know when she had to, you know, take this

8    into the election board.  By law, she had to do this.  So she

9    wanted me to put that address on there and the amount on there,

10   so she could -- instead of her having to look up every name to

11   see their address, she could just pull that piece of paper out

12   and transfer it from that piece of paper to the official form

13   that she had to take in to the election board.

14          So that's what I did.  I did what she asked me to

15   do.

16   **Q.**  Now, did she fill out her own election board forms or did

17   you fill out those forms for her?

18   **A.**  She filled out her own forms.

19   **Q.**  So you kept track of what came in and out, gave that to her

20   and then she did her own forms?

21   **A.**  Yes.

22   **Q.**  But as far as you were concerned, the purpose of keeping

23   track was so that she could fulfill her responsibilities to the

24   election board?

25   **A.**  Yes, she had to -- yes.

Q.   Okay.  Now, were there occasions when people left checks or

envelopes on your chair, on your desk, or stopped you in the

hall and gave you payments and things of that nature?

A.   Yes.

Q.   And did you make any inquiry as to what you should do if

people brought you money when you are on your way to the

restroom or going downstairs outside?

A.   There were some employees who didn't want to deal with

their deputies for whatever reason, and they were giving me

money.  I would go to the restroom, or if I'm going downstairs

to the break room or going downstairs to talk to somebody, they

would give me money.  Not a whole lot of employees, just a few.

        And I went into Ms. Elgin and I said, "Trustee,

these people are giving me money.  I'm going to the bathroom,

they're giving me money.  What should I do?"  She said, "Take

it."

Q.   So you were supposed to take it and keep track of it?

A.   Take it and keep track of it.

Q.   Did you ever ask anybody else what you should do with

respect to keeping track of the tickets during work hours?

A.   Well, Ms. Elgin told -- when I got the information that I

should keep track of all of this and what was political and

what was not political, I asked Cynthia Holman-Upshaw, the

employee that had been there the longest through several

administrations, so I figured she would know, you know, about

 1  this type of thing.  So I asked her, I said, "Can I do these

 2  tickets on my lunch hour, on my break, and after work?  I mean,

 3  is this political?  I mean, what is this?"

 4       She said, "I don't think it's political, as long as

 5  you're doing it on your break, after work, and lunch time."  So

 6  I didn't question it any further.  I believed her.

 7  **Q.**  Okay.  Now, Mr. Garbutt testified that he made a point of

 8  saying that this was political work being done.  Did he tell

 9  you about -- that you shouldn't be taking these tickets during

10  the day?

11  **A.**  I believe when -- I believe when the FBI came in, if I

12  remember correctly, he mentioned to me that I should not be

13  doing tickets on my lunch hour, break, or after work, that it

14  was wrong to do.  And I didn't respond to him because I'm

15  seeing you do -- you're my boss and you're doing political work

16  on the clock, not only for Ms. Elgin, but you're doing it for

17  several politicians.  So I just couldn't grasp that.

18       I'm doing it on my lunch hour.  You doing it on the

19  clock, and you're telling me that it's wrong.  What's wrong

20  with it, if I'm doing it on my lunch hour and on break and

21  after work and you're doing it on the clock, every day, all

22  day, when you're there?  So --

23  **Q.**  So you didn't take --

24  **A.**  -- I didn't take too much --

25  **Q.**  You didn't take him seriously?

1    **A.**   No, I didn't.

2    **Q.**   When you were hired in, in the first place, were you given

3    an employee handbook?

4    **A.**   Yes, I was given an employee handbook.

5    **Q.**   Showing you what has been marked as Government's

6    Exhibit 27, did your handbook look something like this?

7    **A.**   Similar, yes.

8    **Q.**   And what was contained in the employee handbook?

9    **A.**   Different rules and regulations.

10   **Q.**   And were you familiar with it?  Did you go through it?

11   **A.**   I looked through it, but, you know, as an employee, I am

12   looking for sick days, vacation days.  You know, it's a

13   personal thing.  It's an awful large handbook, so I didn't have

14   time to go through all of that book.  You know, I am working a

15   very busy job.

16   **Q.**   But you did go through it to find things as you needed

17   them?

18   **A.**   Yes.

19   **Q.**   Was there anything in that handbook that talked about

20   violations of the law, specific laws, or anything with respect

21   to that?

22   **A.**   I didn't see anything in there about violation of the law.

23   **Q.**   Now, were you -- who was responsible for creating, if you

24   know, the policies that were in the handbook?

25   **A.**   Mary Elgin.

1 **Q.**  And did they change from time to time?

2 **A.**  Changed them all the time.  We were getting memos every

3 other week.  You know, one day, we have sick days.  She'd come

4 in and say, "You no longer have the sick days that you have

5 accumulated."  So a lot of people was upset about that.  Come

6 in one day, your mother -- you get five days if your mother

7 pass away and your brother and sister pass away.  She called me

8 in the next day and say, well --

9         **MS. LERNER:**  Relevance and hearsay.

10        **THE COURT:**  It's gone beyond the question.

11        **MS. GAMBINO:**  Okay.

12 **Q.**  So the long and short of it -- it's okay Mrs. Elgin --

13 Mrs. Shelton.

14 **A.**  Okay.

15 **Q.**  My brain; I'm sorry.

16        We're going to keep closer to the questions.  But

17 the long and short is --

18 **A.**  She changed it all the time.

19 **Q.**  -- she changed the policies.  And then you would put the

20 memos in the book and go on from there?

21 **A.**  I wouldn't personally put them in the book.  Personnel took

22 care of that.

23 **Q.**  Okay.  And they would be passed around?

24 **A.**  Yes.

25 **Q.**  And you were shown -- we saw this Government's Exhibit 55,

1   "Statement of Acknowledgment of Employee Handbook."  When you

2   were given a handbook or a new one or a revised one, were you

3   asked to sign one of these?

4   **A.**   I don't know whether I got one every time they changed, but

5   I did get one.

6   **Q.**   Okay.  And in 2011, it looks like you signed this.  Is that

7   your signature?

8   **A.**   That is my signature.

9   **Q.**   Okay.  And who kept track of these -- these statements of

10   acknowledgment of employee handbook?

11   **A.**   I believe personnel kept track of that.

12   **Q.**   So this would have come, as it says down here, "original to

13   employee personnel file," this is out of your personnel file?

14   **A.**   Yes.

15   **Q.**   As far as you know?

16   **A.**   As far as I know.

17   **Q.**   Now, were there times when you took a break to do something

18   with respect to the tickets and the time went over what the

19   break should have been?

20   **A.**   Yes, there have been a couple of times it went over.

21   **Q.**   And what would you do in situations like that?

22   **A.**   What would I do in situations like that?

23   **Q.**   Right.  Would you make up the time, or would you just let

24   it ride?

25   **A.**   I worked over so much until -- yes, I would make up the

```
 1   time.
 2   Q.  Okay.  Did you ever cheat the township out of time in terms
 3   of your work?
 4   A.  No, I did not.
 5   Q.  And in terms of the hours that you worked, did they
 6   regularly exceed the 8:00 to 4:00 hours that were the regular
 7   hours of business?
 8   A.  Yes.
 9   Q.  And were you compensated for the overtime that you put in?
10   A.  No, I was not.
11   Q.  Now, let's talk a little bit about EPIC.  What was EPIC?
12   A.  I think that's Elgin Political Initiative Committee.
13   Q.  Okay.  And at what point -- were you involved in EPIC?
14   A.  I was not involved at first with EPIC.  It was, I believe,
15   a committee formed before she became trustee and the
16   original -- you know, original committee.
17   Q.  The original group of supporters?
18   A.  Yes.
19   Q.  And who was in that group at first?
20   A.  I believe Lamar Taylor, Alex Wheeler, Edward Harris,
21   Donna Frazier, Steven Hunter.  That's all I can remember right
22   off the top of my head.
23   Q.  And did you know or come to know all of these individuals?
24   A.  I came to know all those individuals.
25   Q.  And were you friendly with them?
```

```
 1    A.   I was friendly with them.

 2    Q.   Now, at what point did you become involved with EPIC?

 3    A.   I believe it was 2008 when we went into the building.  It

 4    might have been 2007, but I think it was when we went into the

 5    new building.

 6    Q.   What was the nature of your involvement in the beginning?

 7    A.   I was to be at the EPIC meeting for scheduling purposes,

 8    scheduling the trustee's schedule.

 9    Q.   Okay.  And why was that important?

10    A.   She had been having problems with -- when she come to work

11    and tell me, "Put this on my schedule; put this on my

12    schedule," she said I had to be there in order -- to be part of

13    the meeting to know when she scheduled something.  She wanted

14    me to put that on that schedule right there.

15    Q.   Did she want you to do that because she, herself, was

16    forgetful?

17    A.   She was forgetful, so I was taking the heat.  She would

18    say, "I told you to put it on my schedule."  I said, "You

19    didn't tell me," so I had to be at the meetings.

20    Q.   Okay.  So that was how your involvement was at first?

21    A.   That was my involvement.

22    Q.   How often did the EPIC supporters meet?

23    A.   We met whenever she called a meeting.

24    Q.   And when would those meetings occur?

25    A.   Most of them occurred after work at her house.
```

```
 1   Q.   And were there times when they occurred at other places?
 2   A.   We had a couple at the north annex, I believe, in 2013.
 3   Q.   There were meetings at the north annex?
 4   A.   There were meetings at the north annex.
 5   Q.   And what time of day would the meetings at the north annex
 6   be?
 7   A.   Usually on our lunch hour, food would be ordered in.  We
 8   would have lunch and go over there for a meeting or after work
 9   at her house or at the north annex, wherever she wanted to have
10   them.
11   Q.   So the meetings were basically held at a place that was
12   convenient to her?
13   A.   Yes.
14   Q.   But the three general spots would have been -- well, two
15   general spots, the north annex and her home?
16   A.   And her home.
17   Q.   Depending on what else was going on?
18   A.   Right.
19   Q.   And what was the nature of the EPIC meetings?  What sorts
20   of things were discussed at those meetings?
21   A.   If we were coming up to an election, you know -- election
22   was every four years, I believe.
23   Q.   Uh-huh.
24   A.   And if it was coming up to an election, we would talk about
25   the election, campaign headquarters, what we were going to be
```

1   doing, that type of thing.

2   **Q.**   And as far as campaign headquarters, as far as you know,

3   did Mary Elgin secure campaign headquarters each election year?

4   **A.**   Yes, she did.

5   **Q.**   And for what period of time would she have a campaign

6   headquarters open?

7   **A.**   I'd say probably she would normally get it about two or

8   three months before the election and she would keep it maybe

9   two or three months after the election, and then she wouldn't

10   have it anymore until the next election came around.

11   **Q.**   So she didn't maintain campaign headquarters year round?

12   **A.**   No, she did not.

13   **Q.**   Do you know why she did not?

14   **A.**   Money, because of the rent you would have to pay.

15   **Q.**   Because it was expensive?

16   **A.**   It was expensive.

17   **Q.**   Okay.  Let's talk about the different fundraising events.

18   Did EPIC talk about those?

19   **A.**   Yeah, they talked about those, the extravaganza, the prayer

20   brunch.  Those were basically the two discussed.

21   **Q.**   And what about the Mardi Gras?

22   **A.**   That wasn't discussed so much at the EPIC meeting, if I can

23   remember correctly, not the Mardi Gras.  That was a men's

24   thing.

25   **Q.**   That was a men's thing?

1   **A.**   Yes, they put this on every year.

2   **Q.**   Okay.  And did you -- and what about the prayer brunch?

3   **A.**   The prayer brunch was the women's committee.

4   **Q.**   And who was on the women's committee?  Did that change

5   every year?  How did that work?

6   **A.**   There was several employees that was -- several women that

7   was on that list.  It was totally voluntary.  It could change.

8   Someone could decide they don't want to be on the committee,

9   and someone might decide I want to join the committee.  It

10  could change.  I can't tell you whether or not it did change.

11  **Q.**   Okay.  And with respect to the extravaganza, were there

12  different chairs every year?

13  **A.**   Most of the time, yes, I believe so.

14  **Q.**   And was it the EPIC committee that organized the

15  extravaganza or was there yet another committee that organized

16  the extravaganza?

17  **A.**   Another committee, I believe, organized the extravaganza.

18  It could have been people that was on the EPIC committee that

19  was part of that committee, but it was a separate committee, if

20  I remember correctly.

21  **Q.**   And with respect to the extravaganza, you yourself were a

22  committee chair for the extravaganza, were you not?

23  **A.**   Yes, the last year, 2014.

24  **Q.**   Then you were chair of the extravaganza?

25  **A.**   I was the chairperson of that extravaganza.

1    **Q.**   Okay.  Now, who decided on the price of the tickets?

2    **A.**   Mary Elgin.

3    **Q.**   And did the committee have some input into what the price

4    of the tickets would be?

5    **A.**   I don't think so.  If Mary Elgin say, "It's going to be

6    $100," it's going to be $100.  We could discuss it, but

7    ultimately it was her decision.

8    **Q.**   Okay.  And how much were the tickets for the prayer brunch?

9    **A.**   $100 each.

10   **Q.**   For the prayer brunch?

11   **A.**   I'm sorry.  $30.

12   **Q.**   And was the turnout generally better for the prayer brunch

13   or for the extravaganza?

14   **A.**   I would say probably the prayer brunch.

15   **Q.**   And do you think that had anything to do with the price of

16   the tickets?

17   **A.**   Probably.

18   **Q.**   Now, what was the extravaganza as an event?  What was it

19   like?

20   **A.**   It was a social event.  We had people from the community

21   come in and, let's say, a band.  Trustee Elgin selected

22   speakers, and we had a nice meal.  It was an enjoyable evening.

23   It was beautiful.

24   **Q.**   Was it a sit-down dinner?

25   **A.**   It was a sit-down dinner.

1    **Q.**   Okay.  And with respect to the prayer brunch, when did that

2    occur?

3    **A.**   That normally occurred around Easter time, Good Friday, in

4    that time frame.

5    **Q.**   And what day of the week would that be?  What day of the

6    week would it be held on?

7    **A.**   Usually on a Saturday.

8    **Q.**   And were you involved with the prayer brunch?

9    **A.**   I was involved.

10   **Q.**   And what was that event like?  What happened at the prayer

11   brunch?

12   **A.**   We had -- most of the time we had -- it was a women's

13   committee, so Trustee Elgin tried to get women ministers to

14   come.  People in the community that had a musical ability, they

15   would come, soloists, praise dancers.  She tried to reach out

16   to people to showcase their talents.  It was that type of

17   thing.

18   **Q.**   So she used it not only for fundraising but to encourage

19   community involvement --

20   **A.**   Yes, she did.

21   **Q.**   -- and showcase talent?

22   **A.**   She gave tickets to the senior citizens and that type of

23   thing.

24          **MS. LERNER:**  Objection.  This is going beyond the

25   question.

1        **THE COURT:**  I'm going to overrule the objection.

2    She has finished the answer, I think.

3    **BY MS. GAMBINO:**

4    **Q.**   So she had a table or tickets for the senior citizens?

5    **A.**   Yes.  We got a table for them to come and to -- she gave

6    them tickets to come and enjoy the event, both the prayer

7    brunch and the extravaganza.

8    **Q.**   Okay.  Without charging them for that?

9    **A.**   Without charging them.

10   **Q.**   Did you keep track of the prayer brunch tickets as well as

11   the extravaganza tickets?

12   **A.**   Yes, I did.

13   **Q.**   And did you keep track of those tickets for the same reason

14   that you kept track of the extravaganza tickets?

15   **A.**   Yes, I did.

16   **Q.**   And that had to do with reporting requirements and keeping

17   track of donations?

18   **A.**   Yes, ma'am.

19   **Q.**   Now, you were also responsible or got involved with putting

20   the tickets in the envelopes and all that sort of thing,

21   getting them ready to be distributed?

22   **A.**   Yes.

23   **Q.**   And where did you do that and when did you do that?

24   **A.**   I would say 99.8 percent of those tickets was done at my

25   home.

1  **Q.**  And when you did them at your home, were there other people

2  there to help you?

3  **A.**  Yes.  I asked my -- the children that I had in my home

4  Jocelyn, Brittany, and their brother Bryan and their mother,

5  Belinda.  I asked them to come over and help me.  And we would

6  form a thing around the table at my house.  And one would do

7  one thing, pass it down to the other one, until that envelope

8  was completed and we turned it over.

9  **Q.**  So you had a little assembly line going?

10  **A.**  We had a little assembly line doing the tickets.  It was a

11  lot of tickets.

12  **Q.**  How many tickets ordinarily were sent out for the

13  extravaganza?

14  **A.**  I would say we sent out probably around 1500, even though

15  she ordered 2500, because we were giving out free tickets.  So

16  usually she ordered 2500.

17  **Q.**  Okay.  And so you were responsible for putting together

18  packets of 2500 tickets?

19  **A.**  About 2000.

20  **Q.**  About 2000 of them.  And then you also mailed them out?

21  **A.**  Yes, I had to mail them out in bulk mail.

22  **Q.**  In bulk mail.

23          Now, the employees' tickets weren't mailed out.  Why

24  were the employees' tickets not mailed out, as far as you know,

25  or if you know?

1   **A.**   I don't know.

2   **Q.**   Had they been distributed the same way since you had

3   started working there?

4   **A.**   Yes.  The deputies always gave the tickets out.  My deputy,

5   when I got hired, Irene Vargo, she gave me my tickets every

6   year.

7   **Q.**   Now, you testified yesterday that when you were an employee

8   you didn't feel like you were obligated to buy these tickets.

9   **A.**   No, I didn't feel obligated to buy them, but I wanted to

10   buy them.  I wanted to support her.

11   **Q.**   When you started working as her secretary, did your opinion

12   change about whether employees were pressured to buy these

13   tickets?

14   **A.**   My opinion didn't change.

15   **Q.**   Did you ever personally pressure any employee to buy a

16   ticket?

17   **A.**   Never did I ever pressure any employee to buy a ticket.

18   **Q.**   Was it a matter of personal concern to you whether they

19   bought the tickets or they didn't buy the tickets?

20   **A.**   No, it was not.

21   **Q.**   And as far as you knew, did it have anything to do with

22   whether they would stay in their job or not?  In other words,

23   were these tickets a kickback to Mary Elgin so that the

24   people who --

25            **MS. LERNER:**  Objection.  Calls for a legal

1   conclusion.

2          **THE COURT:**  I'm going to overrule the objection.

3   **BY MS. GAMBINO:**

4   **Q.**  Did you view these tickets as a kickback to Mary Elgin so

5   the employees could keep their jobs?

6   **A.**  No, I don't know anything about kickbacks.  I just did my

7   job.

8   **Q.**  And you as far as you knew, the people that bought tickets

9   bought them because they wanted to?

10  **A.**  They bought them because they wanted to.

11  **Q.**  Now, it has been raised several times during the course of

12  the trial that there were layoffs or reductions in force at the

13  township office.  Do you have any knowledge about why there

14  were reductions in force at the township office?

15  **A.**  Because of money, budget reasons.

16  **Q.**  Budget reductions and things of that nature?

17  **A.**  Yes.

18  **Q.**  Okay.  And as far as you know, were those layoffs ever used

19  to threaten employees with respect to buying tickets?

20  **A.**  Well, I kept a list, you know, who bought tickets and who

21  didn't buy tickets.  There were people laid off who bought

22  tickets.  There were people laid off who didn't buy tickets.

23  There are still people there today that didn't buy tickets.  So

24  it was never whether or not an employee bought a ticket.

25  Ms. Elgin never asked me to look to see who bought a ticket or

1   who didn't buy a ticket when she started making her layoffs.

2   **Q.**   So as far as you know, the layoff decisions had nothing to

3   do with ticket purchases?

4   **A.**   As far as I know, it didn't.

5   **Q.**   And you wouldn't have any reason to know if you weren't

6   included in the conversations about the layoffs; is that right?

7   **A.**   I was not included in those conversations.

8   **Q.**   Did any employee ever complain to you and say that they

9   felt that they were being laid off unfairly because they didn't

10   buy tickets?

11   **A.**   The only employee that complained to me was -- a couple

12   employees that got laid off, they had bought their tickets, and

13   they couldn't understand why -- it was in their minds that that

14   was -- why did they get laid off when they're buying their

15   tickets.   I told them it wasn't because you're not buying a

16   ticket; it's because, you know, I imagine, when she'd look at

17   it and decided, I can do without you here and do without this

18   employee there.   I don't know how she decided that, but it

19   wasn't decided based on tickets.

20   **Q.**   What percentage or proportion of the people who were sent

21   tickets or bought tickets were actually the employees?   Of the

22   1500 or 2,000 tickets that were sold or given away, how many

23   went to employees?

24   **A.**   The number of employees that we had, I don't know.   Some

25   employees got five tickets, some got four.   I would say -- I'm

```
 1    going to say about 300.

 2    Q.   300 tickets went to the employees?

 3    A.   Maybe 2-something.  I can't recall.

 4    Q.   To your best recall.

 5    A.   I would say 300.

 6    Q.   Now, as far as you know, did Mary Elgin or any of the

 7    deputies exert any pressure on the employees to buy these

 8    tickets?

 9    A.   Not to my knowledge.

10    Q.   And would you have agreed with any decision to force people

11    to buy these tickets?

12    A.   You can't pray with people and then expect -- force them to

13    buy tickets.

14    Q.   Is that a "yes" or a "no"?  Would you agree with anyone who

15    said --

16    A.   No, I would not agree.

17    Q.   Okay.  And would you make your feelings known about that?

18    A.   Yes.

19    Q.   All right.  Now, I want to talk to you about -- there was a

20    conversation that was recorded by Stafford Garbutt of the EPIC

21    meeting on September 26th of 2013.  Do you recall listening to

22    that recording?

23    A.   I recall.

24    Q.   Okay.  And I'm going to put this up, Government's

25    Exhibit 44, September 26th, 2013.  What time did that meeting
```

```
 1    take place?

 2    A.   9/26/13.

 3              THE COURT:   You have to move the microphone.

 4    BY MS. GAMBINO:

 5    Q.   9/26/13, the very first one.

 6    A.   12:07 p.m.

 7    Q.   Okay.  So this was one of the lunchtime meetings that you

 8    were talking about?

 9    A.   Yes.

10    Q.   This transcript only has clips from that meeting.  There

11    are a couple of pieces from the meeting; is that correct?

12    A.   That's correct.

13    Q.   And the entire meeting lasted for over two hours; is that

14    right?

15    A.   Yes.

16    Q.   Now, the general purpose of that meeting was -- well, if

17    you recall, what was the general purpose of that meeting?  Was

18    that the meeting at which Mary Elgin announced that she was,

19    after all, going to run for the last time?

20              MS. LERNER:   Objection.  Leading.

21              THE COURT:   I'm going to let it be answered.

22    Overruled.

23              DEFENDANT SHELTON:   Yes.

24    BY MS. GAMBINO:

25    Q.   Because had she -- had there been rumors or talk that she
```

1   wasn't going to run this time in 2014?

2   **A.**   Yes, it had been rumored that she would not run.

3   **Q.**   Now, who called this meeting?

4   **A.**   Mary Elgin.

5   **Q.**   And was it, in fact, a lunch meeting?

6   **A.**   Yes, it was.

7   **Q.**   And, in fact, if you listen to the recording -- and you

8   have listened to the recording, right?

9   **A.**   Yes.

10  **Q.**   You can hear people talking about food and wrapping and

11  unwrapping and eating while they're talking and that sort of

12  thing?

13  **A.**   Yes.

14  **Q.**   And there were other topics of discussion in this meeting

15  as well, were there not?

16  **A.**   Yes.

17  **Q.**   And, for example, the issue of whether or not they were

18  going to support Ron Matlock; is that right?

19  **A.**   Yes.

20  **Q.**   So there's a considerable chunk of meeting devoted to that?

21  **A.**   Yes.

22  **Q.**   Now, where these clips come in, there is a discussion about

23  whether or not to change the extravaganza, the nature of it; is

24  that right?

25  **A.**   Yes.

```
 1   Q.   And what were the options that were being discussed?

 2   A.   We talked about having it at the Genesis Center versus the

 3   Majestic Star.

 4   Q.   And what's the Majestic Star?

 5   A.   It's a casino and they have a ballroom, so we discussed

 6   that.

 7   Q.   And was there a lot of discussion about the difference

 8   between the nature of the event if it was at the Genesis Center

 9   versus the Majestic Star?

10   A.   They kind of wanted to have -- not the Genesis Center, but

11   at the Majestic Star.  I think it was called the Lakeshore Room

12   or something like that.  It was a smaller room.  It was not as

13   formal, more casual where you would just kind of mingle with

14   each other, that type of thing.

15   Q.   And it wouldn't -- at that point, if it were going to be

16   held at the casino, it wouldn't involve a sit-down dinner?

17   A.   No, it would not involve a sit-down dinner.

18   Q.   Now, I'm going to turn your attention to the first page on

19   Clip A there, and it starts off LS.  Who is LS?

20   A.   Lendell Smith, I believe.

21   Q.   And was Lendell Smith at that time an employee of the

22   Calumet Township Trustee's Office?

23   A.   He was.

24   Q.   And what department did Lendell Smith work in?

25   A.   He worked in general assistance as a case worker.
```

1    **Q.**  Now, you can see where he's in the middle of this

2    conversation.  You had already been talking about having it at

3    the Majestic Star versus the Genesis.

4            So where he says:  "Now, as a goodwill gesture, you

5    could lower the price, have a mini extravaganza at the

6    Lakeshore Lounge and maybe pickup a few other people.  You may

7    not raise as much then if you had kept it at 100 and had the

8    big extravaganza, but 100 and having it at the Lakeshore Lounge

9    may cause a little..."

10           So that's what that's referring to?

11   **A.**  Yes.

12   **Q.**  And then later on, there's a piece of conversation here

13   that starts out with Alex Wheeler -- AW is Alex Wheeler; is

14   that right?

15   **A.**  Yes.

16   **Q.**  And he's saying:  "No matter where you have it, there will

17   probably be a few people who say we didn't get anything to

18   eat."

19           So when he says "no matter where you have it," he's

20   referring to your discussion as to whether to have it at the

21   Majestic or at the Genesis Center?

22   **A.**  Yes.

23   **Q.**  And you say:  "I think the employees will be the biggest

24   problem."

25           Now, why was it that you said that?

```
 1    A.   I said that because employees would complain to me about

 2    the food.  They would complain to me about a lot of things that

 3    happened.  I think that the employees would have wanted it to

 4    be at the Genesis Center.  It was a big deal, you know, sit

 5    down, being formal, dress up.  They like that, so I thought

 6    that would be a big problem to tell them that.

 7    Q.   Would it also be a problem that you're going -- they were

 8    talking about whether to lower the price or not.  If you didn't

 9    lower the price, then they would be paying the same amount of

10    money for less?

11    A.   Absolutely.

12    Q.   And so that was an issue?

13    A.   That was an issue.

14    Q.   And that discussion never really got resolved in that

15    meeting, did it?

16    A.   Oh, no, it didn't get resolved in that meeting.

17    Q.   Now, there has been made a lot -- actually, the discussion

18    about the employees in this meeting was rather brief, and no

19    conclusions were reached; is that fair to say?

20         MS. LERNER:   Objection.  Leading and characterizes

21    the evidence.

22    Q.   How would you characterize, Mrs. Shelton, the degree of

23    attention that was spent on employees' purchase of tickets at

24    that particular meeting?

25    A.   It wasn't any degree how the employees -- with employees
```

1    versus tickets.  I didn't even remember that until I read it.

2    **Q.**   Okay.  Now, a lot has been made about this comment by

3    Alex Wheeler, and the one where he's talking about hitting

4    people upside the head with a stick.

5             Now, you know Alex Wheeler, right?

6    **A.**   Yes, I do.

7    **Q.**   And you have known him for a number of years?

8    **A.**   Yes, I have known him for a number of years.

9    **Q.**   And did anybody -- was that serious, that comment?

10   **A.**   That wasn't a serious comment.  That's the way Alex talked.

11   **Q.**   So nobody took him at his word?

12   **A.**   I did not take him at his word.  He had told me many -- I

13   won't say "many," but he told me several times, "Ethel, I'm

14   going to go upside your head."  I didn't take him serious.  He

15   never went upside my head.

16   **Q.**   So that was just his expression?

17   **A.**   That's just his expression.

18   **Q.**   Mrs. Shelton, what would you have done if Alex had gone

19   upside your head?

20   **A.**   He wasn't going to go upside my head.  He was just talking.

21   **Q.**   Would you have hit him back?

22           **MS. LERNER:**  Objection.

23           **MS. GAMBINO:**  I withdraw.

24           **THE COURT:**  Sustained.

25

1          **MS. GAMBINO:**   I withdraw.   Not serious.

2     **BY MS. GAMBINO:**

3     **Q.**   So what you took out of that meeting -- did you leave that

4     meeting thinking that anybody was going to go try to force the

5     employees to buy tickets?

6     **A.**   No, I didn't take that from that meeting.

7     **Q.**   And what was your biggest concern as a result of that

8     meeting which occurred on September 26th?

9     **A.**   What was my biggest concern?

10    **Q.**   Right, if you remember.

11    **A.**   I don't remember being concerned about anything coming out

12    that meeting.

13    **Q.**   Okay.  And is this the meeting at which Stafford Garbutt

14    took a picture of everybody?

15    **A.**   Yes, he took a picture of -- he asked us to, you know, line

16    up and take a picture.

17    **Q.**   In fact, you can hear him on the recording telling

18    everybody to clear their food and stuff off the table?

19    **A.**   Yes.

20    **Q.**   And this is the picture that we're referring to,

21    Government's Exhibit 15?

22    **A.**   Yes, that's the picture.

23    **Q.**   Okay.  So that was everyone who was left at the end of the

24    meeting but not everybody who had been at the meeting; is that

25    right?

**A.**   Right.

**Q.**   Now, this meeting was held in the north annex, and the north annex rented space; is that right?

**A.**   Yes.

**Q.**   And did you do anything on behalf of Mary or on behalf of EPIC in order to rent a space in the north annex for that meeting?

**A.**   Yes.

**Q.**   And what did you do?

**A.**   I wrote the check for $25 for the rental.

**Q.**   Now, at what point in time -- you say you wrote the check, so you had a checkbook for EPIC?

**A.**   I had a checkbook for EPIC.

**Q.**   And did you also have a checkbook for the township?

**A.**   No.

**Q.**   And who kept the checkbook for the township?

**A.**   Finance department.

**Q.**   Okay.  And the EPIC checkbook, when did you become responsible for the EPIC checkbook?

**A.**   I know it was in the new building, but I don't remember the year.

**Q.**   Okay.  And who was responsible for it before you?

**A.**   Donna Frazier.

**Q.**   And do you know why it was that the checkbook was given to you or taken from Donna Frazier?

 1  **A.**  Can I say I was told -- I don't know how to --

 2          **THE COURT:**  Just answer the way you understand the

 3  question.

 4          **DEFENDANT SHELTON:**  Okay.

 5  **A.**  I got the checkbook, and I was told that Donna Frazier had

 6  misused the township credit card and the checkbook for EPIC,

 7  and Ms. Elgin did not trust her to have that checkbook and that

 8  credit card.  So she asked me to take the checkbook and the

 9  credit card.  I told her I didn't want the credit card.  I

10  didn't want a credit card that -- for the township.  She

11  authorized me to sign her name to checks.  I was not put on the

12  checkbook.  I was not -- just sign her name because she's out

13  of the office on many, many occasions, and I was told to take

14  that checkbook.  She authorized me to sign her name up to a

15  certain amount of money.

16  **Q.**  And after that you would have to ask her permission?

17  **A.**  After that I would have to ask her permission.

18  **Q.**  So basically she wanted the checkbook closer to her?

19  **A.**  Yes, she wanted the checkbook closer to her.

20  **Q.**  Now, were you ever a signatory on the EPIC account?

21  **A.**  No, I am not on the EPIC account.

22  **Q.**  And were you ever a signatory?  Did you have anything to do

23  with the township?

24  **A.**  No.

25  **Q.**  So your only authority was to write checks for Mary when

---

1  she wanted you to?

2  **A.**  Yes.

3  **Q.**  Okay.  Did you ever know what the balance -- were you

4  authorized to get the balance of what was in the account?

5  **A.**  No, the bank would not give me that.  I am not on the

6  account.  They wouldn't give it to me.

7  **Q.**  Were you ever asked to find out?

8  **A.**  I was asked to check to see what the balance was, and

9  without thinking, I went to the bank -- because I know that I

10  can't get the balance -- and I asked.  And they said, "You are

11  not on the account.  We cannot give you that balance."

12  **Q.**  Now, I want to talk to you about two particular instances

13  that we've heard about here in court regarding tickets.  The

14  first one has to do with Gladys Miller.

15  **A.**  Uh-huh.

16  **Q.**  Now, Gladys Miller recounted that you -- that she had some

17  tickets.  She wasn't going to sell them and that you called and

18  asked her if she wanted an appointment with Ms. Elgin.  Do you

19  recall that?

20  **A.**  You know, this is the one thing I have tried to remember,

21  you know, if this happened.  I just can't remember.  When

22  Gladys testified -- at first, it said 2005 on the FBI report,

23  and I knew that in 2005 I was working in the finance

24  department, and I had nothing to do with tickets.  So I knew

25  that wasn't the truth.  So when she changed her testimony and

```
 1   said 2008, I thought about it.  I couldn't remember, but if
 2   this had been any other employee besides Gladys Miller, I would
 3   probably say I didn't say it or something like that, but I knew
 4   Gladys Miller.  I work with her.  She's very detailed.  I
 5   respect her a lot.  She has a lot of integrity.  So I will have
 6   to say that if Gladys Miller said it, I will have to say it is
 7   probably true.
 8   Q.   Okay.  But you don't have any personal recollection --
 9   A.   I don't have a personal recollection of it, but I know her.
10   Q.   So you think that interaction between you and she probably
11   did happen?
12   A.   It probably did happen.
13   Q.   The way she said?
14   A.   Probably the way she said it happened.
15   Q.   Okay.  And if you had been making a call like that, why
16   would you be making a call like that?
17   A.   It would be at the direction -- at the directive of the
18   trustee because she couldn't have a meeting with the trustee
19   that the trustee didn't know about.
20   Q.   Now, would that interaction have upset you?
21   A.   It did.
22   Q.   And then you had another interaction with
23   Linda Collins-Brown.  Do you recall that?
24   A.   Yes, I did.
25   Q.   So what happened with Linda Collins-Brown?
```

 1    **A.**   I remember that Linda Collins-Brown -- I believe she was

 2    working in job search works, and she sent in the

 3    interdepartment mail a ticket and a check.  And when I received

 4    it from Johnnie Barbie, I made a phone call to her and I called

 5    her.  She's on the 1st floor.  I am on the 3rd floor.

 6         So I called her and I said, "Linda, I cannot receive

 7    tickets back from you.  I can't receive them.  Ms. Elgin has

 8    instructed me not to receive any tickets back," and I believe I

 9    told her, you know, you have to -- you should go through your

10    deputy.  That's who gave you your ticket, and that's who you

11    should go back to.  And she started talking about I was

12    coercing her to buy tickets.  I was --

13    **Q.**   Let's not talk about what she said.

14    **A.**   Okay.

15    **Q.**   But how did the things that she said to you make you feel?

16    **A.**   I was upset about it because what she was saying was not

17    true.

18    **Q.**   And then did you take any further action in terms of saying

19    whether or not you were going to make phone calls of this

20    nature anymore?

21    **A.**   I went in to Ms. Elgin and I said, "I will never go to this

22    person again, to Linda Collins again.  I am not going to talk

23    to her.  If it has anything to do with tickets or anything

24    outside of the township, I would not be talking to her."  I

25    told her that, and I meant that because I didn't trust her.

 1   **Q.**  And did you ever have any conversation with her about
 2   tickets ever again?
 3   **A.**  The only conversation I had with her, she would invite me
 4   to her birthday parties and invite me to church with her, but I
 5   did none of that with her.
 6   **Q.**  Okay.  Now, did you very often or were you often asked to
 7   call and follow up with employees about tickets?
 8   **A.**  No.
 9   **Q.**  And would you have wanted to do that if you had been asked?
10   **A.**  I would not have done that.
11   **Q.**  And why would you not have done that?
12   **A.**  I don't think you should do that.  I would not have done
13   it.
14   **Q.**  And would you have agreed with Mary Elgin or anyone else
15   that that's something that should be done?
16   **A.**  No, I would not have agreed with her about that.
17   **Q.**  Now, you also worked at these extravaganzas; is that right?
18   **A.**  Yes, I did.
19   **Q.**  Were you ever compensated by the campaign for the work that
20   you did?
21   **A.**  No, never compensated.
22   **Q.**  Was it totally voluntary?
23   **A.**  Totally voluntary.
24   **Q.**  And you were familiar with keeping an eye on the door in
25   terms of people coming in, whether they paid or they didn't pay

 1   and that sort of thing?

 2   **A.**   Yes.

 3   **Q.**   And, to your knowledge, were people allowed to participate

 4   in the extravaganza if they didn't purchase a ticket?

 5   **A.**   The first few years that I was involved in the

 6   extravaganza, we had employees to come to the door and say,

 7   "You know, I don't have the money to pay for the ticket," for

 8   whatever reason.  "I'll pay you next week."  So we let

 9   employees come in and enjoy the festivities.  We didn't want to

10   embarrass them at the door.  This happened quite frequently.

11   **Q.**   Now, did you ever -- you know, there's some conversation

12   about encouraging 100 percent participation of the employees in

13   fundraising events.  Was that a goal or was that a reality?

14   **A.**   That was a goal.

15   **Q.**   And was there ever a time when there was 100 percent, or

16   anywhere close to it, participation?

17   **A.**   Not even close.

18   **Q.**   And was that discussed as a problem?

19   **A.**   No.

20   **Q.**   Now, I want to direct your attention to another meeting of

21   EPIC.  This was a little bit later, a couple weeks after the

22   one we talked about earlier, October 3rd of 2013.  It is

23   Tab 4T, Government's Exhibit 4T.

24            Now, this is a year that you were chairperson of the

25   extravaganza; is that right?

 1   **A.**   Yes, it is.

 2   **Q.**   And we looked at this passage a couple of times, and you

 3   are saying that you want to enlist the help of the deputies to

 4   try and get a better ticket return; is that right?

 5   **A.**   That's correct.

 6   **Q.**   Now, when you say, "I need the deputies to just, just go to

 7   your employees and say, look we need your help.  We need your

 8   help.  This is election year.  We need you to buy tickets.  I

 9   know you can't make anybody.  You can't.  I know what you can't

10   do and what is legal and what is not legal.  But ask them in a

11   nice way.  Can I get that from the deputies?"

12          Were you seriously asking them to ask in a nice way?

13   **A.**   Yes, I was.

14   **Q.**   Were you doing a wink and a nod thing where you knew that

15   they were going to go and try and force their people to buy

16   tickets?

17   **A.**   No.

18   **Q.**   Was this really encouraging and not anything to do with any

19   kind of force or --

20          **MS. LERNER:**   Objection.  Leading.

21          **THE COURT:**   Overruled.

22   **A.**   No.

23   **BY MS. GAMBINO:**

24   **Q.**   Okay.  And when you say, "I know what you can't do and what

25   is legal and what is not legal, but ask them in a nice way,"

 1   what did you mean?

 2   **A.**   I meant that -- you know, I knew that they -- at least at

 3   that time I felt that they could go and ask an employee or

 4   anyone to buy a ticket in a nice way, not in a forceful way.

 5   **Q.**   And would you ever have been as chairperson of this event

 6   wanting the deputies or anyone else to force people to buy

 7   tickets?

 8   **A.**   No.  Absolutely not.

 9   **Q.**   Whether they were employees or not?

10   **A.**   Whether they were employees or not, absolutely not.

11   **Q.**   Now, was there, as far as you know, any understanding on

12   behalf of Mary with regard to giving or keeping jobs based on

13   participation in fundraisers?

14   **A.**   Not to my knowledge.

15   **Q.**   Now, let's talk a little bit about Stafford Garbutt.

16   **A.**   Okay.

17   **Q.**   When did you first meet him?

18   **A.**   I met Stafford when I went to the township.

19   **Q.**   And you met him in the context of him working for Mary?

20   **A.**   Yes.

21   **Q.**   Okay.  And subsequently you learned other things about him?

22   **A.**   I didn't hear you.

23   **Q.**   You learned about his separate relationship with Mary; is

24   that right?

25   **A.**   Yes.

 1   **Q.**   Now, you and Stafford in the beginning, how did you get

 2   along?

 3   **A.**   We got along fairly well.

 4   **Q.**   And how would you describe him?

 5   **A.**   Stafford is someone who is the smartest guy in the room.

 6   Everybody else is not so smart.  He liked to be in a position

 7   of importance, authority, that type of thing.

 8   **Q.**   And did he do or say things to try and make you feel like

 9   you were less important than he was?

10   **A.**   Yes.

11   **Q.**   Now, he was given authority over you by Mary, right?

12   **A.**   Yes.

13   **Q.**   So he could give you work to do?

14   **A.**   He could give me work to do.

15   **Q.**   And was he the kind of person that kept to himself or

16   stayed in his office or how was he?  How did he behave in the

17   office?

18   **A.**   He didn't exactly stay in his office.  He wasn't a very

19   social person.  He didn't socialize with people at all.  So

20   he -- he pretty much stayed to himself, talked to Mary, talked

21   to me, that type of thing.  He didn't interact with the other

22   employees very much.

23   **Q.**   Okay.  And you said in the beginning he and Mary also got

24   along very well?

25   **A.**   As far as I know at that time, yes.

```
 1              MS. GAMBINO:  Judge, if we could approach for a

 2   moment.

 3              THE COURT:  Let's do this.  Let's take our lunch

 4   break.

 5              MS. GAMBINO:  Okay.

 6              THE COURT:  About an hour.

 7              Usual admonitions:  Don't talk to each other and

 8   don't let anybody talk to you.

 9              I'll see you back here in about an hour.

10        (Jury out at 11:58 a.m.)

11              THE COURT:  You can go back over there.  You can be

12   seated.

13              MS. GAMBINO:  Your Honor, at this point I intend to

14   ask Ms. Shelton about she and Mr. Garbutt getting into

15   exchanges about their respective religious views, and without

16   getting into the specifics of what he said to her, did he ever

17   say things to her that were offensive or that hurt her

18   feelings.

19              THE COURT:  That would be your question?

20              MS. GAMBINO:  Basically, yes.

21              THE COURT:  Basically.

22              MS. GAMBINO:  Without saying what, in fact, did he

23   say to make you feel that way.  You know, in the course of

24   these conversations, did he say things that offended you or

25   hurt your feelings?
```

1          **MS. LERNER:**  Your Honor, I don't understand the

2    relevance still, because when Mr. Stafford [verbatim] was on

3    the witness stand -- and I assume the whole point of this is

4    to -- it goes to Mr. Stafford's character.  He testified

5    that --

6          **THE COURT:**  It goes to bias.

7          **MS. LERNER:**  Or bias.  Either way, Your Honor, he

8    testified he had no animus towards Ms. Shelton and he had no

9    recollection of anything that she found offensive.  So I don't

10   understand how her belief, her understanding, her feeling about

11   it goes to his bias.

12         It doesn't -- if he doesn't think that he offended

13   her, then that has no bearing on who he chose to record.

14   There's no connection between the two.  They just want to

15   malign Mr. Stafford's -- Mr. Garbutt's character.  That's all

16   it really is.

17         **THE COURT:**  Well, that's been going on all over this

18   case, maligning other people's character.

19         **MS. LERNER:**  We would prefer to keep it within the

20   rules, if possible.

21         **THE COURT:**  This is well within the rule.  She is

22   going to ask:  Has he said things to you that has offended you?

23   Because he says he didn't.  And she's going to say she believes

24   he did.  Without getting into a religious issue at this point,

25   we can go farther than that to some extent, but I'm going to

 1  let that question be asked because it goes to his bias -- it

 2  goes to his bias.

 3          I mean, he's the one who started this ball rolling

 4  by going to the FBI and walking into the office and started

 5  talking to them.  He had that one letter he took to them or a

 6  couple of letters, and I think she has a right to indicate that

 7  they didn't like each other, basically, because that's the sum

 8  and substance of it.

 9          **MS. GAMBINO:**  Basically, yes.

10          **MS. LERNER:**  Your Honor, the government has zero

11  objection if the question is:  Did he say things that you found

12  offensive?

13          **THE COURT:**  That's what she said.

14          **MS. LERNER:**  But my understanding is she would like

15  to go further into the religious aspect of it.

16          **THE COURT:**  If she goes further, she will come up

17  here and tell me what the question is going to be.  That's why

18  she brought this up to start off with because she's going into

19  an area which could be construed that, so she's coming to me

20  saying, "Here's the question I'm going to ask," and I said that

21  that's okay.

22          **MS. LERNER:**  If the question is:  Did he say things

23  that are objectionable to you, the government withdraws its

24  objection to that question.

25          **THE COURT:**  You don't have to withdraw your

1   objection.  I'm just saying I'm going to let that happen.  If

2   it goes into something else -- I mean, you know the three

3   objections I've sustained, at least two of them, and they were

4   very pointed in a certain way.  And my basis was not that she

5   couldn't ask those questions under 610, but, rather, it's a 403

6   analysis, that the probative value is far outweighed in my view

7   by the prejudice of that question.

8           So, I mean, you have to understand, I am running two

9   things together on this one, more on 403 than anything else.

10  This one does not violate either one of them in my view.

11          **MS. GAMBINO:**  Thank you, Judge.

12          **THE COURT:**  You don't have to thank me, but that's

13  my ruling.

14          See you back here about 1:00.

15      (Recess had at 12:03 p.m., and proceedings resumed in open

16       court at 1:11 p.m.)

17          **THE COURT:**  You can be seated.

18          Is the government ready to proceed?

19          **MS. LERNER:**  We are, Your Honor.

20          **THE COURT:**  Is the defense ready to proceed?

21          **MS. GAMBINO:**  We are.

22          **MR. ROGERS:**  We are.

23          **THE COURT:**  Ms. Shelton, you can go back on the

24  witness stand or chair, whatever we're going to call it today.

25  Remember you're still under oath.

```
 1              DEFENDANT SHELTON:  Yes.

 2              THE COURT:  Bring the jury in.

 3              Ms. Gambino, are you going to get into issues that

 4   arguably implicate 610?

 5              MS. GAMBINO:  With respect to?

 6              THE COURT:  Religion.

 7              MS. GAMBINO:  No.  We are going to do what I told

 8   you, that they had religious discussions and that he said

 9   things that hurt her.

10              THE COURT:  Right.

11              MS. GAMBINO:  Without getting into any of the

12   particulars of what was said.

13         (Jury in at 1:12 p.m.)

14              THE COURT:  You can be seated.

15              First, good afternoon.  I'll be the first to tell

16   you that.

17              Proceed.

18              MS. GAMBINO:  Thank you, Your Honor.

19   BY MS. GAMBINO:

20   Q.  Before the break, Mrs. Shelton, we were talking about

21   Stafford Garbutt.

22              Now, did you and Mr. Garbutt get into discussions

23   and even arguments over your religious views?

24   A.  Yes.

25   Q.  And did Mr. Garbutt on occasion say things that were
```

1   purposefully hurtful and upsetting to you?

2   **A.**  Yes, he did.

3   **Q.**  And would he also say things that were offensive to you?

4   **A.**  Yes, he did.

5   **Q.**  And would you let him know when you were feeling hurt or

6   upset or offended?

7   **A.**  Yes, I did.

8   **Q.**  Now, Mr. Garbutt, did he come into your office to talk to

9   you?

10  **A.**  Yes.

11  **Q.**  And we heard several recordings of Mr. Garbutt coming into

12  your office to talk to you.  What would you be doing when he

13  would wander into your office?

14  **A.**  I would be doing my job.

15  **Q.**  And would he be coming in to talk or to work?

16  **A.**  He would be coming in to talk to me.

17  **Q.**  And would you always pay close attention to what he was

18  saying to you?

19  **A.**  No, I did not.

20  **Q.**  And would you engage on occasion in conversations with him?

21  **A.**  Yes, I would.

22  **Q.**  And did you have any reserve in answering his questions or

23  giving him information if he asked for it?

24  **A.**  No, I didn't.

25  **Q.**  Now, with respect to Elena Lynch, did you know her?

1   **A.**  I knew her.

2   **Q.**  And how was it that you knew her?

3   **A.**  I worked at the township in the IS&T department and,

4   whenever I would call the help desk, Steven Hunter would decide

5   who would come up to look at my computer, and she was one of

6   those individuals.

7   **Q.**  And so she helped you out with your computer?

8   **A.**  Yes, once or twice.

9   **Q.**  And how would you assess your level of computer skill?

10  **A.**  Not very good.

11  **Q.**  And were other people from the IS&T department sent up from

12  time to time to help you with your computer?

13  **A.**  Yes.

14  **Q.**  Who else would come and help you?

15  **A.**  John Davis, Warrien Poole, and Elena.  Those are the three

16  I remember.

17  **Q.**  Now, other than having them come up and help you with your

18  computer, did you ever engage in conversation with them with

19  respect to fundraising tickets?

20  **A.**  No, I did not.

21  **Q.**  Mr. Davis, did you actually have a professional

22  relationship with him outside of work as well?

23  **A.**  Yes.

24  **Q.**  And what did you do with Mr. Davis outside of work?

25  **A.**  He would come over to my home when I -- I bought a new

1   computer.  He would come.  He hooked it up and set it up for

2   me.

3   Q.   And would you pay him for his work for you at home?

4   A.   I paid him.

5   Q.   Lamar Taylor, who was he?

6   A.   He was Ms. Elgin's campaign manager, and he was the deputy

7   of the multipurpose center.

8   Q.   And the multipurpose center was a separate building from

9   the one that you worked in?

10  A.   Yes, it was.

11  Q.   And did you have any kind of regular interaction with Lamar

12  Taylor?

13  A.   Not regularly.  I would see him from time to time.

14  Q.   And he was involved in the EPIC meetings that you attended?

15  A.   Yes, he was.

16  Q.   And, in fact, the first EPIC meeting that was recorded, he

17  was one that was very concerned about the relationship with

18  Ron --

19        MS. LERNER:  Objection.  Leading and characterizes

20  the evidence.

21        MS. GAMBINO:  I can rephrase the question, Judge.

22        THE COURT:  Okay.  It might be easier.

23  BY MS. GAMBINO:

24  Q.   Okay.  In that September 26th meeting that we discussed

25  earlier, did Lamar Taylor raise any issues that were important

1   to him during that meeting?

2   **A.**   I think that was the meeting about the mandatory buying of

3   tickets or something like that, and he raised that issue in the

4   meeting with Ms. Elgin.

5   **Q.**   And with respect to other people who were running for

6   office that year, did he bring up anybody else in particular?

7   **A.**   I don't remember.

8   **Q.**   Do you remember a conversation about Ron Matlock?

9   **A.**   Yes, I do.

10  **Q.**   And why was Lamar Taylor concerned about Ron Matlock?

11  **A.**   Ron Matlock and Lamar --

12          **MS. LERNER:**   Objection.   Hearsay.

13          **THE COURT:**   It is hearsay.

14  **BY MS. GAMBINO:**

15  **Q.**   Was Ron Matlock affiliated with the EPIC campaign at one

16  point?

17  **A.**   I believe he was.

18  **Q.**   And at some point there was a discussion about whether he

19  would be supported or not; is that right?

20  **A.**   Yes.

21  **Q.**   And did that happen during that first meeting?

22  **A.**   Yes.

23  **Q.**   With respect to Cynthia Holman-Upshaw, who was she?

24  **A.**   She was the deputy of general assistance.

25  **Q.**   And where did she work?

1   **A.**   She worked on the 1st floor.

2   **Q.**   And did you have any regular interactions with Ms. Upshaw?

3   **A.**   No, I did not.

4   **Q.**   From time to time, you would consult her about things as

5   needed with respect --

6   **A.**   Yes.

7   **Q.**   Yes?

8   **A.**   Yes.

9   **Q.**   Okay.  Now, there's been made much of Ms. Elgin's inner

10  circle.  From your point of view, who was in Ms. Elgin's inner

11  circle?

12  **A.**   Lamar Taylor, Ed Harris, Alex Wheeler, Donna Frazier,

13  Steven Hunter.  That's all I can remember.

14  **Q.**   And that was basically the first group of people that

15  supported her back in 2002, right?

16  **A.**   Yes.

17  **Q.**   And did Ms. Elgin have a falling out with Mr. Wheeler?

18  **A.**   At some point she did.

19  **Q.**   And so for quite a period of time, they weren't on good

20  terms or talking to each other?

21  **A.**   They were not.

22  **Q.**   Would you describe Ms. Elgin as a difficult person?

23  **A.**   She was difficult.

24  **Q.**   And was it unusual for her to have arguments and fall out

25  with people?

1    **A.**   Not unusual at all.

2    **Q.**   And, in fact, you and she had had one such falling out; is

3    that right?

4    **A.**   Yes.

5    **Q.**   And what was the subject of that?

6    **A.**   I had been told that I would be supported by her and that

7    she would help me with my campaign.

8               **MS. LERNER:**   Objection.   Hearsay.

9               **THE COURT:**   I think it's hearsay, but I think also

10   it explains why she had a conversation, so I'm not going to

11   admit it for the truth of what Ms. Elgin said but what she was

12   trying to say.   So I guess I'm sustaining the objection, but I

13   am asking you to rephrase the question.   And she's rephrased

14   the question, and I'm going to -- I am jumping ahead a little

15   bit.

16   **BY MS. GAMBINO:**

17   **Q.**   So what was your understanding, Mrs. Shelton, about why it

18   was that you and Mary had a disagreement?   Did you have certain

19   expectations?

20   **A.**   Yes.

21   **Q.**   What were your expectations?

22   **A.**   I expected her to help me with the campaign.   She had asked

23   me to --

24   **Q.**   Without saying what she said.

25   **A.**   Okay.

1    **Q.**   Was she involved in your decision to run for the board?

2    **A.**   Yes.

3    **Q.**   Okay.  And as part of that, you understood that she was

4    going to support you in your run?

5    **A.**   Yes.

6    **Q.**   Now, did she, in fact, do that?

7    **A.**   No, she did not.

8    **Q.**   Did she give you any financial support?

9    **A.**   She bought a table at my fundraiser, I believe.  $300, ten

10   people.

11   **Q.**   And who paid for your campaign materials?

12   **A.**   I did.

13   **Q.**   And who paid for your fundraiser supplies?

14   **A.**   I did.

15   **Q.**   And who paid for your T-shirts?

16   **A.**   I did.

17   **Q.**   So it's fair to say that you didn't get the kind of support

18   that you had hoped for or had been led to believe you could

19   expect from Mary Elgin; is that right?

20   **A.**   That's right.

21   **Q.**   And was she rather -- without saying what she said to you,

22   was she rather mean in the way that she told you that she

23   wasn't going to support you?

24   **A.**   She did.

25   **Q.**   So, yes, she was mean?

```
 1   A.   Yes, she was mean.

 2   Q.   Now, with respect to Stafford Garbutt, once she and

 3   Stafford Garbutt fell out, did she do her best to humiliate him

 4   in public?

 5   A.   She did.

 6   Q.   And she would say rude things to him in front of other

 7   people?

 8   A.   She did.

 9   Q.   And were you aware of how Mr. Garbutt reacted to that?

10   A.   He said mean things to her.

11   Q.   And he was upset by what she did?

12   A.   He was extremely upset.

13   Q.   Now, in your view, did Mr. Garbutt sometimes lump you and

14   Mrs. Elgin together?

15   A.   Yes.

16   Q.   So if he was mad at Ms. Elgin, he would also be mad at you?

17   A.   Yes.

18   Q.   And did you believe that was unfair of him?

19   A.   Yes, I did.

20        MS. LERNER:  You know, have we established a

21   foundation for this line of questioning?

22        THE COURT:  You mean when it took place?

23        MS. LERNER:  Yes.

24        MS. GAMBINO:  Sure.

25
```

1  **BY MS. GAMBINO:**

2  **Q.**  When did your falling out with Mrs. Elgin occur?

3  **A.**  2013, I believe, just before, you know, the campaign.

4  **Q.**  Okay.  And the falling out between Mrs. Elgin and

5  Mr. Garbutt, if you can remember, when did that happen?

6  **A.**  That happened 2011, because I remember it happened right

7  after Josephine Brooks had passed away.

8  **Q.**  And who was Josephine Brooks?

9  **A.**  She was a longtime girlfriend of Mr. Garbutt.

10  **Q.**  So she also had a relationship with him in addition to

11  Mrs. Elgin?

12  **A.**  She did.

13          **MS. LERNER:**  Can we establish foundation for that as

14  well?

15          **MS. GAMBINO:**  I think she said 2011.

16          **MS. LERNER:**  That Mr. Garbutt had a girlfriend.  How

17  does she know that?

18  **BY MS. GAMBINO:**

19  **Q.**  How did you know about Mr. Garbutt's girlfriend, Josephine?

20  **A.**  He told me.

21          **MS. LERNER:**  Objection.  Hearsay.  Can you strike

22  the answer?

23          **THE COURT:**  Well, you asked for it.  You said you

24  have to establish a basis when it happened, and she did, so I

25  am going to overrule the objection.

```
 1              MS. LERNER:  I'm in a quandary, Your Honor.  I don't
 2    know what the question and answer are going to be until they
 3    are asked.
 4              THE COURT:  Well, on this one you said,
 5    "foundation," and she established foundation and how she knows
 6    what the date is, so I'm going to overrule the objection.
 7              MS. LERNER:  Thank you, Your Honor.
 8    BY MS. GAMBINO:
 9    Q.  Were you aware of other women that Mr. Garbutt saw as
10    romantic partners?
11              MS. LERNER:  Objection.  Relevance.
12              MS. GAMBINO:  It goes to bias and credibility,
13    Judge.
14              THE COURT:  She can answer the question --
15              MS. LERNER:  May we approach?
16              THE COURT:  -- "yes" or "no."
17              MS. LERNER:  May we approach, Your Honor?
18              THE COURT:  Yes.
19         (Bench conference.)
20              THE COURT:  The question is:  Was she aware?
21              MS. LERNER:  It is cumulative and there is no
22    foundation that this is somehow a bias in the case, that he had
23    other girlfriends.  There's been no explanation for this
24    whatsoever.  They are trying to get in the fact that he had
25    other girlfriends, which --
```

1        **MR. ZANZI:**  Your Honor, they're trying to use it --

2        **MS. LERNER:**  -- and it is based on hearsay.

3        **THE COURT REPORTER:**  One at a time, please.

4        **MR. ZANZI:**  They're trying to use extrinsic evidence

5   to attack his character by saying that he sleeps around.

6        **MS. LERNER:**  Exactly.

7        **THE COURT:**  It's extrinsic.  She's stuck with the

8   answer.  She can't follow up on the answer.  She gets the

9   answer, and that's it.  She's done.

10       **MS. LERNER:**  She knows what the answer is.  This is

11  her client.

12       **THE COURT:**  Well, I understand.  But I'm saying --

13       **MR. ZANZI:**  She's asking these leading questions,

14  and she's answering it --

15       **THE COURT:**  Well, leading questions have not been

16  unique to this case.  People from both sides have been asking

17  leading questions all over the place.  So that's not a bar,

18  just because you've asked leading questions --

19       **MR. ZANZI:**  No.  I'm just saying, Your Honor, if the

20  question is asked, what are we supposed -- we are just supposed

21  to allow it then?

22       **THE COURT:**  No.  You make your objection like you

23  did.  And the objection, is, again --

24       **MS. LERNER:**  It's cumulative.  It's not relevant.

25  It doesn't go to bias.  It requires hearsay.

 1            THE COURT:  What's the relevancy of the question?

 2            MS. GAMBINO:  It goes to the bias and credibility of

 3    Mr. Garbutt.

 4            THE COURT:  Because he had relationships with other

 5    women?

 6            MS. GAMBINO:  Because he's testified to a variety of

 7    things, which Mrs. Shelton knows to be untrue.  For instance,

 8    that he was having an relationship with Mary Elgin --

 9            THE COURT:  She testified to that, I believe.

10            MS. GAMBINO:  Right.  And he also had a relationship

11    with this Josephine Brooks.

12            THE COURT:  What's the relevance of that

13    relationship?

14            MS. GAMBINO:  The relevance is he has shown himself

15    to be a deceitful person.

16            THE COURT:  Because he has relationships?

17            MS. GAMBINO:  Because he had intimate relationships

18    with women while he's married to a woman in Belize, and that

19    goes to his credibility.

20            THE COURT:  On the basis of that, I'm going to

21    sustain the objection.

22            MS. LERNER:  Thank you, Your Honor.

23        (End of bench conference.)

24            THE COURT:  Objection sustained.

25

 1   **BY MS. GAMBINO:**

 2   **Q.**   Now, Mrs. Shelton, you also were aware that Mr. Garbutt was

 3   married?

 4   **A.**   I was aware.

 5   **Q.**   And that was a subject of discussion between the two of you

 6   as well?

 7   **A.**   Yes.

 8   **Q.**   Now, you, at some point, became precinct committee person.

 9   When was that?

10   **A.**   I believe it was 2007.

11   **Q.**   And, first of all, explain to the jurors what is a precinct

12   committee person.

13   **A.**   The precinct committeeman is the person in the spectrum of

14   political -- the lowest person on the totem pole, I would

15   phrase it.  You meet with the community, calls come in:  street

16   need paving; there's a hole in front of my house; garbage is

17   being dumped, that type of thing.  So I interact with the

18   community mostly being a precinct committeeman.

19   **Q.**   Now, is that something you do from an office or something

20   you do from home?

21   **A.**   You do from home.

22   **Q.**   And how was it that you became precinct committee person

23   the first time that you started doing it?

24   **A.**   The late Mayor Rudy Clay came to me.  There was a vacancy

25   in the precinct in which I lived.  I was friends with him.  He

1    asked me would I take that position, and he appointed me to it.

2    **Q.**  Once you were appointed, could you just continue

3    indefinitely as the precinct committee person?

4    **A.**  No, I could not.

5    **Q.**  What has to happen after your appointment expires?

6    **A.**  Once I was appointed, I served, I think, two years; and

7    after that two years was up, I had to run for that position.  I

8    couldn't be appointed again, so I ran for precinct

9    committeeman.

10    **Q.**  What does that entail?  What do you do when you run for

11    precinct committeeman?

12    **A.**  You are put on the ballot just like any other person that

13    is running for public office, and you campaign but not to the

14    degree you would for any other office.

15    **Q.**  Now, did Mr. Garbutt assist you with your first run for

16    precinct committee person?

17    **A.**  He was aware that I had been appointed by the mayor and

18    that I was going to be running for precinct committeeman, and

19    he asked me did I need his help.  And he volunteered to do a

20    card for me.

21    **Q.**  And did he do that card for you?

22    **A.**  He did.

23    **Q.**  And did you use the card?

24    **A.**  I used it.

25    **Q.**  And did you know whether he did the card for you on

1  township time, whether he did it on his own time?  Was that a

2  concern of yours?

3  **A.**  Wasn't a concern of mine.  He said he would do it.  He did

4  it.

5  **Q.**  Okay.  And did you use the card that he designed for you

6  for that election?

7  **A.**  I did.

8  **Q.**  Now, in the time period of 2013 when you had decided to run

9  for board, how were you going to finance your campaign?

10  **A.**  I thought Trustee Elgin was going to give me money from her

11  political fund because I didn't have one.

12  **Q.**  But she didn't.  So how did you, in fact --

13  **A.**  I used -- I went home, asked my husband, discussed it with

14  him, and so we used our personal funds.

15  **Q.**  Okay.  And did you also hold a fundraiser?

16  **A.**  I did.

17  **Q.**  And did you make tickets or have tickets made?

18  **A.**  Yes, I did.

19  **Q.**  And who made the tickets to your fundraiser?

20  **A.**  I think Rebecca designed a ticket for me, but Mr. Garbutt

21  kept coming in my office, you know, asking could he help me

22  out.  Why was I using Rebecca?  I explained it to him.  He was

23  pestering me, I would say.

24          So I said to him -- you know, I didn't want him to

25  feel bad because, you know, we were talking.  I said to him,

1    "Well, why don't you just do my ticket.  Do you want to do my

2    ticket?"  And he said, "Yes, I'll do your ticket."

3              **MS. LERNER:**  Objection.  Hearsay.

4              **THE COURT:**  We've moved away from your question

5    quite a bit.

6    **BY MS. GAMBINO:**

7    **Q.**  He volunteered to help you?

8    **A.**  He volunteered to help me.

9    **Q.**  And you said, "Do the ticket."

10   **A.**  I said, "Yes, do the ticket."

11   **Q.**  And he did the ticket?

12   **A.**  He did do the ticket.

13   **Q.**  Did you pay him for that ticket?

14   **A.**  No.

15   **Q.**  Now, you sent out your tickets how?  How did you deliver

16   your tickets for your own fundraiser?

17   **A.**  I sent them in the mail.

18   **Q.**  And who did you send them to?

19   **A.**  I sent them to my friends, family, a few of the employees

20   at the Calumet Township office.

21   **Q.**  And what phone number did you use on your campaign

22   materials to call about tickets or to call for further

23   information?

24   **A.**  I am pretty sure I used my personal cell phone.  I didn't

25   have any other phone.

1   **Q.**   And what address would you use for your campaign if

2   somebody wanted to mail a return ticket to you?

3   **A.**   Would you repeat that?

4   **Q.**   What address did you use for your --

5   **A.**   I used my address.

6   **Q.**   Did you have a campaign manager?

7   **A.**   No.

8   **Q.**   Who, in effect, was your campaign manager?

9   **A.**   I was.

10  **Q.**   So you were basically one-stop shopping; you did everything

11  for your campaign?

12  **A.**   Yes, I did.

13  **Q.**   Did you recruit family and friends to help you out?

14  **A.**   Yes, I did.

15  **Q.**   And did you do any work for your campaign on Calumet

16  Township Trustee's Office time?

17  **A.**   No, I did not.

18  **Q.**   Now, were you at all concerned about what would happen if

19  you won this election?

20  **A.**   Was I concerned about it?

21  **Q.**   Right, given the fact that you had fallen out with

22  Mary Elgin.

23  **A.**   I was concerned about it.

24  **Q.**   And what was the nature of your concern?

25  **A.**   Well, if she won and I won and I'm on the board, I would

 1  have to have meetings with her.  I would make my own opinions

 2  concerning the materials I would have for the board.  I knew

 3  her temper, so I was concerned about it.

 4  **Q.**  And what if you won and she didn't; would that have been as

 5  big an issue?

 6  **A.**  Oh, yeah, that would have been an issue.

 7  **Q.**  For her or for you?

 8  **A.**  For her.

 9  **Q.**  Now, you had a computer in your office; is that right?

10  **A.**  Yes, I did.

11  **Q.**  And was your computer password protected?

12  **A.**  Yes, it was.

13  **Q.**  As far as you know?

14  **A.**  As fan as I know.

15  **Q.**  And did you personally give your password to anybody?

16  **A.**  To one person.

17  **Q.**  And who would that have been?

18  **A.**  That was Trustee Elgin's daughter, Lori.

19  **Q.**  And why would you have given her your password?

20  **A.**  Because there was a form that I didn't know how to do that

21  Trustee Elgin wanted me to put into my computer, so Lori was

22  visiting from California.  She lived in California at the time.

23  She was in the office, and I believe Trustee Elgin asked her to

24  do it on my computer.

25  **Q.**  Okay.  Did anybody else have access to your computer or

```
1    could they have while it was up and running?  If you were not

2    in the office and your left your computer on, could anybody

3    else use it?

4    A.   Yes.

5    Q.   Would you have wanted or given permission to anybody else

6    to use it?

7    A.   No.

8    Q.   Now, I'm going to show you what has been marked as

9    Government's Exhibit 43.

10              THE COURT:  You need to get in front of a

11   microphone, I think.

12   BY MS. GAMBINO:

13   Q.   I am going to show you what has been marked and admitted

14   already as Government's Exhibit 43, and it's labeled as Room C,

15   Ethel Shelton office computer documents.  And I'm going to show

16   the documents that were in this computer and taken off your

17   computer and ask you to tell us what they are and why they were

18   there.  Okay.

19              What document is this, Ms. Shelton?

20   A.   This is a letter that I had written for precinct

21   committeeman G610 asking for -- it's the letter I sent out with

22   my tickets.

23   Q.   You sent out with your tickets for your fundraiser?

24   A.   For my fundraiser, yes.

25   Q.   Do you recall whether you did this letter or wrote this
```

1    letter on your computer or whether it was sent to your

2    computer?

3    **A.**   I'm not really sure.  I did letters at my home on my home

4    computer that I will pull up and -- to my computer at work.  I

5    could have typed this at home.  I'm not sure.  I could have

6    typed it at work.  I'm not sure.

7    **Q.**   And if you had typed it at work, would it have been during

8    the working day or would it have been sometime when you were

9    after hours?

10   **A.**   Either after hours or on my lunch or break or -- I just

11   can't remember.

12   **Q.**   And what is this?

13   **A.**   This is the letter that I was going to probably use at the

14   opening of the campaign headquarters.  And we had -- I believe

15   that's what it is.

16   **Q.**   And when you say "campaign headquarters," are you talking

17   about the campaign headquarters for Mary Elgin or for you?

18   **A.**   For Mary Elgin.

19   **Q.**   And do you recall whether you actually wrote this at work

20   or at home?

21   **A.**   I can't recall.  Sorry.

22   **Q.**   Now, there are two copies of this.  Do you recognize what

23   this is?

24   **A.**   I do.

25   **Q.**   And what is this?

1   **A.**   This is -- this comes from the election board.

2   **Q.**   From the election board?

3   **A.**   Yes.

4   **Q.**   Do you need to see the other pages of it?

5   **A.**   No, I don't.

6   **Q.**   And why would this be on your computer?

7   **A.**   Well, this is already in the computer from the election

8   board, I'm assuming, because you could go in and put in their

9   address and pull it up.

10  **Q.**   So this was a document that you pulled up and looked at?

11  **A.**   This is a document I pulled up and looked at, printed it

12  out for Ms. Elgin, she wanted it, and she took a look at it.

13  **Q.**   Okay.  Do you recall whether you saved it and if you saved

14  it where you saved it to?

15  **A.**   I probably saved it if she wanted it.  I don't know where I

16  saved it to or --

17  **Q.**   Okay.  Now, there's a whole stack of these.  There's one

18  that is labeled 2013 ticket list.  It has some entries on it,

19  and it's numbered through 2000.

20  **A.**   Yes.

21  **Q.**   What is this?

22  **A.**   This is the ticket list for Ms. Elgin's extravaganza.  This

23  is the list that Lori Elgin put in for me because I am not good

24  with making this type of list with these lines.

25  **Q.**   How did you typically keep track of tickets?  Did you do it

1   on this or did you do it in some other way?

2   **A.**   This was in the computer, and when Ms. Elgin saw that I was

3   putting paid, paid, on this particular form in the computer,

4   she -- I was told to put it on a written form --

5   **Q.**   So she --

6   **A.**   -- handwritten form, not to do this in the computer.

7   **Q.**   So you were instructed to stop doing this and do a

8   handwritten form?

9   **A.**   Yes.

10  **Q.**   And this one from 2012, there are no entries in here.  Do

11  you know what this is or why this was in the computer?

12  **A.**   The same reason.

13  **Q.**   The same reason --

14  **A.**   Ticket list.

15  **Q.**   Ticket list.

16          Now, is this your stationery?

17  **A.**   Yes, it is.

18  **Q.**   And this was designed for you by whom?

19  **A.**   Rebecca Smith.

20  **Q.**   And Rebecca would send things to your e-mail address.  Did

21  you have a personal e-mail address?

22  **A.**   Yes, I did.

23  **Q.**   And did you also have a work e-mail address?

24  **A.**   Yes, I did.

25  **Q.**   And did she send it to both addresses?

 1  **A.**  Yes, she did.

 2  **Q.**  Now, at the bottom of your stationery, there is an address

 3  listed there.  Do you see that?

 4  **A.**  Yes, I do.

 5  **Q.**  4644 Pierce Street.

 6  **A.**  Yes.

 7  **Q.**  Whose address is that?

 8  **A.**  That's my address.

 9  **Q.**  Is that your home address?

10  **A.**  That's my home address.

11  **Q.**  And that's what you were using for your campaign?

12  **A.**  Yes, I was.

13  **Q.**  And there's a phone number on there, (219) 670-8293.  Whose

14  phone number is that?

15  **A.**  That's my cell phone number.

16  **Q.**  Is that the number you were using to contact people for

17  your campaign?

18  **A.**  Yes, it was.

19  **Q.**  And the e-mail, is that your personal e-mail?

20  **A.**  Yes, it is.

21  **Q.**  And is that how you wanted people to communicate with you

22  for matters regarding your campaign?

23  **A.**  Yes.

24  **Q.**  Now, you didn't actually produce this, did you?

25  **A.**  No, I did not.

1  **Q.**  Okay.  Who produced it?

2  **A.**  Rebecca Smith.

3  **Q.**  And at no time did Rebecca Smith ever work at Calumet

4  Township Trustee's Office?

5  **A.**  No, she did not.

6  **Q.**  Now, would she send you what she was working on to approve

7  or to edit or to ask questions?

8  **A.**  Yes, she did.

9  **Q.**  And do you recognize this?

10  **A.**  Yes, I do.

11  **Q.**  And what is this?

12  **A.**  This is an ad that I bought.  This is Van Buren Missionary

13  Baptist Church.  Their pastor is Dwight E. Mosley.  This is his

14  eight-year pastoral anniversary celebration.  I bought this ad.

15  If it's a full-page ad, I believe it was $100.

16  **Q.**  Did you pay for that yourself?

17  **A.**  Yes, I did.

18  **Q.**  Who designed this ad for you?

19  **A.**  Rebecca Smith did.

20  **Q.**  And why would this be in your township computer?

21  **A.**  She probably sent it to me.  I checked the spelling, and

22  then I sent it over to the church with my check.

23  **Q.**  Do you have any specific recollection whether you would

24  have checked it at work or at home?

25  **A.**  No, I don't.

1    **Q.**   Do you recognize this document?  Let's see if I can --

2    **A.**   Can you make it just a little bit bigger?  I can't really

3    see it.

4    **Q.**   Sure.

5    **A.**   Yes, I do recognize this.

6    **Q.**   And what was this for?

7    **A.**   My sister Barbara's 70 birthday party.

8    **Q.**   And it is a receipt from All in One Party Rentals?

9    **A.**   Yes.

10   **Q.**   And what's the address on there?

11   **A.**   5445 Broadway, Merrillville, Indiana.

12   **Q.**   So this is personal business?

13   **A.**   Yes, it is.

14   **Q.**   Do you have any idea why this would be in your work

15   computer?

16   **A.**   This is dated 5/6 -- is that 5/6?

17   **Q.**   Yeah, it's 5/3 -- will call 5/3.  Return 5/6.

18   **A.**   Okay.  I probably talked to them about -- I had to pay

19   them.  I think I called them and asked them to send me the

20   bill.

21   **Q.**   Now, does it happen during the course of a working day that

22   you have to do personal business or other business with

23   institutions who are not open the hours when you are off work?

24   **A.**   Yes.

25   **Q.**   And if you had to do personal business or campaign business

```
 1   because you had to deal with another business that wasn't going
 2   to be open when you got off, when would you choose to do that?
 3   A.  Around my lunch time.
 4   Q.  Do you recognize this?
 5   A.  Yes.
 6   Q.  And what is this?
 7   A.  For my sister Barbara's 70th birthday party.
 8   Q.  Same thing as the last?
 9   A.  Same as the last.
10   Q.  But different goods?
11   A.  Different items.
12   Q.  Now, we have two letters with different dates.  Let me
13   correct that.  Three letters, two with the same date and one
14   with a different date.  They're all the same letter, and there
15   is the beginning of the text.
16           Do you recognize this?
17   A.  I do recognize this.
18   Q.  Okay.  And what is this or are these?
19   A.  Would you put that back up again?
20   Q.  I'm sorry.
21   A.  This is a letter, I believe, I sent to the churches that I
22   was affiliated with, churches that I knew, knew their pastors,
23   that I sent this letter to, I believe.
24   Q.  And do you know whether you did this letter at work or at
25   home?
```

1   **A.**   I kind of remember doing this letter at home, maybe pulling

2   it up at work.

3   **Q.**   Now, there's also this -- I don't know that this is related

4   to these other letters, but it's entitled "Ethel letter" and

5   what does that look like?

6   **A.**   It's Ethel letter, EthelShelton86@yahoo.com, CC.

7   **Q.**   Is that your personal e-mail address?

8   **A.**   Yes, it is.

9   **Q.**   And who is the CC on this letter?

10  **A.**   Rebecca Smith.

11  **Q.**   And the subject?

12  **A.**   Ethel's letter.

13  **Q.**   And attachments?

14  **A.**   Ethelletter.DOCX.

15  **Q.**   Are you sending this -- whatever letter it was, were you

16  sending it both to yourself and to Rebecca Smith?

17  **A.**   Probably.

18  **Q.**   Looking at this e-mail heading, can you tell what it's for

19  or which letter it would be for?

20  **A.**   No, I can't tell.

21  **Q.**   Now, I think we some saw of this yesterday, but let's go

22  through it again.

23          Do you recognize this?

24  **A.**   Yes, I do.

25  **Q.**   And what is it?

```
 1    A.   It's a card, plugger, a plugger card.

 2    Q.   And who produced this plugger card for you?

 3    A.   Rebecca Smith.

 4    Q.   And why would it be in your computer?

 5    A.   She sent it to me either to my home or to the township

 6    office.

 7    Q.   And you pulled it up and saved it?

 8    A.   Yes, I did.

 9    Q.   Is this the same thing?

10    A.   Yes.

11    Q.   And what is this?

12    A.   This is a card that you would give to people getting your

13    name out there telling them something about yourself.

14    Q.   Was it the back --

15    A.   This is the back of a card.

16    Q.   And the face of it would be your face, presumably?

17    A.   Yes.

18    Q.   And, again, is this produced by Rebecca Smith?

19    A.   Rebecca Smith.

20    Q.   And sent to you at your home and at your place of business?

21    A.   Yes.

22    Q.   How about this?

23    A.   Yes.  This is a card sent to me at my home and at the

24    township.

25    Q.   Now, did you actually have to do any work on these
```

 1  documents beyond just looking at them?

 2  **A.**   No, I just looked at them.

 3  **Q.**   Who sent them to the printer?

 4  **A.**   I think LaDarean sent a couple of them to the printer.

 5  **Q.**   How about this?

 6  **A.**   Yeah, I think I ordered this -- I think she ordered this

 7  from Visa Printer on the internet.

 8  **Q.**   That's Rebecca?

 9  **A.**   Yeah, Rebecca or LaDarean.  I'm not really sure.

10  **Q.**   And are these smaller versions of the backs that we already

11  looked at?

12  **A.**   Yes, it is.

13  **Q.**   Do you recognize this?

14  **A.**   Yes.

15  **Q.**   And what's this?

16  **A.**   Roosevelt High School Class of 1963.  It's an ad.

17  **Q.**   And this ad was going to go where?

18  **A.**   In a booklet that Ms. Elgin had for her class 50th reunion.

19  I bought an ad.

20  **Q.**   Okay.  So you bought an ad for her reunion.  And who

21  produced this ad for you?

22  **A.**   Rebecca Smith.

23  **Q.**   And how did you pay for it to go into the ad book?

24  **A.**   Would you repeat that?

25  **Q.**   How did you pay for it to go into the ad book?

1   **A.**   Oh, I paid from my personal account.

2   **Q.**   Did you go to Roosevelt High School?

3   **A.**   No, I did not.

4   **Q.**   Okay.  What high school did you go to?

5   **A.**   Tolleston High School.

6   **Q.**   Do you recognize this?

7   **A.**   Yes, I do.

8   **Q.**   And what is this?

9   **A.**   This is a flyer for my fundraiser on March 28th.

10   **Q.**   And it's being held at the Calumet Township Multipurpose

11   Center.  Do you have to rent space in the multipurpose center

12   for your fundraiser?

13   **A.**   Yes, I did.

14   **Q.**   And who paid for that?

15   **A.**   I paid it out of my personal account.

16   **Q.**   And this flyer says "Sponsored By Committee to Elect

17   Ethel Shelton."  Who, in effect, was that committee?

18   **A.**   My friends from Bethlehem Steel, Rebecca, and numerous

19   friends that I have from the steel mill.  They came so I put

20   them down as my committee.

21   **Q.**   So this didn't involve or concern Calumet Township

22   employees at all?

23   **A.**   No, it did not.

24   **Q.**   And do you recognize this?

25   **A.**   Yes.

1    **Q.**   And what is this?

2    **A.**   I believe this is a ticket for the dinner, my fundraiser at

3    the multipurpose center.

4    **Q.**   And the donation requested for the ticket is how much?

5    **A.**   $30.

6    **Q.**   Do you recognize this?

7    **A.**   I do.

8    **Q.**   And what is this?

9    **A.**   This is a list of individuals, both political and

10   nonpolitical.

11   **Q.**   It's a mailing list?

12   **A.**   It's a mailing list.

13   **Q.**   And who produced this mailing list?

14   **A.**   Who produced it?

15   **Q.**   Yeah.  Did you write it?

16   **A.**   No.

17   **Q.**   Who wrote it?

18   **A.**   I believe Mary Elgin wrote this and Donna Smith was her

19   executive secretary at this time.  She produced most of the

20   mailing lists.

21   **Q.**   So this was already in your computer when you became the

22   secretary?

23   **A.**   The list was already in my computer.  I added to that list,

24   but it was already in my computer.

25   **Q.**   So you would update it, but you --

 1  **A.**   I would update it, yes.

 2  **Q.**   And this was part of your Calumet Township work?

 3  **A.**   Yes, it was.

 4  **Q.**   We have another piece of your stationery.  Same as what we

 5  looked at before?

 6  **A.**   Uh-huh.

 7  **Q.**   Yes?

 8  **A.**   Yes.

 9  **Q.**   Do you have any idea why there would be multiple copies of

10  these different things in your computer?

11  **A.**   She sent them to me.  I probably saved them.

12  **Q.**   And would you --

13  **A.**   They were there.

14  **Q.**   And if she sent them to you more than once, would you end

15  up saving them more than once?

16  **A.**   Yeah.  I saw a couple in here that she sent one, and I

17  didn't like it; and she changed it, and she sent it again.

18  **Q.**   Okay.  And what is this?

19  **A.**   This is a card that I used, and this is one that I think I

20  had put in the *Post Tribune*.

21  **Q.**   Okay.  So this was for an ad?

22  **A.**   Yes.

23  **Q.**   Do you recognize this?

24  **A.**   I recognize it.

25  **Q.**   And what is it?

 1   **A.**  It's a letter -- the mission statement for the Calumet

 2   Township Trustee's Office.  I vaguely remember it, but I do

 3   remember it.  I said I -- oh, I did this -- this is a speech

 4   that I did at my fundraiser.

 5   **Q.**  At your fundraiser.  And do you know where you printed out

 6   the speech or where you wrote it?

 7   **A.**  I know I wrote this speech at home.

 8   **Q.**  And why would it be on your township computer?

 9   **A.**  Probably pulled it up, take a look at it.  I don't know.

10   **Q.**  And what is this?

11   **A.**  This is my speech.

12   **Q.**  So it looks like you're sending your speech from your

13   Calumet Township address, right?

14   **A.**  Uh-huh.

15   **Q.**  What's the date in which it was sent?

16   **A.**  3/24/2014.

17   **Q.**  And what's the time in which it was sent?

18   **A.**  8:56 p.m.

19   **Q.**  So that's well after hours?

20   **A.**  Well after hours, yes.

21   **Q.**  And who were you sending it to?

22   **A.**  I was sending it to myself.

23   **Q.**  And is that your personal e-mail address?

24   **A.**  It is.

25   **Q.**  And in the subject area where it says "Ethel's speech," do

1   you believe that was the speech that we just looked at?

2   **A.**   Yes.

3   **Q.**   How about this?

4   **A.**   This was on the back of my T-shirts.  Rebecca designed

5   that.

6   **Q.**   Okay.  So this is another design that Ms. Smith sent to

7   you?

8   **A.**   Yes.

9   **Q.**   And this?

10  **A.**   That's the front of my T-shirt.

11  **Q.**   Now, she designed -- Ms. Smith designed a T-shirt for you.

12  Did you have them produced by somebody else?

13  **A.**   Yes.

14  **Q.**   And who produced them for you?

15  **A.**   James Leslie.  He has his own T-shirt business.

16  **Q.**   From where did he operate his own T-shirt business?

17  **A.**   At first he had an office on 4th and Broadway, and then

18  later he moved into his home.

19  **Q.**   So he was able to silkscreen or print or do whatever you do

20  to T-shirts once there's a design made?

21  **A.**   Yes, he was.

22  **Q.**   Was there equipment of that nature on the premises of the

23  Calumet Township Trustee's Office?

24  **A.**   Not to my knowledge.

25  **Q.**   So this was something that Mr. Leslie did outside the

 1   office?

 2   **A.**   Yes.

 3   **Q.**   And did you pay him for the T-shirts?

 4   **A.**   Yes, I did.

 5   **Q.**   And do you recall how much you paid him for the T-shirts?

 6   **A.**   Around 800-something dollars.  I don't know the exact

 7   amount.  I do know it was $800.

 8   **Q.**   And how many T-shirts did you order from him?

 9   **A.**   I don't remember exactly.  Maybe 50, 40.  I don't know.  I

10   can't remember.

11   **Q.**   And what did you do with those T-shirts?  Did you sell

12   them?

13   **A.**   No, I did not sell them.

14   **Q.**   What did you do?

15   **A.**   I gave them to my family and friends to wear for me.

16   **Q.**   And did they?

17   **A.**   They did.

18   **Q.**   Do you recognize this?

19   **A.**   Yes.

20   **Q.**   And what was this?

21   **A.**   I believe this was something that I put in the paper.

22   **Q.**   That you put in the paper?

23   **A.**   I believe it was.  Not all of this, but part of it I did.

24   **Q.**   Okay.  And in the second paragraph there where it says,

25   "This newspaper article gives you an insight about parts of my

1    life, please read it and pass on the information to family and

2    friends," did you include a newspaper article with this

3    mailing?

4    **A.**  Did I what?

5    **Q.**  Did you include a newspaper article with this mailing, or

6    was this what was printed in the newspaper?

7    **A.**  I don't remember.  I'm sorry.  I don't remember.

8    **Q.**  Now, we have, again, another copy of this, which you have

9    already explained.  Do you have any idea why there would be two

10   copies of this in your computer?

11   **A.**  No, I don't.

12   **Q.**  And there is one from 2012.  This is all blank sheets.  Any

13   idea why this would be in your computer twice?

14   **A.**  Well, it's two different years.

15   **Q.**  Well, there are two sets of 2012s.

16   **A.**  I don't know.

17   **Q.**  Okay.  And then, again, blank sheets for 2009.  Is this

18   anything that you worked on or that you used?

19   **A.**  I used it.  I printed it out, and after I was told not to

20   type it in, I would print the form out and I would write it in.

21   **Q.**  Okay.

22   **A.**  Only on the night of the extravaganza.

23   **Q.**  So a list like this would be at the table --

24   **A.**  That would be at the table.  That's the table copy.

25   **Q.**  Okay.  Do you recognize this?

 1   **A.**   This is a precinct committeeman's list.

 2   **Q.**   And it is a list of what?

 3   **A.**   I believe this is the Griffith and Calumet unincorporated

 4   area precinct committeeman list, yes.

 5   **Q.**   And why would this be in your computer?

 6   **A.**   Trustee Elgin kept all precincts.

 7   **Q.**   So she kept mailing lists from all precincts?

 8   **A.**   Yes.  They were in the computer when I became secretary to

 9   her.

10   **Q.**   So these had been done by a previous secretary?

11   **A.**   Yes.

12   **Q.**   And, again, you would keep them updated?

13   **A.**   Yes, I would.

14   **Q.**   So, for instance, this entry, Ruth Galvan has a red mark

15   next to it that says "moved."  Is that something you would have

16   done?

17   **A.**   I would have done that.

18   **Q.**   You recognize this?

19   **A.**   Yes, I do.

20   **Q.**   And what is this?

21   **A.**   This is Michelle.  She worked for the *Post Tribune*, and

22   this is for an ad.

23   **Q.**   And this relates to your campaign for board?

24   **A.**   Yes, it does.

25   **Q.**   And at the top there you see "sent" and what was the date

1    that it was sent?

2    **A.**   February 21st, 2014, at 8:27 p.m.

3    **Q.**   Okay.  And then there's a thread and you've got another

4    date, which is at what time?

5    **A.**   On Friday, February 21st, is that what you're talking

6    about?

7    **Q.**   Yes.

8    **A.**   Friday, February 21st, 2014, at 1:55 p.m.

9    **Q.**   And that would have been a time that you would have sent an

10   e-mail to her?

11   **A.**   Yes.

12   **Q.**   And then you see another sent date and time, and what is

13   that?

14   **A.**   Friday, February 21st, 2014, at 9:34 a.m.

15   **Q.**   How about this?

16   **A.**   These are the table signs --

17   **Q.**   Okay.

18   **A.**   -- that Rebecca Smith had done for me to put on my tables

19   at my event.

20   **Q.**   And what's the date and time that this e-mail is going to

21   Rebecca?

22   **A.**   3:25, 2014, 7:07 p.m.

23   **Q.**   And that's well after your working hours, no?

24   **A.**   Yes, it is.

25   **Q.**   And how about this?  She's sending back to you, what's the

1    date and time?

2    **A.**    Tuesday, March 25th, 2014, 12:19 p.m.

3    **Q.**    Now, it says:  "Okay, Ms. Daisy."  Why does she call you

4    "Ms. Daisy"?

5    **A.**    That what she called me, "Ms. Daisy," from the movie.  I

6    forgot who it was.

7    **Q.**    From "Driving Ms. Daisy"?

8    **A.**    "Driving Ms. Daisy."

9    **Q.**    Were there occasions in which you had asked her to drive

10    you to different places?

11    **A.**    Yes.

12    **Q.**    Both you and Ms. Cummings?

13    **A.**    Yes.

14    **Q.**    And she would refer to that as "Driving" --

15    **A.**    "Driving Ms. Daisy."

16    **Q.**    How about this photograph; is that you?

17    **A.**    That's me.

18    **Q.**    And when was that photograph taken?

19    **A.**    Stafford took this picture.  I did a -- I've done a couple

20    of commercials and an ad came in the paper for a reenactment of

21    a murder that had occurred in Merrillville.  And I wanted to

22    send my picture to the person that was advertising so I would

23    become -- I think I played the mother of the victim.  And he

24    took this picture for me, and I had him send it over to where

25    it needed to go.

1    **Q.**   So he took the picture and sent it to you?

2    **A.**   Yes.

3    **Q.**   So this had nothing to do with --

4    **A.**   It had nothing to do with campaign.

5    **Q.**   Do you recognize this?

6    **A.**   Yes, I do.

7    **Q.**   And what is this?

8    **A.**   This is for the Roosevelt Class of 1963 graduates.

9    **Q.**   Did you write this?

10   **A.**   No, I did not.

11   **Q.**   Who wrote this?

12   **A.**   Stafford Garbutt wrote this.

13   **Q.**   And what's it doing in your computer?

14   **A.**   Well, from time to time he would send letters over to me to

15   proofread for him.  Sometimes he walked across the hall and

16   other times he sent it to me, and I would read it, proofread

17   it, and either send it back to him or take it back to him.

18   **Q.**   Okay.  And up here where there's an apparent edit made, is

19   that an edit that he made or that you made?

20   **A.**   "Our day will come"?

21   **Q.**   Where "will" is crossed out and "has" is included.

22   **A.**   That was already there.  I didn't make that.

23   **Q.**   So that was deliberate?

24   **A.**   Yes.

25   **Q.**   Do you recognize this?

1    **A.**    Another mailing list.

2    **Q.**    And what sorts of names and addresses are on this mailing

3    list?

4    **A.**    Just people in the community, business people.  I don't see

5    any politicians on here.

6    **Q.**    Is this a list that you kept for Ms. Elgin?

7    **A.**    I kept it for Ms. Elgin, yes.  She had a lot of lists.

8    **Q.**    And is this one that was produced by someone else and you

9    maintained and updated?

10    **A.**    Yes.

11    **Q.**    Do you recognize this?

12    **A.**    Yes, I do recognize it.

13    **Q.**    And what is this?

14    **A.**    It was from Mayor Karen Freeman-Wilson.  I believe this was

15    her ad that she put in the Roosevelt book.  She's a Roosevelt

16    graduate.

17    **Q.**    And why is this on your computer?

18    **A.**    Probably the secretary from her office sent it to me to be

19    put in the book.

20    **Q.**    So her secretary would have sent it to you to give to Mary

21    for her book?

22    **A.**    Yes.

23    **Q.**    Okay.  Did you produce Mary's ad book?

24    **A.**    No, I did not.

25    **Q.**    Who produced Mary's ad book?

1    **A.**   Stafford Garbutt.

2    **Q.**   How about this?  Do you recognize this?

3    **A.**   I don't recognize this.

4    **Q.**   If I make it a little bit bigger, maybe you can see the

5    names better.  Is this a list that you produced?

6    **A.**   I don't remember producing this list, no.

7    **Q.**   And do you have any idea who these people are or why this

8    was in your computer?

9    **A.**   I see Solomon Barnes on here, so it's probably a Roosevelt

10   list.  These are her classmates.

11   **Q.**   These are Ms. Elgin's classmates?

12   **A.**   Yes.

13   **Q.**   And why would this list be in your computer?

14   **A.**   I don't know.  I don't know why this one is in my computer.

15   I didn't do anything with this list.

16   **Q.**   Do you sometimes or did you sometimes receive things on

17   behalf of Mary because you were Mary's secretary?

18   **A.**   Yes.  She always said "sent it to my secretary."

19   **Q.**   We're almost done.  Don't worry.

20           Okay.  Here we have another document.  It may be a

21   repeat of one we looked at before.  Did you recognize this?

22   **A.**   Yes.  I think this is also a -- I believe, yes, Solomon

23   Barnes is on this list.  This is a Roosevelt list for her

24   reunion.

25   **Q.**   So this also is a mailing list that deals with her reunion?

1  **A.**  Yes.

2  **Q.**  Did you type out this list?

3  **A.**  No, I did not.

4  **Q.**  Do you know who did?

5  **A.**  No, I don't know who did.

6  **Q.**  Do you know why it's in your computer?

7  **A.**  I know she had John Davis take a list of the Roosevelt

8  Class of 1963, and I think she put it on -- somebody sent it to

9  me.  I did not produce this list.

10  **Q.**  Okay.  So this was a list that was sent to you.  Did you do

11  anything with it?

12  **A.**  Yes, I did a little bit with this.  If she had a name or a

13  change in address from any of these people, she would send them

14  out and they say, "I moved," or she got a address and they

15  moved out of the city, she would say -- let's say, for

16  instance, Robert Adams, he moved from Gary to Atlanta City.

17  She'd get the address.  She'd give it to me, tell me to change

18  that address.

19  **Q.**  Now, when she would do that -- and clearly it's not

20  township-related business -- would you challenge her or ask her

21  why she was asking you to do that?

22  **A.**  No, I would not.

23  **Q.**  And why didn't you?

24  **A.**  I'm working for -- I am well aware of the difference

25  between working for a union and working at an at-will state.

```
 1   At that time, it was at will.  Right now, it's right to work.
 2   So you don't have any protection.  I'm not going to be
 3   insubordinate because I told all my members when I represented
 4   them, the first thing I learned as a griever was if your boss
 5   asks you to do a job, even if that job is out of your seniority
 6   unit, if that job is even in another office --
 7            MS. LERNER:  Your Honor, I'm going to object to the
 8   relevance of this line of answer.
 9            THE COURT:  I think she's probably getting there,
10   but you might want to refocus on the question.
11   BY MS. GAMBINO:
12   Q.  Based on your prior experience then, you knew that the
13   first rule before you can complain about something is that you
14   do what your boss tells you to do?
15   A.  You do what your boss tell you to do, and then you file a
16   grievance.
17   Q.  You grieve it afterwards?
18   A.  You grieve it afterwards.  And I'm in an area where I don't
19   have the protection.  If she asked me to do the job, I'm going
20   to do it.
21   Q.  In an ordinary course, if you complain about it afterwards,
22   you might take it up with her in a different forum, at a
23   different time, but you're not going to be insubordinate in the
24   moment?
25   A.  I'm not going to do that.
```

```
 1   Q.   Finally, do you recognize this?

 2   A.   I do recognize this.

 3   Q.   And what is this?

 4   A.   This is an ad that Ms. Elgin put into the book as Calumet

 5   Township trustee.

 6   Q.   And who did this ad, do you know?

 7   A.   Rebecca Smith did this ad as well because she didn't want

 8   Stafford to do it.

 9   Q.   "She" who?

10   A.   Mary Elgin didn't.

11   Q.   Why not, if you know?

12           MS. LERNER:  Objection.

13           THE COURT:  I'm going to let her answer it.

14   Overruled.

15   A.   Because she wanted a little feminine flair to it like I did

16   with my ad, so she asked me --

17           MS. LERNER:  Objection.  Hearsay.

18   BY MS. GAMBINO:

19   Q.   So you asked --

20   A.   I asked Rebecca to do the ad for her.

21   Q.   Because you liked the style better and she liked the style

22   better?

23   A.   Definitely.

24   Q.   All right.  We're done with that.

25           Now, I'm going to show you what has been marked as
```

1  Government's Exhibit 47.  Do you recognize this?

2  **A.**   I do.

3  **Q.**   And what is this?

4  **A.**   This is a form that Gladys Miller had put on the computer

5  to make a receipt for herself to show who gave her money and

6  that she received that money.  And she did it on the computer,

7  and I wrote a note to her telling her not to use the government

8  computer to record political donations.

9  **Q.**   Okay.  And why did you do that?

10  **A.**   Because Trustee Elgin did not like employees putting that

11  type of information on computers.  And when I showed that to

12  her, I had to go down and -- I had to write that note and give

13  it to Gladys Miller.

14  **Q.**   And after that were any other computer records with respect

15  to tickets given to you, after you delivered this note to her?

16  **A.**   Okay.  Was any --

17  **Q.**   Did she ever bring anything like this back to you?

18  **A.**   No, she did not.

19  **Q.**   And you recognize this document, Government's Exhibit 62?

20  **A.**   I recognize it.

21  **Q.**   And what is it?

22  **A.**   It's a letter from Linda Collins-Brown to me.

23  **Q.**   And did you agree with her characterization of your

24  conversation?

25  **A.**   I did not agree with it.

 1   **Q.**   And what did you disagree with?

 2   **A.**   "The call I received from you yesterday at work regarding

 3   unacceptable return of a ticket was quite upsetting and quite

 4   disappointing, to say the least.  I have been and continue to

 5   be supportive."  It was something in here she said about

 6   coercing her or something.

 7   **Q.**   Is that on the second page?  "I work diligently to earn a

 8   paycheck and personally don't take highly to someone" --

 9   **A.**   Force feeding, yes, that was it.

10   **Q.**   Did you feel like that properly characterized the nature of

11   your conversation?

12   **A.**   Absolutely not.

13   **Q.**   And how would you characterize the nature of your

14   conversation?

15   **A.**   She sent some tickets back to me in the interdepartment

16   envelope with a check, and I was told not to accept any tickets

17   back.  I called her to let her know that.  She knew that -- she

18   knew she wasn't supposed to send them back to me.  And I come

19   up with this long conversation.  She's telling me that I was

20   wrong; I'm coercing her.  And I knew her history, and I knew

21   what she would do.  She write letters all the time.

22            **MS. LERNER:**  Objection.  Relevance.

23            **THE COURT:**  I'm going to let her finish answering

24   this question.  Objection overruled.

25   **A.**   She would write letters like this all the time.  She wrote

```
 1   one to Mary and --

 2            MS. LERNER:  Objection.  Hearsay.

 3            THE WITNESS:  -- she sent copies.

 4            MS. LERNER:  Objection.  Hearsay.

 5            THE COURT:  Overruled.

 6   A.   She sent copies to different -- I think she sent a copy of

 7   this to Mary.  I remember receiving a letter that she had

 8   written to Alex Wheeler.  She sent it to Ms. Elgin.  She sent

 9   Ms. Elgin a letter.  She just sent letters.  She believe in

10   this paper trail thing.

11   BY MS. GAMBINO:

12   Q.   Now, did you believe that she was accurate in the way that

13   she described the interaction between you and her?

14   A.   No, she was not accurate at all.

15   Q.   And did you ever respond in writing to this letter?

16   A.   I did not respond in writing.

17   Q.   At the end of the letter where she says, "p.s., please

18   return the envelope to me with all its contents including my

19   check," did you do that?

20   A.   Yes, I did.

21   Q.   And did you have any conversations of any kind with her

22   about tickets after that?

23   A.   I didn't have any conversation with her about anything.

24   Q.   After this?

25   A.   After this letter was written to me.
```

 1   **Q.**   Is it fair to say that this letter was upsetting to you?

 2   **A.**   Very upsetting.

 3   **Q.**   Now, I want to ask you about Government's Exhibit 59.  Do

 4   you recognize this?

 5   **A.**   I recognize it.

 6   **Q.**   And what is it?

 7   **A.**   It's Mary Elgin's headquarters.

 8   **Q.**   And there are three posters out in front there:  one

 9   depicting you, one depicting her, and one depicting

10   Alex Wheeler.

11   **A.**   Uh-huh.

12   **Q.**   Did you ask for that poster of you to be produced?

13   **A.**   No, I was surprised to see that picture.

14   **Q.**   Do you know who produced that poster?

15   **A.**   I believe James Leslie told me that he did, that Mary had

16   asked him to do it.

17   **Q.**   So as far as you know, these posters were produced at

18   Mary's direction and without your input?

19   **A.**   Absolutely.

20   **Q.**   Did you pay James Leslie for that poster?

21   **A.**   No, I didn't know he was doing it.

22   **Q.**   And did you have a poster like that in your campaign event

23   or anything of that nature?

24   **A.**   No.

25   **Q.**   Now, I want to show you what has been marked as

1   Government's Exhibit 48.  Can you tell from this photograph

2   what kind of car that is in the front windscreen of this

3   picture?

4   **A.**   No, I can't.

5   **Q.**   Now, what kind of car were you driving in 2013,

6   Mrs. Shelton?

7   **A.**   Yeah, I'm thinking when I bought my new car.  2013, I was

8   driving a 2007 GMC Acadia.

9   **Q.**   Now, could it be this car here?

10  **A.**   It could be.

11  **Q.**   Again, is it detailed enough for you to be able to tell?

12  **A.**   It looks like an Acadia to me.

13  **Q.**   And can you read the license plate to know whether that's

14  your license plate or not?

15  **A.**   I can't read that license plate.  I'm sorry.

16  **Q.**   Now, the testimony you heard was that Agent Cooley had

17  observed you in the parking lot of a print shop, Paramount

18  Printers, are you familiar with Paramount Printers?

19  **A.**   Very familiar with it.

20  **Q.**   And where is Paramount Printers located?

21  **A.**   It's located on 47th Avenue.  It's very close to my home.

22  **Q.**   It is located on 47th Avenue, and where approximately is

23  your house?

24  **A.**   I live on 4644 Pierce Street.  You can go to the corner and

25  there's 47th Avenue, West 47th.  You go down, take me about

 1   maybe 5 or 10 minutes at the most to get to Paramount Printers

 2   from my home.

 3   **Q.**   Now, who used Paramount Printing?

 4   **A.**   EPIC used it, Calumet Township materials, some of their

 5   materials was printed there.

 6   **Q.**   Did you use it for your own campaign?

 7   **A.**   She did tickets for me and -- I think that's all she did

 8   for me.

 9   **Q.**   Now, do you have any reason to remember why you would have

10   been at the Paramount Printing in the morning around 9:00,

11   9:53, or whenever it was?

12   **A.**   Trustee Elgin calls me at home all the time when I was

13   working for her.  If she needed something, she would say:

14   Ethel, stop by the printer and pick up this.  Stop by the

15   Genesis Center.  Whatever she told me to do, I did it.  I'm on

16   the clock for her, for the township, so Paramount Printing, I

17   believe -- Joyce was very precise.  She opened up at 9:00, and

18   I didn't want to drive all the way on 4th and then have to

19   drive all the way back to 47th, so I would just stay home until

20   almost the time for the shop to open, and then I would go.

21   **Q.**   So it could have been or it happened that she would tell

22   you -- that Mary would tell you that you needed to pick up

23   something from the printer, whether it was from Calumet

24   Township or for some other purpose, and you would just stay at

25   home until it was time for the shop to open, go by and pick up

1   the --

2   **A.**  And then go to work.

3   **Q.**  Do you remember or have any memory at all of what you

4   picked up on that particular day?

5   **A.**  I have no idea what I picked up.  It was something quick

6   because it was three or four minutes.  I went in and went out.

7   **Q.**  Okay.  So let's look at Government's Exhibit 49.  Do you

8   recognize this picture?

9   **A.**  I recognize it.

10  **Q.**  And what's depicted in this picture?

11  **A.**  That's me getting into my car.

12  **Q.**  And do you recognize where the car is parked?

13  **A.**  No, I don't know where it's parked.

14  **Q.**  Could it be at the Genesis Center?

15  **A.**  It might be.

16  **Q.**  Does this help?

17  **A.**  I don't know.

18  **Q.**  Do you have any?

19  **A.**  I don't know where it is.

20  **Q.**  Do you have any memory of what you were doing at the time

21  this picture was taken?

22  **A.**  I have no idea.

23  **Q.**  And were you aware that this picture was taken?

24  **A.**  No, I was not aware it was being taken.

25  **Q.**  I'm going to show you what has been marked and admitted as

 1   Government's Exhibit 17.  Do you recognize this?

 2   **A.**   I recognize it.

 3   **Q.**   And what is it?

 4   **A.**   This is a memo.

 5   **Q.**   And what does the memo concern?

 6   **A.**   "No political activities during work hours."

 7   **Q.**   And who is issuing this memo?

 8   **A.**   Mary Elgin.

 9   **Q.**   Did you write this?

10   **A.**   No.

11   **Q.**   Do you have any idea who did write this?

12   **A.**   Stafford wrote all of her -- he did all of her letters and

13   her mailing.

14   **Q.**   But do you specifically know that he did this?

15   **A.**   No, I don't specifically know that he did this.

16   **Q.**   Okay.  And who is Laura McFarland?

17   **A.**   Laura McFarland came upstairs to the 3rd floor after I

18   worked there maybe a couple years because I was alone up there

19   so much and I got concerned because of my heart condition and,

20   you know, being sick.  I thought about being here by myself.

21   So I asked Mrs. Elgin, would she bring up the switchboard

22   operator to the 3rd floor.

23   **Q.**   And did she do that?

24   **A.**   She did that.

25   **Q.**   And that's who Laura McFarland is?

1   **A.**   That's who Laura McFarland is.

2   **Q.**   Do you recall signing one of these memos?

3   **A.**   I signed one of these.

4   **Q.**   And is that the practice, whenever a memo or new policy was

5   issued, it would be passed around and everybody would have to

6   sign it?

7   **A.**   Yes.

8   **Q.**   Who was Teresa Hamblin?

9   **A.**   Teresa Hamblin worked in the maintenance department and her

10  responsibility was to keep the 3rd floor where I worked clean.

11  She was the maintenance person on the floor.

12  **Q.**   And did she help you out from time to time?

13  **A.**   Yes, she did.

14  **Q.**   And was there a time when you had some tickets to work on

15  and you were in the office and she helped you with that?

16  **A.**   Yes, I had a few tickets left over from the night before.

17  **Q.**   And she helped you to package them up?

18  **A.**   She helped me, yes.

19  **Q.**   Okay.  Was there ever a time when you spent entire days or

20  halves of days or chunks of days doing political work at the

21  Calumet Township Trustee's Office?

22  **A.**   That would have been impossible for me to do.  That office

23  is very busy.  Ms. Elgin is a hands-on supervisor.  She had a

24  camera at her house that she could see what was going on --

25          **MS. LERNER:**  Objection.  Relevance.

Ashley N. Stokes, CSR, RPR
Ashley_Stokes@innd.uscourts.gov/ (219) 852-6557

```
 1              MS. GAMBINO:  Let's stick with "yes" or "no" for now
 2     and we'll get to that.
 3              DEFENDANT SHELTON:  Okay.
 4     BY MS. GAMBINO:
 5     Q.  Would you or did you ever spend days on political work at
 6     Calumet Township?
 7     A.  No, I did not.
 8     Q.  Okay.  And you talked about Ms. Elgin being a hands-on
 9     manager.  Did she keep good track of what her employees were
10     doing?
11     A.  She kept very good track of what her employees were doing,
12     all of them.
13     Q.  And including having cameras throughout the office that she
14     could check in on from time to time?
15     A.  And she had a camera at home that she could look at, the
16     grounds.
17              MS. LERNER:  Objection.  Relevance.  What does her
18     home have to do with the office?
19              THE COURT:  I'm going to overrule that objection.
20     BY MS. GAMBINO:
21     Q.  So she could see what was going on in the office when --
22     A.  She could be home and see what's going on at the office.
23     She had a camera on her desk, the same thing.  Steven Hunter
24     had a camera on his desk on his computer, and an employee in
25     his office had a camera on her computer.  So she could see
```

1   everything that was going on.  So when you came to work, when

2   you left, whether or not you went across the hall, went

3   downstairs, anything that happened in that office, she could

4   see.

5   **Q.**   Now, you have seen all these boxes of materials that were

6   taken out of the Calumet Township office, much of it taken out

7   of the storage room.  Did you ever make comments or suggest

8   where these items should be kept?

9   **A.**   I talked to Trustee Elgin because she was keeping a lot of

10  her personal stuff there as well as campaign stuff.  I told

11  her, I said, "You need to take these boxes and either take them

12  home or put them in a storage area," because she was a hoarder.

13  She kept everything.

14  **Q.**   So sort of like what my mother used to refer to as a pack

15  rat?

16  **A.**   Yes, she was a pack rat.

17  **Q.**   So she would keep lots and lots of papers and items and

18  documents and all that sort of thing and then not pay attention

19  to it?

20  **A.**   Yes.

21  **Q.**   And whose responsibility would it be to keep everything

22  neat and organized?

23  **A.**   Whose responsibility would it be?

24  **Q.**   Uh-huh.

25  **A.**   Ethel Shelton's.

1            **MS. GAMBINO:**  Thank you.

2            I tender the witness, Your Honor.

3            **THE COURT:**  Cross-examination.

4            **MS. LERNER:**  Your Honor, I'm wondering if we could

5    take a break at this point.

6            **THE COURT:**  Jurors want a break?

7            **UNIDENTIFIED JUROR:**  Yes.

8            **THE COURT:**  You win.  We'll take a break, 15 to

9    20 minutes, and we'll start back up.  Usual admonition.

10       (Jury out at 2:32 p.m.)

11           **THE COURT:**  About 15 or 20 minutes.

12       (Recess had at 2:33 p.m., and proceedings resumed in open

13        court at 3:04 p.m.)

14           **THE COURT:**  You can be seated.

15           Remember, you are still under oath.

16           **DEFENDANT SHELTON:**  Yes, sir.

17           **THE COURT:**  Mr. Rogers, are you going to have any

18   questions, cross?  I forgot about you last time on one of them.

19           **MR. ROGERS:**  I would be happy to follow Ms. Lerner.

20   If I do, I will have very few.

21           **THE COURT:**  Is that okay, Ms. Lerner, if he follows

22   you?

23           **MS. LERNER:**  It's fine.  I am okay with it.

24           **MR. ROGERS:**  I'll defer, and I mean that.

25           **THE COURT:**  Are you ready for the jury?

 1              **MS. LERNER:**  We are, Your Honor.

 2              **THE COURT:**  Ready for the jury?

 3              **MS. GAMBINO:**  Yes, Your Honor.

 4              **THE COURT:**  Ready for the jury, Mr. Rogers?

 5              **MR. ROGERS:**  Yes.

 6              **THE COURT:**  Bring the jury in.

 7         (Jury in at 3:06 p.m.)

 8              **THE COURT:**  You can be seated.  Ms. Lerner.

 9                        **CROSS-EXAMINATION**

10    **BY MS. LERNER:**

11    **Q.**  Good afternoon, Ms. Shelton.

12    **A.**  Good afternoon.

13    **Q.**  Your direct concluded, more or less, with your attorney, I

14    think, asking you about probably every single one of the

15    documents in these binders; is that right?

16    **A.**  That's correct.

17    **Q.**  And I wanted to ask you about a couple of them myself.  And

18    this is, for the record, Government's Exhibit 43.

19              So you remember when you saw this exhibit, correct?

20    **A.**  I do.

21    **Q.**  Would you read to us what it says right here, that

22    sentence?

23    **A.**  Part of it's covered.  I can't -- when you circled it.

24    **Q.**  Can you read it okay now?

25    **A.**  I can now.

1          "I have been employed at the Calumet Township office

2    for service years.  I have become familiar with the budget,

3    annual report, and the overall function of the Calumet Township

4    office."

5    **Q.**  And this is dated 2014, correct?

6    **A.**  Yes, it is.

7    **Q.**  And is that a fair statement that you were pretty familiar

8    with how the township office functioned?

9    **A.**  Pretty much from my experience in the finance department.

10   **Q.**  Okay.  And then here's another letter dated June 27, 2014.

11   And in this letter you identify yourself as the executive

12   secretary to Trustee Mary Elgin, correct?

13   **A.**  Yes.

14   **Q.**  And not as the secretary that you've been saying here

15   today, correct?

16   **A.**  I was the executive secretary.

17   **Q.**  That says, "executive assistant," does it not?

18   **A.**  I clearly see that it says that, but my job was executive

19   secretary.

20   **Q.**  Are you saying that you misrepresented your title in that

21   letter?

22   **A.**  It was a mistake.  Stafford Garbutt is the executive

23   assistant to the trustee.

24   **Q.**  Okay.  And there was an e-mail that was dated March 24,

25   2014.  You remember this?

1   **A.**   Yes.

2   **Q.**   And if I remember correctly, you said that you worked on

3   this at home in the evening?

4   **A.**   I said I either worked on it at home in the evening, pulled

5   it up, and brought it to my e-mail address at work.  I could do

6   that.

7   **Q.**   Okay.  And are you saying that based on the e-mail itself

8   or on your independent recollection?

9   **A.**   I did quite a bit at home.  I don't remember whether I

10   typed it at home and pulled it up at work or typed it at work.

11   I don't remember that.

12   **Q.**   Let me ask you:  Do you know what this indicator is right

13   there, the plus OO:00?

14   **A.**   No, I do not.

15   **Q.**   Have you ever heard of Coordinated Universal Time, UTC;

16   it's sometimes called Greenwich Mean Time?

17   **A.**   I don't know anything about that.

18   **Q.**   Are you aware that computers, especially programs like

19   Yahoo, keep track of time in UTC, Universal Coordinated Time?

20   Are you aware of that?

21   **A.**   I am not aware of that.

22   **Q.**   Are you aware that Universal Coordinated Time is six hours

23   ahead of Central Standard Time?

24   **A.**   I am not aware of that.

25   **Q.**   So if this is Universal Coordinated Time, then this would

```
 1   be about 3:00 in the afternoon; is that right?
 2   A.   I don't know.  I'm not aware of that type of time.
 3   Q.   And you were also shown this e-mail?
 4   A.   Yes, I was.
 5   Q.   And as I recall, you said that you also worked on this in
 6   the evening; is that correct?
 7   A.   I worked on what?
 8   Q.   Whatever this e-mail is or you were -- you received it in
 9   the evening; is that correct?
10   A.   I received this e-mail from Michelle.
11   Q.   But you had responded while you were at work; is that what
12   your testimony was?
13   A.   Yes.
14   Q.   And so your testimony regarding the items in this binder is
15   that you received or worked on them at work at some point or
16   other; is that correct?
17   A.   Yes.
18   Q.   And that's even though you had testified earlier that you
19   had not done any campaign work at the office; is that correct?
20   A.   I didn't consider it campaign work.
21   Q.   You don't consider it campaign work to put together
22   campaign-related items such as this, which says, you know,
23   "Vote for Ms. Shelton for Calumet Township Board."  That's not
24   campaign work?
25   A.   That came from Rebecca Smith to me.
```

1    **Q.**   And you received it and looked at it at your computer?

2    **A.**   I did.

3    **Q.**   So you don't consider this to be campaign work, vote for

4    Ethel Shelton?

5    **A.**   (No audible response.)

6    **Q.**   Is that a "yes" or a "no"?  The Court needs to take an

7    answer.

8    **A.**   Yes.

9    **Q.**   That's campaign work.  All right.  Is this campaign work?

10   **A.**   Yes.

11   **Q.**   And is that campaign work?

12   **A.**   Yes.

13   **Q.**   What about that, is that campaign work?

14   **A.**   Yes.

15   **Q.**   And that?

16   **A.**   Yes.

17   **Q.**   And that's campaign work; is that right?

18   **A.**   Yes.

19   **Q.**   As well as this?

20   **A.**   Yes.

21   **Q.**   So you did campaign work at the office?

22   **A.**   I looked at some work at the office, yes, on my computer.

23   **Q.**   At least this much?

24   **A.**   Not that much.

25   **Q.**   So, Ms. Shelton, we have been sitting here through -- I

1    think is it eight days of trial; is that correct?

2    **A.**   I'm not sure.  It has been a few days.

3    **Q.**   About that.  And during that time you have been, of course,

4    paying close attention to the exhibits that have been admitted

5    into evidence, correct?

6    **A.**   I've been looking at them, yes.

7    **Q.**   And you've been paying close attention to the testimony

8    that has been coming in; is that correct?

9    **A.**   Yes.

10    **Q.**   And you listened carefully when Stafford Garbutt was

11    testifying, correct?

12    **A.**   Yes, I did.

13    **Q.**   And you listened carefully when Gladys Miller was

14    testifying, correct?

15    **A.**   Yes, I did.

16    **Q.**   And you listened carefully when Lamar Taylor was

17    testifying, correct?

18    **A.**   Yes.

19    **Q.**   And you listened carefully when Linda Collins-Brown was

20    testifying, correct?

21    **A.**   Yes.

22    **Q.**   And when Elena Lynch was testifying, correct?

23    **A.**   Yes.

24    **Q.**   And when Horace Clay was testifying?

25    **A.**   Yes.

```
 1   Q.   And when Cynthia Holman-Upshaw was testifying?

 2   A.   Yes.

 3   Q.   And when Debra Piggee was testifying?

 4   A.   Yes.

 5   Q.   And when John Davis was testifying?

 6   A.   Yes.

 7   Q.   And when Warrien Poole was testifying?

 8   A.   Yes.

 9   Q.   And when Agent Holbrook was testifying?

10   A.   Yes.

11   Q.   And when Don Cooley was testifying?

12   A.   Yes.

13   Q.   And when Steven Martinez was testifying?

14   A.   Yes.

15   Q.   And you had a lot of time to think about how you were going

16   to respond to all that testimony before you testified, didn't

17   you?

18   A.   No.  I'm sworn to tell the truth.

19   Q.   But you had a lot of time to think about all the testimony

20   that you heard before you testified; is that correct?

21   A.   Yes.

22   Q.   Yes.

23          Let me ask you about the ticket lists that you kept.

24   And I believe you testified that there were three fundraisers,

25   correct?
```

1    **A.**   I think I testified to two, but it was three, the

2    Mardi Gras, if you include the Mardi Gras.

3    **Q.**   Did you generally participate in only the extravaganza and

4    the prayer brunch?

5    **A.**   Sometimes I did the Mardi Gras, not all the time.

6    **Q.**   Can you remember how many years you kept track of the

7    ticket lists for those while you were Ms. Elgin's executive

8    assistant?

9    **A.**   I don't remember keeping a ticket list for the Mardi Gras.

10   **Q.**   What about the extravaganza and the prayer brunch?

11   **A.**   I kept a ticket list for the extravaganza, and we pretty

12   much used the same list for the prayer brunch but with less

13   people.

14   **Q.**   Do you remember on average how many people attended the

15   extravaganza from the office, the employees?

16   **A.**   Anywhere from 35 to 40 percent of the employees attended.

17   **Q.**   And is that when the employment was on the high end, when

18   it was about 200, or on the low end?

19   **A.**   It basically stayed the same, whether on the high end or

20   the low end.

21   **Q.**   Okay.  And what about the prayer brunch?

22   **A.**   Prayer brunch, usually a couple hundred people, maybe a

23   little bit more.

24   **Q.**   What about from the office?

25   **A.**   Oh, from the employees?  I'm sorry.  It was a little bit

1    more, maybe 40, 45 percent.

2    **Q.**   Okay.  And is this number of tickets or number of

3    employees?

4    **A.**   Number of employees.

5    **Q.**   So the 35 to 40 percent for the extravaganza, that's

6    between two to five tickets per person, correct?

7    **A.**   Yes, correct.

8    **Q.**   So if there were 100 employees, there was going to be more

9    than 35 to 40 tickets sold to those employees, correct?

10   **A.**   Yes.

11   **Q.**   And is that the same for the prayer brunch?

12   **A.**   That's correct.

13   **Q.**   The number you gave me is for a percentage of employees,

14   not number of tickets, correct?

15   **A.**   Yes.

16   **Q.**   Okay.  All right.  You started out in finance, correct?

17   **A.**   That's correct.

18   **Q.**   And do you know what the SBOA is?

19   **A.**   The what?

20   **Q.**   The State Board of Accounts.

21   **A.**   Yes, State Board of Accounts.  Yes, I am familiar with

22   them.

23   **Q.**   You probably had to deal with it a little bit when you were

24   in finance?

25   **A.**   I did.

1  **Q.**  And as the executive assistant, you sometimes deal with the

2  SBOA; is that right?

3  **A.**  No, not at all.

4  **Q.**  When they had to go to Ms. Elgin, did you coordinate with

5  them at all on what they needed to do when they did their

6  audits?

7  **A.**  The State Board of Accounts?

8  **Q.**  Yes.

9  **A.**  No, finance department did that.

10  **Q.**  Did they just deal directly with finance?

11  **A.**  Yes.

12  **Q.**  Okay.  But you understand the importance of keeping

13  accurate public records, correct?

14  **A.**  Yes, I am familiar with that.

15  **Q.**  Because the State Board of Accounts audits you every -- is

16  it every two to three years?

17  **A.**  Yes, something like that.

18  **Q.**  And because the Calumet Township Trustee's Office is a

19  public entity, they are held accountable to the State Board of

20  Accounts, correct?

21  **A.**  That's correct.

22  **Q.**  I'm going to show you what has been marked as Government's

23  Exhibit 53, and you remember this exhibit, right?

24  **A.**  I do.

25  **Q.**  And that's your signature as timekeeper, correct?

1   **A.**   Correct.

2   **Q.**   And that signature certifies that statement, correct?

3   **A.**   Correct.

4   **Q.**   Can you read it again for us?

5   **A.**   "We certify to the best of our" --

6   **Q.**   Into the microphone.  Thanks.

7   **A.**   "We certify to the best of our knowledge that the

8   employees' actual work time is correct, and that the signatures

9   are their own."

10  **Q.**   And you signed that because these records were accurate to

11  the best of your knowledge; is that right?

12  **A.**   To the best of my knowledge.

13  **Q.**   I'm going to show you a page from that.  Okay.  Hold on one

14  second.

15          Before I ask you any questions on that, I'm going to

16  show you Exhibit 44, which, as you recall, for a recording made

17  on September 26, 2013.  It was done 12:07 p.m., and it lasted

18  two and a half hours, correct?

19  **A.**   Correct.

20  **Q.**   And your entry for September 26, 2013, is that you came in

21  at 8:00 and left at 4:00, correct?

22  **A.**   That's correct.

23  **Q.**   And there's no indication in there for personal business or

24  political business or anything else?

25  **A.**   No.

1  **Q.**  So you took at least an hour and a half that you got paid

2  by the citizens of Calumet Township where you were doing

3  political work; is that right?

4  **A.**  That's not correct.

5  **Q.**  Okay.  Let's go into that recording.  And let me start by

6  establishing that I'm going to be playing one of the clips from

7  Exhibit 1, and it has a corresponding transcript, 1T.  And I

8  understand the jury doesn't have their transcripts, so I will

9  put the transcript on the ELMO.

10       And what's the date for that recording?

11  **A.**  September 26, 2013.

12  **Q.**  And that's you, correct?

13  **A.**  That's me.

14  **Q.**  And that's Mr. Lendell Smith, correct?

15  **A.**  Yes.

16  **Q.**  I'm going to play the transcript.  It is Clip 1B, and I'm

17  going to do my best to start it at minute 7, 25 seconds.

18  Sorry.  Clip 1C.

19    (Audio played.)

20       **MS. LERNER:**  Shoot, I don't know how to do the ELMO

21  and the tape at the same time.  Is there a way?

22       **THE COURTROOM DEPUTY:**  No.

23       **MS. LERNER:**  It is one or the other?

24       **THE COURTROOM DEPUTY:**  Yes.

25       **MS. LERNER:**  Let's just do the recording then.

```
 1        (Audio played.)
 2   BY MS. LERNER:
 3   Q.   And that's you speaking, correct?
 4   A.   I believe it is.
 5   Q.   Okay.
 6        (Audio played.)
 7   Q.   That's Mr. Wheeler, correct?
 8   A.   Yes, it is.
 9        (Audio played.)
10   Q.   You were agreeing with Mr. Wheeler, weren't you, when you
11   said "there ain't no consequences"?
12   A.   I said "consequences."
13   Q.   Yes.  If you look, you were interrupted.  Would you like me
14   to play it again?
15   A.   What you circled --
16   Q.   Yes.
17   A.   -- he asked, "There's consequences?"
18   Q.   Well, there's two times that you're talking, correct, and
19   you were interrupted there?  Would you like me to play it
20   again?
21   A.   You can play it again if you want to.
22        (Audio played.)
23   Q.   That was you saying "there ain't no consequences," correct?
24   A.   Uh-huh, yes.
25   Q.   And that was on September 26, 2013, and that was a meeting
```

1    that you were at, correct?

2    **A.**   Correct.

3    **Q.**   And it lasted two hours and 20 minutes, correct?

4    **A.**   Correct.

5    **Q.**   And there is no indication on your worksheet for personal

6    business or anything else, correct?

7    **A.**   Correct.

8    **Q.**   And you said that when you were being recorded, you didn't

9    know you were being recorded?

10   **A.**   No, did not know I was being recorded.

11   **Q.**   So you weren't watching what you said; you just said what

12   came to your mind, correct?

13   **A.**   Correct.

14   **Q.**   I'm going to show you part of another exhibit without

15   playing it.  And this is going to be from the transcript, 6T.

16   And we've heard not only from Ms. Cynthia Holman-Upshaw, but

17   we've also heard you talk about her, correct?

18   **A.**   Correct.

19   **Q.**   Can you tell us what you said when you didn't know you were

20   being recorded?

21   **A.**   She's a punk.

22   **Q.**   Why was she a punk?

23   **A.**   Because the employees that she was a supervisor over would

24   come up and talk to Ms. Elgin, and Ms. Elgin would believe what

25   they said.  And they were basically telling on Cynthia and

1    Cynthia would cry, and I thought she was a punk for doing that.

2    **Q.**  So you didn't think very much of her then; is that fair to

3    say?

4    **A.**  No, I didn't think very much of her the way she dealt with

5    the employees.

6    **Q.**  And I'm also going to show you part of a transcript, which

7    is 9T.  And you recall when we played the transcript with

8    Chuck Winer, correct?

9    **A.**  I believe I was present for Chuck Winer.

10   **Q.**  And what was the reason Mr. Winer had come into the

11   trustee's office?

12   **A.**  He was over the computers.  He had a contract with the

13   trustee's office.

14   **Q.**  I'm showing you from Page 7 of transcript 9T.

15        Right here (indicating), isn't he handing you a

16   fundraiser check at the office?

17   **A.**  I can't say he was handing me a fundraiser check.  It

18   doesn't really say it, but Chuck Winer was a -- he had a

19   contract with the township.

20   **Q.**  And he also gave a lot of money, correct?

21   **A.**  He what?

22   **Q.**  He also gave a lot of money to Ms. Elgin's campaign,

23   correct?

24   **A.**  I don't know what he gave to her campaign.  He bought

25   tickets.

```
 1    Q.   Quite a bit, correct?
 2    A.   He bought a table.
 3    Q.   At the extravaganza?
 4    A.   At the extravaganza.
 5    Q.   Which is a thousand dollars?
 6    A.   A thousand dollars.
 7    Q.   I'm going to show you Page 19 of transcript 11T.  And this
 8    is when you're having a conversation with Mr. Garbutt and the
 9    phone rings.  Who is that calling you?
10    A.   Cynthia Holman-Upshaw.
11    Q.   And what does she say there?
12    A.   She says, "It's Cynthia.  Just wanted to know if you were
13    here.  I was going to bring some money up."
14    Q.   And that's for the extravaganza?
15    A.   That's for the extravaganza.
16    Q.   Because you collected money at work, correct?
17    A.   Mary Elgin told the deputies to bring the money to me.  And
18    when they came up and brought the money to me, I accepted it.
19    Q.   Can I ask you, again, about the early days when you met
20    Ms. Elgin.  You stated that when you first met her, you first
21    didn't vote for her for a union position; is that correct?
22    A.   That's correct.
23    Q.   And then you met her again later during or after her
24    campaign for her first run for the trustee's position; is that
25    correct?
```

1   **A.**   That was not the first time I met her at the union, the

2   first one that you said.

3   **Q.**   Okay.  In any event --

4   **A.**   I met her through my twin brother the first time.

5   **Q.**   That's correct.  I forgot about that.

6             In any event, you then met her again either before

7   or after the election, after her first run; is that correct?

8   **A.**   Yes.

9   **Q.**   And I believe you testified that she offered you a deputy

10  position; is that correct?

11  **A.**   Deputy or assistant deputy; she asked me would I want a

12  deputy or assistant deputy job.

13  **Q.**   And she did this out of the blue; she offered you a

14  supervisor position?

15  **A.**   She did.

16  **Q.**   Were you that close to her at that point?

17  **A.**   I was not close to her.  I was surprised that she would ask

18  me that.

19  **Q.**   And then you testified that you got the offer in the mail;

20  is that correct?

21  **A.**   For the finance department, I got that offer in the mail.

22  **Q.**   Okay.  Did you interview for it?

23  **A.**   I didn't hear you.

24  **Q.**   Did you interview for it?

25  **A.**   Yes, I did.

 1   **Q.**  And you testified, if I recall correctly, that she also

 2   asked you to be her executive assistant, also kind of out of

 3   the blue; is that also right?

 4   **A.**  No, it wasn't out of the blue.  She called me and asked me

 5   to go to lunch with her.  I went to lunch with her.  She asked

 6   me to -- would I be interested in being her executive

 7   secretary.  She told me how much the pay was, and I accepted

 8   it.

 9   **Q.**  And you said that you accepted it because the pay was

10   higher and you needed the extra money for your granddaughter;

11   is that correct?

12   **A.**  That's correct.

13   **Q.**  And you had taken this position after turning down the

14   deputy position earlier because the hours were going to be too

15   long; is that correct?

16   **A.**  Well, I wasn't aware what a deputy job was, nor was I aware

17   of an assistant deputy.  I had not heard that term before.  So

18   she told me supervisor, and I told her I didn't want the extra

19   stress of that particular job.  I didn't know how much that job

20   paid or any of that.

21   **Q.**  Didn't you also testify that you really didn't need this

22   job at all because you had multiple sources of other income

23   from your husband?

24   **A.**  Yes.

25   **Q.**  And, yet, you also want us to believe that you took this

1  position because of the additional $10,000?

2  **A.**  I didn't say -- I said that I did not have to work and

3  decided to take this job because I wanted to.  I wanted to help

4  my granddaughter.  It was extra money.  Yes, college costs a

5  lot of money.

6  **Q.**  The stuffing of the envelopes -- the tickets into envelopes

7  for the employees, where was that done?  Did you do that at

8  work or the office?

9  **A.**  I did that at my home.  The majority was done at my home.

10  **Q.**  And did you have to keep track of the tickets that were

11  sent out not just for the employees but also for other donors

12  that Ms. Elgin sent letters to?

13  **A.**  Yes.

14  **Q.**  And where did those come into?

15  **A.**  The tickets?

16  **Q.**  Yes, the money for the tickets.

17  **A.**  They came in the mail.

18  **Q.**  And did they come into the township trustee's office?

19  **A.**  No, she had a post office box.

20  **Q.**  And who picked up the mail at the post office box?

21  **A.**  Sometimes Trustee Elgin did and sometimes she would call me

22  and ask me to pick it up.

23  **Q.**  Did you have a key to the post office box?

24  **A.**  No, she had a key in her desk, and I would take the key out

25  of her desk and go get the mail if she told me to do it.

1    **Q.**   And what would you do with this mail once you took it out

2    of the post office box?

3    **A.**   Pick it up, take it back to the office, put it on her desk.

4    **Q.**   You took it back to the office?

5    **A.**   Yes.

6    **Q.**   And you testified that keeping track of ticket sales is

7    important because of campaign finance laws; is that correct?

8    **A.**   That's what Ms. Elgin told me.

9    **Q.**   Well, you have to file those yourself too, don't you?

10   **A.**   I filed it one time when I ran for the board, Calumet

11   Township board.

12   **Q.**   You filed at least a couple of reports, haven't you?

13   **A.**   No.  I filed one report that I remember.

14   **Q.**   Okay.  In any event, regardless of how many you've filed,

15   you know that the reports require you to keep track of all

16   donations, correct?

17   **A.**   I did when I ran for the board, yes.

18   **Q.**   And is that the reason that you were keeping track of the

19   ticket sales?

20   **A.**   They weren't my tickets.  I didn't have to report that.

21   Mary Elgin had to report that.

22   **Q.**   I'm not asking you if you put them in your report.  I'm

23   asking you is that why you kept track of ticket sales, because

24   those need to be reported in the campaign finance reports?

25   **A.**   That's what Ms. Elgin told me.

1   **Q.**  Yes.  Is that the reason that you did it, or did you do it

2   for another reason?

3   **A.**  I did it because she told me to do it.

4   **Q.**  Okay.  And you also know that the campaign finance reports

5   require you to report expenditures, correct?

6   **A.**  Correct.

7   **Q.**  And it's important that those be accurate because they have

8   to be filed, correct?

9   **A.**  Correct.

10   **Q.**  And often the public looks at them, correct?

11   **A.**  I'm not aware of that.

12   **Q.**  And if you don't file them correctly, you could get in

13   trouble, correct?

14   **A.**  Correct.

15   **Q.**  I'm going to show you an exhibit from inside the box that's

16   marked as Government's Exhibit 18.

17         And, for the record and for counsel, Government's

18   Exhibit 18 was taken from Mary Elgin's office.

19         Can you tell us what that is?

20   **A.**  That is the list of the prayer brunch and the people that

21   attended, I believe.

22   **Q.**  Okay.  And that's -- this is your handwriting on this,

23   correct?

24   **A.**  Yes, it is.

25   **Q.**  Because that looks very much like your signature, correct?

1   **A.**   It does.

2   **Q.**   What does "NP" mean?

3   **A.**   I believe that means not paid.

4   **Q.**   There is another one, correct?

5   **A.**   Yes.

6   **Q.**   And we remember -- we heard Elena Lynch testify she never

7   paid for a single ticket, correct?

8   **A.**   Correct.

9   **Q.**   And apparently neither did John Davis, at least for the

10   2013 prayer brunch; is that correct?

11   **A.**   That's correct.

12   **Q.**   So if you have to keep accurate lists for the purpose of

13   campaign finance reports, why are you keeping track of who

14   doesn't pay?

15   **A.**   This list right here was used at the door when this event

16   happened.

17   **Q.**   Ms. Lynch --

18   **A.**   People coming in through the door.

19   **Q.**   Ms. Lynch testified that she did not attend.

20   **A.**   No, she didn't attend.  I have it right here, not paid.

21   She didn't attend.

22   **Q.**   That's right.

23   **A.**   Where you see these check marks, these are people that come

24   in that attended.  If you don't see a check mark by that name,

25   those people did not attend.

 1   **Q.**   And, again, my question is:  Why do you need to keep track
 2   of people who have not paid?
 3   **A.**   I got to keep track of who's coming through the door, who's
 4   paid.  Ms. Elgin kept very close track of the money that was
 5   coming in.  I had no way of keeping it except that.
 6   **Q.**   And you were keeping track of who paid at the door in this
 7   manner, correct?
 8   **A.**   Move your hand and let me see who that is.  Yes,
 9   Cynthia Jolly paid at the door.
10   **Q.**   Right.  So you initially had her down as NP?
11   **A.**   Yes.
12   **Q.**   And then she paid at the door?
13   **A.**   Yes.
14   **Q.**   So this NP appears to have been made before the event; is
15   that fair to say?
16   **A.**   I don't understand what you mean.
17   **Q.**   I'll withdraw the question.
18              This is also from Box 18.  Can you tell us what this
19   is?
20   **A.**   That's a list of people that paid.  This is before the
21   event, this particular list.
22   **Q.**   And that's for the 2013 extravaganza; is that correct?
23   **A.**   Yes, it is.
24   **Q.**   And is that your handwriting on this?
25   **A.**   Yes, it is.

1   Q.   And this is broken out by department; is that correct?

2   A.   Yes, it is.

3   Q.   And why is it broken out that way?

4   A.   Because when the deputy bring the money back to me like

5   Ms. Elgin had instructed, I could go to the department and make

6   a check mark to mark that it was paid.

7   Q.   And that's because you keep -- you send out the tickets by

8   department, correct?

9   A.   Yes.

10   Q.   And you handle incoming payments too, as well, do you not?

11   A.   I do.

12   Q.   Including cash?

13   A.   I do.

14   Q.   And we saw these the other day, but there is a number of

15   envelopes from Mr. Clay; is that correct?

16   A.   That's correct.

17   Q.   And he was paying in increments, correct?

18   A.   Correct.

19   Q.   And you kept these envelopes to keep track of how much

20   money he had given you?

21   A.   I did these envelopes and gave them to Ms. Elgin.

22   Q.   What did you do with the cash after it was given to you?

23   A.   Put it in an envelope and gave it to Ms. Elgin.

24   Q.   To who --

25   A.   Put it in her cabinet.

 1   **Q.**   Was there a lockbox for it?

 2   **A.**   In her cabinet.  It was locked.

 3   **Q.**   And what about checks?

 4   **A.**   Checks was not given to her.

 5   **Q.**   What happened --

 6   **A.**   They came to me --

 7   **Q.**   Okay.

 8   **A.**   -- and generally I would take a copy of the check because

 9   Ms. Elgin -- she was very, very detailed about that money.

10   **Q.**   Answer the question, please:  What did you do with the

11   checks?

12   **A.**   I kept them until I got enough to go to the bank, and after

13   work I would deposit it in her account, EPIC account.

14   **Q.**   So you deposited the checks into the EPIC account; is that

15   correct?

16   **A.**   Yes, I did.

17   **Q.**   You testified about your impression of Mr. Wheeler and

18   whether or not he was serious about the comment that we just

19   heard.

20         You didn't sit in on his interview with the FBI, did

21   you?

22   **A.**   No, I did not.

23   **Q.**   And he made that same comment that -- well, not that exact

24   comment, but he expressed his frustration that he had no

25   leverage with employees during that interview.  You didn't sit

1    on that interview to hear that, did you?

2    **A.**   No, I did not.

3    **Q.**   So is there a reason why he would tell the FBI the same

4    thing if he was really joking about it?

5    **A.**   Well, you'd have to ask him.

6              **MR. ROGERS:**   I don't believe that I heard anything

7    regarding that during anyone's testimony.

8              **MS. LERNER:**   On what?

9              **MR. ROGERS:**   What Mr. Wheeler told the FBI regarding

10   that.   I may be mistaken, but -- and even so, this witness is

11   not in a position to testify as to what Alex Wheeler said to

12   the FBI, if anything.

13             **MS. LERNER:**   May we approach, Your Honor?

14             **THE COURT:**   Yes.

15       (Bench conference.)

16             **MS. LERNER:**   I am impeaching her.   She testified

17   that he would never say something like that.

18             **THE COURT:**   You're saying it's what you're

19   impeaching her from, is what you're saying?

20             **MR. ROGERS:**   Nobody testified to that.

21             **MS. LERNER:**   Steve Martinez.

22             **MR. ROGERS:**   That Alex Wheeler said that in the

23   interview?   I don't recall him saying that --

24             **MS. LERNER:**   Steve Martinez said they interviewed --

25             **MR. ZANZI:**   (Indiscernible.)

1        THE COURT REPORTER:  I can't hear you.

2        THE COURT:  You've got to get away from that so we

3    can record you.  This is not a good source.

4        MR. ZANZI:  This is for the jury to recall whether

5    or not, but Steve Martinez --

6        MS. GAMBINO:  It's improper impeachment anyway,

7    Judge.  She can't impeach this witness with Mr. Wheeler's FBI

8    report.  That's just improper impeachment.

9        THE COURT:  The objection is she didn't say it.

10       MR. ROGERS:  Improper impeachment.

11       THE COURT:  I don't think that's going to make a

12   difference or something --

13       MR. ROGERS:  Yeah.

14       THE COURT:  I'll let it stand where it is.

15       MS. LERNER:  Okay.

16    (End of bench conference.)

17   BY MS. LERNER:

18   Q.  You told us about the incident that Gladys Miller testified

19   about earlier.  Do you remember that?

20   A.  Yes.

21   Q.  And you told us that you didn't remember it very well; is

22   that correct?

23   A.  I didn't remember it at all.

24   Q.  You didn't remember it at all, actually.  And you said, "If

25   Ms. Miller said it, it was probably true," but you didn't

 1  remember it.  And, yet, didn't you also testify that it upset

 2  you?

 3  **A.**   That what upset me?

 4  **Q.**   The incident.

 5  **A.**   I don't remember saying it upset me.

 6         **THE COURT:**  I think it's two different things.

 7         **MS. LERNER:**  That's not my recollection, Your Honor.

 8  I'll move on.

 9         **THE COURT:**  I will rely on your recollection.  I

10  thought it was two different instances they're talking about.

11  **BY MS. LERNER:**

12  **Q.**   You talked about your falling out with Mary Elgin in about

13  2013.  Was that around the fall or was it earlier?

14  **A.**   You said was it in the fall?

15  **Q.**   Yes.

16  **A.**   I don't remember when it was.

17  **Q.**   Was it regarding the campaign or was it something entirely

18  different?

19  **A.**   It was regarding the campaign at that point.

20  **Q.**   So is it fair to say that it was in the fall, or had you

21  already started campaigning at that point?

22  **A.**   I don't remember.  I'm sorry.

23  **Q.**   Do you remember when she contacted you to talk to you about

24  running for the township board?

25  **A.**   She didn't contact me.  I saw her in the office when she

```
 1   came in.

 2   Q.   When did she talk to you about it?

 3   A.   Where or when?

 4   Q.   When.

 5   A.   I don't know.

 6   Q.   You have no recollection?

 7   A.   It was prior to me running, maybe 2012.

 8   Q.   And it upset you that she supported you for the position

 9   and then didn't give you the support that you wanted; is that

10   fair to say?

11   A.   That's fair to say.

12   Q.   Probably made you angry; isn't that right?

13   A.   I wouldn't say she made me angry.  I was hurt.

14   Q.   Probably cost you money; isn't that right?

15   A.   That wasn't the reason.

16   Q.   And she didn't give you the backing that you had hoped, and

17   you ultimately lost the election, correct?

18   A.   I didn't lose the election because she didn't give me the

19   backing.

20   Q.   She didn't give you the backing you expected; is that fair

21   to say?

22   A.   That's fair to say.

23   Q.   And you also talked about the -- let me pull it up so the

24   jury can see it.

25              You also talked about Exhibit 47, which is your
```

 1   admonition to Gladys Miller to not put campaign-related things

 2   on the computer.

 3           If she received the tickets at the office, why isn't

 4   she permitted to use her computer to make a receipt?

 5   **A.**   She received the tickets at the north annex after hours.

 6   **Q.**   By you?

 7   **A.**   By me.

 8   **Q.**   That's right.  And it's not okay for her to do that, but it

 9   is okay for you in Exhibit 43 to have campaign-related material

10   on your computer.  Is that what you're telling us?

11   **A.**   I took my directive from the trustee.  Whatever she told me

12   to do, I did.

13   **Q.**   Ms. Shelton, you called several witnesses here before you,

14   and I asked all of them:  Does Ms. Shelton exercise independent

15   judgment, and they all answered "yes."  Do you remember that?

16   **A.**   I remember that.

17   **Q.**   And I asked them:  Does she stand up for herself and not

18   take crap from anyone -- not in those words -- but they all

19   said "yes."  Do you remember that?

20   **A.**   I remember that.

21   **Q.**   But your answer here is that Mary Elgin made me do it and

22   Mary Elgin's mean.  Is that fair to say?

23   **A.**   No.  I said I took my directive from Mary Elgin.  She was

24   my boss.  I was working in a nonunion environment.  I took my

25   directives from her.  Whatever she told me to do, as long as it

1   didn't harm me or my coworkers, I did it.

2   **Q.**  Did she force you to put those documents on your computer,

3   the ones that your friend sent you by e-mail to your work

4   e-mail address?

5   **A.**  Not those documents, no, she did not force me.  That was

6   between me and --

7   **Q.**  All of the personal --

8   **A.**  -- Rebecca Smith.

9        **THE COURT:**  You're starting to talk over each other

10  a little bit.

11  **Q.**  All of the personal campaign-related documents that are on

12  your computer, those are by Mary Elgin's directive?

13  **A.**  No, it's not by Mary Elgin's directive.  It came from my

14  friend, Rebecca Smith.  She sent them to me to my work computer

15  and my home computer.

16  **Q.**  And you said yourself you're not -- you're in a nonunion

17  environment, and you have no protection.  And can you not

18  imagine how employees receiving tickets from you might feel,

19  that there's an implication that they have to buy the tickets

20  in that situation?

21  **A.**  I did not directly interact with the employees.  I went to

22  the deputies.

23  **Q.**  You did interact with employees that paid you, however?

24  **A.**  Only the ones that came to me.  I did not go to -- there is

25  not one employee that can say that I came to them and asked

```
 1   them to buy a ticket for me or Ms. Elgin.  Not one.
 2   Q.   I'm going to play for you one of the clips from Exhibit 4?
 3            THE COURT:  Ms. Lerner, let me ask you a question.
 4   Is there any reason the government doesn't have the transcripts
 5   for the jurors?
 6            MS. LERNER:  Because I decided shortly before lunch
 7   was over that I was going to play the clips.  They're short,
 8   Your Honor.  We can take a break or I can wait to play this at
 9   a later time.
10            THE COURT:  It's whatever you want to do.  I'm not
11   telling you how to do it.  I'm saying, when you listen to the
12   tapes, sometimes -- people have a lot better hearing than I
13   have, but sometimes they're talking over each other and so
14   forth, and it's hard to follow.  And when you played them the
15   first time, they had a transcript -- they had the tapes but
16   they had the transcripts, likewise.
17            MS. LERNER:  Honestly, Your Honor, I didn't realize
18   that I wouldn't be able to put the transcript itself on the
19   ELMO and play this at the same time.
20            THE COURT:  Okay.  That's fine.
21            MS. LERNER:  Sorry about that.  It is going to be
22   the first few seconds of Clip 4D.
23       (Audio played.)
24   BY MS. LERNER:
25   Q.   So you told the deputies in the room that -- go to your
```

1  employees.  Tell them it's an election year, and we need you to

2  buy the tickets, correct?

3  **A.**  Correct.

4  **Q.**  And your testimony is that this was at Ms. Elgin's

5  directive?

6  **A.**  Ms. Elgin is who told me to go to the meeting.  I was the

7  chairman of the extravaganza that year.  She come in the

8  office:  "I want you at this meeting.  I want you at this

9  meeting."  I went to the meeting.

10 **Q.**  Did you feel coerced by Ms. Elgin?

11 **A.**  I didn't feel coerced by her.

12 **Q.**  Did you feel pressured?

13 **A.**  I didn't feel pressured.  She told me to go to the meeting

14 to talk to the deputies about the extravaganza and the tickets,

15 and that is exactly what I did.

16 **Q.**  Did you feel threatened by Ms. Elgin?

17 **A.**  Not at that point.

18 **Q.**  You're telling us that you appear to know what the law is,

19 but at the time you just did what she told you without

20 question?

21 **A.**  Number one, I don't know what the law was.  Nobody told me

22 anything about the law.  I was told I could do them on my lunch

23 hour, I could do them on my break, and I could do them after

24 work.  She told me that, and she told every deputy that.  It

25 was no secret.

1    **Q.**  But you knew that Mr. Van Til had gotten in trouble for

2    doing stuff like that at work, didn't you?  That happened just

3    a few months earlier.

4    **A.**  I had no idea what Mr. Van Til did at work.

5    **Q.**  Well, you referred to it in one of the recordings, didn't

6    you?

7    **A.**  I might have said something about Van Til.  But I'm not

8    interested in what Mr. Van Til did at work or didn't do at

9    work.

10   **Q.**  Didn't you tell Ms. Miller when you were handing her the

11   tickets, "I'm not going to jail for anybody"?

12   **A.**  I told her that, "I'm not going to jail for anybody."

13   **Q.**  So you know it's right?

14   **A.**  I know it's right?

15   **Q.**  You know what you're supposed to do, correct?

16   **A.**  As long as I was doing it on my lunch hour, my break, or

17   after work, I didn't think I was doing anything wrong.  I

18   didn't know the handbook was the law, that I could possibly go

19   to jail.

20   **Q.**  I didn't ask a question, please.

21         So just to get this straight, you didn't vote for

22   Mary Elgin when she ran for a union position a while back,

23   correct?

24   **A.**  No, I did not vote for her.

25   **Q.**  You chose to leave the steel mill after you had health

1  concerns, correct?

2  **A.**  Would you repeat that?

3  **Q.**  You chose to leave the steel mill, if I'm not mistaken,

4  because you had some health concerns?

5  **A.**  Yes.

6  **Q.**  And you chose to turn down the first position that

7  Ms. Elgin offered you of a deputy position; is that correct?

8  **A.**  Correct.

9  **Q.**  And then you chose to take the position as executive

10  secretary, correct?

11  **A.**  Correct.

12  **Q.**  And now you're saying that you had no control over anything

13  that you were going to do because Mary Elgin told you?

14  **A.**  I did not say that.

15  **Q.**  You said everything that you did was by her directive.

16  **A.**  She was my boss.  Stafford was my boss.  Donna Frazier was

17  my boss.  Whatever they told me to do -- I don't understand why

18  nobody understands it.

19          **DEFENDANT SHELTON:**  I'm sorry, Your Honor.  I don't

20  understand.  I'm sorry.

21          **MS. LERNER:**  Do you need another minute?

22          **DEFENDANT SHELTON:**  No.  I'm okay.

23          **MS. LERNER:**  You ready?

24          **DEFENDANT SHELTON:**  Yes.  This is my life.

25          **MS. LERNER:**  Should we take a break, Your Honor?

```
 1          THE COURT:  Do you want to take a break?

 2          DEFENDANT SHELTON:  Yes.

 3          THE COURT:  Okay.  We'll take a five-minute break.

 4   Be back here in five minutes.  Same admonition.

 5      (Jury out at 4:00 p.m.)

 6          THE COURT:  You can go back there.  Get some water

 7   back there if you want to.  We'll take about a five-minute

 8   break.

 9      (Recess had at 4:00 p.m., and proceedings resumed in open

10       court at 4:11 p.m.)

11          THE COURT:  You can all be seated.

12          Ms. Shelton, how are you feeling right now?

13          DEFENDANT SHELTON:  I feel okay.

14          THE COURT:  Are you ready to go forward?

15          DEFENDANT SHELTON:  I'm ready.

16          THE COURT:  You need to put on your union griever

17   hat.  You were in the mill and you saw worse than this in the

18   mill.  You just have to put that hat on and go forward and do

19   what you're doing.

20          DEFENDANT SHELTON:  I will.

21          THE COURT:  Is the government ready?

22          MS. LERNER:  It is, Your Honor.

23          THE COURT:  Defense ready?

24          MS. GAMBINO:  Yes.

25          MR. ROGERS:  We are.
```

```
 1              THE COURT:  Bring the jury in.
 2              We're going to go probably until 20 of the hour.
 3              MR. ROGERS:  I'm sorry?
 4              THE COURT:  We'll go to about 20 of the hour, if we
 5    can get that far.
 6         (Jury in at 4:13 p.m.)
 7              THE COURT:  You can be seated.
 8              We're going to go between 20 and 30 more minutes and
 9    then break for the day.
10              MS. LERNER:  Thank you, Your Honor.
11    BY MS. LERNER:
12    Q.  Ms. Elgin [verbatim], I'm going to show you some things
13    from the Government Exhibit marked 23, which were items that
14    were seized from your desk.  So this is a folder that is titled
15    "January 2014 Receipts."
16              Can you tell us what that is?
17    A.  That's a --
18    Q.  Does that help?
19    A.  It's for Elgin's extravaganza.
20    Q.  Okay.  And I'm going to show you an item in another folder
21    in your desk that was -- the folder is marked "March Expenses
22    2014."
23              Can you tell us what this is?
24    A.  Rent for the campaign headquarters.
25    Q.  And what's the date at the top there?
```

1    **A.**  It looks like 3 --

2          **THE COURT:**  The microphone you have to bring over to

3    you.

4    **BY MS. LERNER:**

5    **Q.**  Into the microphone, please.

6    **A.**  I'm sorry.  March 6, 2014.

7    **Q.**  Do you remember -- is that Ms. Elgin's signature or is that

8    when you were signing on her behalf?

9    **A.**  No, that's Mrs. Elgin's signature.

10   **Q.**  Okay.  When did Ms. Elgin move into her headquarters?

11   **A.**  I don't remember the date because I wasn't really involved

12   in when she moved or anything to do with the campaign

13   headquarters.

14   **Q.**  Can you tell us what this is?  This is from a folder marked

15   "February Expenses 2014."

16   **A.**  This is from one of Ms. Elgin's friends, Louise.  She gave

17   a donation of $100 for the extravaganza.

18   **Q.**  I don't know if I'm wrong, but that "E" looks a lot like

19   the "E" for Ethel.  Did you sign that?

20   **A.**  That is my signature.

21   **Q.**  So this is one that you signed on her behalf, I assume?

22   **A.**  Wait.  I'm sorry.  This is a check that I wrote to

23   Louise Lee --

24   **Q.**  Yes.

25   **A.**  -- for $100.

1   **Q.**   And that's on the EPIC checks, correct?

2   **A.**   That's on EPIC checks.  She was the pianist, I believe.

3   **Q.**   And I'm going to show you something in the folder called

4   "EPIC Stationery."  Can you tell us what that is?

5   **A.**   That's Ms. Elgin's stationery.

6   **Q.**   And there's a number of pages in there?

7   **A.**   Yes.

8   **Q.**   Okay.  And another folder called "EPIC Bank Statements."

9   **A.**   Yes.

10  **Q.**   And this says "Ethel file," correct?

11  **A.**   Yes.

12  **Q.**   Is that Ms. Elgin's handwriting?

13  **A.**   That's Ms. Elgin's handwriting.

14  **Q.**   And are these Chase Bank statements for the Elgin Political

15  Initiative Committee?

16  **A.**   This was in my desk?

17  **Q.**   Yes.

18  **A.**   Yes, it looks like a bank statement.

19  **Q.**   And this is "January 2014 Expenses."  Is this another check

20  for the rent for the campaign headquarters?

21  **A.**   Yes.

22  **Q.**   And you keep these, correct?

23  **A.**   I keep it in my desk, yes.

24  **Q.**   And you keep these records, correct?

25  **A.**   Yes.

1  **Q.**  At least initially?

2  **A.**  Yes.

3  **Q.**  And that appears to be -- is it fair to say this is you

4  signing on Ms. Elgin's behalf?

5  **A.**  I am signing on her behalf.

6  **Q.**  Okay.  And this is a folder called "Ethel Stuff"?

7  **A.**  Uh-huh.

8  **Q.**  And this is, I assume, what appears to be the rental

9  agreement for your fundraiser in March of 2014; is that

10  correct?

11  **A.**  That's correct.

12  **Q.**  And did Ms. Elgin make you put that in your desk?

13  **A.**  No.

14  **Q.**  Okay.  And this is from World of Media Production, and

15  that's on a check that says "Committee to Elect Ethel Shelton."

16  I assume this is for your fundraiser?

17  **A.**  No, this was not -- you have to let it stay there long

18  enough for me to look at it.

19  **Q.**  Okay.

20  **A.**  That was not for my fundraiser.

21  **Q.**  Sorry.  Correction.  For campaign advertising.

22        And did Ms. Elgin make you put that in your desk?

23  **A.**  No, she did not.

24  **Q.**  And can you tell us what this is?

25  **A.**  That's the card that -- I can't see it very good.  Yeah.

1    That's the card that I -- that was ordered for me.

2    **Q.**  Okay.  And you had it shipped to the trustee's office,

3    correct?

4    **A.**  No, I don't think I received those cards at the township

5    office.

6    **Q.**  Well, what's that's address there that says "ship to"?

7    **A.**  I see 4644 Pierce Street here (indicating), and I see 610

8    Connecticut Street.

9    **Q.**  Can you point on your screen where it says Pierce Street?

10   I'm looking in the yellow one where it says "ship to."

11   **A.**  (The witness complied.)  Calumet Township, 610 Connecticut

12   Street.

13   **Q.**  My question was:  Did you have them shipped to the

14   trustee's office?

15   **A.**  LaDarean did that, and she put that on there.  I hadn't

16   noticed that before.

17   **Q.**  So somebody else did it?

18   **A.**  Yes.  You see ladarean@yahoo.com.

19   **Q.**  Okay.  And here's another check -- let me zoom out -- for,

20   I guess pastor's banquet, and the check says "Committee to

21   Elect Ethel Shelton."  Did Ms. Elgin make you put this one in

22   your desk?

23   **A.**  No, she did not.

24   **Q.**  And here is an advertisement for an ad book or something.

25   Did Ms. Elgin make you put this one in your desk?

1    **A.**   No, she did not.

2    **Q.**   Did Ms. Elgin make you put that in your desk?

3    **A.**   No, she did not.

4    **Q.**   What about that?

5    **A.**   No, she did not.

6    **Q.**   And that, which is a check which also says "Committee to

7    Elect Ethel Shelton."

8    **A.**   No, she did not.

9    **Q.**   What about the item on letterhead that says "Ethel Shelton

10   precinct committee person"?  Did she make you put that in your

11   desk?

12   **A.**   No.

13   **Q.**   Do you recall that there was an EPIC rally just before the

14   extravaganza?

15   **A.**   Yes.

16   **Q.**   And several employees who came to testify, they were asked

17   questions about that.  Do you remember that?

18   **A.**   I remember.

19   **Q.**   And you were talking at that rally, correct?

20   **A.**   Yes, I was.

21   **Q.**   And encouraging the employees to buy tickets, correct?

22   **A.**   I was the extravaganza chairperson.  I --

23   **Q.**   Okay.  And there was something called EPIC trivia.  What

24   exactly was that?

25   **A.**   You take the paper off too fast for me to look at it.

1   **Q.**   Sorry.  EPIC trivia is listed on this agenda.

2   **A.**   I don't remember what that was.  Donna Frazier did that.

3   **Q.**   Let me show you.  Does that refresh your memory?

4   **A.**   I don't remember this.

5   **Q.**   Can you read --

6   **A.**   It's trivia.

7   **Q.**   Can you read that for us?

8   **A.**   "What does EPIC stand for?  What year was EPIC founded?

9   Who was Mary Elgin's opponent in the May 2006 primary?  When

10   was the first public fundraiser for EPIC?  Who are the

11   president, vice president, and treasurer for EPIC?  What two

12   groups are spinoffs of EPIC?"

13   **Q.**   And going back to the agenda, this is a rally that was held

14   at the multipurpose center, correct?

15   **A.**   I don't believe it was held at the multipurpose center, if

16   I'm correct.  It was held at the north annex.

17   **Q.**   At the north annex then.

18              And employees were given invitations on their desks

19   or chairs to attend this rally, correct?

20   **A.**   I don't remember that.

21   **Q.**   Well, how did they know to show up?

22   **A.**   I don't remember an invitation.  You asked me did I know

23   about an invitation.

24   **Q.**   Okay.  The employees did show up, correct?

25   **A.**   They were notified.

1   **Q.**   Yes.  And how were they notified?

2   **A.**   I have no idea.

3   **Q.**   But they arrived and it started at 4:00 p.m., correct?

4   **A.**   That's correct.

5   **Q.**   And most employees, they had finished work at that point,

6   correct?

7   **A.**   Yes.

8   **Q.**   And normally they would be going home at that point,

9   correct?

10  **A.**   Yes.

11  **Q.**   But instead they were playing EPIC trivia, yes?

12  **A.**   The meeting was not mandatory.

13  **Q.**   It's a yes-or-no question, yes?

14  **A.**   I don't know what they were playing.  I can't answer that

15  "yes" or "no."

16  **Q.**   That's what's listed on the agenda, correct?

17  **A.**   It's listed on the agenda, yes.

18  **Q.**   And attendance was taken at this meeting, correct?

19  **A.**   Correct.

20  **Q.**   And several people are on here that we've heard from.

21          Let's see, Ms. Piggee is on there, correct?

22  **A.**   Uh-huh.

23  **Q.**   And Donna Frazier didn't testify, but we've heard about

24  her.  She's there.  And then on the second page, of course, we

25  heard from Horace Clay.  You just testified about

```
 1    Teresa Hamblin.  Elena Lynch did come.  Mary Elgin showed up.
 2    Alex Wheeler was there.  All these people came to this,
 3    correct, and there's you?
 4    A.  Uh-huh.
 5    Q.  Okay.  And this was a sign-in sheet that everybody had to
 6    sign?
 7    A.  They didn't have to sign in.
 8    Q.  What would be the point of showing up and not having the
 9    trustee know that you were there?
10    A.  They did a sign-in sheet.  If they signed in, they signed
11    in.  If they didn't, they didn't.
12    Q.  Did Mary Elgin tell you to put that in your desk
13    (indicating)?
14    A.  No, she did not.
15    Q.  Did Mary Elgin tell you to put that in your desk
16    (indicating)?
17    A.  No, she did not.
18    Q.  And what about that (indicating); did she tell you to put
19    that in your desk?
20    A.  No, she did not.
21    Q.  Did Mary Elgin tell you to put this in your desk
22    (indicating)?
23    A.  No.
24    Q.  And this is -- some of it is printed, some of it is
25    letterhead, that says "Ethel Shelton, precinct committee
```

1    woman"?

2    **A.**   Yes.

3    **Q.**   And did Ms. Elgin tell you to put this in your desk

4    (indicating)?

5    **A.**   No.

6    **Q.**   And you testified that on occasion you would pick up the

7    mail from the post office box for EPIC; is that right?

8    **A.**   That's correct.

9    **Q.**   And then you would bring it to the office?

10   **A.**   Most of the time, yes.

11   **Q.**   And the returned mail, where would that be kept?

12   **A.**   I would bring it and put it on Ms. Elgin's desk.  She would

13   come in, take a look at it, bring it in, and put it on my table

14   in my room, my desk -- I mean my office.  Sorry.

15   **Q.**   You kept it in your office, yes?

16   **A.**   Yes.  Yes.

17   **Q.**   Instead of the store room?

18   **A.**   Yes.

19   **Q.**   So we've heard from witnesses that have come in to testify

20   on your behalf that you were a chair of the civil rights

21   committee, correct?

22   **A.**   Yes, I was.

23   **Q.**   And that you served on joint committees; is that correct?

24   **A.**   That's correct.

25   **Q.**   You investigated complaints of civil rights violations,

1   correct?

2   **A.**   I did.

3   **Q.**   You were -- one witness said you were a champion in the

4   steel industry; is that correct?

5   **A.**   Those were her words.

6   **Q.**   Do you disagree?

7   **A.**   I don't disagree.

8   **Q.**   And I asked them and they all answered in the affirmative

9   that you exercised independent judgment and that you are a

10   strong person.  Do you agree with that?

11   **A.**   I agree with that.

12   **Q.**   You are a tough woman; is that fair to say?

13   **A.**   I wouldn't say I'm tough.  If you work in the steel

14   industry, you --

15   **Q.**   Well, you -- go ahead and finish.

16   **A.**   -- you've got to be tough.

17   **Q.**   Yeah.  So you're a tough woman, correct?  You don't take

18   crap from anybody; fair to say?

19   **A.**   Not quite fair to say.

20   **Q.**   Well, your bishop said that you stand up to him all the

21   time, and you tell him what's what when you don't think he's --

22   **A.**   I knew him when he was a kid, so, yes, I would tell him

23   when he was wrong, when he was running in and out of my house.

24   I told him when he was doing wrong and in the streets and doing

25   things that he's not supposed to do, yes, I did tell him.

 1   **Q.**  And that's because you can make your own decisions,

 2   correct?

 3   **A.**  I make my own decisions, absolutely.

 4           **MS. LERNER:**  No further questions.

 5           **THE COURT:**  Mr. Rogers.

 6           **MR. ROGERS:**  Judge, I have very few questions to

 7   ask.

 8                    **CROSS-EXAMINATION**

 9   **BY MR. ROGERS:**

10   **Q.**  Good afternoon.

11   **A.**  Good afternoon.

12   **Q.**  Now, Ms. Shelton, you and I have never met regarding this

13   case, have we?

14   **A.**  No.

15   **Q.**  We have met at various court hearings to exchange

16   pleasantries, correct?

17   **A.**  Correct.

18   **Q.**  So we have not gotten together to coordinate our defenses,

19   have we?

20   **A.**  No, we have not.

21   **Q.**  Okay.  I believe you testified that Alex Wheeler and

22   Mary Elgin had a falling out at some point?

23   **A.**  Yes.

24   **Q.**  Was that in 2012?

25   **A.**  Around about that time.

1   **Q.**  Isn't it true from 2012 until the end of Mr. Wheeler's

2   employment at the Calumet Township Trustee's Office, that

3   Mary Elgin wouldn't talk to him or would very seldom talk to

4   him?

5   **A.**  That's true.

6   **Q.**  You indicated that Alex Wheeler worked long hours -- and I

7   don't want to put words in your mouth -- at the Calumet

8   Township Trustee's Office; is that true?

9   **A.**  That's true.

10  **Q.**  What do you mean by "long hours"?

11          **MS. LERNER:**  Would you establish a foundation for

12  how she knew that.

13          **MR. ROGERS:**  Is that an objection?

14          **MS. LERNER:**  Yes, it's an objection.

15          **THE COURT:**  Can you establish a foundation?

16  **BY MR. ROGERS:**

17  **Q.**  You worked at the Calumet Township Trustee's Office,

18  correct?

19  **A.**  I do.

20  **Q.**  Did you see Alex Wheeler working at the Calumet Township

21  Trustee's Office after the hours that he was supposed to work?

22  **A.**  I did.

23  **Q.**  Did you ever see Alex Wheeler at the Calumet Township

24  Trustee's Office before the time that he was supposed to start

25  his employment?

```
 1   A.   Before he was supposed to come in?

 2   Q.   Yeah, before he was supposed to start work.

 3   A.   I've seen him on occasion come in early.

 4   Q.   How was it that you would be able to see Alex Wheeler after

 5   the office closed for official business?

 6   A.   Alex worked on the 1st floor, and when he would work over,

 7   most of the time it was just me and him working over and

 8   Ms. Elgin at some point.

 9        If Ms. Elgin was there, we could stay as late as we

10   want to because she had the keys and she took care of the

11   burglar alarm.  And when Alex got ready to leave the building,

12   because Ms. Elgin wanted to know who was in the building and

13   who was leaving, he would most of the time come upstairs and

14   say, "Ethel, I'm leaving," just to let me know that he's

15   leaving.  Or he would either call or have the security guard to

16   call upstairs and say that Mr. Wheeler has left for the day.

17   Q.   Now, you have been presented with and you have seen a

18   number of time sheets that individuals filled out, correct?

19   A.   Correct.

20   Q.   Let me show you specifically Government Exhibit 52.

21        You did not sign off on this particular sheet that

22   contains Alex Wheeler's time, did you?

23   A.   No, I did not.

24   Q.   Did you ever sign off on any of Alex Wheeler's time sheets?

25   A.   No, I did not.
```

1  **Q.**  If we went through Government's Exhibit 2 and it appeared,

2  let's say, 99 percent of the time Mr. Wheeler indicated he left

3  the office at 5:00, would that be true, based on what you've

4  seen?

5  **A.**  That would be true.

6  **Q.**  That he left the Calumet Township Trustee's Office at 5:00?

7  **A.**  He left at 5:00 sometimes.  He left at 6:00, 8:00.  He left

8  at different times.  He was different than all the rest of the

9  deputies.  His hours -- I think Alex came in at 9:00 in the

10  morning.  He was different than the other deputies.  He stayed

11  late sometimes.  Sometimes he left at 5:00.

12  **Q.**  I heard during your testimony that there were a series of

13  cameras throughout the Calumet Township Trustee's Office; is

14  that correct?

15  **A.**  There was a series of what?

16  **Q.**  Cameras, video cameras.

17  **A.**  Oh, yes, definitely.

18  **Q.**  If you know, who was able to view those video cameras?

19  **A.**  I know three people that was able to view it.  That was

20  Mary Elgin, the trustee; her son, Steven Hunter; and I believe

21  Joyce Sease-Reese in Steven Hunter's department were able to

22  view those.

23  **Q.**  In Steven Hunter's apartment?  Did you say "department" or

24  "apartment"?

25  **A.**  Department.

 1   **Q.**  Okay.  And did you ever observe Mary Elgin when she was in

 2   her office observing what various employees were doing?

 3   **A.**  Yes, she did it all the time.

 4   **Q.**  Did Mary Elgin have either a recording -- audio recording

 5   device on her phone or the ability to record telephone calls?

 6   **A.**  Yes, she did.

 7   **Q.**  If you know, did Mary Elgin record telephone calls made to

 8   her office?

 9          **MS. LERNER:**  I'm going to object to relevance.  I

10   don't understand what the relevance of this line of questioning

11   is.

12          **THE COURT:**  Can you answer that question, what the

13   relevance is?

14          **MR. ROGERS:**  Well --

15          **THE COURT:**  Or do you want to come up here and do

16   it?

17          **MR. ROGERS:**  Yes.  I just learned of this, I

18   think -- yes.  And see if any of those recordings existed, were

19   obtained by the government --

20          **MS. LERNER:**  Your Honor, this is -- we filed a

21   motion on this.  First of all, they were not obtained by the

22   government.  If they had been, they would have been turned

23   over.

24          Can we approach and deal with this at sidebar?

25          **THE COURT:**  You may have answered it.  You would

```
 1   have turned them over if you had them?

 2             MS. LERNER:  We've turned over everything we've had.

 3             THE COURT:  That's what I'm saying.  If you had

 4   them, you would have turned them over?

 5             MS. LERNER:  Yes.  If we had them, we would have

 6   turned them over.

 7             MR. ROGERS:  All right.

 8             Judge, I was just asking if the witness knew of the

 9   existence of any stash of recordings.  That's all.

10   BY MR. ROGERS:

11   Q.  And lastly, Ms. Shelton, did any of the money collected for

12   these fundraiser tickets that were sold for the extravaganza,

13   the prayer breakfast, the Mardi Gras, was any of that money

14   ever split up amongst the deputies or other employees?

15   A.  Not to my knowledge.

16   Q.  What did it all go for?

17   A.  It went for Mary Elgin's campaign fund.

18             MR. ROGERS:  Okay.  Thank you.

19             I'll pass the witness.

20             THE COURT:  We're going to take our break for the

21   evening.

22             Usual admonition, the usual admonition I give all

23   the time:  Don't talk to anybody else or let anybody talk to

24   you.

25             I'll see you tomorrow morning at 9:00.
```

```
 1          (Jury out at 4:36 p.m.)

 2          THE COURT:  Ms. Shelton, you can go back there.

 3          We'll be in recess until tomorrow morning at 9:00.

 4          MS. LERNER:  Your Honor, before the recess, the

 5   government's filed a motion to prevent discovery requests from

 6   being made on the record.  If Mr. Rogers had asked me, I could

 7   have resolved this issue.  We are continuing to have the same

 8   discussion on this over and over again.

 9          THE COURT:  It was resolved pretty quickly.  I

10   asked -- you said you gave them everything you had.  That took

11   care of it.

12          MS. LERNER:  We told that to them about the other --

13   the source reporting documents, and they don't believe us.  But

14   we filed a motion to prevent discovery requests from being made

15   in front of jury, and it was violated.

16          THE COURT:  I don't think the jury understands quite

17   the sophistication that you're putting on right now based on

18   the answer -- your answer to what I said.  I said:  You turned

19   it all over?  You said:  Yes, turned it all over.  That was the

20   end of day.

21          MS. LERNER:  I would request that in the future that

22   it be done outside the presence of the jury to prevent any

23   confusion.

24          THE COURT:  Okay.

25          MR. ROGERS:  Judge, can I be heard?
```

 1          THE COURT:  Yeah, be heard.

 2          MR. ROGERS:  As I'm sitting here hearing Ms. Shelton

 3   testify for the first time, I heard for the first time the

 4   existence of cameras.  Somewhere along the line, while she's

 5   testifying, I heard for the first time that Mary Elgin -- not

 6   through the witness but other source -- that Mary Elgin had the

 7   ability to record conversations.

 8          I wasn't accusing the government of hiding anything.

 9   For all I know, they might have been at Mary Elgin's house.  I

10   didn't even know if they exist.  So I asked her a question.

11   Simple as that.  That happens in trial.  So there was no intent

12   to violate some great edict that the government has.

13          THE COURT:  The other thing is it was resolved very

14   quickly and very nondescriptly.

15          MS. LERNER:  I would not have had any objection if

16   we had gone up to sidebar and resolved it, but Mr. Rogers then

17   said:  I wanted to make sure the government gave it to us.

18   There was no point for that gratuitous comment other than to

19   malign us.

20          THE COURT:  Okay.  See you tomorrow morning at 9:00.

21      (Proceedings adjourned at 4:30 p.m.)

22

23

24

25

1                          * * * * *

2                        *CERTIFICATION*

3

4        I, ASHLEY N. STOKES, Federal Court Reporter, certify
    that the foregoing is a correct transcript from the record of
    proceedings in the above-entitled matter.

5
             S:/Ashley N. Stokes_____ May 15, 2020
6            Certified Realtime Reporter
             United States District Court
7            Northern District of Indiana
             Hammond Division

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25